# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

**FILED**

AUG 2 4 2011

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**3M COMPANY,**
c/o 3M Office of General Counsel
3M Center
St. Paul, MN 55133-3428

        **Plaintiff,**

        - v -

**HARVEY BOULTER,**
7th Floor
23 Buckingham Gate
Westminster
London SW1E 6LB

**PORTON CAPITAL TECHNOLOGY FUNDS,**
Maples and Calder Limited
P.O. Box 309
Ugland House
South Church Street
Grand Cayman, Cayman Islands
KY1-1104

**PORTON CAPITAL, INC.,**
Maples Corporate Services Limited
P.O. Box 309
Ugland House
South Church Street
Grand Cayman, Cayman Islands
KY1-1104

**LANNY DAVIS**
c/o Lanny J. Davis & Associates, PLLC
600 13th Street, N.W., Suite 600
Washington, D.C. 20005

**LANNY J. DAVIS & ASSOCIATES, PLLC**
600 13th Street, N.W., Suite 600
Washington, D.C. 20005

**DAVIS-BLOCK LLC**
600 13th Street, N.W., Suite 600
Washington, D.C. 20005

        **Defendants.**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**Civil Action No. _____**

Case: 1:11-cv-01527
Assigned To : Kessler, Gladys
Assign. Date : 8/24/2011
Description: PI/Malpractice

## 3M COMPANY'S ORIGINAL COMPLAINT AND JURY DEMAND

Plaintiff 3M Company ("3M") files this Complaint against defendants Harvey Boulter, Porton Capital Technology Funds, Porton Capital, Inc. (collectively, the "Boulter Defendants"), Lanny Davis, Lanny J. Davis & Associates, PLLC, and Davis Block LLC (collectively, the "Davis Defendants," and together with the Boulter Defendants, the "Defendants"), upon personal knowledge as to its own actions, and on information and belief as to all other matters, as follows:

### I.

### PRELIMINARY STATEMENT

1.     This lawsuit arises from a conspiracy – memorialized in written statements authored by Defendants – whose purpose was to unlawfully coerce one of the world's largest and most successful companies, 3M, into paying tens of millions of dollars needed by the Boulter Defendants to save them from the consequences of yet another unprofitable investment. Defendants' illicit campaign has included overt threats of reprisals by holders of large blocks of 3M stock; public demonstrations by paid individuals posing as victims of an altogether fabricated public health "issue" allegedly created by 3M's decision to discontinue selling a product no one wanted; multiple press conferences aimed at disseminating false and defamatory information; and a constant stream of media advisories that flooded the airwaves with defamatory statements about 3M and its CEO, George Buckley ("Buckley").  Specifically, the public relations aspect of the pressure campaign – launched with great fanfare on May 11, 2011, by Defendants' agent and self-proclaimed public relations expert, defendant Lanny Davis ("Davis") – has featured a barrage of disparaging and defamatory statements disseminated in domestic and international forums, and through every imaginable medium.  It has included multiple media events, an interactive website, and various written commentaries asserting damaging and knowingly unfounded allegations that 3M put the health of victims of methicillin-

2

resistant *Staphylococcus aureus* ("MRSA") at risk when 3M chose to cease its multi-year attempts to market an MRSA screening test that was not commercially viable.

2.     When these tactics failed to yield the financial windfall Defendants sought, they resorted to making extortionate demands upon 3M.  On June 18, 2011, Defendants Harvey Boulter and Davis acted together to make these demands by sending to 3M's counsel an unsolicited e-mail in which Boulter claimed that the British Minister of Defence had instructed Boulter to inform 3M that if it did not pay over $30 million, the Minister of Defence would interfere with 3M's ability to do business with the British government.  He also threatened that the British government would reconsider the recently announced call to knighthood of Buckley. This crude extortion attempt threatened both to embarrass Buckley and to tarnish 3M's most valuable asset, its corporate brand.

3.     3M brings this lawsuit to: (i) vindicate its rights; (ii) uncover the true extent of the damage done to 3M by Defendants' defamatory campaign and efforts to interfere with 3M's business interests in the United Kingdom (the "U.K."); (iii) pursue those who aided, abetted, conspired, or participated with Defendants in any manner relative to their defamatory media campaign and the extortionate demands; and (iv) recover all damages caused by Defendants' wrongful acts.

## II.

### PARTIES

#### A.    Plaintiff

4.     Plaintiff 3M Company is a Delaware corporation with its principal place of business in Minnesota.  Its principal mailing address is:  **3M COMPANY,** c/o 3M Office of General Counsel, 3M Center, St. Paul, MN  55133-3428.

5.     Defendant Harvey Boulter is a director of defendant Porton Capital Technology Funds and the Chief Executive Officer of defendant Porton Capital, Inc.  He maintains

3

residences in the U.K. and Dubai.  His principal mailing address is: **Harvey Boulter**, 7th Floor, 23 Buckingham Gate, Westminster, London SW1E 6LB.

6.    Defendant Porton Capital Technology Funds ("Porton Technology") is an entity organized under the laws of the Cayman Islands which does business in the U.K., Dubai, and other jurisdictions internationally.  The company's principal mailing address is: **PORTON CAPITAL TECHNOLOGY FUNDS,** Maples and Calder Limited, P.O. Box 309, Ugland House, South Church Street, Grand Cayman, Cayman Islands KY1-1104.

7.    Defendant Porton Capital, Inc. ("Porton Capital") is an entity organized under the laws of the Cayman Islands which does business in the U.K., Dubai, and other jurisdictions internationally.  The company's principal mailing address is: **PORTON CAPITAL, INC.,** Maples Corporate Services Limited, P.O. Box 309, Ugland House, South Church Street, Grand Cayman, Cayman Islands  KY1-1104.

8.    Defendant Lanny J. Davis is an individual who works in Washington, D.C., and is the principal of at least two Washington, D.C. businesses having their principal places of business in Washington, D.C.   Davis portrays himself as a "crisis manager and public legal advocate" who uses the media to attempt to obtain positive results for his clients when those results cannot be achieved in court.  His principal mailing address is: **LANNY DAVIS,** c/o Lanny J. Davis & Associates, PLLC, 600 13th Street, N.W., Suite 600, Washington, D.C. 20005.

9.    Defendant Lanny J. Davis & Associates, PLLC is a professional services firm organized under the laws of the District of Columbia and having its principal place of business in Washington, D.C.   It was formed by Davis upon his departure last year from the law firm McDermott Will & Emery.  At that time, Davis stated that "[s]ince legal issues frequently overlap with media and legislative issues, through my new law firm and in cooperation with other non-legal entities I hope to organize or affiliate with in the future, I will use all of these

4

three disciplines, as needed, to solve client problems." Davis is a principal of Lanny J. Davis & Associates. Its principal mailing address is: **LANNY J. DAVIS & ASSOCIATES, PLLC,** 600 13th Street, N.W., Suite 600, Washington, D.C. 20005.

