## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

3M COMPANY,

    Plaintiff,

     v.

HARVEY BOULTER,
PORTON CAPITAL TECHNOLOGY FUNDS,
PORTON CAPITAL, INC.,
LANNY DAVIS,
LANNY J. DAVIS & ASSOCIATES, PLLC,
and DAVIS-BLOCK LLC,

    Defendants.

11-cv-1527-RLW

Judge Robert L. Wilkins

## MEMORANDUM OF LAW IN SUPPORT OF MOTION BY PORTON CAPITAL TECHNOLOGY FUNDS AND PORTON CAPITAL, INC. FOR DISMISSAL WITH PREJUDICE PURSUANT TO FED. R. CIV. P. 12(b)(2) FOR LACK OF PERSONAL JURISDICTION, OR RULE 12(b)(6) FOR FAILURE TO STATE A CLAIM

Christopher E. Duffy (*pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, New York  10022
Phone: (212) 446-2300
Fax: (212) 446-2350
CDuffy@BSFLLP.com

Melissa Felder, Bar No. 497459
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, N.W., Suite 800
Washington, D.C.  20015
Phone: (202) 237-2727
Fax: (202) 237-6131
MFelder@BSFLLP.com

*Attorneys for Defendants Porton Capital*
*Technology Funds and Porton Capital, Inc.*

November 18, 2011

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iii

PRELIMINARY STATEMENT ........................................................................... 1

SUMMARY OF THE ALLEGATIONS IN THE COMPLAINT .................................. 4

ARGUMENT ................................................................................................. 9

I.   THIS COURT DOES NOT HAVE PERSONAL
     JURISDICTION OVER THE PORTON DEFENDANTS ................................... 9

     A.   No Jurisdiction Exists Under the D.C. Long-Arm Statute .................... 10

          1.   Porton Does Not Transact Business in the District of Columbia ........... 10

          2.   The Complaint Does Not Allege Tortious Injury in the District. ............. 11

          3.   The Complaint Does Not Allege Tortious Injury in
               the District by an Act or Omission Outside of the District. ................... 12

               a.   The Complaint Does Not Allege Injury Within the District ............ 12

               b.   Defendants Do Not Engage In or Solicit Business, or Derive
                    Substantial Revenue from Goods or Services in the District ........... 14

          4.   Jurisdiction Does Not Exist Under Conspiracy or Agency Theories. ...... 15

               a.   Conspiracy Jurisdiction Does Not Exist. ................................... 15

               b.   Jurisdiction Under an Agency Theory is Not Proper Here. ............ 16

     B.   An Exercise of Personal Jurisdiction
          Would Offend Traditional Notions of Fair Play and
          Substantial Justice, and Would Not Comport With Due Process. ........... 17

          1.   Defendants Are Not Subject To Specific Jurisdiction. ..................... 19

               a.   Defendants Did Not Purposefully
                    Establish Minimum Contacts Within the District ........................ 19

               b.   Traditional Notions of Fair Play and Substantial
                    Justice Preclude an Exercise of Specific Jurisdiction. ................. 20

          2.   Defendants Are Not Subject To General Jurisdiction ...................... 22

II.    EACH OF THE FIVE COUNTS IN THE COMPLAINT FAILS
       TO STATE A CLAIM ON WHICH RELIEF CAN BE GRANTED.. ............................24

       A.    Count One (Intimidation and Blackmail) Fails
             to Allege that Porton Forced 3M to Perform Any
             Particular Act, and Fails to Allege Any Resulting Loss to 3M. ............................24

       B.    Count Two (Tortious Interference with Prospective Business
             Relationships and Economic Advantage) Lacks Sufficient Details Regarding
             the Losses that 3M Purportedly Suffered as a Result of Defendants' Actions......27

       C.    Count Three (Commercial Defamation) Relies
             Upon the Purported Defamatory Content of
             Statements that Are Not Actionable as a Matter of Law. .....................................31

             1.    Each Disputed Statement Is Either a Protected
                   Statement of Opinion, Lacks Allegations of Falsity, and/or Is
                   Facially Non-Defamatory in the Context in Which It Was Made. ............33

                   a.    The Statements About the Public Health
                         Effects of 3M Not Marketing BacLite Are Pure
                         Opinion, and Cannot Be Proven True or False................................35

                   b.    The Statements About 3M Not Sharing Its
                         Technical Report with the FDA Are Not Alleged to Be False. .......40

             2.    The Allegedly Defamatory Statements Are Privileged. ...........................41

       D.    Counts Four (Aiding and Abetting) and Five (Civil Conspiracy) Do Not
             State a Claim Because 3M Has Not Properly Alleged Any Underlying Tort. ......42

CONCLUSION...................................................................................................................43

# TABLE OF AUTHORITIES

## Cases

*Am. Ass'n of Cruise Passengers v. Cunard Line, Ltd*,
  691 F. Supp. 379 (D.D.C. 1987) ............................................................................14

*American Fuel Corp. v. Utah Energy Development Co., Inc.*,
  122 F.3d 130 (2d Cir. 1997) .................................................................................32

*Asahi Metal Industry Co. Ltd v. Super. Ct. of Cal*,
  480 U.S. 102 (1987) ...............................................................................18, 19, 21

*Ashcroft v. Iqbal*,
  129 S. Ct. 1937 (2009) ...................................................................................30, 31

*Atlantigas Corp. v. Nisource, Inc.*,
  290 F. Supp. 2d 34 (D.D.C. 2003) ................................................................9, 16, 17

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ..............................................................................................30

*Boland v. Fortis Const. Co., LLC*,
  No. 10-1701, 2011 WL 2685612 (D.D.C. July 12, 2011) .......................................9

*Browning v. Clinton*,
  292 F.3d 235 (D.C. Cir. 2002) ..............................................................................36

*Buesgens v. Brown*,
  567 F. Supp. 2d 26 (D.D.C. 2008) ...................................................................18, 19

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985) ..........................................................................................18, 20

*Burman v. Phoenix Worldwide Indus., Inc*,
  437 F. Supp. 2d 142 (D.D.C. 2006) ......................................................................14

*Capital Bank Intern. Ltd v. Citigroup*,
  276 F. Supp. 2d 72 (D.D.C. 2003) ...................................................................19, 20

*Cellutech, Inc. v. Centennial Cellular Corp*,
  871 F. Supp. 46 (D.D.C. 1994) .............................................................................17

*Coles v. Washington Free Weekly, Inc*,
  881 F. Supp. 26 (D.D.C. 1995) .............................................................................42

*Collier v. Banker's Life & Cas. Co.*,
  No. 02-C-7062, 2002 WL 31870546 (N.D. Ill. Dec. 20, 2002) .............................16

*Crane v. Carr,*
    814 F.2d 758 (D.C. Cir. 1987) ........................................................................13

*Crane v. N.Y. Zoological Soc.,*
    894 F.2d 454 (D.C. Cir. 1990) ........................................................................13

*D'Onofrio v. SFX Sports Group, Inc.,*
    534 F. Supp. 2d 86 (D.D.C. 2008) ..............................................................22, 23

*Diamond Chemical Co., Inc. v. Atofina Chemicals, Inc.,*
    268 F. Supp. 2d 1 (D.D.C. 2003) ..................................................................19

*Dooley v. United Technologies Corp.,*
    786 F. Supp. 65 (D.D.C. 1992) .....................................................................15

*Exponential Biotherapies, Inc. v. Houthoff Buruma N.V.,*
    638 F. Supp. 2d 1 (D.D.C. 2009) ..............................................................22, 23

*FC Inv. Group LC v. IFX Mkts., Ltd.,*
    529 F.3d 1087 (D.C. Cir. 2008) .....................................................................15

*FC Inv. Group LC v. IFX Mkts., Ltd.,*
    479 F. Supp. 2d 30 (D.D.C. 2007) .............................................................10, 15

*FCC v. League of Women Voters.,*
    468 U.S. 364 (1984) ......................................................................................39

*Flax v. Shertler,*
    935 A.2d 1091 (D.C. 2007) ...........................................................................43

*Fraternal Order of Police v. Gates,*
    562 F. Supp. 2d 7 (D.D.C. 2008) ..................................................................30

*Freiman v. Lazur,*
    925 F. Supp. 14 (D.D.C. 1996) .....................................................................16

*Gatewood v. Fiat, S.p.A,*
    617 F.2d 820 (D.C. Cir. 1980)) .....................................................................13

*Goodyear Dunlop Tires Operations, S.A. v. Brown,*
    131 S. Ct. 2846 (2011) ..................................................................................23

*Gibbons & Co., Inc. v. Roskamp Institute,*
    No. 06-720, 2006 WL 2506646 (D.D.C. Aug. 28, 2006) ..............................11

*GTE News Media Servs. v. BellSouth Corp.,*
    199 F.3d 1343 (D.C. Cir. 2000) .................................................................10, 18

*Helicopteros Nacionales de Colombia v. Hall*,
   446 U.S. 408 (1984)....................................................................................22, 23

*Hercules & Co., Ltd. v. Shama Rest. Corp.*,
   566 A.2d 31 (D.C. 1989) ...........................................................................28

*Hollingsworth v. Duff*,
   444 F. Supp. 2d 61 (D.D.C. 2006) ...........................................................9

*International Shoe Co. v. Washington*,
   326 U.S. 310 (1945)....................................................................................18

*Janklow v. Newsweek, Inc.*,
   788 F.2d 1300 (8th Cir. 1986) ...................................................................33

*Jones v. Mirgon.*,
   No. 88-7001, 1989 WL 105498 (D.C. Cir. Aug. 31, 1989) ........................42

*Jungquist v. Sheik Sultan Bin Khalifa Al Nahyan*,
   115 F.3d 1020 (D.C. Cir. 1997)..................................................................15

*Klayman v. Segal.*,
   783 A.2d 607 (D.C. 2001) ..........................................................................37

*KnowledgePlex, Inc. v. Metonymy, Inc.*,
   574 F. Supp. 2d 164 (D.D.C. 2008)............................................................18

*Lane v Random House, Inc*,
   985 F. Supp. 141 (D.D.C. 1995) ................................................................42

*Mar-Jac Poultry, Inc. v. Katz,,*
   773 F. Supp. 2d 103 (D.D.C. 2011)............................................................32, 35

*Margoles v. Johns*,
   483 F.2d 1212 (D.C. Cir. 1973)..................................................................11

*Merrill Lynch, Inc. v. Raffa*,
   [2001] 1 I.L.Pr. 31 .....................................................................................27

*Moldea v. New York Times Co.*,
   22 F.3d 310 (D.C. Cir. 1994).......................................................................36

*Moncrief v. Lexington Herald-Leader Co.*,
   807 F. 2d 217 (D.C. Cir. 1986) ..................................................................11

*Naartex Consulting Corp. v. Watt*,
   722 F.2d 779 (D.C. Cir. 1983).....................................................................15, 16

*Norvel Ltd. v. Ulstein Propeller AS*,
   161 F. Supp. 2d 190 (S.D.N.Y. 2001) ........................................................................21, 22

*OBG Ltd. v. Allan*,
   [2008] 1 A.C. 1 (H.L.) ..................................................................................................29

*Ollman v. Evans*,
   750 F. 2d 970 (D.C. Cir. 1984) .............................................................33, 34, 35, 36, 39

*Perkins v. Benguet Consol. Mining Co.*,
   342 U.S. 437 (1952) ......................................................................................................23

*Q Intern. Courier, Inc. v. Seagraves.*,
   No. 95-1554 (RMU), 1999 WL 1027034 (D.D.C. Feb.26 1999) ...............................34

*Riddell v. Riddell Washington Corp.*,
   866 F.2d 1480 (D.C. Cir. 1989) ...................................................................................43

*Rogers v. Petroleo Brasileiro, S.A.*,
   741 F. Supp. 2d 492 (S.D.N.Y. 2010) ..........................................................................29