10.    Defendant Davis-Block LLC is an entity organized under the laws of the District of Columbia and having its principal place of business in Washington, D.C. Lanny J. Davis is a principal of Davis-Block LLC. Its principal mailing address is: **DAVIS-BLOCK LLC,** 600 13th Street, N.W., Suite 600, Washington, D.C. 20005.

### III.

### JURISDICTION AND VENUE

11.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1332 and 1367. The matter in controversy exceeds, exclusive of interest and costs, the sum specified by 28 U.S.C. § 1332, *i.e.*, the amount in controversy is greater than $75,000.

12.    This Court has personal jurisdiction over all defendants because they are entities organized under the laws of the District of Columbia (Lanny J. Davis & Associates, PLLC, and Davis Block LLC); because they transact substantial business in the District of Columbia (the Davis Defendants); or because they are foreign entities acting in the District of Columbia by and through, and in conspiracy with, the Davis Defendants as their agents and co-conspirators (the Boulter Defendants). In addition, this Court has personal jurisdiction over all Defendants because jurisdiction would exist pursuant to D.C. Code Sections 13-423(a)(3) and (a)(4) on the grounds that all Defendants have caused tortious injury by acts and omissions within and without the District of Columbia, including: extorting and blackmailing 3M and its chairman and CEO by threatening to deprive 3M of business opportunities and causing the loss of a knighthood that had been promised to Buckley by the Queen of England, wrongfully interfering with 3M's prospective business opportunities and relationships; and defaming and disparaging 3M in its business in order to damage its reputation and goodwill, and ultimately to cause economic

damage to its good will.  Jurisdiction is also proper in this Court because the Davis Defendants are persons domiciled in, and maintain a principal place of business in the District of Columbia.

13.    As detailed below, Davis – acting on behalf of the Boulter Defendants and for the benefit of Defendants – orchestrated the conspiracy from Washington, D.C.  Indeed, Davis's offices in Washington, D.C. served as the "nerve center" of a campaign to coerce and intimidate 3M into paying Defendants tens of millions of dollars under the guise of "settling" a lawsuit that was then pending in the U.K. between the Boulter Defendants and 3M.  Among other things, Davis made telephone calls from those Washington, D.C. offices to 3M's counsel to facilitate the campaign of intimidation, set the stage for Boulter's improper threats and assisted Boulter in doing so.  Davis also used his Washington, D.C. offices as a base from which to issue multiple disparaging and false press releases about 3M and Buckley for the purpose of defaming them in the public eye and increasing pressure on 3M and its CEO to induce 3M to pay tens of millions of dollars by damaging 3M's good will.  To that end, Davis originated from his Washington, D.C. offices a so-called "citizen's petition" to the FDA based on those same unsupportable allegations, and orchestrated public demonstrations by purported MRSA "victims" – all with the intent of cowing 3M into settling the U.K. litigation on unfair terms that had nothing to do with the merits of the case.  In short, Davis was the "spider in the web" of the unlawful conspiracy that united Defendants' wrongful acts.

14.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(a), (c) and (d) because a substantial part of the events giving rise to the claims stated herein occurred in the District of Columbia; because at least one defendant is subject to personal jurisdiction in this district; and because the Boulter Defendants are aliens.

## IV.

## FACTUAL BACKGROUND

### A.  3M And Its Business

15.  3M was founded in 1902 in Two Harbors, Minnesota, by five businessmen hoping to capitalize on a mining mineral used for grinding wheels. Their persistence paid off and they began manufacturing sandpaper in 1905. The company moved to the St. Paul area in 1910. In 1916, the company paid its first dividend of 6 cents a share.

16.  Today, 3M is a company that applies technologies – often in combination – to satisfy a wide array of consumer needs. To that end, the company produces literally thousands of products and is a leader in numerous markets. In particular, 3M competes in such varied fields as health care, highway safety, office products, abrasives, and adhesives. Among 3M's more notable products are Scotch® Magic TM Tape, Post-it® Note Pads, and Nexcare TM Adhesive Bandages. 3M's goal is to make life better for its customers.

17.  The engine that drives 3M's long-term success is its commitment to innovation. In the early 1920s, 3M introduced the world's first waterproof sandpaper. In 1925, 3M invented masking tape – an innovative step toward diversification and the first of many Scotch brand pressure-sensitive tapes. 3M then invented Scotch® Cellophane Tape for box sealing and soon hundreds of practical uses were discovered. In the early 1940s, 3M dove into the production of defense materials for World War II. Thereafter, new ventures such as Scotchlite™ Reflective Sheeting for highway markings, magnetic sound recording tape, filament adhesive tape, and offset printing plates were started. In the 1950s, 3M introduced the Thermo-Fax™ copying process and Scotch-Brite® Cleaning Pads. In the 1960s, 3M developed photographic products, carbonless papers, overhead projection systems, and a rapidly growing health care business of medical and dental products. In the 1970s and 1980s, 3M expanded into pharmaceuticals, radiology, and energy control. In 1980, 3M introduced Post-it® Notes, which changed people's

communication and organization behavior forever. In the 1990s, 3M continued to develop an array of innovative products, including immune response modifier pharmaceuticals; brightness enhancement films for electronic displays; and flexible circuits used in inkjet printers, cell phones, and other electronic devices.

18. Today, 3M has more than 35 business units, organized into six businesses divisions – namely: Healthcare; Consumer and Office; Display and Graphics; Electro and Communications; Industrial and Transportation; and Safety, Security and Protection Services. 3M employs more than 80,000 persons globally, with operations in more than 65 countries, and sells its products in nearly 200 countries. In particular, 3M presently employs 7,350 researchers worldwide. In 2010, 3M had global sales of $27 billion.

19. Importantly, 3M traditionally enjoyed excellent relationships with governmental authorities in the U. K. Based on those relationships, 3M has done business with, and had expected to do more business with, many of those governmental authorities. Unfortunately, defendants interfered and threatened to further interfere with 3M's business relationships by depriving it of business opportunities and damaging the good will of both 3M and Buckley.

20. Throughout its history, 3M has maintained an unwavering commitment to act with honesty and integrity in everything it does. Indeed, 3M has an enviable record of achievement in corporate responsibility, and continually strives to improve its performance and address ongoing challenges and opportunities. In 2010, 3M and the 3M Foundation donated approximately $59 million in cash and products to educational and charitable institutions.

**B.    George W. Buckley, 3M's Visionary Chairman/CEO**

21. George Buckley is the Chairman of the Board, President, and CEO of 3M. Buckley was born and raised in Sheffield, England and is a dual citizen of both the U.S. and the U.K. He has a Ph.D. in electrical engineering. He is a scientist and the inventor of several patents. Having overcome extreme poverty as a child, Buckley has become a success in both

business and life.  Under his leadership, 3M has thrived not only economically, but in fulfilling its mission of community involvement and civic leadership.