*S. Air Transp., Inc. v. Am Broadcasting Cos.*,
   670 F. Supp. 38 (D.D.C. 1987) .....................................................................................41

*Tavoulareas v. Comnas*,
   720 F.2d 192 (D.C. Cir. 1983) ......................................................................................14

*Teltschik v. Williams & Jensen*, PLLC.,
   683 F. Supp. 2d 33 (D.D.C. 2010) ..........................................................................41, 42

*Tolbert v. Nat'l Harmony Mem'l Park*,
   520 F. Supp. 2d 209 (D.D.C. 2007) .............................................................................27

*Urban Institute v. FINCON Servs.*,
   681 F. Supp. 2d 41 (D.D.C. 2010) ...............................................................................14

*U.S. v. Ferrara*, 54 F.3d 825,
   54 F.3d 825 (D.C. Cir. 1995) ........................................................................................10

*U.S. v. Philip Morris, Inc.*,
   116 F. Supp. 2d 116 (D.D.C. 2000) ...........................................................10, 18, 19, 20

*Washington v. Smith*,
   893 F. Supp. 60 (D.D.C. 1995) ...............................................................................34, 36

*White v. Fraternal Order of Police.*,
   707 F. Supp. 579 (D.D.C. 1989) .............................................................................32, 34

*World-Wide Volkswagen Corp. v. Woodson*,
  444 U.S. 286 (1980)............................................................................................19, 20, 21

*Von Kahl v. Bureau of Nat. Affairs, Inc.*,
  No. 09-CIV-0635 (RWR), 2011 WL 4032384 (D.D.C. Sept. 13 2011).................................32

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) ..............................................................................................24

## Statutes and Rules

D.C. Code § 13-423 ...........................................................................10, 11, 12, 13, 14

Fed. R. Civ. P. 8...............................................................................................29, 30, 31

Fed. R. Civ. P. 12.............................................................................................3, 30, 41, 43

Fed. R. Civ. P. 44.1..........................................................................................................26

Fed. R. Evid. 408 .............................................................................................................27

Theft Act 1968 (England) § 21 .......................................................................................25

U.S. Constitution, First Amendment .................................................................4, 33, 36, 39, 40

## Other Authorities

Restatement (Second) of Conflict of Laws § 145.........................................................28

## PRELIMINARY STATEMENT

Plaintiff 3M Company ("3M") started this lawsuit in June 2011 when it filed claims against three of the named defendants in New York state court. *See 3M Co. v. Boulter, Porton Capital Technology Funds, and Porton Capital, Inc.*, No. 651708/2011 (Sup. Ct., N.Y. Cty.) (Singh, J.). Those defendants filed a motion to dismiss. Instead of opposing the motion, 3M filed an amended complaint, in the process adding three new defendants to its suit: Lanny Davis, Lanny J. Davis & Associates, PLLC, and Davis-Block LLC (collectively, the "Davis Defendants"). 3M also asked the New York court to reassign the case to a different judge. The chief administrative rejected 3M's request, and in the process held in a written order that 3M's complaint was "devoid of any monetary demand" – not exactly getting 3M off to a roaring start.[1] All defendants then filed a motion to dismiss 3M's amended pleading. Three business days later, before even asking the New York court for a discontinuance, 3M filed its virtually identical complaint in the instant action (the "Complaint" or "Compl" (Doc. No. 1)). Defendants Porton Capital Technology Funds and Porton Capital, Inc. (together, "Porton" or the "Porton Defendants") hereby move to dismiss that Complaint – the third pleading that 3M has filed against Porton – due to lack of personal jurisdiction or, in the alternative, for failure to state a claim upon which relief can be granted. The Complaint is 3M's third bite at the apple, and thus Porton seeks a dismissal with prejudice, and without leave to amend.[2]

3M's claims in the New York lawsuit, and in its virtually identical Complaint in this Court, stem from a 2008 civil action filed by Porton in the High Court of Justice in London,

---

[1]     *See* Exhibit A hereto (July 27, 2011 Administrative Order signed by Administrative Judge Sherry Klein Heitler, Justice of the Supreme Court of the State of New York for the County of New York).

[2]     For the Court's reference, 3M's original complaint filed in the New York court on June 19, 2011, and its first amended complaint filed there on July 21, 2011, are attached hereto as Exhibits B and C, respectively.

England against 3M and one of its United Kingdom-based subsidiaries for breach of contract (the

"High Court Action").  *See* Compl. ¶¶ 55-56.  Porton's co-claimant in that action was

Ploughshare Innovations Limited ("Ploughshare"), a wholly-owned subsidiary of the Defence

Science and Technology Laboratory, a part of the United Kingdom's Ministry of Defence.  *See*

Compl.  ¶¶ 24, 55.  Porton and Ploughshare's suit against 3M arose from 3M's acquisition of a

U.K. company – Acolyte Biomedica Limited ("Acolyte") – from Porton and Ploughshare

(among other then-shareholders), and 3M's subsequent failure to abide by marketing obligations

that 3M assumed under a written contract.  *Id.* at ¶¶ 24, 45-48, 54-55.  The trial in the High Court

Action began on June 13, 2011, and concluded on November 7, 2011 with the issuance of a final

judgment holding 3M liable to Porton and Ploughshare for money damages due to its breach of

contract.  *See* 3M Notice of Supplemental Authority (Nov. 14, 2011) (Doc. No. 28).

On June 19, 2011, less than one week after the start of the trial in the High Court Action,

3M filed what was effectively a countersuit against Porton and Harvey Boulter, the head of

Porton.[3]  3M premised the claims in its original New York complaint "on Defendants' wrongful

efforts to extort millions of dollars from it."  *See* Exhibit B hereto at 1.  3M makes similar

allegations in its Complaint in this Court.  *See* Compl. ¶¶ 1-2.  The so-called "extortionate

demands" by Mr. Boulter, *see id.* ¶ 2, were statements he made to William Brewer, 3M's Texas-

based outside counsel, during a discussion about the possible settlement of Porton's claims

against 3M in the High Court Action.  *Id.* at 68-76.  3M also claims that Porton has tortiously

interfered with 3M's prospective business relationships with the British government, and that it

has defamed 3M by issuing public statements about the High Court Action and an application by

Porton to the U.S. Food and Drug Administration (the "FDA") seeking a public hearing on 3M's

---

[3]      3M has named Mr. Boulter as a defendant in the instant action, but has not served him
with a summons and Complaint.

conduct in connection with the testing and marketing of BacLite, the medical diagnostic product at the center of the contract dispute between Porton and 3M.

As shown at Point I below, each of the Porton Defendants is a Cayman Islands company with no offices, employees, or any other minimum contacts in the District of Columbia.  The presence of one of their attorneys in D.C. – defendant Lanny Davis – is an insufficient hook for personal jurisdiction in this Court.  The Court thus should dismiss the Porton Defendants from the action under Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction.

Even if personal jurisdiction did exist over the Porton Defendants, each claim against them is still subject to dismissal under Rule 12(b)(6).  3M's intimidation/blackmail claim (Count One) fails as a matter of law for a simple reason: it fails to allege any damage, an essential element of the tort.  *See* Point II.A below.  3M alleges that Porton improperly tried to convince 3M to pay $30 million to settle the High Court Action, but acknowledges that 3M refused.  The High Court Action proceeded to a final judgment, in which the High Court held 3M's English subsidiary liable for breach of contract to Porton, and ordered it to pay approximately $1.3 million in damages.  3M never made any "blackmail" payment to Porton, and thus has failed to allege the existence of damages in connection with Porton's private settlement offer.  3M's effort to premise a cause of action on statements made during settlement discussions is also a violation of English law, as well as Fed. R. Evid. 408.

3M's claim for "tortious interference with prospective business relationships and economic advantage" (Count Two) also fails as a matter of law.  *See* Point II.B below.  Here again, 3M fails to identify any damages that it has suffered, beyond a vague and conclusory comment that "It does appear, however, that Defendants have exercised their influence with the U.K. government and Ministry of Defence to cause 3M to lose business opportunities with those

entities." Compl. ¶ 81.  The Complaint does not identify even one such lost opportunity.  Just as importantly, it does not identify even one action undertaken by Porton (or any other named defendant) to interfere with 3M's commercial relations with the British government.

The Court should also dismiss 3M's commercial defamation claim, which is premised on statements made by Porton's attorneys in one press release and one press conference in May 2011.  *See* Point II.C below.  The press release and press conference both related to Porton's attorneys' commencement of an administrative proceeding at the U.S. Food and Drug Administration involving allegations against 3M, and also discussed the High Court Action.  The statements at issue commented on the scope of information that 3M shared with the FDA relating to 3M's testing of BacLite, and the possible public health implications of 3M's decision to abandon the development and marketing of BacLite (a decision for which the High Court held 3M's English subsidiary in breach of contract to Porton earlier this month).  Viewed in context – which is required under the law of this Circuit – those statements are all exempt from liability under the First Amendment.  They are also privileged under the fair comment privilege and the common interest privilege, both of which are recognized under the law of the District of Columbia, which applies to the defamation claim (as distinct from Counts One and Two, which are governed by English law).

<u>**SUMMARY OF THE ALLEGATIONS IN THE COMPLAINT**</u>

This action arises from recent settlement discussions related to the High Court Action, which was brought in 2008 by Porton and Ploughshare against 3M (a Minnesota-based Delaware corporation) and its English subsidiary, 3M UK Holdings Limited ("3M-UK"), in the High Court of Justice in London, England.  *See* Compl. ¶¶ 56-82.  The High Court Action is a contract dispute relating to 3M-UK's purchase of Acolyte (a U.K. company) from Porton, Ploughshare,

and other then-shareholders.  *See id.* ¶¶ 24, 36, 39, 45-48, 54-55.

Porton Capital Technology Funds is a Cayman Islands company that does business in the United Kingdom.  *See id.* ¶ 6.  It is an investment fund that invests in life science ventures, among other things.  *See id.* at ¶ 23.  Porton Capital, which is also a Cayman Islands company, is an affiliate of Porton Technology.  *See id.* ¶¶ 7, 23.  Mr. Boulter, a U.K. citizen who resides in Dubai, is the chief executive officer of Porton Capital and a director of Porton Technology.  *See id.* ¶ 5.

Davis & Associates, a law firm, is a Delaware company with its primary place of business in Washington, D.C.  *See id.* ¶¶ 9, 26.  Davis-Block is a Washington, D.C. company that does business in Washington, D.C.  *See id.* ¶ 10.  Mr. Davis, who is both a citizen of and resides in Maryland, is a principal of both Davis & Associates and Davis-Block.  *See id.* ¶¶ 9-10.  Porton engaged Mr. Davis as an attorney to provide it with legal advice in connection with the High Court Action.  *See id.* ¶ 57.

3M purchased Acolyte in February 2007 from Porton, Ploughshare, and the other then-shareholders because Acolyte owned the rights to BacLite, a product designed to allow hospitals and clinics to screen patients for the Methicillin-resistant *Staphylococcus aureus* bacteria, the "superbug" known as MRSA.  *See id.* ¶ 36.  3M acquired Acolyte under a written contract that provided Porton and Ploughshare with the right to "earn-out" payments from 3M's sales of BacLite.  *See id.* ¶ 39 & n.2.  Subsequently, 3M decided that it wanted to shut down the BacLite business, and sought consent to do so from Porton and Ploughshare.  *See id.* ¶ 47.  That request led to a dispute over 3M-UK's contractual obligations to Porton and Ploughshare, who commenced the High Court Action against 3M-UK later that year (and subsequently added 3M to the lawsuit).  *See id.* ¶¶ 48, 54-55.  Trial in the High Court Action commenced in London in

mid-June 2011 and ended on July 18, 2011.  *See id.* ¶ 56.  On November 7, 2011, the High Court

issued a judgment that held 3M-UK liable to Porton and Ploughshare for breach of contract.  *See*

3M Notice of Supplemental Authority (Nov. 14, 2011) (Doc. No. 28).