22.   In recognition of his business accomplishments and his contributions to his alma mater, the University of Huddersfield, it was announced in June 2011 that Buckley would be invested by Queen Elizabeth II with the rank of Knight Bachelor.  The British Consul General Robert Chatterton Dickson described Buckley and his accomplishments as follows:  "As Chairman of the Board, President and CEO of 3M, Dr. Buckley, now Sir George, has been a leader in the American and Midwestern business community for decades.  Throughout his career he has maintained close ties to the U.K. and a commitment to educating future generations as exemplified by his involvement with the University of Huddersfield.  Sir George represents excellence in business and learning. . . ."

## C.   The Boulter Defendants And Their Business

23.   Boulter is a Director of Porton Technology, an investment fund that, through five sub-funds, makes investments in a number of areas, including life science ventures.  Boulter is also the Chief Executive Officer of Porton Capital, the investment manager for Boulter's funds.

24.   It is reported that Boulter's funds were created around a strategy of partnering with the U.K. government, including the Ministry of Defence.  One of Porton Technology's investments was an ownership interest in Acolyte Biomedica Limited ("Acolyte"), a British Company.  Ploughshare Innovations Limited ("Ploughshare"), an entity controlled by the British Ministry of Defence, was a minority investor in Acolyte.  Acolyte was in the business of developing and marketing various products whose aim was to detect certain dangerous microorganisms.

25.   An important part of Boulter's strategy for his funds has been to invest with the Ministry of Defence in its attempts to commercialize certain intellectual property that it owns. Unfortunately for Boulter, he and his funds are under tremendous financial pressure from

investors to dramatically improve performance. As set forth herein, that pressure caused Boulter to commit desperate, unlawful acts, in an effort to salvage what had become a bad investment in Acolyte for all parties involved.

**D.**     **Lanny Davis:  Champion of Anyone Willing To Pay Top Dollar**

26.     Davis is the principal of Lanny J. Davis & Associates, a self-styled public relations and law firm located in Washington, D.C. that Davis formed in 2010 after departing from his prior firm, McDermott Will & Emery LLP.  According to the firm's website, Davis offers to provide to his clients a "unique combination" of legal and "crisis management" services.

27.     Davis' approach to assisting clients in managing a crisis is to step outside of the facts and merits of any associated legal disputes, and to concoct a media strategy aimed at giving his client an advantage in the court of public opinion.  In his own online marketing materials Davis declares that "there are often no purely legal solutions to legal problems," and that "the rules of media and crisis management have no borders."

28.     Indeed, one of Davis' "no borders" marketing points is that, because he is an attorney, he can shield unsavory facts and conversations behind the attorney-client privilege.  As Davis says on the Lanny J. Davis & Associates website, "Davis – along with other attorneys involved in sensitive litigation and regulatory matters – will also be able to ensure the ongoing confidentiality protection afforded through attorney-client privilege."  He goes on to say, "I have learned over the years that having the protection of the attorney-client privilege . . . is essential to developing effective messages . . . ."

29.     Davis has been described in *The New York Times* as "a kind of front man for the dark side, willing to take on some of the world's least noble companies and causes."  One Washington, D.C. lobbyist described Davis' client list as "unseemly," "tawdry," and "an illustration of what most of the American people think of as wrong with Washington."

30.     For example, beginning in December 2010, Davis accepted a $100,000-per-month retainer to represent Laurent Gbagbo, the former president of the Ivory Coast who lost an election in late 2010 but refused to relinquish power.  It was widely reported in the media that, after losing the election, Gbagbo and his supporters had begun violently suppressing opposition protests by killing or abducting scores of opposition marchers, and had instituted death squads to deal with dissent.

31.     In response, Davis called a press conference in which he said, among other things, that "Mr. Gbagbo opposes violence." This public relations event prompted observations that Davis' spin "does not square with the known facts" and subjected Davis to broad criticism in the press.  Ultimately, Davis was forced to abandon an earlier statement that "there is substantial documentary evidence that President Laurent Gbagbo is the duly elected president" of the Ivory Coast.  Eventually, amid a firestorm of public criticism, Davis resigned from the representation – but not before pocketing a reported $150,000.

32.     Davis' willingness to represent foreign dictators with dismal records of human rights abuses is well known.   In 2010, he also accepted a $1 million-per-year contract to represent Teodoro Obiang, the 30-year president of Equatorial Guinea.  Obiang was well known in human rights circles, where Human Rights Watch had described his regime as "one of the most abusive and corrupt in the world."   According to news reports, in June 2010, Davis declared himself to be Obiang's "reform counsel" and then shuttled to South Africa to conduct a press conference at which he promoted Obiang's reformed policies because, according to Davis, "the president [Obiang] wants to turn the page" and would make his country "like the United States in its values, its democracy."

33.     Only a few months later, however, in October 2010, Davis' supposedly-reformed client, Obiang, was cited by the human rights watchdog Amnesty International for causing his regime to abduct, torture, and execute his political opponents.

34.     In 2009, Davis represented supporters of the illegal coup in Honduras that installed Roberto Micheletti as de facto leader of the country.   There, Davis' version of "crisis management" was to publish a press release declaring that "democracy and civil liberties are flourishing in Honduras" under the Micheletti regime.   Davis made this statement just days after Micheletti's troops opened fire on protesters and just one day before the regime arrested and deported foreign journalists.

35.     Davis' track record, therefore, reveals his willingness to take on whatever client is willing to pay him top dollar, apparently with little concern for whether his public statements are, in fact, true.   It now appears that Davis' approach was precisely what the Boulter Defendants sought in their campaign against 3M.

**E.      The Underlying Dispute—3M Acquires Acolyte And An MRSA Screening Test Product In Order To Expand Into A Potential New Market.**

36.     As part of its plan to expand into the global in vitro diagnostics market, 3M caused 3M U.K. Holdings Limited – a wholly-owned subsidiary of 3M – to acquire all of the outstanding shares of Acolyte.   Acolyte's only commercially available product at the time was BacLite MRSA ("BacLite"), a device that allegedly allowed hospitals and clinics to screen patients for methicillin resistance *Staphylococcus aureus* bacteria MRSA.   While staph bacteria are ubiquitous in daily life, MRSA and related organisms, commonly known as "superbugs," are of particular concern to medical professionals.   Those superbugs are resistant to treatment from conventional antibiotics and can spread quickly when introduced into hospitals.   The goal of screening tests such as BacLite is to identify carriers of MRSA and quarantine them before the bacteria can spread to the general patient population.