In the months leading up to the trial, Mr. Boulter and the Porton Companies' engagement

of Mr. Davis included work on reaching a settlement with 3M.  *See id.* ¶ 57.  3M alleges that Mr.

Davis, in connection with his work for the Porton Companies, issued press releases that "falsely,

disparagingly, and maliciously claimed" that 3M acted in bad faith and dealt dishonestly with the

FDA.  *See id.* ¶ 57.  3M bases its defamation claim against Porton on various statements made on

May 11, 2011 in a press release and press conference organized by Mr. Davis, including:

- "All those who have suffered from MSRA … could have avoided exposure but for the decision by 3M to abandon it and to refuse to seek approval from the FDA."  *See id.* ¶ 60.

- "Thousands and thousands and thousands of people who died might be alive today had there been a BacLite."  *See id.*

- "Hospital patients in Europe, the U.S., and all over the world could have been unnecessarily exposed to MSRAs and possibly exposed to life-and-death risk."  *See id.*

3M also alleges (at ¶ 62) that as part of Mr. Davis's purported scheme to defame 3M, he

accused it of withholding or not representing "material facts" to the FDA.  Mr. Davis's actions

allegedly include:

- Issuing a press release stating that 3M "fail[ed] to disclose a secret internal technical committee report on testing errors" to the FDA.  *See id.* ¶ 62.

- Stating that "the secret 3M technical advisory report never publicly disclosed or disclosed to the FDA cited many errors by 3M testers that the drafter of the report implied were both careless and avoidable."  *See id.*

- Citing "several FDA regulations as the basis for [his] request for an FDA investigation … including a regulation permitting an administrative hearing … when there is evidence of misconduct that could affect the public health."  *See id.*

A few days after the commencement of the trial in the High Court Action, Mr. Davis granted permission to 3M's attorney, Mr. Brewer, to communicate directly with Mr. Boulter about a possible settlement of the High Court Action.  *See id.* ¶ 68.  Mr. Boulter explained during the ensuing telephone call that he was authorized to negotiate on behalf of all the claimants in the High Court Action (*i.e.*, Porton and Ploughshare).  *See id.* ¶ 69.  3M alleges that during the call, Mr. Boulter "made clear that the U.K. Claimants' demand of '30 mn+' had 'little to do with the case in the Court,' but was instead 'about losing face.'"  *See id.* ¶ 71.  3M alleges that this settlement offer on behalf of the claimants in the High Court Action was "for tens of millions of dollars more than the claims in the lawsuit were worth."  *See id.* ¶ 57.  3M has conceded, however (at ¶ 48), that the claimants in the High Court Action were seeking approximately $66.8 million in damages in that action, more than twice what Mr. Boulter suggested as an appropriate settlement during his settlement discussion with Mr. Brewer.

On June 18, 2011, Mr. Boulter transmitted to Mr. Brewer an e-mail reviewing what was discussed on their call about the possible settlement of the High Court Action (the "June 18 E-mail").  *See* Compl. ¶¶ 71 & Ex. C.  3M alleges that the June 18 E-mail is extortionate, and was a "threat to interfere with the business interests of 3M in the UK," *see id.* ¶ 76, because Mr. Boulter made the following statements, listed below in the order in which they appear in the June 18 E-mail:

- "As I said I would not normally be reaching out to you at this point however this morning, in dubai, I had 45 minutes with Dr Liam Fox, the British Defence Minister on our current favourite topic."  *See* Compl. ¶ 71 & Ex. C.

- "In summary, our dispute actually has little to do with the case in Court, the opening statements are done and as discussed you will make headway next week as we will the week after.  It is about losing face."  *See* Compl. ¶ 71 & Ex. C.

- "As such they feel that you should do the right thing.  I can tell you that even at USD20-25mm you will leave them not feeling great about the whole episode.  In the end maybe your QC gets a judgement of GBP1mn - he will rightly tell you he got a

great result - a battle win - but 3M may lose the war (sorry figure of speech).  It might leave Gov quietly seething, with ramifications for a while - they have memories like elephants."  *See* Compl. ¶ 72 & Ex. C.

- "I am being asked, and have been given the sole authority by the MoD[4] to settle on behalf of them."  *See* Compl. ¶ 73 & Ex. C.

- "From next week monday there are politics that will likely remove any further change of settlement.  We will both be committed to the end."  *See* Compl. Ex. C.

- "From my side, I don't hold a grudge, whether this is $5mn or $35mn it is small beer. We manage $700mn and many of our investors call $5mn a rounding error."  *See* Compl. ¶ 73 & Ex. C.

3M's complaint also alleges (at ¶ 74) that the June 18 E-mail threatened "Buckley's investiture as a Knight Bachelor" by subjecting it to an "embarrassing public debate," due to the following statement by Mr. Boulter:

> Of course a settlement might not be possible, but as a result of my meeting today you ought to understand that David Cameron's Cabinet might very shortly be discussing the rather embarrassing situation of George's knighthood.  It was discussed today.  Government's are big and sometimes decisions in one part are not well coordinated.

*See* Compl. Ex. C.[5]

The complaint alleges (at ¶ 75) that a second e-mail from Mr. Boulter to Mr. Brewer was also a part of the purported blackmail.  The body of that e-mail, sent hours before 3M filed its complaint, reads in relevant part:

> I need to tell something to Dr Fox's office on Sunday night prior to the commencement of his week Monday.
>
> I don't really want to give a 'radio silence' message as he is Secretary of Defence and will not expect that.  I am trying to manage all the dynamics carefully, please let me know what if anything I can say.

---

[4] "MoD" is a reference to the United Kingdom's Ministry of Defence.

[5] All quotations from Mr. Boulter's e-mail are shown exactly as they appeared in the e-mail, including typographical errors.  The "George" referenced in Mr. Boulter's e-mail is George Buckley, or "Sir George," who is the chairman, president and chief executive officer of Minnesota-based 3M.  *See* Compl. ¶¶ 21-22.  Mr. Buckley is not a plaintiff in this action, and 3M fails to articulate any connection between his recent knighthood and 3M's financial condition.

*See* Compl. Ex. D.

3M alleges that it has "traditionally enjoyed excellent relationships with governmental authorities in the U.K.," and that it "has done business with, and had expected to do more business with, many of those governmental authorities." *See id.* at ¶ 19. It alleges in conclusory fashion that the "defendants interfered and threatened to further interfere with 3M's business relationships by depriving it of business opportunities and damaging the good will of both 3M and Buckley." *See id.* 3M's Complaint provides no details whatsoever about the purported interference, including which defendants interfered; when they did so; how they did so; the particular opportunities that were foreclosed; the representatives of the British government who were involved; or any other information that would support a business interference claim.

3M purports to state claims for (1) intimidation, under English law; (2) tortious interference with prospective business relationships and economic advantage; (3) commercial defamation; (4) aiding and abetting; and (5) civil conspiracy. *See* Compl. at pp. 26-31.

## <u>ARGUMENT</u>

## I.   THIS COURT DOES NOT HAVE PERSONAL JURISDICTION OVER THE PORTON DEFENDANTS.

3M must shoulder the burden of proving jurisdiction over the Porton Defendants, because "when a defendant brings a motion to dismiss for lack of . . . personal jurisdiction pursuant . . . 'the [p]laintiff bears the burden of establishing by a preponderance of the evidence that the Court possesses jurisdiction.'" *Boland v. Fortis Const. Co., LLC*, No. 10-1701, 2011 WL 2685612, at *3 (D.D.C. July 12, 2011) (citing *Hollingsworth v. Duff*, 444 F. Supp. 2d 61, 63 (D.D.C. 2006)). To meet this burden, a plaintiff "must allege specific facts on which personal jurisdiction can be based; it cannot rely on conclusory allegations." *Atlantigas Corp. v. Nisource, Inc.*, 290 F. Supp. 2d 34, 42 (D.D.C. 2003). In considering a motion to dismiss for lack of personal jurisdiction, the

Court is not required to assume the truth of the plaintiff's allegations, and instead "may receive and weigh affidavits and any other relevant matter to assist it in determining the jurisdictional facts." *U.S. v. Philip Morris, Inc.*, 116 F. Supp. 2d 116, 120 n.4 (D.D.C. 2000).

In evaluating jurisdiction, this Court must first look to the District of Columbia's long-arm statute, codified at D.C. Code § 13-423.  If jurisdiction over a defendant is available under the long-arm statute, then the Court must determine whether the exercise of jurisdiction comports with the due process requirements of the Fourteenth Amendment of the U.S. Constitution.  As the D.C. Circuit has explained, "To establish personal jurisdiction over a non-resident, a court must engage in a two-part inquiry: A court must first examine whether jurisdiction is applicable under the state's long-arm statute and then determine whether a finding of jurisdiction satisfies the constitutional requirements of due process." *GTE News Media Servs. v. BellSouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000) (citing *U.S. v. Ferrara*, 54 F.3d 825, 828 (D.C. Cir. 1995)).

## A.      No Jurisdiction Exists Under the D.C. Long-Arm Statute.

### 1.      Porton Does Not Transact Business in the District of Columbia.

Under D.C. Code § 13-423(a)(1), a court may exercise jurisdiction over a person relating to a claim for relief arising from that person's "transacting any business in the District of Columbia."  For jurisdiction to exist under this provision, "a plaintiff must demonstrate that: (1) the defendant transacted business in the District of Columbia; (2) the claim arose from the business transacted in the District; (3) the defendant had minimum contacts with the District; and (4) the Court's exercise of personal jurisdiction would not offend traditional notions of fair play and substantial justice." *FC Inv. Group LC v. IFX Markets, Ltd.*, 479 F. Supp. 2d 30, 38 (D.D.C. 2007) (internal citations omitted).  "While the long-arm statute is to be interpreted broadly, a plaintiff must allege some specific facts evidencing purposeful activity by the defendant in the

District by which the defendant invoked the benefits and protections of its laws." *Gibbons & Co., Inc. v. Roskamp Institute*, No. 06-720, 2006 WL 2506646, at *2 (D.D.C. Aug. 28, 2006).

3M cannot show purposeful activity by the Porton Defendants.  Both are incorporated in the Cayman Islands with offices in London, Dubai, the Cayman Islands, and representative offices in Thailand and South Africa.  *See* Declaration of Andrew Collins filed simultaneously herewith (the "Collins Decl.") at ¶ 5.   They have not leased or owned properties in the District of Columbia; maintained offices in the District; kept a telephone listing or files in the District; had employees based in the District; advertised in the District; registered to do business in the District; had a bank account in the District or drawn checks from a District bank; or been required to file taxes in the District.  *Id.* at ¶¶ 6-13.  They have no investors in the District, own no stock in any D.C. companies, and do not maintain any agent for service of process in the District.  *Id.* at ¶¶ 14-16.

As none of the Porton defendants have transacted business in the District or otherwise availed themselves of its privileges, 3M cannot establish personal jurisdiction under § 13-423(a)(1).

## 2. <u>The Complaint Does Not Allege Tortious Injury in the District.</u>

Under D.C. Code § 13-423(a)(3), courts have jurisdiction over non-resident defendants where a cause of action arises from "causing tortious injury in the District of Columba by an act or omission in the District of Columbia."  This subsection is "a precise and intentionally restricted tort section, which stops short of the outer limits of due process, and which confers jurisdiction only over a defendant who commits an act *in* the District which causes an injury *in* the District, without regard to any other contacts."  *Moncrief v. Lexington Herald-Leader Co.*, 807 F.2d 217, 221 (D.C. Cir. 1986) (emphasis added; internal citations and quotations omitted). This is true for defamation claims as well.  *See Margoles v. Johns*, 483 F.2d 1212 (D.C. Cir.