37.     Acolyte sold 3M on the prospects of BacLite by touting its ability to fill a market niche existing in early 2007.   Competing screening products then on the market were either much cheaper but slower (*i.e.* chromogenic agar tests cost $2-3 per test, but took 48-72 hours), or much faster but far more expensive (*i.e.* genetic-based PCR tests cost approximately $25 or more per

test, but provided results within 1-2 hours). Acolyte represented to 3M that BacLite was an easy-to-use test that could obtain results in 5 hours at a cost of only $12-15 per test, and that in clinical trials it had achieved diagnostic sensitivity and specificity in acceptable ranges of 95.2% and 93.2%, respectively.[1]

38.     In acquiring Acolyte, 3M intended to utilize its strong global presence and leadership in the medical products field to exploit that niche – specifically an MRSA screening test that was faster than traditional culture-based chromogenic agars but less expensive than genetic PCR screening methods.

**F.     Unfortunately, BacLite Is A Commercial Failure In The Global Market.**

39.     Immediately after the acquisition, and in fulfillment of its obligations under provisions of the Sales and Purchase Agreement ("SPA") (which granted Acolyte's selling shareholders (the "Vendors") an opportunity to receive conditional earn-out payments on net sales of BacLite through December 2009[2]), 3M not only continued to actively market BacLite in the U.K., but also began marketing in the rest of the European Union ("E.U."), Canada, Australia, and the United States ("U.S."). In addition, 3M obtained an import license for BacLite's distribution in Australia, and began diligent efforts to gain similar approval from U.S. and Canadian authorities.

40.     As is the case with most medical and pharmaceutical products, BacLite could not be sold in the U.S. without approval from the Food and Drug Administration ("FDA"). The key

---

[1] The sensitivity of a screening test measures how accurate it is at identifying that a sample actually contains MRSA, while its specificity indicates how accurate it is at identifying that a sample is negative for MRSA. Thus, a sensitivity rating of 95.2% would mean a test gave "false negative" readings only 4.8% of the time, while a specificity rating of 93.2% would mean it only gave a "false positive" reading 6.8% of the time.

[2] Specifically, the SPA provided that Vendors would receive an amount equal to all of the Net Sales that 3M made of BacLite from February 2007 through December 31, 2009, less certain adjustments. These payments were, of course, not guaranteed and expressly contingent upon 3M's success in generating sales.

to obtaining FDA approval for BacLite was the successful completion of clinical trials demonstrating support for the product's claims relating to clinical sensitivity, specificity, and positive and negative predictive values, as well as data demonstrating the product's performance against an acceptable comparator/reference method.

41.     Results from these trials, conducted at prestigious hospitals around the U.S., showed sensitivity and specificity percentages alarmingly below those claimed by Acolyte before 3M's acquisition.  Sensitivity percentages at times were as low as 50%, meaning that BacLite would be about as accurate as a coin flip at determining whether a patient carried MRSA.

42.     Customer trials of BacLite in other parts of the world, such as Hong Kong and France, also reported lower than expected performance.

43.     3M spent months trying to root out the cause of these surprising results, but with little success.  Instead, 3M came to the disappointing conclusion that BacLite, in its current form, did not meet the performance expectations that Acolyte had claimed for it prior to the acquisition.

44.     In the meantime, despite 3M's extensive marketing efforts in the U.K. and the E.U., it became apparent that the product was becoming rapidly obsolete in the face of newer, more robust competitors.

45.     Ultimately, 3M determined that BacLite was not commercially viable because: (i) it was not "robust," meaning that it was not capable of meeting its claimed performance parameters in a real world environment; (ii) it was overly complicated, involving over a dozen manual steps, thus increasing the chances of error in busy clinical environments and requiring highly-skilled personnel to operate it; (iii) it was too slow to meet current market demands, even if it could be run in 5 hours, as Acolyte claimed; (iv) the test could not actually be run in 5 hours; (v) it was doubtful the test could routinely achieve the sensitivity and specificity ratings stated by

Acolyte prior to the acquisition; and (vi) by early 2008, the market niche 3M expected to exploit with BacLite had unexpectedly narrowed because the cheaper chromogenic agar tests had gotten faster and the faster PCR tests had gotten cheaper.

46.     In sum, 3M came to the reasonable conclusion that BacLite:  did not perform as Acolyte had claimed; was obsolete; would never be commercially viable in the U.S., Canada, or Australia in the form in which it was sold to 3M; and that its prospects in the E.U. and the U.K. were rapidly eroding.

**G.     3M Seeks Vendor's Consent To Cease The BacLite Business.**

47.     In light of the above facts, and pursuant to its rights under the SPA, in July 2008, 3M sought the Vendors' consent to allow 3M to stop marketing BacLite before December 2009. In return, 3M offered to pay the Vendors the amount of net sales that 3M expected to actually achieve from that point through December 31, 2009.  In effect, 3M at that time offered to pay the earn-out payments that would have been otherwise due to the parties who are now claimants in the London litigation which 3M believed to be less than $2 million.   Under the SPA, the Vendors' consent to that request was not to be unreasonably withheld.

48.     Unfortunately, the Vendors refused to consider 3M's request.  Instead, they demanded £41 million (at current exchange rates, about $66.8 million), an amount bearing no rational relationship to what could have been achieved pursuant to the earn-out under any circumstances.  The Vendors' disproportionate and unreasonable demand destroyed any chance for an amicable resolution.

**H.     Defendants' Campaign Of Harassment And Intimidation Begins: Boulter Threatens Retaliation If 3M Does Not Agree To Resolve The Dispute On His Terms.**

49.     Fully aware that the terms of the SPA prevented them from realizing an additional return on their investment in Acolyte anywhere near the amounts they were demanding from 3M, the Boulter Defendants looked for other ways to force 3M to pay them and the other U.K. Claimants tens of millions of dollars – an unjustifiable windfall.  Unfortunately, the tactics

chosen by the Boulter Defendants included overt threats of economic harm, a defamatory media campaign and blackmail.

50.     In what we now know was the beginning of Defendants' extortion campaign, Boulter contacted his friend Robert L. Hamburger ("Hamburger"), who allegedly has influence over several groups of investors that purportedly hold large blocks of 3M stock.  On August 30, 2008, Hamburger sent an e-mail to Buckley, which contained in its text a copy of an e-mail from Boulter to Hamburger.  In the e-mail, Hamburger and Boulter told Buckley that they "have one investor group in [Porton Capital, Inc.] who . . . control[s] a very material position of 3M stock." According to Hamburger and Boulter, they "informed" the investors of 3M's position regarding Acolyte, and those investors "have taken a view that 3M is a dishonest party and have threatened to sell their entire position."