1973) (Wisconsin resident who slandered plaintiff during telephone conversation with District of Columbia listener not subject to personal jurisdiction pursuant to § 13-423(a)(3) because statement was made in Wisconsin).

3M's Complaint does not allege that the Porton Defendants committed any acts or omissions in the District of Columbia at all, let alone an act or omission that caused tortious injury within the District.  Even if 3M had properly alleged injury to itself (which it has not), any such injury would not take place within the District, because 3M is neither based here nor incorporated here.  Because the Porton Companies did not commit any acts within the District, or cause any harm to 3M within the District, personal jurisdiction is not available over the Porton Companies under D.C. Code § 13-423(a)(3).

> ### 3. The Complaint Does Not Allege Tortious Injury in the District by an Act or Omission Outside of the District.

A court may exercise jurisdiction under D.C. Code § 13-423(a)(4) when an act or omission outside of the District of Columbia causes tortious injury within the District, but only if the person over whom jurisdiction is sought "regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia."

> #### a. The Complaint Does Not Allege Injury Within the District.

In this case, § 13-423(a)(4) cannot serve as a basis for jurisdiction because 3M has not been injured in the District.  3M alleges that Porton sought to "interfere with 3M's business interests in the United Kingdom," *see* Compl. ¶ 3; that they would somehow induce the U.K. Ministry of Defence "to deprive 3M of its ability to pursue its business interests with the U.K. government," *see id.* ¶ 72; and that they defamed and disparaged 3M in manner that caused "economic damage to its goodwill."  *Id.* ¶ 12.  But the Complaint does not allege any harm, or

even possible harm, in the District, thus excluding § 13-423(a)(4) as a possible basis of jurisdiction.

In cases where courts in this Circuit have found tortious injuries in the District under § 13-423(a)(4), the plaintiffs have resided within the District at the time they suffered the financial losses or reputational damage (*e.g.*, *Crane v. N.Y. Zoological Soc.*, 894 F.2d 454, 457-58 (D.C. Cir. 1990)); have been injured in the District by defective imported products (*e.g.*, *Gatewood v. Fiat, S.p.A.*, 617 F.2d 820, 827-28 (D.C. Cir. 1980)); or have alleged tortious interference with their revenues from, or business relationships with, District consumers (*e.g.*, *N.Y. Zoological*, 894 F.2d at 458.  3M's allegations do not fit into any of these categories.  The Complaint accuses the Porton Companies of attempting to "interfere with 3M's business interests in the *United Kingdom*," and, more specifically, 3M's "business interests with the *U.K. government*."  Compl. ¶¶ 3, 72 (emphasis added).  3M's focus is on harm in England, not in the District of Columbia.

Here, the sole conceivable connection between the alleged tortious acts and the District is that the alleged defamatory statements may have appeared in the District, thus causing 3M "economic damage to its goodwill."  Compl. ¶ 12.  But this fact is insufficient to establish personal jurisdiction.  3M is a Delaware corporation based in Minnesota.  Compl. ¶ 4.  The purported "economic damage" alleged in its defamation claim thus would not have arisen in the District, but rather in Minnesota, where 3M is based.  "Quite clearly, economic loss resulting from defamation is most likely to be felt in one's place of business whatever the locus of its publication."  *N.Y. Zoological*, 894 F.2d at 457; *see also Crane v. Carr*, 814 F.2d 758, 760 (D.C. Cir. 1987) (defamation "is felt with greatest force in the place where plaintiff lives.").

**b.   Defendants Do Not Engage In or Solicit Business, or Derive Substantial Revenue from Goods or Services in the District.**

Even assuming *arguendo* that 3M could establish that it suffered harm within the District, the Court still could not exercise personal jurisdiction over Porton under § 13-423(a)(4).  3M has not alleged, and cannot establish, that the Porton Defendants "regularly [engage in or solicit] business, engage[] in any other persistent course of conduct, or derive[] substantial revenue from goods used or consumed, or services rendered, in the District of Columbia."  D.C. Code § 13-423(a)(4).  As shown by the supporting declaration submitted herewith, the Porton Defendants clearly do not meet this standard.  *See generally* Collins Decl.

Even if the Porton Companies made business-related telephone calls from outside the District into the District, such conduct would not satisfy the requirement in § 13-423(a)(4), regardless of the nature or frequency of the telephone calls.  *E.g.*, *Tavoulareas v. Comnas*, 720 F.2d 192, 194 (D.C. Cir. 1983); *see also Burman v. Phoenix Worldwide Indus., Inc.*, 437 F. Supp. 2d 142, 154 (D.D.C. 2006) (holding that existence of approximately 1,326 telephone calls to the District does not constitute a "persistent course of conduct").  Occasional travel to the District is also insufficient.  *E.g.*, *Urban Institute v. FINCON Servs.*, 681 F. Supp. 2d 41, 47-48 (D.D.C. 2010) (finding that three unsuccessful trips to solicit business in D.C. "did not rise to the requisite level"); *Burman*, 437 F. Supp. 2d at 153-54 (finding that attendance by defendants' employees at "continuing education programs, seminars, and conferences" in D.C., with no evidence that their attendance was regular or persistent, did not satisfy subsection (a)(4)); *Am. Ass'n of Cruise Passengers v. Cunard Line, Ltd.*, 691 F. Supp. 379, 381 (D.D.C. 1987) (finding that "sporadic attendance at trade association meetings" in D.C. was insufficient under subsection (a)(4)).

### 4.    Jurisdiction Does Not Exist Under Conspiracy or Agency Theories.

#### a.    Conspiracy Jurisdiction Does Not Exist.

The Porton Defendants are not subject to jurisdiction in D.C. by way of their relationship with the Davis Defendants under either a conspiracy theory or an agency theory of jurisdiction. Three prerequisites must be established by a plaintiff "[i]n order to attribute the acts of one co-conspirator for jurisdictional purposes[:]… (1) the existence of a civil conspiracy… (2) the defendant's participating in the conspiracy, and (3) an overt act by a co-conspirator within the forum, subject to the long-arm statute, and in furtherance of the conspiracy." *FC Inv. Group LC v. IFX Mkts., Ltd.*, 479 F. Supp. 2d 30, 41 (D.D.C. 2007) (internal citations and quotations omitted). 3M is unable to satisfy any of these three requirements.

3M's Complaint neither adequately alleges the existence of a conspiracy, nor the Porton Defendants participation in a conspiracy. Courts reject assertions of conspiracy jurisdiction that are based on "bald speculation" and "conclusionary statement[s]." *Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 787 (D.C. Cir. 1983); *see also Jungquist v. Sheik Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1031 (D.C. Cir. 1997) (finding that the "district court could not, consistent with due process, exercise personal jurisdiction over" defendants based on "bald speculation or a conclusory statement that individuals are co-conspirators"). "Instead, the plaintiff must plead with particularity 'the conspiracy as well as the overt acts within the forum taken in furtherance of the conspiracy.'" *Jungquist*, 115 F.3d at 1031 (quoting *Dooley v. United Technologies Corp.*, 786 F. Supp. 65, 78 (D.D.C. 1992)); *FC Inv. Group LC v. IFX Mkts., Ltd.*, 529 F.3d 1087, 1097 (D.C. Cir. 2008) ("In order 'to establish jurisdiction under a theory of civil conspiracy, the plaintiff must plead with particularity overt acts within the forum taken in furtherance of the conspiracy.'").

Here, 3M offers nothing but the kind of bald, conclusory allegations to support its conspiracy theory that courts regularly reject.  It alleges without any specificity, for example, that the Porton Defendants acted "by and through, and in conspiracy with, the Davis Defendants as their agents and co-conspirators."  Compl. ¶ 12.  The Complaint does not plead with particularity allegations such as the Porton Defendants role in the conspiracy, when the conspiracy was formed, and what its terms were.  *See Collier v. Banker's Life & Cas. Co.*, No. 02-C-7062, 2002 WL 31870546, *1 (N.D. Ill. Dec. 20, 2002) (stating that a plaintiff must allege "some minimum description of the defendant's complained of conduct.  Such a minimum description includes when the alleged conspiracy was formed, what its terms were, and what each conspirator's specific roles were") (internal citation and quotation omitted), *affirmed in relevant part, vacated in part*, 79 Fed.Appx. 213 (7th Cir. Oct. 20, 2003).  3M's conclusory allegations of conspiracy therefore cannot serve as a basis on which to subject the Porton Defendants to personal jurisdiction in D.C.  In addition, the press conference and press release on which 3M premises its defamation claims both show on their face that they originated in Minnesota, not D.C.  *See* Exhibits D (press conference) and E (press release) attached hereto.

### b.  <u>Jurisdiction Under an Agency Theory is Not Proper Here.</u>

The Porton Defendants are similarly not subject to jurisdiction under an agency theory. The "courts of this jurisdiction have long recognized 'a government contacts' exception to the 'transacting business' provision of the [D.C.] long-arm statute.  Under that exception, a person or company does not subject itself to the jurisdiction of the courts of the District of Columbia merely by filing an application with a government agency, or by seeking redress of grievances from the Executive Branch or the Congress."  *Atlantigas Corp. v. Nisource, Inc.*, 290 F. Supp. 2d 34, 44 (D.D.C. 2003); *see also Naartex*, 722 F.2d at 787; *Freiman v. Lazur*, 925 F. Supp. 14, 24 (D.D.C. 1996).  "The District of Columbia's unique character as the home of the federal

government requires this exception in order to maintain unobstructed access to the instrumentalities of the federal government." *Cellutech, Inc. v. Centennial Cellular Corp.*, 871 F. Supp. 46, 50 (D.D.C. 1994).

The defendants in *Atlantigas* lobbied federal agencies and Congress, and conducted its lobbying operations from a District of Columbia office. *Atlantigas*, 290 F. Supp. at 44-45. The Court "easily conclude[d] that such [lobbying] activities are precisely the type of activities protected by the 'government contacts' exception and cannot serve as the basis for personal jurisdiction." *Id.* at 44. This exception is not negated by the government contacts being made by an agent, such as a law firm. *See Cellutech*, 871 F. Supp. at 50 ("The fact that defendants engaged a District of Columbia attorney to assist with the FCC filing does not change the outcome under the government contacts exception).

Here, the Complaint alleges that the Porton Defendants engaged the Davis to ask the FDA to investigate 3M's clinical trial of BacLite. *See* Compl. ¶ 13 ("To that end, Davis originated from his Washington, D.C. offices a so-called 'citizen's petition' to the FDA"); Ex. E hereto (May 11, 2011 press release stating that Porton's attorneys "announced they were filing today a 'citizens' petition' and letter with the FDA seeking an investigation of 3M and a public hearing under applicable FDA regulations."). The Porton Defendants' only connection with D.C. is that it is the place of business of a law firm that they hired to correspond with the FDA regarding a public health matter. The case law makes clear that such connections are insufficient to establish personal jurisdiction.

**B.    An Exercise of Personal Jurisdiction Would Offend Traditional Notions of Fair Play and Substantial Justice, and Would Not Comport With Due Process.**

Even assuming *arguendo* that 3M could establish a statutory basis for jurisdiction under D.C. law, the exercise of personal jurisdiction over the Porton Defendants would violate the Due

Process Clause of the U.S. Constitution.  "Even when the literal terms of the long-arm statute have been satisfied, a plaintiff must still show that the exercise of personal jurisdiction is within the permissible bounds of the Due Process Clause."  *GTE News Media*, 199 F.3d at 1347.  The requirements of due process are satisfied "where the exercise of personal jurisdiction 'does not offend traditional notions of fair play and substantial justice.'"  *U.S. v. Philip Morris, Inc.*, 116 F. Supp. 2d 116, 128-29 (D.D.C. 2000) (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).  To determine whether the exercise of personal jurisdiction over a non-resident defendant satisfies the requirements of *International Shoe*, District of Columbia courts must "consider two issues: first, whether [the non-resident defendant] has 'minimum contacts' with D.C., and second, whether exercising jurisdiction over [that defendant] would be reasonable." *Id.* at 129.