51.     Hamburger and Boulter stated that the investors controlled so much 3M stock that it constituted an amount greater than "high multiples" of $100 million.  Boulter and Hamburger threatened that these foreign-based investor groups were "propping up various U.S. sectors right now," implying that 3M's stock price was dependent on those groups.  Boulter and Hamburger pressed the urgency of their threat by stating that their unnamed investor groups could not be relied on to "do it in a western rational way," and that the situation was "a recipe to get a lot worse rapidly."  According to Hamburger and Boulter, "3M's actions [in discontinuing BacLite] have created one hell of a storm."

52.     Later that same day, Boulter sent a second e-mail in which he sharpened his earlier threats by declaring that it was "essential that 3M do nothing to further escalate this situation" because it had already "triggered a rather unexpected chain of events."  Boulter warned that the investor groups, who he claimed were threatening to sell off massive quantities of 3M stock, were a volatile group that was "understandably not very happy" and were "simple

people of vast means." Boulter claimed that Buckley needed to do something to "help me [Boulter] buy some time" with the investors and, thus, forestall the threatened sell-off.

53.     In those e-mails, Boulter threatened 3M with a crippling sell-off of 3M's stock and commensurate damage to 3M's value if 3M did not accede to his demands.

**I.     Certain Owners Of Acolyte Vendors Sue 3M In London – Many Do Not.**

54.     In a letter to 3M in November 2008, the Vendors' attorneys declared 3M to be in breach of the SPA, and withdrew their request that 3M continue to perform under the contract.

55.     Certain of the Vendors – defendants Porton Technology and Porton Capital, and Ploughshare (the "U.K. Claimants") – then filed a lawsuit in the U.K. in December 2008, claiming damages against 3M for breach of contract. Specifically, U.K. Claimants alleged that 3M failed to actively market BacLite, to diligently seek regulatory approval for BacLite in the U.S. and Canada, and to devote resources to BacLite to a similar overall degree as were given to other products in 3M's Medical Division. In its defense of the lawsuit, 3M has denied each of these contentions, asserted that the Vendors' consent for 3M to cease the business of BacLite was unreasonably withheld, and that, in any event, U.K. Claimants are entitled to no more than $2 million. This is the amount of net sales that 3M expected to make between July 2008 and December 2009.

56.     The bench trial of the U.K. lawsuit in High Court began in mid-June, 2011 and ended on July 18, 2011. (Closing arguments are scheduled for September 29, October 3, and October 4, 2011.). However, the Boulter Defendants, apparently afraid that their contentions would not withstand careful judicial scrutiny, set off on a campaign to extort from 3M an unreasonably high settlement payment that had no connection whatsoever to the merits of the U.K. lawsuit.

J.     **Enter Lanny Davis:  The Boulter Defendants And The Davis Defendants Conspire To Pressure 3M Into Paying Tens Of Millions Of Dollars To Settle The U.K. Lawsuit.**

57.     In the months leading up to the trial of the U.K. lawsuit, the Boulter Defendants hired Davis to further their scheme to pressure 3M into "settling" the lawsuit by paying tens of millions of dollars more than the claims in the lawsuit were worth.  Thereafter, Davis undertook to orchestrate an effort to force an unwarranted settlement from 3M – a smear campaign that began as a defamatory media blitz and culminated in the outright attempted blackmail of 3M and Buckley.  Davis orchestrated this campaign from his offices in Washington, D.C.  As detailed below, Davis – acting on behalf of the Boulter Defendants and for the benefit of Defendants, generally – used his Washington, D.C. offices as the "command center" of a campaign to coerce 3M into paying Defendants tens of millions of dollars in "settlement" for the U.K. lawsuit.  Additionally, Davis launched multiple disparaging and false press releases from his Washington, D.C. offices, each of which was intended to defame 3M, damage its good will and thereby to exert pressure on 3M and its CEO.  Those press releases falsely, disparagingly, and maliciously claimed, among other things, that 3M had dropped BacLite out of "bad faith," had dealt dishonestly with the FDA, and therefore endangered "thousands" of lives.  To that end, Davis even fabricated a so-called "citizen's petition" to the FDA, parroting those same unsupportable allegations, and orchestrated public demonstrations attended by purported "victims" in hopes that 3M could be bullied into paying Defendants' demands.

58.     In particular, Davis and the Boulter Defendants falsely stated that 3M had ulterior financial motives for not pursuing BacLite, despite the fact that BacLite was shown not to be commercially viable.  For example:

- A press release issued by Davis from his Washington, D.C. offices falsely stated that "the decision to shelve BacLite" was a result of "3M's bad faith" and was an attempt to "evade[]" investors.

18

- Davis also told the press that "3M sabotaged the trial because it was developing a more expensive molecular test to detect MRSA internally . . . and wanted it to be the first to reach the market."

59.     Defendants knew that these allegations – which articulate their conspiracy theory that 3M scuttled the BacLite product in favor of another product called "Fastman" – were false when they made them.  Indeed, a judge in the U.K. proceedings had already dismissed those allegations when discovery of the parties' respective internal documents failed to support Defendants' theory.

60.     Davis and the Boulter Defendants also attempted to create pressure on 3M and Buckley by falsely accusing them of being responsible for the deaths of MRSA victims.  Among other statements, Davis and the Boulter Defendants intentionally, falsely, and maliciously made the following public statements:

- "All those who have suffered from MSRA . . . could have avoided exposure but for the decision by 3M to abandon it and to refuse to seek approval from the FDA."

- "Tests . . . were botched in the United States so that American hospitals don't have the benefit of this product that can detect this deadly superbug that killed more people than AIDS in this last year."

- "All those who have suffered from MSRA . . . could have avoided exposure but for the decision by 3M to abandon it and to refuse to seek approval from the FDA."

- "Thousands and thousands and thousands of people who died might be alive today had there been a BacLite . . ."

- "Hospital patients in Europe, the U.S., and all over the world could have been unnecessarily exposed to MSRAs and possibly exposed to life-and-death risk."

- Davis further told the press that "the famous U.S. 3M Corporation today was alleged by the private equity partner of the British Ministry of Defence, the Porton Group [*i.e.* Davis, himself], to have exhibited 'negligence and possible recklessness putting lives at risk' due to 3M's 'botched' 2007 clinical trials of a medical device called 'BacLite,' which can detect within five hours the presence of the potentially deadly MRSA/staph 'superbug.'"

- The Guardian newspaper quoted Davis as describing "3M's failure to retake the FDA tests as a 'betrayal' of U.K. taxpayers and MRSA sufferers around the world."

61.    Defendants knew that the foregoing statements were false when made. A principal reason why BacLite was not commercially viable was that other products on the market were far more effective at detecting MRSA than BacLite. While 3M certainly hoped to develop a better and more commercially viable product, it was knowingly false and reckless for the Defendants to repeatedly publicly assert that 3M's decision was a "life-and-death" "betrayal" of patients.