Due process requires "that individuals have 'fair warning that a particular activity may subject them to the jurisdiction of a foreign sovereign.'"  *Buesgens v. Brown*, 567 F. Supp. 2d 26, 35 (D.D.C. 2008) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)).  Where a particular forum seeks to assert jurisdiction over an out-of-state defendant who has not consented to suit there, "this 'fair warning' requirement is satisfied if the defendant has 'purposefully directed' his activities at residents of the forum … and the litigation results from alleged injuries that 'arise out of or relate to' those activities."  *Id*. (quoting *Burger King*, 471 U.S. at 472 (internal quotations and citations omitted)).  Moreover, it is essential in each case that there be "some act by which the defendant purposefully avails [himself] of the privilege of conducting activities with the forum state, thus invoking the benefits and protections of its laws." *KnowledgePlex, Inc. v. Metonymy, Inc.*, 574 F. Supp. 2d 164, 169 (D.D.C. 2008) (quoting *Asahi Metal Indus. Co. v. Superior Ct.*, 480 U.S. 102, 109 (1987)).

The "minimum contacts" standard may be met either through specific or general jurisdiction.  "A court may exercise personal jurisdiction over a non-resident defendant by finding specific jurisdiction based on conduct connected to the suit."  *Capital Bank Intern. Ltd. v. Citigroup*, 276 F. Supp. 2d 72, 74-75 (D.D.C. 2003) (internal citations and quotations omitted). "The Due Process Clause permits such general jurisdiction over foreign corporations only . . .  if the defendant's business contacts with the forum district are continuous and systematic." *Diamond Chemical Co., Inc. v. Atofina Chemicals, Inc.*, 268 F. Supp. 2d 1, 6 (D.D.C. 2003) (internal citations and quotations omitted).

### 1.      Defendants Are Not Subject To Specific Jurisdiction.

Analysis of specific jurisdiction involves a two-part inquiry.  First, courts consider whether "'the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.'"  *Buesgens*, 567 F. Supp. at 34 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).  If this requirement is met, the court next asks whether the assertion of personal jurisdiction comports with "traditional notions of fair play and substantial justice" – that is, "whether the exercise of jurisdiction would be reasonable."  *Philip Morris*, 116 F. Supp. at 129-30; *see also*, *e.g.*, *Asahi Metal*, 480 U.S. at 113.

### a.      Defendants Did Not Purposefully Establish Minimum Contacts Within the District.

To support specific jurisdiction, a plaintiff must establish that the defendant purposefully availed itself of the privilege of conducting activities in the forum state by undertaking actions that create a substantial connection there.  *E.g.*, *Asahi*, 480 U.S. at 112 ("The 'substantial connection,' between the defendant and the forum State necessary for a finding of minimum contacts must come about by *an action of the defendant purposefully directed toward the forum*

*State*.") (citations omitted; emphasis in original).  The U.S. Supreme Court has emphasized that the "'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts or of the unilateral activity of another party or third person."  *Burger King*, 471 U.S. at 475 (internal quotation marks and citations omitted).  "In short, 'the defendant's conduct and connection with the forum State [must be] such that he should reasonably anticipate being haled into court there.'"  *Capital Bank*, 276 F. Supp. 2d at 75 (quoting *World-Wide Volkswagen* 444 U.S. at 297).

As discussed above at Point I.A, the Porton Defendants have no meaningful contacts, ties or relations with the District.  *See* Collins Decl. ¶¶ 5-16.  Unlike a defendant "who 'purposefully directs' his activities toward forum residents," *Burger King*, 471 U.S. at 473, the Porton Defendants are alleged to have hired the Davis Defendants to communicate with a federal agency regarding the Porton Companies' legal issues, about which the Davis Defendants made public statements from Minnesota that 3M alleges were defamatory.  As discussed above, such efforts do not create ties sufficient to establish personal jurisdiction.  *See* Point I.A.4.b above.  The Porton Defendants have no other ties or connections to D.C.  *See generally* Collins Decl.  3M has thus not established that the Porton Defendants purposefully availed themselves of the privilege of conducting activities in the District, or that they have sufficient minimum contacts to justify this Court's exercise of jurisdiction.

### b. Traditional Notions of Fair Play and Substantial Justice Preclude an Exercise of Specific Jurisdiction.

Even assuming *arguendo* that either of the Porton Defendants established minimum contacts within the District, an exercise of specific jurisdiction would nevertheless violate traditional notions of fair play and substantial justice, which are requirements of due process. *Philip Morris*, 116 F. Supp. at 129.  In deciding whether the exercise of jurisdiction would

violate traditional notations of fair play and justice, courts consider several factors, including (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interests of the states in furthering substantive social policies. *Norvel Ltd. v. Ulstein Propeller AS*, 161 F. Supp. 2d 190, 206-07 (S.D.N.Y. 2001); *see also Asahi Metal*, 480 U.S. at 114. Here, the relevant factors weigh heavily against the exercise of jurisdiction.

The burden on the defendant in litigating in the forum is "always a primary concern" in determining the reasonableness of personal jurisdiction. *World-Wide Volkswagen*, 444 U.S. at 292. Here, the burden is considerable. The Porton Defendants would be put in the position of defending a lawsuit in a foreign country in which they do no business and have no connections, while simultaneously litigating another related case against 3M in the High Court Action (which is likely to continue through an appeal process).

States have an interest in providing a forum for their residents to seek redress for injuries caused by out-of-state parties. However, that interest is non-existent here, because 3M is not a D.C. resident. *See* Compl. ¶ 4. Nothing prevents 3M, a large, international, publicly-traded company, from seeking redress in an appropriate forum where the Porton Defendants are properly subject to personal jurisdiction.

In evaluating the fourth factor, the interest of the interstate judicial system in the efficient resolution of controversies, "courts generally consider where witnesses and evidence are likely to be located." *Norvel*, 161 F. Supp. 2d at 207. 3M has not alleged anything other than that the Porton Defendants hired the Davis Defendants to communicate with the federal government in

Washington, D.C.  Aside from the Davis Defendants, all witnesses and evidence are located outside of the District (primarily in England).  Moreover, it would be more efficient for courts in England, rather than D.C., to resolve claims that unambiguously arise under English law.  *See* Point II.A below (discussing the English tort on which 3M premises its first cause of action, and English law governing whether statements made during settlement discussions are actionable); and Point II.B below (explaining why English law applies to 3M's tortious interference claim under D.C.'s choice-of-law rules).

Finally, 3M has "asserted no policy arguments in [its] favor which would support a finding that it would be reasonable to subject" the Porton Defendants "to the jurisdiction of the United States."  *Norvel Ltd.*, 161 F. Supp. 2d at 207.  To the contrary, a regime in which personal jurisdiction were available over defendants simply because they retained counsel in the District of Columbia would have a chilling effect on foreign parties' willingness to hire professionals in the District.  The resulting harm to the District's economy is a sound policy reason for refusing 3M's effort to obtain personal jurisdiction over the Porton Defendants in this case.  This Court should reject 3M's contrary arguments.

## 2.    <u>Defendants Are Not Subject To General Jurisdiction.</u>

To support the exercise of general jurisdiction, a plaintiff must establish that the defendant's contacts with the forum are "continuous and systematic."  *See Helicopteros Nacionales v. Hall*, 466 U.S. 408, 416 (1984).  This is a demanding and rarely satisfied test, and represents a "'high bar' that requires a greater showing than specific jurisdiction."  *Exponential Biotherapies, Inc. v. Houthoff Buruma N.V.*, 638 F. Supp. 2d 1, 12 (D.D.C. 2009) (citing *D'Onofrio v. SFX Sports Group, Inc.*, 534 F. Supp. 2d 86, 90 (D.D.C. 2008)).  In a recent decision, U.S. Supreme Court held that the quantum of contacts must be enough to render a

defendant "essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011). In fact, the Supreme Court has found general jurisdiction to exist only once, and in that instance, the defendant corporation maintained offices, files and bank accounts in the forum state; sent business correspondence from the forum state; drew and distributed checks on a bank in the forum state; retained employees in the forum state, utilized a transfer agent in the forum state; and held directors' meetings in the forum state. *See Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 447-48 (1952).

The Supreme Court has rejected general jurisdiction even where a defendant's contacts with the forum state were much closer than those present here, including the formation of an agreement in the forum state, accepting checks drawn on a bank in the forum state, purchasing goods and services from a company located in the forum state, and sending personnel to the forum state for training. *See Helicopteros,* 466 U.S. at 416. Similarly, a court in this District rejected an assertion of general jurisdiction where the foreign defendant was alleged to have attended seminars, visited clients, and solicit business in the District as well as the rest of the country. However, the Court found that the plaintiff offered "nothing to suggest that these occasional visits . . . meet the 'steep requirement' of 'continuous and systematic' contacts." *Exponential Biotherapies*, 638 F. Supp. 2d at 12 (citing *D'Onofrio*, 534 F. Supp. at 90).

The circumstances present here clearly demonstrate that the Porton Defendants are clearly not "essentially at home" in the District of Columbia. *Goodyear*, 131 S. Ct. at 2851. If the facts in *Helicopteros* and *Exponential Biotherapies* did not support general jurisdiction, then the even fewer District of Columbia contacts in this case are insufficient too.

## II.     EACH OF THE FIVE COUNTS IN THE COMPLAINT FAILS
##          TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.[6]

### A.     Count One (Intimidation and Blackmail) Fails
###          to Allege that Porton Forced 3M to Perform Any
###          Particular Act, and Fails to Allege Any Resulting Loss to 3M.

For its lead claim – titled "Intimidation And Blackmail (United Kingdom Law)" – 3M

alleges that Mr. Boulter, the Dubai-based head of Cayman Islands-based Porton, attempted to

blackmail 3M during discussions with 3M's outside attorney about the possible settlement of

Porton's breach of contract lawsuit in England against 3M.  *See* Compl. ¶¶ 68-76.  3M alleges

that during these discussions, which took place by phone and e-mail between June 17 and 19,

2011, Mr. Boulter made threats about what might happen to 3M's prospective business

relationships with the English government in the absence of a settlement of at least $30 million.

The Complaint describes Mr. Boulter as having made "an overt *attempt* to blackmail 3M" (¶ 76)

by which "Defendants *intended* to cause loss to 3M" (¶ 88).  *See also id.* at ¶ 2 (referencing

"crude extortion *attempt*") (emphasis added).  It does not, however, allege that 3M ever made

any payment as a result of this purported "attempt" at blackmail or extortion.

3M acknowledges that the "common law tort of intimidation" in England "is committed

when a defendant *compels* a plaintiff, by unlawful means, to ***do some act* *whereby loss accrues***

to plaintiff."  *Id.* at ¶ 85 (emphasis added).  Under that undisputed standard, 3M's

intimidation/blackmail claim fails for an obvious reason: It does not allege that any defendant

successfully compelled 3M to "do some act" (and thus naturally does not allege any resulting

loss to 3M).  It does not allege that 3M actually made a settlement payment of $30 million, or

---

[6]     As the Complaint constitutes the third pleading that 3M has filed against Porton (one in this Court, and two in New York state court), any dismissal under Rule 12(b)(6) should be with prejudice.  *E.g.*, *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1007 (9th Cir. 2009) (district court's discretion to deny leave to amend particularly broad when plaintiff previously granted leave to amend and subsequently failed to add requisite particularity to its claims).

any other amount, because 3M never did.  Instead, as shown on the front page of Exhibit B hereto, 3M sued Mr. Boulter and Porton in New York immediately after the purported threat – on Sunday, June 19, 2011 – later adding the Davis Defendants to the lawsuit, and, later still, re-filing the entire action in this Court.