62.    Davis and the Boulter Defendants also falsely accused 3M of withholding or misrepresenting material facts to the FDA. For example:

- Davis accused 3M in a press release of "failing to disclose a secret internal technical committee report on testing errors" to the FDA.

- Davis and Boulter both stated that "a secret report . . . confirmed 3M testers had made fundamental errors that led to unacceptable 50% reliability results."

- Davis stated that "the secret 3M technical advisory report never publicly disclosed or disclosed to the FDA cited many errors by 3M testers that the drafter of the report implied were both careless and avoidable."

- Davis also accused 3M of "fail[ing] to disclose to FDA the contents of the secret technical report on the multiple errors leading to failure of the U.S. trials" concerning BacLite, and "fail[ing] to disclose possible financial conflicts of interest that might explain such 3M decisions." (Subsequently, a U.K. judge threw out Defendants' allegations that 3M failed to disclose any conflicts of interest to the FDA.)

- Davis "cited several FDA regulations as the basis for [his] request for an FDA investigation . . . including a regulation permitting an administrative hearing . . . when there is evidence of misconduct that could affect the public health."

- Davis' allegations were republished by various media outlets, such as the Minneapolis Fox News affiliate. In a report titled "British Company calls on FDA to Investigate 3M Over BacLite MRSA-Detecting Device," the affiliate said that "lawyers representing a British company [Davis] will ask the FDA to investigate 3M, saying the company deliberately sabotaged their own clinical trials because they had a more expensive product

already in the pipeline." Other news outlets reported on the story in a similar way.

63.     Of course, Defendants knew that there was no "secret report" at the time that they made these statements, just as they knew that 3M never withheld any material information concerning BacLite from the FDA and had appropriately informed the FDA of all required information – even up to the point that 3M decided not to continue with BacLite. Nevertheless, Defendants made these false and defamatory statements to the press as part of their campaign to disparage 3M and force it to offer the Boulter Defendants an undeserved settlement in the U.K. lawsuit.

64.     Defendants, led by Davis' Washington, D.C. public relations machine, even went so far as to organize public demonstrations ostensibly attended by citizen "victims" purportedly affected by 3M's decision not to market BacLite. Defendants' cynical use of these so-called MRSA "victims" to further their own financial self-interest prompted Jeanine Thomas, a MRSA survivor and founder of the legitimate Chicago-based MRSA Survivors Network, to refuse Defendants' request that she participate in the "staged" U.K. protests because, as she insightfully told reporters, "Everybody was suspicious of what was happening there, that that was not a true protest . . . . Everyone in the U.K. and myself, we suspected that those were not true protestors. Where were they before that? Nobody had seen them . . . . They're not legitimate, and they're only used for certain purposes." Thomas, who works as a MRSA patient advocate, emphasized that MRSA victims have "had to fight for our legitimacy" and pointed out that the cynical demonstrations by "pretend protestors" organized by Defendants impair the ability of groups like hers to advocate for real MRSA victims.

65.     Unfortunately, Davis and the Boulter Defendants did not stop at artificial demonstrations. They even manufactured a "citizen's petition" to the FDA in which they reasserted many of the false and disparaging statements made in their press releases, and then republished those same false allegations on a website specifically developed by them and

maintained in Washington, D.C., called www.MRSA-INJUSTICE.com.   All of these public

relations efforts were initiated, coordinated, and directed by and through Davis and his staff in

Washington, D.C. both on behalf of and together with the Boulter Defendants.

**K.**     **3M Terminates Settlement Discussions When Boulter Continues To Seek An Unreasonable Settlement Amount.**

66.     Notwithstanding Defendants' pressure campaign, one of 3M's attorneys agreed to

speak with Davis in an effort to reach a fair settlement.   Unfortunately, the discussions were not

fruitful because, as Davis informed 3M's attorney in an e-mail dated June 8, 2011, Boulter

"would rather litigate for anything less than $33 million total . . . ."

67.     Despite the wide gulf separating the parties, Davis told 3M's attorney that he was

interested in continuing settlement discussions.   3M's attorney disagreed.   In an e-mail to Davis

dated June 9, 2008, he told Davis in no uncertain terms that 3M would not be responding to the

offer, and that settlement discussions were terminated:   "We gave it a shot.  We're not inclined to

respond given the distance between us."[3]

**L.**     **Boulter, In Conjunction With The Davis Defendants And On Behalf Of The Other Boulter Defendants, Threatens 3M With Retaliation By The British Government If 3M Does Not Agree To Settle The U.K. Lawsuit For Tens Of Millions Of Dollars.**

68.     Driven by his determination to obtain an exorbitant payment to "settle" the U.K.

litigation, Boulter, acting in concert with Davis, devised a scheme to blackmail 3M.   That

scheme began with an unsolicited phone call by Davis to 3M's attorney on June 17, 2011,

wherein Davis suggested that 3M's attorney speak directly with Boulter. Thereafter, Davis sent

an e-mail to 3M's attorney that specifically gave him authorization to speak with Boulter.  Davis

knew – but of course 3M's attorney did not know – that the purpose of authorizing Boulter to

speak with 3M's attorney directly was for Boulter, as a foreign citizen and non-attorney, to

communicate an extortionate threat.   In the e-mail, which was also directed to Boulter, Davis

---

[3]     A true and correct copy of Davis' e-mail to 3M's attorney, dated June 8, 2011, and
3M's attorney's response, is attached hereto as Exhibit A.

noted that any such contact between Boulter and the 3M attorney was unlikely to result in an agreement as to the merits of the U.K. litigation.[4]

69.   Later that day, Boulter called 3M's attorney.  During the conversation, Boulter stated that he was authorized to speak on behalf of all of the U.K. Claimants, including Ploughshare.   In fact, Boulter represented that he was specifically authorized by the U.K. Minister of Defence, Dr. Liam Fox ("Fr. Fox"), to speak for the Ministry of Defence.

70.   During the brief conversation, Boulter indicated that it was in the best interests of 3M to settle the dispute with the U.K. Claimants immediately and that the failure to do so would have "consequences" for both 3M and Buckley.  Boulter stated that, in a meeting he had earlier that day in Dubai, Dr. Fox had informed him that if 3M did not resolve the U.K. litigation satisfactorily, there would be repercussions for 3M and Buckley. The conversation ended abruptly because of a lack of cell service – before 3M's attorney was able to respond.

71.   On June 18, 2011, Boulter sent an unsolicited e-mail to 3M's attorney that amplified his earlier threat.[5]  In the e-mail, Boulter made clear that the U.K. Claimants' demand of "$30 mn+" had "little to do with the case in the Court," but was instead "about losing face." Boulter stated he was "being asked, and [had] been given the sole authority by the [British Ministry of Defence] to settle on behalf of them."   Boulter added that "I had 45 minutes with Dr. Liam Fox, the British Defence Minister on our current favourite topic."