As 3M itself made clear in its Notice of Supplemental Authority filed in this action on November 14, 2011 (Doc. 28), the English lawsuit never settled, and instead proceeded all the way to a final judgment that the High Court issued on November 7, 2011.  *See id.* at 2 (statement by 3M that High Court liability judgment against 3M subsidiary required it to pay damages of approximately $1.3 million, which 3M describes as "at least $30 million less than what Defendants *attempted* to extort from 3M") (emphasis added).  Thus, although the Complaint alleges (at ¶ 88) that the allegedly threatening "communications with 3M's counsel" were designed to cause 3M to "engage in conduct from which it had a legal right to abstain," and to "give up valuable rights it was entitled to pursue," it fails to allege that 3M actually yielded to the alleged threats.  In these circumstances, no claim for the English tort of intimidation can stand.[7]

As explained in the accompanying Declaration of Pushpinder Saini Q.C. (the "Saini Decl."), under English law, "damage is the gist of a plaintiff's claim in tort."  Saini Decl. ¶ 21.2. A plaintiff such as 3M therefore "has to prove more specifically that it has been injured by the

---

[7]    Paragraph 87 of the Complaint, which is part of 3M's charging allegations for Count One, quotes from Section 21 of England's Theft Act 1968 ("Theft Act § 21"), an exclusively criminal statute that is not enforceable in civil litigation.  When 3M first filed suit in New York on June 19, 2011, its lead cause of action attempted to plead a claim against Porton under Theft Act § 21.  After Porton moved to dismiss the claim, 3M filed an amended pleading in New York that dropped the Theft Act § 21 claim.  In any event, Theft Act §21 has no bearing on the question of whether 3M has satisfied the pleading requirements for the tort of intimidation, including the completion by the plaintiff of an unlawfully compelled act, and the accrual of a resulting loss.

instrumentality of the relevant unlawful conduct." *Id.* Here, the Complaint offers no allegations

of injury arising from the purported blackmail. Count One therefore does not state a claim on

which relief can be granted, because "it is settled, up to and including the Court of Appeal, that

the tort [of intimidation] can only be invoked by a claimant who has in fact yielded to the threat

he characterizes as intimidatory. *See* Saini Decl. ¶ 13; *see also J.T. Stratford & Son Ltd. v.

Lindley* [1965] A.C. 269, at 283E-F ("it is essential to the cause of action that the person

threatened should comply with the demand. If he has the courage to resist it . . . the party

threatened has no cause of action for intimidation . . . [because he has] suffered no damage by

the threat") (discussed at Saini Decl. ¶ 13). *See also* Saini Decl. ¶¶14-15.3 (collecting cases with

same holding).[8]

    As if the absence of allegations of damage were not enough of a reason to dismiss Count

One, it is independently subject to dismissal because the very events upon which it is based –

settlement discussions – are subject to a strict privilege that prevents them from being actionable

under English law. As Mr. Saini explains, "an English court would regard the Communications

(as now pleaded at paras. 68-76 of the present Complaint) as *prima facie* privileged, and would

be likely to go on to conclude that there was no merit in the Plaintiff's contention that they were

not so, because there had been a clear abuse of an otherwise privileged occasion." *See* Saini

Decl. ¶ 8; *see also id.* at ¶¶ 5.1-5.3; Ex. 2 to Saini Decl. at ¶ 28 ("for a plaintiff to issue

proceedings referring to *prima facie* privileged settlement discussions, but without first giving

the defendant notice of its intention to do so, would be regarded by the English court as a strong

indicator of bad faith and abuse of process."); *id.* at ¶ 25 (stating that claim based on settlement

---

[8]    Porton respectfully submits the Saini Declaration pursuant to Fed. R. Civ. P. 44.1, for the
Court's consideration in its determination of issues of English law that arise in the instant
motion.

discussions would, subject to certain exceptions, "be inadmissible in an English court, and a

claim pleaded by reference to them would be struck out (*i.e.*, summarily dismissed, on an

application made by the Defendants before trial for that purpose).")  *See* Saini Aff. ¶ 25.

> As one English judge stated in a similar context:

> I do not think that it automatically amounts to blackmail for one party to say to another in negotiations something to the effect of 'If this litigation proceeds, it is going to be bad publicity and embarrassing for you, and that may affect your business'.  That can be a fair negotiating point. What will make it objectionable is if the threat is made to continue the litigation by means of false evidence.

*Merrill Lynch, Inc. v. Raffa*, [2001] 1 I.L.Pr. 31, at para. [41] (cited at Saini Decl. Ex. 2 ¶ 29).

Mr. Boulter's statements are likewise inadmissible in this Court pursuant to Fed. R. Evid.

408(a)(2), which bars the admissibility of "conduct or statements made in compromise

negotiations" regarding a disputed claim.  Porton thus moves to strike all references to these

discussions from the Complaint, including paragraphs 2, 68-76, 80, 86, 88, 89, and Exhibits A,

B, C, and D.

**B.  Count Two (Tortious Interference with Prospective Business Relationships and Economic Advantage) Lacks Sufficient Details Regarding the Losses that 3M Purportedly Suffered as a Result of Defendants' Actions.**

Count Two of 3M's Complaint is titled "Tortious Interference with Prospective Business

Relationships and Economic Advantage."  *See* Compl. ¶¶ 2, 70-76.  3M's pleading does not

expressly invoke the law of any particular jurisdiction in connection with Count Two.  A choice

of law analysis, however, makes clear that English law applies to this claim under the District of

Columbia's choice of law rules.  In cases where this Court's jurisdiction arises from diversity of

citizenship, *see* Compl. ¶ 11, the Court applies the choice of law rules of the District of Columbia

court system.  *E.g.*, *Tolbert v. Nat'l Harmony Mem'l Park*, 520 F. Supp. 2d 209, 211 (D.D.C.

2007).

"To determine which jurisdiction's substantive law governs a dispute, District of

Columbia courts blend a 'governmental interests analysis' with a 'most significant relationship' test." *Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 842 (D.C. Cir. 2009) (citing *Hercules & Co., Ltd. v. Shama Rest. Corp.*, 566 A.2d 31, 40-41 & n.18 (D.C. 1989)). As explained by the D.C. Court of Appeals: "Under the governmental interests analysis as so refined, we must evaluate the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be most advanced by having its law applied to the facts of the case under review." *Hercules*, 566 A.2d at 41 (internal quotations omitted). To determine which jurisdiction has the most significant relationship to a particular case, a court must "consider the factors enumerated in the Restatement § 145." *Id.* at 40. Section 145 of the Restatement (Second) of Conflict of Laws outlines the factors to consider in assessing where the center of gravity lies:

> (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered. These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Here, an evaluation of these factors points strongly toward the application of English law to the tortious interference claim. Although 3M fails to identify its injury, it does identify the place where it believes that any interference-related injury *would* take place – England. Specifically, 3M alleges (albeit in a conclusory fashion) that the named defendants have made "efforts to interfere with 3M's business interests *in the United Kingdom*." *See* Compl. ¶ 3. England is also where the relationship between 3M and Porton is centered. England is where Acolyte, a U.K. Company, was sold by Porton and other then-shareholders to 3M's English subsidiary (3M U.K. Holdings Limited), and England is where the parties litigated their subsequent breach of contract case. *See* Compl. ¶¶ 36, 55-56. Moreover, as noted at Point III.A above, 3M has expressly acknowledged that English law applies to its claim for

intimidation/blackmail, which arises from the same allegations as the tortious interference claim. *See* Compl. ¶¶ 68-76.

As explained in the Saini Declaration (at ¶ 18), "The English counterpart of the tort of interference with business relations (Count 2, at §90-§100 of the Complaint) is the tort of causing loss by unlawful means." To state such a claim, "the Plaintiff would have to show that the Defendants had wrongfully interfered with the actions of a third party in which the Plaintiff had an economic interest, with the intention of thereby causing loss to the Plaintiff. *See* Saini Decl. ¶ 18.1 (citing *OBG Ltd. v. Allan* [2008] 1 A.C. 1 (H.L.)). Mr. Saini opines (at ¶ 18.1) that he has "difficulty in seeing how the Plaintiff could make out any claim" because the "Complaint does not specify what actions the Defendants have committed vis-à-vis the U.K. government with the intention of injuring the Plaintiff." Mr. Saini is correct; 3M *fails to identify any conduct at all* by any named defendant that constitutes interference with 3M's relations with the U.K. government. Moreover, as Mr. Saini also points out (at ¶ 18.2), "The Complaint also fails to allege any particular business with the U.K. government which the Plaintiff has lost, meaning that it fails to allege the key element of damage, which is the gist of any economic tort under English law." *See also* Saini Decl. ¶ 21.2 ("damage is the gist of a plaintiff's claim in tort"); *id.* at ¶ 22 ("In English procedure, it would not be enough for a claimant to make a wholly unparticularized allegation of loss and damage.").

The Court therefore should dismiss Count Two for failure to allege the requisite elements of a claim for causing loss by unlawful means under English law. The result is no different when viewed through the prism of the requisite pleading standards of Fed. R. Civ. P. 8(a). *Cf. Rogers v. Petroleo Brasileiro, S.A.*, 741 F. Supp. 2d 492, 498 (S.D.N.Y. 2010) (applying Rule 8(a) pleading standards to claims arising under Brazilian law). A court should dismiss a complaint

under Rule 12(b)(6) if it contains no more than "'naked assertions' devoid of 'further factual enhancement,'" or if it is "an unadorned, the defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (internal alteration omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007)). Likewise, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." *Id.* at 1950 (citing Fed. R. Civ. P. 8(a)(2); internal quotations and alterations omitted). The facts a plaintiff alleges "'must be enough to raise a right to relief above the speculative level,' and the court need not accept as true inferences unsupported by the facts set out in the complaint or legal conclusions cast as factual allegations." *Fraternal Order of Police v. Gates*, 562 F. Supp. 2d 7, 11 (D.D.C. 2008) (citations omitted).

In evaluating the sufficiency of allegations under Rule 8(a), courts must disregard any "legal conclusion couched as a factual allegation," as well as formulaic "recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 129 S. Ct. at 1949-51. Second, a court must evaluate any allegations not disregarded, and "determine if they plausibly suggest an entitlement to relief." *Id.* at 1951. The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," and is not met by allegations "that are 'merely consistent with' a defendant's liability. *Id.* at 1949. Here, Count Two does not identify a single action taken by Porton (or any other named defendant) to interfere with 3M's relationship with any part of the British government. Moreover, it does not identify a single prospective business relationship that 3M believes was subject to interference by Porton or any named defendant. A review of the skeletal charging allegations under Count Two, *see* Compl.

¶¶ 90-100, highlights the fact that this claim relies exclusively on the kind of "labels and conclusions," and "formulaic recitation of the elements," that the Supreme Court has made clear "will not do" for purposes of Rule 8.  *Iqbal*, 129 S. Ct. at 1949.

The only part of the Complaint where 3M even *tries* to offer an allegation related to Count Two is its conclusory statement (at ¶ 81) that "It does appear, however, that Defendants have exercised their influence with the U.K. government and the Ministry of Defence to cause 3M to lose business opportunities with those entities."  It adds that the "exact amount of the business lost and damages incurred will be the subject of discovery," *see id.*, but offers no allegations about which specific defendants purportedly harmed 3M by exercising influence with the British government; no allegations about which representatives of the British government were purportedly so influenced; no allegations about which of 3M's "prospective business relationships" with the British government were affected and to what degree; and no allegations about when this purported influence took place (other than that it would have started at some point after the issuance of the purported threat in late June 2011).  There are no such allegations because 3M has no good faith basis on which to make them.  As shown above, the absence of such allegations renders the claim subject to dismissal under both the substantive law of the tort, and the pleading requirements of Rule 8(a).