72.   Although Boulter acknowledged in the e-mail that 3M may prevail in the lawsuit, he threatened that, in such an event, 3M will have won the battle but may lose the war because the Ministry of Defence would likely act to deprive 3M of its ability to pursue its business

_____

[4]   A true and correct copy of Davis's e-mail to 3M's attorney and Harvey Boulter, dated June 17, 2011, is attached hereto as Exhibit B.  In his e-mail, Davis states "Harvey – I believe Bill is a great lawyer, nice guy…"

[5]   A true and correct copy of Boulter's e-mail, dated June 18, 2011, is attached hereto as Exhibit C.

interests with the U.K government. Thus, a victory by 3M in the U.K. litigation "might leave [the British government] quietly seething, with ramifications for a while – they have memories like elephants." However, if 3M were to settle the case for "$30mn+ you will allow [the British Ministry of Defence] to internally save face."

73.     Although Boulter conceded in the e-mail that the U.K. Claimants' demands have no basis in the actual merits of the case, he nonetheless attempted to imbue his threats with an urgency that 3M agree to pay quickly. He declared that "[f]rom next week [M]onday there are politics that will likely remove any further chance of settlement." He added that "[f]rom my side . . . whether this is $5mn or $35mn it is small beer. We manage $700mn and many of our investors call $5mn a rounding error."

74.     Boulter also wrote that, without immediate resolution satisfactory to the Ministry of Defence, Buckley's investiture as a Knight Bachelor would shortly become a subject of embarrassing public debate. In this regard, Boulter declared that "as a result of my meeting today [with Minister Fox] you ought to understand that [U.K. Prime Minister] David Cameron's Cabinet might very shortly be discussing the rather embarrassing situation of George's knighthood. It was discussed today. Governments are big and sometimes decisions in one part are not well coordinated."

75.     In an apparent attempt to underscore the need for 3M to accede to Defendants' extortionate demands that weekend, Boulter sent a follow-up e-mail to 3M's counsel, which confirmed that the harm to 3M and Buckely was imminent. Specifically, by e-mail dated June 19, 2011, Boulter pressed 3M for immediate capitulation to Defendants' demands that very day, claiming that he needed to "tell something to Dr. Fox's office on Sunday night."[6] Boulter again warned 3M of the "political consequences" that would occur beginning Monday. In addition, he

---

[6]     A true and correct copy of Boulter's e-mail, dated June 19, 2011, is attached hereto as Exhibit D.

warned against not responding – or as he put it, giving "a 'radio silence' message" – because Dr. Fox "is the Secretary of Defence and will not expect that."

76.     In short, Boulter's e-mails constituted an overt attempt to blackmail 3M by virtue of the threat to interfere with the business interests of 3M in the U.K. and Buckley's public recognition, unless 3M capitulated to Defendants' unfounded demands to settle the U.K. lawsuit for amounts unrelated to the merits of the U.K. Claimants' claims.

## M.     The Aftermath

77.     In the days following the public disclosure of Boulter's extortionate e-mails, the Ministry of Defence disputed Boulter's characterization of his meeting with Dr. Fox, and stated that "Dr. Fox met with Boulter to discuss an entirely different matter.  At no point did he enter into any discussion about this legal case, nor was there any mention of anyone's knighthood."

78.     Recently, however, upon being confronted by U.K. reporters with alleged eyewitness accounts, Dr. Fox reversed his position and admitted that the topic of the U.K. litigation did, in fact, come up between him and Boulter during a meeting in Dubai.  Thus, spokesman for Dr. Fox publicly retracted the Ministry's previous denial and stated that "during their meeting, Mr. Boulter disclosed his involvement in a legal case as a matter of propriety.  But Dr. Fox did not enter into a discussion about this in any respect and at no point raised or discussed the issue of a knighthood."  That meeting reportedly took place on June 17, 2011, just hours before Boulter sent his first improper e-mail to 3M's attorney.

79.     *The Guardian* also reported in August 2011 that the meeting between Dr. Fox and Boulter was arranged by a personal friend to Dr. Fox, Mr. Adam Werrity. It was reported that Werrity exchanged e-mails with Boulter as early as April 2011, assuring Boulter he would "push along as discussed" the MoD's interest in the U.K. litigation. Only one month later, Werrity allegedly told Boulter that he hoped Dr. Fox  would "want to make an issue out of this."

Certainly, an unfortunate "issue" has been made of the UK litigation – to the detriment of one of our country's largest and most successful companies.

80.     It remains unclear to what extent Dr. Fox sponsored Defendants' actions, Defendants' demands that 3M pay the U.K. Claimants $30 million, and Defendants' efforts to pressure 3M into an unwarranted settlement.  Further, it remains unclear whether Dr. Fox was waiting for a response to those demands on Sunday (June 19, 2011), as Boulter suggested, and what was supposed to happen to 3M on Monday (June 20, 2011), relative to the consequences the company faced if it did not agree to immediately offer Defendants tens of millions of dollars.

81.     It does appear, however, that Defendants have exercised their influence with the U.K. government and the Ministry of Defence to cause 3M to lose business opportunities with those entities.  The exact amount of the business lost and damages incurred will be the subject of discovery in this action and will be proved at trial.

82.     Accordingly, 3M now brings this lawsuit to force disclosure of the full extent of Defendants' egregious and wrongful actions, to illuminate the participation of others in Defendants' campaign to intimidate 3M into paying unwarranted sums to the U.K. Claimants, and to seek damages-compensatory and punitive for the harm 3M has suffered.

**V.**

**CAUSES OF ACTION**

A.     **Count One:  Intimidation And Blackmail (United Kingdom Law)**

83.     3M incorporates herein by reference the allegations set forth in the preceding paragraphs.

84.     Boulter is a citizen of the United Kingdom, and all Defendants are subject to United Kingdom law as agents, accomplices, and co-conspirators.

85.     U.K. law recognizes the common law tort of intimidation, which is committed when a defendant compels a plaintiff, by unlawful means, to do some act whereby loss accrues to

26

plaintiff. Intimidation is committed under U.K. law when, for example, a defendant causes loss to the plaintiff by threat to commit a libel or any other tort if the plaintiff does not comply with the defendant's demands.

86.     Defendants committed the tort of intimidation under United Kingdom law by the unlawful means of blackmailing 3M in their effort to compel 3M to pay money to Defendants to which Defendants had no legal right. 3M has been damaged by Defendants' conduct and continues to be damaged by it, in an amount to be proved at trial.

87.     Section 21 of the United Kingdom Theft Act 1968 provides: "A person is guilty of blackmail if, with a view to gain for himself or another or with intent to cause loss to another, he makes any unwarranted demand with menaces; and for this purpose a demand with menaces is unwarranted unless the person making it does so in the belief – (a) that he has reasonable grounds for making the demand; and (b) that the use of the menaces is a proper means of reinforcing the demand."