C.    **Count Three (Commercial Defamation) Relies Upon the Purported Defamatory Content of Statements that Are Not Actionable as a Matter of Law.**

In their prior submissions to this Court, the Davis Defendants and 3M have cited D.C. law in support of their respective arguments regarding 3M's commercial defamation claim.  *See* Davis Defendants' Special Motion to Dismiss at 23; 3M Motion to Strike Defendants' Special Motion to Dismiss at 32-44.  Porton agrees that the Court can properly apply D.C. law to this claim, in part because 3M has alleged that the defamation took place in D.C.  *See* Compl. ¶ 13

("Davis also used his Washington, D.C. offices as a base from which to issue multiple disparaging and false press releases about 3M and Buckley for the purpose of defaming them in the public eye and increasing pressure on 3M and its CEO to induce 3M to pay tens of millions of dollars by damaging 3M's good will.").  In any event, where the parties agree that the forum's law should apply to a particular claim, the Court may apply that law without undertaking a choice-of-law analysis.  *E.g.*, *Mims v. Mims*, 635 A.2d 320, 329 (D.C. 1993) ("This court is not duty bound to resolve an issue of law that the parties do not contest."); *American Fuel Corp. v. Utah Energy Development Co., Inc.*, 122 F.3d 130, 134 (2d Cir. 1997) ("where the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry.").

"To state a claim of defamation under District of Columbia law, a plaintiff must allege: (1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm."  *Von Kahl v. Bureau of Nat. Affairs, Inc.*, No. 09-CIV-0635 (RWR), 2011 WL 4032384, at *3 (D.D.C. Sep. 13, 2011) (internal citations and quotations omitted).

Statements of "opinions are actionable when a reasonable trier of fact could interpret the statement to imply an assertion of objective fact that is defamatory."  *Mar-Jac Poultry, Inc. v. Katz*, 773 F. Supp. 2d 103, 121 (D.D.C. 2011) (internal citations omitted).  "To ensure space for 'imaginative expression' and 'rhetorical hyperbole,' a statement of opinion is actionable only if it implies an explicit or implicit factual foundation and therefore is 'objectively verifiable.'"  *Id.* "The distinction between fact and opinion is a question of law to be decided by the court."  *White v. Fraternal Order of Police*, 707 F. Supp. 579, 591 (D.D.C. 1989).

**1.     Each Disputed Statement Is Either a Protected
Statement of Opinion, Lacks Allegations of Falsity, and/or Is
Facially Non-Defamatory in the Context in Which It Was Made.**

3M bases its defamation claim on statements in the May 2011 press conference and press

release that (1) MRSA victims may have suffered as a result of the discontinuation of BacLite;

and (2) 3M did not share its internal "Technical Report" regarding 3M's laboratory testing of

BacLite.  See Compl. ¶¶ 60, 62 (quoting allegedly defamatory statements).  None of these

allegedly defamatory statements are actionable, as they either amount to constitutionally

protected expressions of opinion (the statements about MRSA victims), or are not even alleged

to be false (the statements about the secret nature of 3M's Technical Report).

In *Ollman v. Evans*, 750 F.2d 970 (D.C. Cir. 1984) (en banc) (plurality opinion), the D.C.

Circuit outlined a test to differentiate between "constitutionally protected expressions of

opinion" and "actionable assertions of fact."  *Id.* at 971.  Differentiating between fact and

opinion is a critical undertaking "because there is no such thing as a 'false' opinion."  *Id.* at 976.

This is a "difficult task," *id.* at 984, brought about by "the richness and diversity of language, as

evidenced by the capacity of the same words to convey different meanings in different contexts."

*Id.* at 977-78.

With this in mind, the lead D.C. Circuit opinion in *Ollman* highlighted four factors that

courts should consider in determining whether a challenged statement is one of fact or opinion.

First, a court should look to the common usage or the meaning of the words themselves to

determine if the allegedly defamatory statements have precise meanings and are thus likely to

give rise to clear factual implications.  *Id.* at 979-80.  "It is difficult to call a vague or imprecise

statement a 'fact,'" and to do so "would place the First Amendment at the mercy of linguistic

subtleties and fourth-ranked dictionary definitions."  *Janklow v. Newsweek, Inc.*, 788 F.2d 1300,

1302 (8th Cir. 1986).  Thus, "statements that are 'loosely definable' or 'variously interpretable' cannot in most contexts support an action for defamation."  *Ollman*, 750 F.2d at 980.

Second, the court should determine whether the statement is capable of being objectively characterized as true or false.  *Id.* at 979.  For a statement to be actionable, it must, at a minimum, express or imply a verifiably false fact.  *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19-20 (1990).  "Insofar as a statement lacks a plausible method of verification, a reasonable reader will not believe that the statement has specific factual content."  *Ollman*, 750 F.2d at 979. A "statement is not actionable if it relates to a matter of public concern and it is clear that the declarant is expressing a subjective view, an interpretation, a theory, conjecture, surmise, or hyperbole, rather than claiming to be in possession of objectively verifiable facts."  *Washington v. Smith*, 893 F. Supp. 60, 62 (D.D.C. 1995).

Third, the court should consider the literary context in which the disputed statement was made.  *Ollman*, 750 F.2d at 979.  Because a reader will inevitably be influenced by a statement's context, the distinction between fact and opinion can only be made in context.  *Id.* at 982.

Fourth, a court should consider the statement in consideration of the broader social context.  *Id.* at 979.  "Readers will inevitably be influenced by a statement's context, and the distinction between fact and opinion can therefore be made only in context."  *Id.* at 982.

In *Ollman*, the D.C. Circuit held that a statement that a person was a "political activist" involved in "political Marxism" was "hopelessly imprecise and indefinite" and could not be proven false.  *Ollman*, 750 F.2d at 987; *see also*, *e.g.*, *Q Intern. Courier, Inc. v. Seagraves*, No. 95-1554 (RMU), 1999 WL 1027034 (D.D.C. Feb. 26, 1999) (rejecting claim of defamation after applying *Ollman* factors); *White*, 707 F. Supp. 579 (same).

### a.    The Statements About the Public Health Effects of 3M Not Marketing BacLite Are Pure Opinion, and Cannot Be Proven True or False.

Here, the statements attributed to Porton regarding the possible public health effects of 3M's breaching a contract by failing to market BacLite, *see* Compl. ¶ 60, are incapable of being proven true or false.  As a result, they cannot give rise to liability for defamation.

3M claims that the defendants defamed them by stating that "All those who have suffered from MRSA . . . could have avoided exposure but for the decision by 3M to abandon it and to refuse to seek approval from the FDA," that "Thousands and thousands and thousands of people who died might be alive today had there been a BacLite," and that "Hospital patients in Europe, the U.S., and all over the world could have been unnecessarily exposed to MRSAs and possibly exposed to life-and-death risk."  *See* Compl. ¶ 60.  3M also alleges that it was defamed by Mr. Davis's describing "3M's failure to retake the FDA tests as a 'betrayal' of U.K. taxpayers."  *Id.*

These statements all fall squarely in the category of statements that "lack[] a plausible method of verification [such that] a reasonable reader will not believe that the statement has specific factual content."  *Ollman*, 750 F.2d at 979.  Mr. Davis's comment that 3M had "betrayed" the U.K. taxpayers is easily dispensed with, as it is similar to the statements made in *Ollman*, where the court made clear that terms such as "political Marxism" were "hopelessly imprecise and indefinite" and could not be proven false.  *Ollman*, 750 F.2d at 987.  Indeed, if "political Marxist" is imprecise, then "betrayal" here even more "hopelessly imprecise and indefinite," and thus incapable of being proven true or false.  What amounts to a "betrayal" to one U.K. taxpayer might be patriotic to another.  It is likewise impossible to determine whether "hospital patients" "all over the world could have been unnecessarily exposed to MRSAs" by virtue of the unavailability of BacLite.  At worst, this statement is classic non-actionable "rhetorical hyperbole."  *Mar-Jac Poultry*, 773 F. Supp. 2d at 121.  By making reference to

patients "all over the world," the statement corresponds to the one addressed in *Washington*, that is, a statement relating to "public concern" in which the declarant expresses "a theory, conjecture, surmise, or hyperbole." *Washington*, 893 F. Supp. at 62.  Because none of these statements are capable of being proven true or false, the second *Ollman* factor requires that the Court treat them as statements of opinion that are exempt from liability under the First Amendment.

3M's allegations bear a resemblance to those in *Browning v. Clinton*, 292 F.3d 235 (D.C. Cir. 2002), in which the D.C. Circuit affirmed the dismissal of a defamation claims against President Clinton's attorney, who used the terms "garbage," "salacious," and "scurrilous" at a press conference to describe a filing that included an affidavit submitted by the plaintiff.  *Id.* at 241.  The Court found that, "given the high profile nature" of the litigation, the defendant's allegedly defamatory statements "amount only to non-actionable 'hyperbole.'" *Id.* at 248.  The Court noted that, as here, the case at bar was an example of "politically charged litigation," and found that if the claims there were actionable, then "[o]rdinary Washington press conferences would otherwise routinely invite litigation." *Id.*

The context of the disputed statements in the instant action, just as in *Browning*, also makes clear that they cannot form the basis of a defamation claim.  Context is crucial in determining whether a particular statement is actionable as a matter of law.  *Ollman*, 750 F.2d at 982 ("courts should…examine the context in which the statement occurs… As the Supreme Court's opinions in *Greenbelt* and *Letter Carriers* suggest, the context to be considered is both narrowly linguistic and broadly social."); *Moldea v. New York Times Co.*, 22 F.3d 310, 313-15 (D.C. Cir. 1994) ("Context" is a critical legal concept for determining whether, as a matter of law, a statement is reasonably capable of susceptible of a defamatory meaning).  Here, the press

conference and press release made clear that the allegedly defamatory statements were being made by parties involved in legal disputes with 3M, including the High Court Action and the FDA proceeding.  *See* Ex. C hereto (May 11, 2011 press conference transcript) at 3:3-6 ("We're announcing this morning that we're filing a petition with the FDA.  That petition will be filed pursuant to federal law."); *id.* at 30:21-24 ("That litigation [*i.e.*, the High Court Action] is pending, has been underway and is scheduled tentatively to go to trial in the summer.").  This context, which the press conference and press release made plain, showed any reader or listener that the statements therein were theories offered in support of legal claims being pursued by the speakers against 3M.  *E.g.*, *Klayman v. Segal*, 783 A.2d 607, 617 (D.C. 2001) ("This detailed review of the whole article, and the challenged material, in context, demonstrates that the article's message centered on Mr. Klayman's drive for publicity, and that the article may not reasonably be read to accuse him of insensitivity to tragic events of the day, including the murder of innocent children."); *id.* (while the alleged defamatory statements could "perhaps be viewed as unpleasant and offensive from Mr. Klayman's perspective, but such perceived unpleasantness and offensiveness are not sufficient to sustain an allegation that material is reasonably capable of defamatory meaning.").

The speakers at the press conference emphasized several points that further make clear that their statements were non-defamatory as a matter of law, including:

- **Their emphasis that they were raising questions to be answered by the FDA.**  *See* Tr. at 3:7-8 (referencing "questions that are raised in that petition"); 5:6-8 ("The questions that we're raising in the petition to the FDA are critical, and they need answers.  They're questions, as I mentioned a moment ago, not only that the investors need, but that the public needs."); Tr. at 6:21-24 ("another very important question, what were 3M's financial interests and what was their involvement with FastMan/Simplexa?"); Tr. 20:9, 20:11-13, 20:21 (statements about what "we're asking the FDA" to do); Tr. 22:22-24 ("We're all looking for answers, we're all waiting for answers to these important questions.").

- **Their request that their listeners draw their own conclusions.** *See* Tr. at 19:24-20:2, 21:1 ("what we're asking you is to take a hard look at it and consider and see if you draw the same conclusions that we're drawing.").