88.     By and through Boulter's and Davis's communications with 3M's counsel, Defendants intended to cause loss to 3M by making unwarranted threats, menaces, and demands that 3M engage in conduct from which it had a legal right to abstain and that 3M give up valuable rights it was entitled to pursue.

89.     Defendants made those unwarranted demands without reasonable basis and without a belief either that such grounds exist or that their use of menaces were proper. The Defendants were motivated by a desire to gain for themselves, and an intent to materially harm 3M.

## B.     Count Two:  Tortious Interference With Prospective Business Relationships And Economic Advantage

90.     3M incorporates herein by reference the allegations set forth in the preceding paragraphs.

91.     3M has a number of prospective business relationships with the English government.

92.     Defendants were, at all relevant times, aware of those prospective business relationships.

93.     Nevertheless, as detailed above, Defendants have wrongfully, intentionally, maliciously and in bad faith taken actions to meaningfully interfere with 3M's prospective business relationships.

94.     Those actions constitute tortious interference with prospective business relationships.

95.     Defendants have interfered and continue to interfere, without lawful justification or excuse, with 3M's prospective business relationships.

96.     Defendants' actions to interfere with 3M's prospective business relationships were taken by unlawful means and for unlawful purpose.

97.     Defendants' wrongful, interfering conduct was and is independently tortious and/or unlawful.

98.     Defendants' interference with 3M's prospective business relationships has resulted in actual harm and damage to 3M in excess of the jurisdictional amount.

99.     3M is entitled to an award of compensatory and consequential damages in an amount to be determined by the trier of fact.

100.     3M is entitled to an award of exemplary damages in an amount to be determined by the trier of fact because Defendants' conduct was and is willful, wanton, malicious, and without lawful justification or excuse.

**C.     Count Three: Commercial Defamation**

101.     3M incorporates herein by reference the allegations set forth in the preceding paragraphs.

28

102.    The defamatory statements alleged herein made by Defendants, acting by and through Davis, directly impugn the basic integrity and reputation of 3M's business. Defendants knew or should have known that those statements were false when made, and that Defendants were not privileged to make them.

103.    Defendants knew that these statements were false because they knew or should have known that, *inter alia*, 3M had not withheld any BacLite technical report from the FDA, that there was no "secret report," that 3M had not failed to disclose any conflicts of interest to the FDA, that 3M was not the cause of any deaths by MRSA victims, and that Buckley had not unilaterally intervened in 3M's decision not to market BacLite.

104.    All of the alleged statements were defamatory *per se* because they directly implied that 3M: is poorly run; used shameful, dishonest, and unethical business practices; and engaged in deception and illegal conduct.

105.    Defendants' statements concern the existing business practices of 3M and were published to the public through press releases, website publications, and public statements. The statements were disseminated with actual malice because Defendants acted with knowledge that the statements were false and with reckless disregard as to whether they were false. Defendants did not simply fail to conduct an investigation as to the falsity of their statements; they published the statements with ill will and with actual and reckless knowledge of their falsity in an effort to damage 3M's business reputation and to pressure 3M into paying them tens of millions of dollars.

106.    Defendants' false statements have proximately caused damage to 3M's reputation by, among other things, calling into question the legality and ethics of its business practices, falsely accusing 3M of having defrauded and deceived the FDA, and of endangering lives and the public health. 3M's reputation and goodwill, which for 2010 was reported by 3M to exceed $6.8 billion, has been substantially damaged in an amount to be proved at trial.

107.   3M has suffered special damages as a result of Defendants' actions and statements in an amount to be proved at trial.

**D.   Count Four:  Aiding And Abetting**

108.   3M incorporates herein by reference the allegations set forth in the preceding paragraphs.

109.   Defendants are liable to 3M for their wrongful acts described above.

110.   Defendants had knowledge of each other's wrongful acts but, nevertheless, knowingly advised, encouraged, aided, abetted, and assisted each other and their wrongful acts.

111.   As a result of their assistance and encouragement of each other's wrongful acts, Defendants committed the wrongful acts detailed herein.

112.   As the direct and proximate result of the Defendants' wrongful conduct, 3M is entitled to actual, compensatory, consequential, and punitive damages in an amount to be determined by the trier of fact.

**E.   Count Five:  Civil Conspiracy**

113.   3M incorporates herein by reference the allegations set forth in the preceding paragraphs.

114.   Defendants and others acted together to accomplish an unlawful object or a lawful object by unlawful means, including extortion and tortious interference.

115.   Defendants had a meeting of the minds whereby they decided to take steps to accomplish their unlawful acts and omissions.

116.   Defendants committed one or more unlawful overt acts in furtherance of this conspiracy, including, but not limited to, extortion, tortious interference, and defamation.

117.   The purpose of the conspiracy was to injure 3M for the financial gain of Defendants.

118.    As a direct and proximate result of Defendants' civil conspiracy, 3M is entitled to actual, compensatory, consequential, and punitive damages in an amount to be determined by the trier of fact.

## VI.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff requests that the Court enter judgment in Plaintiff's favor and against Defendants, jointly and severally, as follows:

a.    awarding Plaintiff actual damages, including compensatory and consequential damages, in an amount to be determined at trial, but not less than $75,000;

b.    awarding Plaintiff special damages in an amount to be determined at trial;

c.    awarding Plaintiff exemplary or punitive damages;

d.    awarding Plaintiff pre-judgment and post-judgment interest at the highest lawful rates;

e.    awarding Plaintiff such costs and disbursement as are incurred in prosecuting this action, including reasonable attorneys' and experts' fees;

f.    granting permanent injunctive relief prohibiting Defendants from interfering with 3M's contracts or prospective business relations with the Government of the United Kingdom and its various Ministries, and further prohibiting Defendants from interfering with the award of knighthood to Buckley or with his status as a knight bachelor; and

g.    granting Plaintiff such other and further relief as this Court deems just and proper.

## VII.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on issues so triable.

Dated: August 24, 2011

Respectfully submitted,

By:  Kenneth J. Pfaehler
(D.C. Bar Number 461718)
David I. Ackerman
(D.C. Bar Number 482075)
**SNR Denton US LLP**
1301 K Street, N.W.
Suite 600, East Tower
Washington, DC  20005-3364
(202) 408-6400  Telephone
(202) 408-6399  Facsimile
kenneth.pfaehler@snrdenton.com
david.ackerman@snrdenton.com

**ATTORNEYS FOR PLAINTIFF
3M COMPANY**

**OF COUNSEL:**

William A. Brewer III
Alexander D. Widell
Robert W. Gifford
**BICKEL & BREWER**
767 Fifth Avenue, 50th Floor
New York, New York 10153
(212) 489-1400

5248287.12
2124-06

32