- **The fact that they were not accusing 3M of iniquitous acts.** *See* Tr. 18:4-15 ("we're not talking about people being evil or people acting in bad faith. We're talking about poor judgment, and we allege that poor judgment was used, according to the 3M technical committee, were botched in the United States so that American hospitals don't have the benefit of this product that can detect this deadly superbug that killed more people than AIDS in the last year.");[9] 42:18-25 ("And finally, the press release that we have sent out in which we make allegations, voice suspicions, but make no factual allegations of wrongdoing. In fact, indeed, as you've heard me today, I'm simply asking 3M not to admit to wrongdoing, because we don't know whether they did anything wrong."); 44:25-45:2 (stating that 3M's CEO is "a good person").

- **The fact that they were expressing opinions and theories.** *See* Tr. 24:10-22 ("We believe, we believe that there is a very significant relationship between 3M's apparent investment and their involvement and their financial interests in FastMan/Simplexa"); Tr. at 29:19-22 (referencing "suspicion that they were motivated by other things besides selling BacLite under the contract."); Tr. at 34:4-9 (I think it's a bellweather in the fact that BacLite would have been in the market and for now on several years would have saved many lives, *potentially*, of people who were supposed [*sic*]*to* MRSA.") (Emphasis added); Tr. at 35:25-36:3 ("thousands and thousands and thousands of people who died might be alive today had there been a BacLite before MicroPhage.").

- **Their adversarial position vis-à-vis 3M in the High Court Action, and the fact that they were taking action against them via an FDA application.** *See* Tr. at 30:21-24 ("That litigation is pending, has been underway and is scheduled tentatively to go to trial in the summer."); Tr. at 3:3-6 ("We're announcing this morning that we're filing a petition with the FDA.").

Another part of the context of the disputed statements is the role and reputation of Mr. Davis, about which the Complaint makes extensive allegations. For example, 3M alleges that Mr. Davis's stock and trade is to "step outside of the facts" of legal disputes by "developing effective messages" that are "aimed at giving his client an advantage in the court of ***public***

---

[9]     Criticisms of someone's "judgment" are inherently opinions, and not actionable under a theory of defamation. *Harder v. Sunrise Senior Living, Inc.*, No. 2:09-CV-11094, 2009 WL 5171843, at *5 (E.D. Mich. Dec. 22, 2009) ("the statement that someone displayed 'poor judgment' is necessarily subjective. Whether someone displays good judgment or poor judgment is not susceptible to being provable as false and therefore cannot form the basis for a defamation action.")

*opinion*."  Compl. ¶¶ 27, 28 (emphasis added).  The Complaint thus effectively characterized

Mr. Davis as exercising the same function as a columnist on an "Op-Ed" page (*i.e.*, the opinion-

editorial section of a newspaper).  As the D.C. Circuit has explained:

> a column on the Op-Ed page suggests, among other factors, that the statement
> would be understood by the reasonable reader as opinion -- even in the absence of
> full disclosure of facts signalling to the reader that the allegedly defamatory
> statement was a characterization. In a word, disclosure of facts in the surrounding
> text is not the *only* signal that hard facts cannot reasonably be inferred from a
> statement.

*Ollman*, 750 F.2d at 985; *see also id.* at 986 ("The reasonable reader who peruses an Evans and

Novak column on the editorial or Op-Ed page is fully aware that the statements found there are

not 'hard' news like those printed on the front page or elsewhere in the news sections of the

newspaper.  Readers expect that columnists will make strong statements, sometimes phrased in a

polemical manner that would hardly be considered balanced or fair elsewhere in the

newspaper."); *see also id.* at 990 n.41 ("Consistent with the point that an Op-Ed piece is in itself

a signal to the reader that what is being read is opinion, the Supreme Court has very recently had

occasion to remind us that the expression of editorial opinion 'lies at the heart of First

Amendment protection.'") (quoting *FCC v. League of Women Voters*, 468 U.S. 364, 381 (1984)).

Like the opinion piece in *Ollan*, the statements in the press conference and press release

are clearly couched as being matters of opinion, and as a matter of law would be regarded by

readers or listeners as just that.  Moreover, after characterizing Mr. Davis – the primary speaker

at the press conference – as a person who is known for focusing on "the court of public opinion,"

Compl. ¶27, the Complaint sets out a lengthy criticism of his occupational pursuits.  *See id.* at ¶¶

29-35.  It stridently alleges (at ¶ 32) that Mr. Davis's willingness to take on highly unpopular

causes "is well known."  By attacking him in this manner, the Complaint helps to "plead itself

out of court" on its defamation claim.  To the extent that Mr. Davis has a "well-known" track

record of representing highly unpopular causes or clients – which is precisely what the

Complaint alleges – then it is all the less likely that communications made on behalf of Mr.

Davis's clients would be interpreted as matters of fact, as distinct from expressions of opinion

that are entitled to First Amendment protection.

> **b.**     **The Statements About 3M Not Sharing Its**
>             **Technical Report with the FDA Are Not Alleged to Be False.**

3M also bases its defamation claims on statements that 3M did not give the FDA its

internal "Technical Report" regarding 3M's laboratory testing of BacLite.  *See* Compl. ¶ 62

(quoting allegedly defamatory statements).  3M alleges that "Davis accused 3M in a press release

of 'failing to disclose a secret internal technical committee report on testing errors' to the FDA."

Compl. ¶ 62.  But the Complaint does not allege that this statement is false.  Nowhere does 3M

allege that it gave the Technical Report to the FDA (because it did not).  *See* Compl. ¶ 63 (stating

that 3M "appropriately informed the FDA of all required information," but failing to allege that

3M provided the FDA with the Report).

3M next seeks to premise liability on the allegation that "Davis and Boulter both stated

that a 'secret report' … confirmed 3M testers had made fundamental errors that led to

unacceptable 50% reliability results,'" and that Davis stated that "the secret 3M technical

advisory report never publicly disclosed or disclosed to the FDA cited many errors by 3M testers

that the drafter of the report implied were both careless and avoidable."  Compl. ¶ 62.  Nowhere

does 3M claim that the allegations concerning the Technical Report's errors are false; rather, it

focuses on the purported defamatory content of the statements that the Technical Report was

kept secret from the FDA, which, as noted above, is also not alleged to be false.

3M also claims to have been defamed because "Davis 'cited several FDA regulations as

the basis for [his] request for an FDA investigation … including a regulation permitting an

administrative hearing … when there is evidence of misconduct that could affect public health."

Compl. ¶ 62.  This statement cannot be defamatory as it merely cites the legal authority that

served as a basis for the petition to the FDA, which 3M does not claim was independently

defamatory.  *See Teltschik v. Williams & Jensen*, PLLC, 683 F. Supp. 2d 33, 53-54 (D.D.C.

2010) ("The District of Columbia recognizes an absolute privilege for statements made [by an

attorney] preliminary to, or in the course of, a judicial proceeding, so long as the statements bear

some relation to the proceeding.") (internal citations and quotations omitted).  Finally, 3M states

that it was defamed because Davis's allegations were republished by a media outlet that wrote

that "the company deliberately sabotaged their own clinical trials."  Compl. ¶ 62.  3M does not

allege the falsity of this fact, which in any event is a statement by a news outlet rather than by

any named defendant, and does not arise to the level of a defamatory statement.

\* \* \*

Because each allegedly defamatory statement either cannot be proven false under the law,

or is not even alleged to be false in the Complaint, 3M's defamation claims are subject to

dismissal.  The defamation claim also does not sufficiently allege damages, and fails for that

independent reason.  The D.C. Circuit has instructed that defamation suits brought by corporate

parties can stand only where "the corporation is one for profit, and the matter tends to prejudice

it in the conduct of its business or to deter others from dealing with it."  *S. Air Transp., Inc. v.

Am Broadcasting Cos.*, 670 F. Supp. 38, 41 (D.D.C. 1987), *aff'd*, 877 F.2d 1010 (1989).  Here,

the Complaint does not allege that any of the statements at the press conference or in the press

release have resulted in anyone deciding not to do business with 3M.

## 2.      The Allegedly Defamatory Statements Are Privileged.

Porton joins in the arguments offered by the Davis Defendants at pp. 17-19 of their

memorandum of law in support of their Rule 12(b)(6) motion to dismiss (Doc. No. 30-2, filed

41

Nov. 18, 2011), and incorporates them herein by reference.[10]  *E.g.*, *Lane v. Random House, Inc.*, 985 F. Supp. 141, 150 (D.D.C. 1995) (D.C. courts recognize the "fair comment" privilege on matters of public interest).  The fair comment privilege, one of those cited by the Davis Defendants, "'was incorporated into the common law as an affirmative defense to an action for defamation' out of 'concern that unduly burdensome defamation law could stifle valuable public debate.'"  *Coles v. Washington Free Weekly, Inc.*, 881 F. Supp. 26, 32 (D.D.C. 1995) (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 13 (1990)).  The fair comment privilege "afford[s] legal immunity for the honest expression of opinion on matters of legitimate public interest when based upon a true or privileged statement of fact."  *Id.*  In the District of Columbia, a speaker's opinions can be found to be privileged even if the facts upon which the opinions are based are not included with the opinion.  *Coles*, 881 F. Supp. at 32 (citation and quotation omitted).  At the disputed press conference, the speakers made clear that they were engaging in dialogue on important matters of public health.  *See* Ex. D hereto at 3:14-16 ("the fact that this product never made it to market raises very serious questions of public health").

### D.   Counts Four (Aiding and Abetting) and Five (Civil Conspiracy) Do Not State a Claim Because 3M Has Not Properly Alleged Any Underlying Tort.

Because each of 3M's primary claims (Counts One, Two and Three) fail to state a claim, then naturally each of its secondary causes of action (Count Four for aiding and abetting, and

---

[10]      3M does not allege that the submissions to the FDA are defamatory; nor could it, because those communications, made to an administrative body of the federal government concerning a public health issue, are absolutely privileged.  "The District of Columbia recognizes an absolute privilege for statements made by an attorney preliminary to, or in the course of, a judicial proceeding, so long as the statements bear some relation to the proceeding."  *Teltschik v. Williams & Jensen, PLLC*, 683 F. Supp. 2d 33, 53-54 (D.D.C. 2010) (internal alterations and quotations omitted).  The judicial proceedings privilege has been extended to apply to statements made in connection with quasi-judicial proceedings conducted by administrative bodies where "a proceeding is designed to adjust the rights or liabilities of the parties before it and calls for an exercise of guided discretion by an impartial decisionmaker."  *Jones v. Mirgon*, No. 88-7001, 1989 WL 105498, at *2 (D.C. Cir. Aug. 31, 1989).

Count Five for civil conspiracy) also fail as a matter of law because they lack an underlying tortious act and do not allege damages. *See* Saini Decl. ¶¶ 19-22. To the extent that English law does not apply (as with any secondary claims arising from the defamation count), neither aiding/abetting nor civil conspiracy is a cause of action under D.C. law. *See Flax v. Shertler*, 935 A.2d 1091, 1108 n. 15 (D.C. 2007) (aiding and abetting); *Riddell v. Riddell Washington Corp.*, 866 F.2d 1480, 1493 (D.C. Cir. 1989) (civil conspiracy).

## CONCLUSION

For the foregoing reason, Porton Capital Technology Funds and Porton Capital, Inc. respectfully request that the Court dismiss them from this action pursuant to Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction, or, in the alternative, dismiss all claims against them with prejudice pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim.

Dated: November 18, 2011
       New York, New York

Respectfully submitted,

BOIES, SCHILLER & FLEXNER LLP

Christopher E. Duffy (*pro hac vice*)
575 Lexington Avenue
New York, New York  10022
Phone: (212) 446-2300
Fax: (212) 446-2350
CDuffy@BSFLLP.com

Melissa Felder, Bar No. 497459
5301 Wisconsin Avenue, N.W., Suite 800
Washington, D.C.  20015
Phone: (202) 237-2727
Fax: (202) 237-6131
MFelder@BSFLLP.com

*Attorneys for Defendants Porton Capital*
*Technology Funds and Porton Capital, Inc.*

43