**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | | |
|---|---|---|
| 3M COMPANY, | : | Civil Action No. |
| | : | **1:11-CV-01527-RLW** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| - v - | : | **ORAL HEARING** |
| | : | **REQUESTED** |
| HARVEY BOULTER, | : | |
| PORTON CAPITAL TECHNOLOGY FUNDS, | : | |
| PORTON CAPITAL, INC., LANNY DAVIS, | : | |
| LANNY J. DAVIS & ASSOCIATES, PLLC and | : | |
| DAVIS-BLOCK LLC, | : | |
| | : | |
| **Defendants.** | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**PLAINTIFF 3M COMPANY'S CONSOLIDATED RESPONSE IN OPPOSITION
TO THE MOTIONS TO DISMISS OF DEFENDANTS LANNY DAVIS,
LANNY J. DAVIS & ASSOCIATES, PLLC, DAVIS-BLOCK LLC,
PORTON CAPITAL TECHNOLOGY FUNDS AND PORTON CAPITAL, INC.**

Kenneth J. Pfaehler
David I. Ackerman
SNR DENTON US LLP
1301 K Street NW
Suite 600, East Tower
Washington, D.C.  20005-3364
Telephone:  (202) 408-6468
Facsimile:  (202) 408-6399

William A. Brewer III
Michael J. Collins
Kenneth N. Hickox, Jr.
Robert W. Gifford
BICKEL & BREWER
767 Fifth Avenue, 50th Floor
New York, New York  10153
Telephone:  (212) 489-1400
Facsimile:  (212) 489-2384

**ATTORNEYS FOR PLAINTIFF 3M COMPANY**

# TABLE OF CONTENTS

**Page**

I. PRELIMINARY STATEMENT ...................................................................................1

II. RELEVANT FACTUAL AND PROCEDURAL HISTORY ...........................................4

    A. The Original Controversy:  The Alleged Failure of BacLite As A Commercially Medical Viable Product. ......................................................5

    B. Defendants' Conceive A Multi-Pronged Conspiracy To Coerce 3M Into Making A Windfall Payment Of Tens Of Millions Of Dollars That Cannot Otherwise Be Obtained By Lawful Means. .........................................................8

        1. Boulter orchestrates threats to 3M's stock price if the company refused to pay former Acolyte shareholders tens of millions of dollars..........................................................................................9

        2. The Davis Defendants join in the scheme to coerce 3M to capitulate to Claimants' unreasonable demands. .....................................11

        3. Defendants' malicious and defamatory media campaign against 3M.........................................................................................12

        4. Defendants seek to harm 3M by making misrepresentations in a sham "citizen's petition" filed with the U.S. Food and Drug Administration. ...................................................................................14

        5. Defendants' initially covert scheme to tortiously interfere with 3M's significant business interests with the U.K. government by "buying" access to key British officials through Tetra Strategy...............18

        6. Defendants implement the final phase of their illegal conspiracy— blackmail and intimidation. ...................................................................20

    C. The U.K. Parliament Undertakes An Investigation And Fox Resigns. .................24

    D. The High Court's Judgment...................................................................................26

    E. The Damage Done .................................................................................................27

    F. The Procedural History Of This Action.................................................................28

III. SUMMARY OF OPPOSITION ..................................................................................30

    A. Personal Jurisdiction ............................................................................................30

    B. Sufficiency Of 3M's Claims ..................................................................................30

IV. ARGUMENT AND AUTHORITIES............................................................................31

    A. This Court Has Personal Jurisdiction Over The Porton Defendants.....................32

        1. The legal standard .................................................................................32

2.      This Court has personal jurisdiction over the Porton Defendants because they are co-conspirators with the District of Columbia Davis Defendants. .................................................................... 33

3.      This Court also has personal jurisdiction over the Porton Defendants because they acted through their agents, the Davis Defendants, in the District of Columbia. .................................... 37

B.   D.C. Law Governs 3M's Claims For Civil Conspiracy, Aiding And Abetting, Tortious Interference With Existing And Prospective Business Advantage, And Commercial Defamation; U.K. Law Applies To 3M's Claim for Intimidation. ................................................................. 39

C.   3M Has Adequately Pleaded Each Of Its Claims. ................................. 41

1.      The legal standard .................................................................. 41

2.      3M has sufficiently pleaded its claim for tortious interference with existing and prospective business advantage and economic opportunity. .............................................................................. 42

3.      3M has sufficiently pleaded its claim for commercial defamation. .......... 44

   a.      3M has pleaded the elements of commercial defamation. ............. 44

   b.      3M has pleaded actual malice. ...................................................... 47

   c.      3M has sufficiently identified Defendants' defamatory statements. .............................................................................. 48

   d.      Defendants' defamatory statements are not mere opinion or hyperbole, but are provably false statements of fact. .................... 50

   e.      Defendants' defamatory statements were not privileged. ............. 52

      (1)    3M has pleaded, and will establish, that Defendants acted with malice, which negates any claim of privilege. ......................................................................... 53

      (2)    Defendants are not entitled to First Amendment protection for their defamatory statements because the "public interest" they allegedly advanced is based solely on Defendants' sham effort to "petition" the federal government. .................................... 55

      (3)    Defendants have not asserted any other valid privileges. ........................................................................ 61

4.      3M has sufficiently pleaded its claim for intimidation under U.K. law. ......................................................................................... 63

   a.      3M has alleged all the elements of intimidation. .......................... 63

   b.      The "without prejudice privilege" and Federal Rule of Evidence 408 do not shield Defendants' threats from liability. ....................................................................................... 66

5.   3M has sufficiently pleaded claims of conspiracy and aiding and abetting......................................................................................68

a.   Conspiracy ...................................................................................69

b.   Aiding and abetting.......................................................................70

V.   CONCLUSION...........................................................................................71

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*ABB Daimler-Benz Transp. (North America), Inc. v. National R.R. Passenger Corp.*,
   14 F. Supp. 2d 75, 86 (D.D.C. 1998) ................................................................33

*Agee v. Muskie,*629
   F.2d 80, 81 n. 1, 90 (D.C. Cir. 1980) .............................................................10

*Agee v. Muskie,*629
   F.2d 80 (D.C. Cir. 1980) ...................................................................................3

*Atlantigas Corp. v. Nisource, Inc.*,
   209 F. Supp. 2d 34, 44 (D.D.C. 2003) ........................................................37, 38

*Atlantigas Corp. v. Nisource, Inc.*,
   290 F. Supp. 2d 34, 42 (D.D.C. 2003) ...........................................................37

*Bailey v. J&B Trucking Servs.*,
   590 F. Supp. 2d 4, 10 (D.D.C. 2008) .............................................................39

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544, 584 (2007) ..............................................................................42

*Brady v. Livingood*,
   360 F. Supp.2d 94, 104 (D.D.C. 2004) ..........................................................33

*Browning v. Clinton*,
   292 F.3d 235, 242 (D.C. Cir. 2002) ...............................................................42

*Carr v. Brown*,
   395 A.2d 79, 84 (D.C. 1978) .........................................................................42

*Casco Marina Development, L.L.C. v. District of Columbia Redevelopment Land Agency*,
   834 A.2d 77, 84 (D.C. 2003) .....................................................................41, 42

*City of Moundridge v. Exxon Mobil Corp.*,
   250 F.R.D. 1, 5 (D.D.C. 2008) ......................................................................33

*Command Consulting Group, LLC v. NeuralIQ, Inc.*,
   623 F. Supp. 2d 49, 51-52 (D.D.C. 2009) ......................................................42

*Crane v. New York Zoological Society*,
   894 F.2d 454, 456 (D.C. Cir. 1990) ...............................................................31

*CSX Transp. v. Williams*,
  2005 U.S. Dist. LEXIS, * 2-3 (D.D.C. Apr. 22, 2005).......................................3, 10

*Day v. Corner Bank (Overseas) Ltd.*,
  789 F. Supp. 2d 150, 155 (D.D.C. 2011) ................................................................31

*Dean v. Walker*,
  756 F. Supp. 2d 100, 102 (D.D.C. 2010) ...............................................................31

*Edmond v. United States Postal Serv. Gen. Counsel*,
  949 F.2d 415, 424-25 (D.C. Cir. 1991)............................................................32, 36

*El-Fadl v. Centr. Bank of Jordan*,
  75 F.3d 668, 678 (D.C. Cir. 1996) ..........................................................................38

*Executive Sandwich Shoppe, Inc. v. Carr Realty Corp.*,
  749 A.2d 724, 738 (D.C. 2000) ...............................................................................33

*FC Inv. Grp. LC v. IFX Mkts., Ltd.*,
  529 F.3d 1087, 1092 (D.C. Cir. 2008) .....................................................................31

*Gonzalez v. Internacional De Elevadores, S.A.*,
  891 A.2d 227, 232 (D.C. 2006) ...............................................................................36

*Graves v. United States*,
  961 F. Supp. 314, 321 (D.D.C. 1997) ......................................................................33

*Haig v. Agee*,
  453 U.S. 280 (1981)..............................................................................................3, 10

*Halberstam v. Welch*,
  705 F.2d 472, 481 (D.C. Cir. 1983) .........................................................................33

*Jackson v. Culinary Sch. of Washington*,
  788 F.Supp. 1233, 1265 n. 36 (D.D.C. 1992) ...........................................................4

*Jia Di Feng v. See-Lee Lim*,
  786 F.Supp.2d 96, 101-02 (D.D.C. 2011)...........................................................31, 32

*Jung v. Ass'n of American Med. Colls.*,
  300 F. Supp. 2d 119, 140 (D.D.C. 2004) ............................................................32, 35

*Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*,
  115 F.3d 1020, 1030-31 (D.C. Cir. 1997)................................................................32

*Koteen v. Bermuda Cablevision, Ltd.*,
  913 F.2d 973, 974 (D.C. Cir. 1990) ....................................................................31, 32

*Liberty Mut. Ins. Co. v. Travelers Indem. Co.*,
  78 F.3d 639, 642 (D.C. Cir. 1996) ......................................................................39

*Long v. Sears Roebuck & Co.*,
  877 F. Supp. 8, 11 (D.D.C. 1995) ......................................................................39

*Mark Marketing Servs., LLC v. Geoplast S.p.A.*,
  753 F. Supp. 2d 141, 163 (D.D.C. 2010) ...........................................................43

*Mazza v. Mazza*,
  475 F.2d 385 (D.C. Cir. 1973) ...........................................................................39

*McDaniel v. FEDITC LLC*,
  2011 WL 5822144, * 2 (D.D.C. Nov. 18, 2011) ...........................................31, 32

*Muir v. Navy Federal Credit Union*,
  529 F.3d 1100, 1108 (D.C. Cir. 2008) ...........................................................42, 43

*Mutambara v. Lufthansa German Airlines*,
  No. 02-0827, 2003 WL 1846083 at *2 (D. D.C. Mar. 24, 2003) ...........................38

*Naartex Consulting Corp. v. Watt*,
  722 F.2d 779, 787 (D.C. Cir. 1983) ...................................................................37

*Nat'l R.R. Passenger Corp. v. Veolia Transp. Servs., Inc.*,
  592 F. Supp. 2d 86, 98 (D.D.C. 2009) ................................................................42

*NCRIC, Inc. v. Columbia Hospital For Women Medical Center, Inc.*,
  957 A.2d 890, 900, 900 n.16 (D.C. 2008) .......................................................40, 41

*Orellana v. CropLife Intern.*,
  740 F. Supp. 2d 33, 38 (D.D.C. 2010) ................................................................36

*Piper Aircraft Co. v. Reyno*,
  454 U.S. 235, 256 (1981).....................................................................................38

*Richards v. Mileski*,
  662 F.2d 65, 73n, 14 (D.C. Cir. 1981) ..................................................................4

*Robinson v. Securitas Servs., Inc.*,
  No. 11–451 (JEB), 2011 WL 4936999, at *1 (D.D.C. Oct. 18, 2011) ...................41

*Schwartz v. CDI Japan, Ltd.*,
  938 F. Supp. 1, 7 (D.D.C. 1996) .........................................................................36

*Sloan v. Urban Title Services, Inc.*,
  689 F. Supp. 2d 94, 105 (D.D.C. 2010) ...............................................................39

*Solers, Inc. v. Doe*,
  977 A.2d 941, 948 (D.C. 2009) ........................................................42

*Southern Air Transport, Inc. v. American Broadcasting Cos., Inc.*,
  670 F. Supp. 38, 40-41 (D.D.C. 1987)..............................................40

*The Washington Post v. Robinson*,
  935 F.2d 282, 291-92 (D.C. Cir. 1991)...........................................3, 10

*United States v. Philip Morris Inc.*,
  116 F. Supp. 2d 116, 120 n. 4 (D.D.C. 2000) ...................................31

*Water & Sand Int'l. Capital, Ltd. v. Capacitive Deionization Tech. Sys., Inc.*,
  563 F. Supp. 2d 278, 282 (D.D.C. 2008) ..........................................31

*Weishapl v. Sowers*,
  771 A.2d 1014, 1023 (D.C. 2001) ....................................................33

*Wiggins v. District Cablevision, Inc.*,
  853 F. Supp. 484, 497-98 (D.D.C. 1994)...........................................33

*Williams v. Federal Nat. Mortg. Ass'n*,
  2006 WL 1774252, *8 (D.D.C. June 26, 2006)...............................42, 43

*Wultz v. Islamic Republic of Iran*,
  755 F. Supp. 2d 1, 79 (D.D.C. 2010) ................................................39

*Youming Jin v. Ministry of State Sec.*,
  335 F. Supp. 2d 72 (D.D.C. 2004).........................................32, 35, 36

*Young Women's Christian Ass'n v. Allstate Ins. Co. of Canada*,
  275 F.3d 1145, 1150 (D.C. Cir. 2002) ..............................................39

## STATUTES

28 U.S.C. § 1404, DC ...............................................................................38

C.P.L.R. 3217(b)......................................................................................28

D.C. Code § 13-423(a)(1) ........................................................................32

## OTHER AUTHORITIES

21 CFR § 10.30 ........................................................................................13

FED. R. CIV. P. 12.............................................................................1, 30, 40

Federal Rule of Evidence 408 ............................................................40-41

Plaintiff 3M Company ("3M") submits this Consolidated Response in Opposition (the "Consolidated Opposition") to:  (1) the Motion to Dismiss of Defendants Lanny Davis, Lanny J. Davis & Associates, PLLC, and Davis-Block LLC (together, the "Davis Defendants"); and (2) the Motion of Defendants Porton Capital Technology Funds and Porton Capital, Inc. (together, the "Porton" Defendants") for Dismissal with Prejudice Pursuant to Fed. R. Civ. P. 12(b)(2) for Lack of Personal Jurisdiction, or Rule 12(b)(6) for Failure to State a Claim, as follows:[1]

## I.

## PRELIMINARY STATEMENT

3M initiated this action to protect itself from an illegal conspiracy among the Defendants.[2]  The aim of that conspiracy was to coerce and intimidate 3M into paying Defendants more than $30 million, allegedly in connection with a breach of contract lawsuit that the Porton Defendants and others (collectively, the "Claimants") had commenced in the High Court of Justice in London (the "London Litigation").[3]  As is fully alleged in the original Complaint, and described in further detail in 3M's recently-filed First Amended Complaint (the

---

[1] The motion to dismiss filed by the Davis Defendants and the motion to dismiss filed by the Porton Defendants are hereinafter referred to as the "Davis Defendants' Motion" and the "Porton Defendants' Motion," respectively.

[2] All references to "Defendants" herein shall include the Davis Defendants, the Porton Defendants, and non-movant Defendant Harvey Boulter ("Boulter").

[3] The substance of that dispute was whether 3M had breached a contract with the Porton Defendants by abandoning efforts to develop a particular medical product, called "BacLite" which was a clinical test to screen for a dangerous form of Methicillin-resistant *Staphylococcus aureus* ("MRSA"). The Porton Defendants argued, albeit erroneously, that BacLite was a commercially viable product, that 3M had made errors in the clinical trials required to secure FDA approval to market that product, that 3M abandoned BacLite in favor of another product that presumably would make 3M more money, and that 3M's decision resulted in deaths.  Each of these arguments were subsequently either withdrawn or rejected by the London court.

"Amended Complaint"),[4] the Defendants, knowing their monetary demands were unjustified by law or fact, resorted to extortion in an attempt to coerce from 3M tens of millions of dollars the Porton Defendants needed to cover bad investments.  As the complaint alleges in detail, the Defendants' effort to strong-arm 3M included, among other things:  (i) falsely broadcasting to the public and the U.S. Food and Drug Administration ("FDA") that 3M's greedy business practices had killed countless individuals; (ii) threatening 3M and its CEO with dire consequences and embarrassment if they did not capitulate to Defendants' shakedown; and (iii) engaging in unseemly "influence peddling" to turn powerful civil servants and bureaucrats in the United Kingdom ("U.K.") Ministry of Defence ("MoD") against 3M and to obtain a private, off-the-record meeting with the U.K.'s Secretary of Defence, Dr. Liam Fox ("Fox") in order to enlist his support of their scheme to tortiously interfere with 3M's existing and pending business relationships with the U.K. Government.  Ultimately, as the complaint also explains in detail, the Defendants acted on their threats to directly interfere with 3M's business interests and, as a result, 3M has suffered meaningful financial harm.

Despite the complaint's detailed articulation of 3M's claims, the Defendants claim that 3M fails to state a claim and have moved to dismiss the complaint.  Under the guise of asserting pleading deficiencies, however, much of the Defendant's moving papers are dedicated to contesting the facts alleged by 3M.  In particular, the Defendants argue that the recent decision of the High Court of Justice in the London Litigation proves that 3M's claims here are without

---

[4] A soon as the Defendants attempted to extort a settlement from 3M, a public company, by threatening the personal interests of 3M's Chief Executive Officer, 3M was constrained to immediately seek relief from the courts.  Because 3M had to file immediately, the events are so recent, the conspirators were secretive, facts are coming to light as the scandal over the Defendants' conduct grows in the British press, and 3M's investigation continues, much previously hidden detail has now been added in the First Amended Complaint, filed last Friday.  Therefore while 3M generally cites in this brief to the original complaint in this Court, it also directs the Court to apposite portions of the amended complaint that clarify the sufficiency of the original complaint and further supplement its allegations  The instances where 3M has added clarifying allegations to address Defendants' arguments are acknowledged herein.

merit.  Setting aside for the moment that a Rule 12(b)(6) motion is not the forum to debate the merits of the case, the High Court's decision in fact reflects the exact opposite.  The court agreed with 3M that the Porton Defendants and other Claimants actually deserved only $1.3 million pursuant to the parties' prior contract—an amount more than $30 million below the extortionate sum that the Defendants demanded from 3M, and scarcely more than 3M had offered to pay Claimants before they filed suit in London Litigation.[5]  Moreover, the court's judgment supports 3M's claim in this action that the Defendants defamed 3M when they published assertions that 3M's removal of BacLite caused the deaths of "thousands" of patients with MRSA-related infections (an allegation, incidentally, never raised by the Claimants in the London Litigation).  The court found instead that the product "would never have been a commercial success" precisely because it could not compete against other available MRSA screening tests, *already being used* by hospitals and clinics, which were becoming faster and cheaper.[6]  The London court also determined, contrary to Defendants' defamatory statements, that 3M did not "botch" the FDA clinical trials for BacLite, but rather that those trials were conducted with "reasonable care . . . . application, industry and perseverance."[7]  The Defendants' claim that the High Court judgment vindicates them here is, to say the least, counterintuitive.[8]

The Defendants' extended arguments about the substantive merits of 3M's claims also should not divert attention from their failure to demonstrate deficiencies in the pleading of 3M's

---

[5] Approved Judgment in the High Court of Justice Queens Bench Division Commercial Court, No: 2008 Folio No. 877 (Porton Capital Technology Funds et. al v. 3M Company), [2011] EWHC 2895 (Nov. 7, 2011), at ¶ 358 (the "Approved Judgment").  A copy is attached as Ex. A.

[6] Approved Judgment at ¶ 250.

[7] Approved Judgment at ¶ 140.

[8] *Cf., e.g.*, *Korn v. New Castle County*, 2007 WL 2981939, at *1 (Del. Ch. Oct. 3, 2007) ("In 279 B.C., Pyrrhus of Epirus ostensibly defeated the Roman army at Asculum, but in the process lost a devastating number of his own troops. Another such victory, he exclaimed, and I shall be ruined.").

claims.   The Boulter Defendants contend that this Court lacks personal jurisdiction over them, overlooking that they are alleged, with specificity, to be co-conspirators with Mr. Davis.   The Davis Defendants claim that the pleadings do not give them notice of which statements are alleged to be defamatory; in fact the pleading requirements for defamation are more than met. The Defendants collectively seek cover behind privileges, the right to petition the government, and even Rule of Evidence 408, but none of these protections apply to the willful and malicious conduct alleged here.   Each of 3M's claims is pled in detail and each element of each claim is stated with particulars.   3M respectfully requests the Court to deny the Defendants' motions to dismiss.

## II.

### <u>RELEVANT FACTUAL AND PROCEDURAL HISTORY</u>[9]

On December 9, 2011, 3M timely filed its Amended Complaint in this action[10] (by which it asserted additional claims[11] and augmented the factual allegations to reflect information learned after the date of the original Complaint).   3M believes that the original Complaint more than adequately pleaded facts and claims sufficient to defeat Defendants' motions to dismiss.   To

---

[9] Facts relevant to 3M's claims are still developing, and where possible, citations are to 3M's pleadings.   However, 3M also includes, citations to recent news articles that have published newly-discovered facts about the issues raised in this lawsuit, including public statements by relevant parties. This Court may take judicial notice of facts generally known that are reported in newspaper articles.   *See CSX Transp. v. Williams*, 2005 U.S. Dist. LEXIS, * 2-3 (D.D.C. Apr. 22, 2005) (taking judicial notice of testimony of U.S. government official quoted in *The Washington Post*); *see also The Washington Post v. Robinson*, 935 F.2d 282, 291-92 (D.C. Cir. 1991) (citing *Agee v. Muskie*, 629 F.2d 80, 81 n. 1, 90 (D.C. Cir. 1980), *r'vd on other grounds*, *Haig v. Agee*, 453 U.S. 280 (1981) (taking judicial notice of facts published in newspaper).   Even if this Court declined to take judicial notice of such facts, they are evidence supporting 3M's contention that it requires further discovery before it can completely respond to the Motions because, if true, the cited facts would contradict Defendants' arguments that the defamatory statements and conduct identified in the Complaint were: (i) made solely in further of advocacy on issues of the public interest; (ii) substantially true; (iii) not made with actual malice; (iv) not intended to further an illegal act; and/or (iv) were otherwise privileged.

[10] 3M Company's First Amended Complaint and Jury Demand ("Amended Comp.").

[11] Amended Compl. ¶¶ 135-42, 153-65 (asserting claims for tortious interference with contract, injurious falsehood and business disparagement, and breach of fiduciary duty).

avoid any doubt, however, 3M has revised its pleading to respond to certain of Defendants' contentions that 3M's claims were insufficiently pleaded.[12]

## A.      The Original Controversy:   The Alleged Failure of BacLite As A Commercially Medical Viable Product.

3M is a global consumer products and technology company best known for its Scotch® Tape and Post-It® products.[13]   Defendant Harvey Boulter[14] and the Porton Defendants are investors who that specialize in developing certain technologies, one of which 3M purchased from them.[15]   The Davis Defendants are purported legal, public relations, and lobbying specialists having their principal places of business in Washington, D.C.[16]

On February 14, 2007, the Porton Defendants and one other shareholder sold to 3M their interests in an entity (called Acolyte) that created and owned BacLite, hoping that BacLite would fill a niche market between the fast-but-expensive molecular MRSA tests and the slow-but-cheap culture-based tests.[17]   BacLite was a clinical test for a dangerous form of antibiotic-resistant bacteria called MRSA.[18]

---

[12] Should this Court, however, determine that 3M's latest pleading is somehow defective but nevertheless correctable, 3M respectfully requests an opportunity to cure such defects in a subsequent amendment.  *See Richards v. Mileski*, 662 F.2d 65, 73n, 14 (D.C. Cir. 1981) ("It is well settled that the policy of the [F.R.C.P.] is to decide cases on the basis of substantive rights rather than technicalities and this requires that plaintiffs receive every reasonable opportunity to cure formal defects in their pleadings.") (*citing Forman v. Davis*, 371 U.S. 178, 182 (1962)); *Jackson v. Culinary Sch. of Washington*, 788 F.Supp. 1233, 1265 n. 36 (D.D.C. 1992) ("The federal rule policy of deciding cases on the basis of substantive rights involved rather than on technicalities requires that plaintiff be given every opportunity to cure a formal defect in the pleading.  This is true [even if] the court doubts that plaintiff will be able to overcome the defects in his initial pleading.").

[13] 3M Company's Original Complaint and Jury Demand ("Compl.") ¶ 16, Amended Compl. ¶ 21.

[14] Boulter is the Chief Executive Officer of Porton Capital, Inc., and a director of Porton Capital Technology Funds.  3M has initiated service on Boulter through the Hague Convention.

[15] Compl. ¶¶ 23, 36, Amended Compl. ¶¶ 28-30, 42-44.

[16] Compl. ¶¶ 8-10, 26; Amended Compl. ¶¶ 12-14, 32.

[17] Compl. ¶ 37; Amended Compl. ¶¶ 42-43.

[18] Compl. ¶ 36; Amended Compl. ¶ 42.

As is common for unproven devices like BacLite, 3M and Acolyte's shareholders (which included the Porton Defendants) agreed to a contingent "earn out" structure under which 3M made an up-front payment of approximately $17.5 million in cash and promised to pay the former Acolyte shareholders a contingent earn out payment for a period of time.[19]   The actual amount of the earn out payment depended on BacLite's financial success in the marketplace, and the parties expressly agreed that it was not guaranteed.[20]   This earn out structure would compensate the Porton Defendants (as former holders of 47.6% of the shares in Acolyte), but only *if* BacLite proved to be a success—medically and commercially.[21]   That structure was also intended to relieve 3M of having to speculate as to the appropriate price to pay for a new technology.[22]

3M was also required under the parties' agreement to "actively market" BacLite and to diligently seek regulatory approval in the United States, Canada, and Australia.[23]   However, as the Court in the London Litigation has already held, as a matter of fact and law, 3M had no obligation to improve the BacLite product.[24]

Although 3M devoted substantial resources to marketing BacLite, it proved to be a commercial disaster.[25]   Prior to 3M's acquisition, Acolyte had secured a total of only three BacLite customers; after the acquisition, there were only six additional sales despite 3M's best

---

[19] Compl.¶ 39; Amended Compl. ¶¶ 45.

[20] Compl. ¶ 39; Amended Compl. ¶ 45, 52.

[21] Compl. ¶ 39; Amended Compl. ¶¶ 45, 52, 58.

[22] Compl. ¶ 39; Amended Compl. ¶¶ 45, 52, 58.

[23] Compl. ¶¶ 39-40; Amended Compl. ¶ 45.

[24] *See* Ex. B (copy of Judgment issued by Mr. Justice David Steel in connection with the London Litigation).

[25] Compl. ¶¶ 40-49; Amended Compl. ¶¶ 45-51.

efforts.[26]   For example, 3M spent more on BacLite in the U.K. and European Union ("E.U.") during the first quarter of 2008 than it had spent on all other commercial products in its Medical Diagnostics Division combined.[27]   In fact, 3M spent an average of $800,000 per month on BacLite[28] – yet, still realized *only* $654,365 in net sales for all of 2008 in the U.K. and E.U.   In the United States, the situation was even worse.   BacLite failed nine clinical tests in connection with the FDA approval process and, consequently, garnered no sales at all.[29]   Although the parties dispute why the U.S. tests failed, the reality was that, even if it had obtained FDA approval, BacLite's middle-market niche had collapsed by the end of 2008.[30]   The faster, and more elegant, molecular tests were becoming cheaper and the less expensive, but slower, chromogenic culture tests were getting faster.[31]   In sum, the operating, financial, and performance characteristics of BacLite made it more expensive and time-consuming for hospital customers to use than similar devices sold by 3M's competitors.[32]

Because there was no realistic hope in sight for BacLite's commercial success, pursuant to the parties' agreement, 3M asked Porton and the other Acolyte shareholders for their consent to cease marketing BacLite.[33]   As part of that request, 3M offered to pay the former shareholders $1.07 million, a sum that 3M believed was a reasonable estimate of the gross BacLite sales it

---

[26] *See* Ex. C (excerpt of Witness Statement of Mark Whitworth, ¶ 70).

[27] *See* Ex. C (excerpt of testimony given by Mark Whitworth on Day 14 of the London Litigation, 2186:3-16).

[28] *See* Ex. D, ¶¶ 23(i), 53(a) (excerpt of Re-Amended Defence of First Defendant and Defence of Second Defendant, submitted in connection with the London Litigation); Ex. E, ¶ 32E (excerpt of witness statement given by James Ingebrand); Ex. F, ¶¶ 144, 149 (excerpt of expert report of Brian Stammers, submitted in connection with the London Litigation).

[29] *See* Ex. G, ¶ 40 (excerpt of supplemental witness statement of Cassie Jacobson).

[30] Compl. ¶¶ 44, 46; Amended Compl. ¶¶ 48-51, 71, 108.

[31] Compl. ¶¶ 44, 46; 39; Amended Compl. ¶¶ 48-51, 71, 108.

[32] Compl. ¶¶ 37, 43-49; Amended Compl. ¶¶ 45-51, 71, 108.

[33] Compl. ¶ 47; Amended Compl. ¶ 52.

otherwise expected through December 31, 2009, which was the end of the agreement's earn-out period.[34]   The Porton Defendants were required by that agreement not to unreasonably withhold their consent.[35]

Unfortunately, instead of negotiating an end to the agreement, the former shareholders demanded that 3M pay them approximately $38 million, an amount far in excess of BacLite's true commercial value.[36]   When 3M refused that this exorbitant demand, in December 2008, the Claimants sued 3M in the U.K. High Court in London, seeking damages in excess of $50 million—a figure far divorced from the reality that few, if any, hospitals or other potential customers needed, wanted, or desired BacLite.[37]   The Claimants included the Porton Defendants.[38]   After a bench trial during June and July 2011, the High Court concluded, in November, that 3M had to pay Claimants approximately $1.3 million—an amount barely larger than what 3M had offered from the beginning.[39]

**B.      Defendants' Conceive A Multi-Pronged Conspiracy To Coerce 3M Into Making A Windfall Payment Of Tens Of Millions Of Dollars That Cannot Otherwise Be Obtained By Lawful Means.**

Even the limited facts that have recently emerged as a result of the public outcry and inquiry in the U.K. over Defendants' actions in connection with the London Litigation have helped shine a light on Defendants' malice toward 3M.   Those facts establish that Boulter, the

----

[34] Compl. ¶ 47; Amended Compl. ¶ 52.

[35] Compl. ¶ 47; Amended Compl. ¶ 52.

[36] Compl. ¶ 48; Amended Compl. ¶¶ 58-60.

[37] Compl. ¶¶ 48, 54-55; Amended Compl. ¶¶ 58-60.  At trial, 3M's experts "showed their work," and based upon actual market data and recorded sales, estimated potential damages to be no more than approximately $1.7 million. *See* Ex. H, ¶¶ 23-27, 242, 273 (excerpt of 3M's Written Closing Submissions in the London Litigation); Ex. I, ¶¶ 369-70 (excerpt of Claimants' Written Closing Submissions in the London Litigation); Ex. F, ¶¶ 144, 149 (Expert Report of Brian Stammers, submitted in connection with the London Litigation).

[38] Compl. ¶ 55; Amended Compl. ¶ 59.

[39] Compl. ¶ 56; Amended Compl. ¶ 60.

Porton Defendants, and the Davis Defendants joined forces to implement a multi-pronged conspiracy to coerce 3M into paying them tens of millions of dollars that they could never obtain in the litigation.  Defendants' illegal scheme had four parts, often carried-out on parallel tracks: (i) threats to artificially depress 3M's stock price; (ii) a multimedia international smear campaign designed to falsely portray 3M as having put MRSA victims lives at risk; (iii) obtaining access to high-level British officials and improperly utilizing existing contacts with civil servants in order to directly interfere with 3M's significant existing and prospective business relationships with the U.K. Government; and (iv) attempting to blackmail and intimidate 3M into paying them millions of undeserved dollars.

1.   **Boulter orchestrates threats to 3M's stock price if the company refused to pay former Acolyte shareholders tens of millions of dollars.**

When 3M first approached the former Acolyte shareholders for permission to stop marketing BacLite, Boulter immediately realized the tenuous nature of the former shareholders' position, given BacLite's commercial failure in the market.[40]  Boulter was nevertheless determined  to save face with his co-investors in Acolyte, many of whom he had brought to the table.[41]  To that end, he enlisted outside help to exert pressure on 3M to pay out tens of millions of dollars to the former shareholders in return for their permission for 3M to stop selling BacLite.[42]  Specifically, Boulter arranged for Robert Hamburger ("Hamburger"), one of the Porton Defendants' agents, to send threatening e-mails to 3M's Chairman and Chief Executive Officer, George Buckley ("Buckley").[43]

---

[40] Compl. ¶¶ 50-53; Amended Compl. ¶¶ 52-56.

[41] Compl. ¶¶ 50-53; Amended Compl. ¶¶ 52-56.

[42] Compl. ¶¶ 50-53; Amended Compl. ¶¶ 54-57.

[43] Compl. ¶¶ 50-53; Amended Compl. ¶¶ 54-57.

In what signified the beginning of Defendants' extortion campaign, on August 30, 2008, Hamburger sent an e-mail to Buckley, which contained in its text a copy of an e-mail from Boulter to Hamburger.[44]   The e-mail alleged that "one investor group"—Boulter's investment fund, Defendant Porton Capital, Inc,—"control[led] a very material position of 3M stock," which it estimated to be in the "high multiples" of $100 million.[45]   It further stated further that Hamburger and Boulter had "informed" those investors of 3M's proposal to discontinue BacLite, and that the investors had "taken a view that 3M is a dishonest party and have threatened to sell their entire position."[46]

Boulter and Hamburger then noted that the unnamed investors were "propping up various U.S. sectors right now," that they could not be relied on to decide matters "in a western rational way," and that, as a result, 3M's situation could "get a lot worse rapidly" because "3M's actions [in discontinuing BacLite] have created one hell of a storm."[47]   In no uncertain terms, Boulter and Hamburger were threatening Buckley with a massive sell-off of 3M's stock, likely to lead to a drop in its price, if 3M did not accede to the former shareholders' outrageous valuation of BacLite's commercial value through the end of 2009.

Later that same day, Boulter sent a second e-mail to Buckley reiterating his threat to use his fund's investors to trigger an artificial deflation in 3M's stock price.[48]   In that e-mail, Boulter stated that it was "essential that 3M" do not "further escalate this situation" because 3M's actions had already "triggered a rather unexpected chain of events," loading the investors (who were

---

[44] Compl. ¶¶ 50-53; Amended Compl. ¶¶ 54-57.

[45] Compl. ¶¶ 50-53; Amended Compl. ¶¶ 54-57.

[46] Compl. ¶¶ 50-53; Amended Compl. ¶¶ 54-57.

[47] Compl. ¶¶ 50-53; Amended Compl. ¶¶ 54-57.

[48] Compl. ¶¶ 50-53; Amended Compl. ¶¶ 54-57.

described as "simple people of vast means") to be "understandably not very happy."[49]   Boulter

ended by exhorting Buckley to do something to "help me [Boulter] buy some time" with the

investors and, thus, forestall the threatened stock sell-off.[50]

### 2.   The Davis Defendants join in the scheme to coerce 3M to capitulate to Claimants' unreasonable demands.

In furtherance of the coercive scheme, in early 2010, Boulter hired Tetra Strategy—a

British lobbying and public relations firm which describes itself as having expertise in "the

process of exerting influence"—and began paying it £10,000 per month in connection with the

London Litigation.[51]   Tetra Strategy has publicly described that engagement as "provid[ing]

litigation PR assistance to the Porton Group in connection with its ongoing High Court claim in

England against 3M."[52]   Then, Boulter brought in Defendant Lanny Davis, a self-proclaimed

media relations specialist, to plan and implement the next two prongs of Defendants' tortious

conspiracy.[53]

Specifically, beginning in early 2011, Boulter and Davis joined forces with Tetra Strategy

to embark on a disparaging media blitz that spread deliberately false and defamatory statements

---

[49] Compl. ¶¶ 50-53; Amended Compl. ¶¶ 54-57.

[50] Compl. ¶¶ 50-53; Amended Compl. ¶¶ 54-57.

[51] Rupert Neate, The Guardian (Oct. 9, 2011), *Revealed: How Lobbyists Were Paid To Set Up Meeting With Fox*, http://www.guardian.co.uk/politics/2011/oct/09/liam-fox-meeting-lobbyists-werritty-boulter, a copy of which is attached at Ex. J-11; *see also* http://www.tetra-strategy.co.uk/about.   This Court may take judicial notice of generally known facts reported in newspaper articles.   *See CSX Transp. v. Williams*, 2005 U.S. Dist. LEXIS, * 2-3 (D.D.C. Apr. 22 2005) (taking judicial notice of testimony of U.S. government official quoted in *The Washington Post*); *see also The Washington Post v. Robinson*, 935 F.2d 282, 291-92 (D.C. Cir. 1991) (citing *Agee v. Muskie,* 629 F.2d 80, 81 n. 1, 90 (D.C. Cir. 1980), *r'vd on other grounds*, *Haig v. Agee*, 453 U.S. 280 (1981) (taking judicial notice of facts published in newspaper).

[52] Rupert Neate, The Guardian (Oct. 9, 2011), *Revealed: How Lobbyists Were Paid To Set Up Meeting With Fox*, http://www.guardian.co.uk/politics/2011/oct/09/liam-fox-meeting-lobbyists-werritty-boulter, a copy of which is attached at Ex. J-11.

[53] Compl. ¶ 57; Amended Compl. ¶ 61.   At the time, Davis was a partner in McDermott, Will & Emery, LLP, the firm then heading Claimants' prosecution of the London Litigation.

about 3M's decision to cease marketing BacLite.[54] As discovery will prove, this campaign had nothing to do with advocacy on issues of public interest but, instead, was crafted solely to advance Defendants' commercial agenda of coercing 3M into a significant settlement in the London Litigation.

In addition, as described herein, in parallel with their defamation campaign and entirely unbeknownst to 3M, Defendants successfully put into motion a plan to directly interfere with 3M's significant existing and prospective business interests with the U.K. Government, including the Ministry of Defence. They did so by buying access to high-level Ministry of Defence officials, including former U.K. Secretary of Defense, Fox, through Tetra Strategy, and utilizing Boulter's existing contacts and relationships with U.K. Government civil servants and bureaucrats to cause harm to 3M's current and future contract and commercial opportunities with the Government.

### 3. Defendants' malicious and defamatory media campaign against 3M.

By March 2011, Defendants' defamatory media campaign was in full swing.[55] In numerous press releases, on websites, twitter feeds, blogs, and manufactured "news" articles, Davis, Boulter, and the Porton Defendants kept up a steady drumbeat of knowing lies, false innuendo, and half-truths about 3M—all designed to put 3M into a false and disparaging light in the public's eye.[56] They were assisted in this endeavor by Tetra Strategy, which is listed as a point of contact "for further information" on the press releases that Davis and Boulter published.[57]

---

[54] Compl. ¶ 57; Amended Compl. ¶ 80.

[55] Compl. ¶¶ 57-64; Amended Compl. ¶¶ 64-77.

[56] Compl. ¶¶ 57-64; Amended Compl. ¶¶ 64-77.

[57] *See* Lanny J. Davis, Reuters (May 10, 2011, 2:43 p.m.), *International Press Conference Advisory — Allegations Against 3M Corporation of Possible "Negligence and Recklessness" in Testing*

For example, Boulter, Davis, and Davis's firms (Defendants Lanny J. Davis & Associates, PLLC and Davis-Block LLC) accused 3M of lying to the FDA (a criminal act, if it were true).[58]   They also maliciously and falsely told the public that 3M had purchased Acolyte with the intention of abandoning BacLite in favor of another MRSA-related technology that 3M was developing.[59]   They made these statements even though they knew that Claimants (including Boulter's companies and the Porton Defendants) had already abandoned this claim in the London Litigation because discovery had proven it completely unsupported by the evidence.[60]

In an especially malicious and defamatory *per se* allegation, Defendants repeatedly and publicly asserted that 3M had endangered "thousands and thousands" of people by taking BacLite off the market, ultimately resulting in deaths, even though they knew that the very reason BacLite proved a commercial failure was the ready availability of other MRSA screening tests that were both effective and preferred by all categories of potential clients for BacLite.[61]   Indeed, the U.K. Ministries of Health and Defence—in response to specific questions on these issues raised by a member of the British Parliament publicly linked to Davis—confirmed those

---

of Proven "Superbug"/Staph ("MRSA") Infection Detection Device — U.S. FDA Investigation and Public Hearings Sought, http://www.reuters.com/article/2011/05/10/idUS224289+10-May-2011+PRN20110510 (listing Catherine Nicholls of Tetra Strategy as contact person), a copy of which is attached at Ex. J-1.

[58] Compl. ¶ 62; Amended Compl. ¶ 74.  The Davis Defendants began their improper efforts to use the FDA to push his and Boulter's wrongful scheme on January 19, 2011, when they filed an Application in the United States District Court for the District of Maryland seeking document discovery from the FDA about BacLite's regulatory approval process, as well as the deposition testimony of FDA Commissioner Margaret Hamburg. *See*  https://ecf.mdd.uscourts.gov/doc1/09313471946 [Doc. #1]. This request was immediately opposed by the FDA as baseless in both law and fact, and has gone nowhere.  *See https://ecf.mdd.uscourts.gov/doc1/09313471946* [Doc. # 10].

[59] Compl. ¶ 58; Amended Compl. ¶ 67.

[60] Compl. ¶¶ 60-62; Amended Compl. ¶¶ 67-68.

[61] Compl. ¶¶ 57, 60; Amended Compl. ¶¶ 70-71.

facts publicly *before* Defendants published their false accusations.[62]  Davis, Boulter, and Tetra Strategy continued this cynical exploitation of legitimate MRSA victims by organizing public demonstrations in the U.S. and U.K. that were attended by individuals hired and paid by Defendants.[63]

A more detailed description of Davis and Boulter's knowingly false and intentionally disparaging statements can be found in 3M's Amended Complaint.[64]

4.   **Defendants seek to harm 3M by making misrepresentations in a sham "citizen's petition" filed with the U.S. Food and Drug Administration.**

On May 6, 2011, the Davis Defendants furthered their scheme by filing a sham citizen's petition with the FDA and requesting that the agency:  (1) "investigate 3M;" (2) hold an "evidentiary public hearing . . . to review 3M's BacLite clinical trial;" (3) "undertake a specific investigation of 3M's financial interests and arrangements regarding its product FastMan/Simplexa;" (4) "audit 3M's BacLite trial data;" and (5) "appoint an independent clinical investigator to re-conduct the 3M trial study . . . at 3M's cost."[65]  That Petition falsely and maliciously blamed BacLite's poor performance in the clinical trial on misconduct by 3M motivated by 3M's alleged desire to promote what Defendants falsely asserted to be a competing

---

[62] On February 17, 2011, in official responses to questions submitted by Member of Parliament Tom Watson, officials with the U.K. government noted that, "*Many laboratory methods* are available to national health service hospitals to detect Methicillin-resistant *Staphylococcus aureus* (MRSA) . . . These tests have been available for many years and are capable of detecting the emergence of a new MRSA on this basis." (emphasis added) Amended Compl. ¶ 72.  Watson was later quoted by Davis in press releases issued as part of Defendants' defamatory media campaign against 3M. Amended Complaint ¶ 67 n.1

[63] Compl. ¶ 64; Amended Compl. ¶ 82.

[64] *See* Compl. ¶¶ 57-64; Amended Compl. ¶¶ 64-77.

[65] Citizen's Petition Pursuant to 21 CFR § 10.30 to the Secretary of Health and Human Services and the Food and Drug Administration Requesting an Investigation of the 3M Corporation and Its Conduct in the BacLite Clinical Trial "A Covered Clinical Study" (May 6, 2011) ("Cit. Pet."); Amended Compl. ¶ 85.

MRSA detection product called "FastMan."[66]  Bootstrapping further media attention with their own false and meritless citizen's petition, Defendants held press conferences repeating and enlarging upon the maliciously false allegations in the citizen's petition, and referred any and all listeners and viewers to Defendant's website, www.MRSA-injustice.com, where Defendants republished the citizen's petition.[67]

Defendants knowingly and maliciously made numerous other false statements in the petition.  For example, Defendants falsely stated that "Acolyte was sold to 3M for a relatively small down payment of 10 million pounds sterling—with another £41 million pounds to be paid out through the end of 2009."[68]  Defendants knew, however, that the Porton Defendants were entitled, under the parties' agreement, only to receive an amount based on the actual sales of BacLite, of which £41 million was the maximum possible payout, not a guaranteed amount.[69]

Defendants also wrongly claimed that "hospital patients in Europe, the U.S., Canada, and Australia are not able to gain the protection of BacLite's ability to deduct deadly MRSAs within hours, rather than days, as a result of 3M's inexplicable conduct in botching the U.S. clinical trials."[70]  That statement was knowingly false because, at the time, Defendants were aware that BacLite was on the market (albeit, competing against genetic MRSA tests that provided results

---

[66] Amended Compl. ¶ 78.

[67] Compl. ¶¶ 57-65; Amended Compl. ¶¶ 64-77.

[68] Amended Compl. ¶ 78.

[69] Compl. ¶ 48-49; Amended Compl. ¶ 45.

[70] Amended Compl. ¶ 78.

in one hour or less—far more quickly than BacLite).[71]  Indeed, the availability of such tests was one of the reasons that 3M rightly determined BacLite was not commercially viable.[72]

Defendants also falsely asserted in the petition that 3M intentionally botched the BacLite clinical trials and abandoned BacLite in order to bolster the market opportunities of another 3M product, FastMan.[73] Defendants knew this statement was false because documents previously produced to the Porton Defendants—and their lawyer, Davis—in the London Litigation had disproved it.[74]  Indeed, as a result, Claimants were forced—nearly a year before the citizen's petition was filed—to amend their claims in the London Litigation to withdraw those allegations.[75]

Finally, in their most insidious and maliciously false allegation, Defendants wrongly asserted that 3M's decision to withdraw BacLite from the market "led to countless unnecessary infections and deaths."[76]  Defendants knew, at the time it was made, that this accusation was patently false, because genetic and chromogenic agar tests for MRSA screening continued to be available, and were being widely used by hospitals and clinics—even those that were also using BacLite.[77]  That is why Defendants have never cited to any evidence that a single infection or death from MRSA has been linked to the unavailability of BacLite, nor could they cite to any

---

[71] Compl. ¶¶ 45-46, 60-61; Amended Compl. ¶¶ 49-51, 71-73

[72] Approved Judgment in the High Court of Justice Queens Bench Division Commercial Court, No: 2008 Folio No. 877 (Porton Capital Technology Funds et. al v. 3M Company), [2011] EWHC 2895 (Nov. 7, 2011), at ¶¶ 121, 282-83 ("Approved Judgment").

[73] Amended Compl. ¶ 78.

[74] Compl. ¶ 59;  Amended Compl. ¶ 68.

[75] Compl. ¶ 59;  Amended Compl. ¶ 68.

[76] Amended Compl. ¶ 78.

[77] Compl. ¶ 61; Amended Compl. ¶¶ 71-73.

evidence that a single patient has gone without effective MRSA screening because 3M stopped selling BacLite.

The foregoing facts were, of course, of no consequence to Defendants, because they filed the sham citizen's petition solely to further their commercial interests—specifically, to advance their joint scheme to coerce 3M into making payments to Defendants that were not owed.[78] When they filed the petition, Defendants knew that the FDA's role is to ensure that unsafe and/or unreliable drugs and medical devices do not make it to market, and not to ensure that products make it to market even if the owner decides to cease seeking approval for the product.[79]  They also knew that, given that charter, the FDA does not further investigate medical devices once the owner ceases seeking approval, and that clinical trial data regarding products and devices that never complete the FDA approval process are not made public.[80]

Moreover, Defendants made a material misrepresentation in their certification of the sham citizen's petition, required by FDA rules, when they stated that "[t]he undersigned certifies, that, to the best knowledge and belief of the undersigned, this petition includes all information and views on which the petition relies, and that it *includes representative data and information known to the petitioner which are unfavorable to the petition*."[81]  Defendants knowingly omitted

---

[78] Amended Compl. ¶ 79.

[79] *Id.; Improving Public Health: Promoting Safe and Effective Drug Use*, U.S. Food and Drug Admin., *available at* http://www.fda.gov/AboutFDA/CentersOffices/OfficeofMedicalProductsandTobacc o/CDER/WhatWeDo/default.htm; FDA Fundamentals, U.S. Food and Drug Admin., *available at* http://www.fda.gov/AboutFDA/Transparency/Basics/ucm192695.htm.

[80] Amended Compl. ¶ 79; *See* Michael A. Rogawski and Howard J. Federoff, *Disclosure of Clinical Trial Results When Product Development Is Abandoned*, 102cm29 Science & Translational Medicine (2011), *available at* http://works.bepress.com/michael_rogawski/40.

[81] Amended Compl. ¶ 78 (emphasis added).

from the citizen's petition facts unfavorable to their allegations, including the existence of other, faster MRSA screening tests and data showing that BacLite was not commercially viable.[82]

**5.** **Defendants' initially covert scheme to tortiously interfere with 3M's significant business interests with the U.K. government by "buying" access to key British officials through Tetra Strategy.**

At the same time that they were conducting a malicious and intentionally defamatory media campaign against 3M, and filing sham petitions with the FDA, Davis and Boulter were also—entirely without 3M's knowledge—embarking on an ambitious scheme to conspire with others to illegally interfere with 3M's existing and prospective business with the U.K. government.  As certain government and media investigations in the U.K., which were begun after 3M first brought its claims against Defendants, have now revealed—and discovery in this case will confirm—the lynchpin of this scheme was Davis's and Boulter's plan to "buy" access and influence with the highest levels of the British government through Tetra Strategy.

Specifically, Davis and Boulter took full advantage of the £10,000 per month being paid to Tetra Strategy to enlist its help in their plan to blackmail and intimidate 3M  into paying them a settlement in the London Litigation they knew was far in excess of what the actual merits of the case warranted.[83]  Davis and Boulter knew that Tetra Strategy had expertise in "influencing" government officials and action, and wanted its assistance in obtaining a private meeting with then Minister of Defence Fox.[84]  Tetra Strategy did not disappoint, recommending that it arrange

---

[82] Compl. ¶¶ 39-46; Amended Compl.  ¶¶ 49-51, 64-73.

[83] Rupert Neate, The Guardian (Oct. 9, 2011), *Revealed: How Lobbyists Were Paid To Set Up Meeting With Fox*, http://www.guardian.co.uk/politics/2011/oct/09/liam-fox-meeting-lobbyists-werritty-boulter ("Indeed,   . . . Tetra introduced its client to Adam Werritty in March 2011 . . . . The purpose of the introduction was to brief the MoD on the litigation."), a copy of which is attached at Ex. J-11.

[84] *Id.*; *see also* http://www.tetra-strategy.co.uk/about ("Tetra Strategy — Bringing the Science of influence and opinion to the Art of strategic communications.").

for Boulter to meet with Adam Werrity ("Werrity").[85]   E-mails published by the British newspaper *The Guardian* establish that Tetra Strategy began working to arrange a meeting between Boulter and Fox or Werrity as early as March 25, 2011.[86]   Werrity is a close personal friend of Fox.[87]   The two had been business associates prior to Fox's appointment as Defence Minister, and had even lived together for a period of time.[88]   Although it was later revealed that Werrity had not been approved to act as an official adviser to Fox, he distributed business cards describing himself as "Advisor to the Rt. Hon. Dr. Fox MP."[89]

There is no doubt that Tetra Strategy introduced Boulter to Werrity so that Boulter could gain private access to Fox.  Boulter himself has admitted as much, stating:

> Tetra suggested a meeting with Adam Werrity because he was an adviser to Mr. Fox . . . It was:  meet the adviser.  If you get through the adviser, you get to see the boss . . . .[90]

The connection was finally made in early April 2011, when Boulter and Werrity exchanged e-mails about the London Litigation.[91]   In those communications, Werrity told Boulter that he

---

[85] Rupert Neate, The Guardian (Oct. 9, 2011), *Revealed: How Lobbyists Were Paid To Set Up Meeting With Fox*, http://www.guardian.co.uk/politics/2011/oct/09/liam-fox-meeting-lobbyists-werritty-boulter ("Indeed,   . . . Tetra introduced its client to Adam Werrity in March 2011 . . . . The purpose of the introduction was to brief the MoD on the litigation."), a copy of which is attached at Ex. J-11.

[86] Rupert Neate, The Guardian (Oct. 8, 2011), *Emails and Video Footage Pile Pressure on Beleaguered Liam Fox*, http://www.guardian.co.uk/politics/2011/oct/08/ emails-video-footage-liam-fox, a copy of which is attached at Ex. J-9.

[87] Rupert Neate, The Guardian (Aug. 18, 2011), *Liam Fox's Friend Set Up Crucial Legal Meeting*, http://www.guardian.co.uk/politics/2011/aug/18/ liam-fox-friend-set-up-crucial-legal-talks, a copy of which is attached at Ex. J-5.

[88] *Id.*

[89] *Id.*

[90] Oliver Wright, Independent (Oct. 8, 2011), *Fox Feels Heat As New Claim Casts Doubt On MoD Denial*, http://www.independent.co.uk/news/uk/politics/fox-feels-heat-as-new-claim-casts-doubt-on-mod-denial-2367349.html, a copy of which is attached at Ex. J-7.

would "push along as discussed" Boulter's agenda and that Werrity hoped Fox would "want to make an issue out of this."[92]

Davis, Boulter, and Tetra Strategy's efforts finally paid-off on June 16, 2011, when Fox and Werrity met with Boulter at a restaurant in the Shangri-La Hotel in Dubai.[93]   It was disclosed by the Ministry of Defence that "no government officials were present at the 16 June meeting and no minutes were taken, which is against protocol."[94]

6.   **Defendants implement the final phase of their illegal conspiracy—blackmail and intimidation.**

Boulter's private, off-the-record meeting with Fox finally allowed Defendants to implement the next phase of their wrongful scheme to force 3M into settling the London Litigation for tens of millions dollars more than they knew it was actually worth.   Almost immediately after the meeting, the Davis Defendants, Boulter, and others put their illegal intimidation scheme against 3M into motion with a call from Davis to 3M's counsel on June 17, 2011, followed immediately by an e-mail, addressed to both 3M's counsel and Boulter, ostensibly to grant Davis's "permission" for 3M's counsel to speak directly to Boulter.[95]   There is no doubt that, Davis had coordinated with Boulter ahead of time as to what threats Boulter would

---

[91] Rupert Neate, The Guardian (Oct. 9, 2011), *Revealed: How Lobbyists Were Paid To Set Up Meeting With Fox*, http://www.guardian.co.uk/politics/2011/oct/09/liam-fox-meeting-lobbyists-werritty-boulter, a copy of which is attached at Ex. J-11.

[92] *Id.*

[93] Rupert Neate, The Guardian (June 27, 2011), *Government Weighs Into "Blackmail" Row Over 3M and MRSA Test*, http://www.guardian.co.uk/business/2011/jun/27/ government-3m-blackmail-row-mrsa, a copy of which is attached at Ex. J-3.

[94] James Kirkup, Telegraph (Oct. 9, 2011), *Liam Fox on Adam Werritty: I Was Wrong and I Am Sorry*,   http://blogs.telegraph.co.uk/news/jameskirkup/100109702/liam-fox-on-adam-werritty-i-was-wrong - and-i-am-sorry, a copy of which is attached at Ex. J-10.

[95] Compl. ¶¶ 71-73; Amended Compl. ¶¶ 85-86.   Rupert Neate, The Guardian (Oct. 9, 2011), *Revealed:   How   Lobbyists   Were   Paid   To   Set   Up   Meeting   With   Fox*, http://www.guardian.co.uk/politics/2011/oct/09/liam-fox-meeting-lobbyists-werritty-boulter.   A copy of which is attached at Ex. J-11.

communicate to 3M's counsel. Indeed, Davis noted in a follow-up e-mail to 3M's counsel—also addressed to Boulter—that "I know your [Boulter's] meeting with UK Minister of Defense Dr Liam Fox has given you even stronger reason not to come down very [sic] in $34m position."[96]

Then, that same date, Boulter called 3M's attorney.[97] During the ensuing conversation, Boulter stated that he was authorized to speak on behalf of all of the Claimants in the London Litigation—which included an affiliate of the U.K.[98]  He also mentioned his Dubai meeting with Fox, and alleged that Fox had authorized him to speak on behalf of the Ministry of Defence.[99] Boulter then told 3M's counsel there would be "consequences" if 3M did not immediately settle the London Litigation, that Fox had indicated there would also be repercussions for Buckley's impending knighthood.[100]  The conversation, however, ended abruptly because of an interruption in cell service—before 3M's attorney was able to respond.[101]

Boulter followed-up with two e-mails, sent on June 18 and 19, 2011.[102]  Those communications unambiguously and directly threatened interference with 3M's business interests in the U.K. unless 3M paid the Porton Defendants $30 million or more, ostensibly in settlement of the London Litigation.[103]  In the mistaken belief that it would intimidate 3M's Chairman and CEO, Boulter also threatened Buckley's pending investiture as a Knight Bachelor

---

[96] Compl. ¶ 68, Ex. A; Amended Compl. ¶ 86.

[97] Compl. ¶¶ 69-70; Amended Compl. ¶ 87.

[98] Compl. ¶¶ 69-70; Amended Compl. ¶ 87.

[99] Compl. ¶¶ 69-70; Amended Compl. ¶ 87.

[100] Compl. ¶¶ 69-70; Amended Compl. ¶ 87.

[101] Compl. ¶¶ 69-70; Amended Compl. ¶ 87.

[102] Compl. ¶¶ 69-70; Amended Compl. ¶ 87.

[103] Compl. ¶¶ 71-75; Amended Compl. ¶¶ 85-93.

by the Her Majesty Queen Elizabeth.[104]  Specifically, Boulter declared in his e-mail of June 18,

2011, that:

> [A]s a result of my meeting today [with Fox] you ought to
> understand that [U.K. Prime Minister] David Cameron's Cabinet
> might very shortly be discussing the rather embarrassing situation
> of George's knighthood.  It was discussed today. Governments are
> big and sometimes decisions in one part are not well coordinated.[105]

While demanding a settlement of the London Litigation of "$30 mn+,"[106] Boulter

conceded that this figure had no basis in the actual merits of the case, noting that it had "little to

do with the case in the Court" but was, instead, "about losing face."  He arrogantly added that

"[f]rom my side . . . whether this is $5mn or $35mn it is small beer.  We manage $700mn and

many of our investors call $5mn a rounding error."

Boulter then articulated his threats to 3M's business interests with the British

Government.[107]  Noting first that he was "being asked, and [had] been given the sole authority by

the [British Ministry of Defence] to settle on behalf of them," he stated that "I had 45 minutes

with Dr. Liam Fox, the British Defence Minister on our current favourite topic."  Boulter then

stated that, while 3M might prevail on the merits in the London Litigation,  it will have won the

battle, but lost the war, because the Ministry of Defence would likely react by taking steps to

deprive 3M of its ability to pursue its business interests with the U.K. Government.  Specifically,

Boulter asserted that 3M's trial victory in the London Litigation "might leave [the British

Government] quietly seething, with ramifications for a while – they have memories like

---

[104] Compl. ¶¶ 71-75; Amended Compl. ¶¶ 85-93.

[105] Compl. ¶¶ 71-75; Amended Compl. ¶¶ 85-93.

[106] Compl. ¶¶ 71-75; Amended Compl. ¶¶ 85-93.

[107] Compl. ¶¶ 71-75; Amended Compl. ¶¶ 85-93.

elephants."  On the other hand, if 3M were to settle the case for "$30mn+ you will allow [the MoD] to internally save face."

Boulter imbued his threats with a sense of urgency, noting that  "[f]rom next week [M]onday there are politics that will likely remove any further chance of settlement."[108]  He underscored this urgency in a follow-up e-mail to 3M's counsel on June 19, 2011,[109] wherein Boulter pressed 3M for immediate capitulation to Defendants' demands and claimed that he needed to "tell something to Dr. Fox's office on Sunday night."[110]  He again warned 3M of the "political consequences" that would occur beginning Monday.  In addition, he warned against not responding—or as he put it, giving "a 'radio silence' message"—because Dr. Fox "is the Secretary of Defence and will not expect that."[111]

It is apparent from this record, and discovery will confirm, that Davis set up the communications between 3M's counsel and Boulter with the intent that Boulter use that opportunity to deliver Defendants' extortionate threats regarding 3M's business interests in the U.K. and Buckley's knighthood.  Given Davis's express reference to the meeting in his e-mail to 3M's counsel of June 18, 2011, it is equally apparent that Davis and Boulter had discussed both what transpired at Boulter's meeting with Fox and what Boulter would say about that meeting to 3M's attorney.

The timing of the foregoing communications, on the eve of trial in the London Litigation, speaks volumes.  Davis and Boulter knew that there was no chance that the High Court would award Claimants anything near the over $30 million return on investment that Boulter had

---

[108] Compl. ¶¶ 71-75; Amended Compl. ¶¶ 85-93.

[109] Compl. ¶¶ 71-75; Amended Compl. ¶¶ 85-93.

[110] Compl. ¶¶ 71-75; Amended Compl. ¶¶ 85-93.

[111] Compl. ¶¶ 71-75; Amended Compl. ¶¶ 85-93.

promised both Acolyte's former shareholders and his own investors in Porton Capital. Accordingly, Davis and Boulter decided to extort that amount out of 3M through blackmail and illegal intimidation.

**C.     The U.K. Parliament Undertakes An Investigation And Fox Resigns.**

After 3M filed its original action in New York on June 19, 2011, the Ministry of Defence refused either to confirm or deny news inquiries about whether Fox had met with Boulter on June 17, 2011, then subsequently denied the London Litigation had been discussed at the meeting.[112]   However, it later reversed course and admitted that Boulter and Fox had discussed the London Litigation, but denied that Buckley's knighthood had been discussed.[113]

In light of this fact, and other revelations about the professional relationship between Werrity to Fox, Parliament insisted on a formal inquiry,[114] and the Ministry of Defence's most senior official below Fox was tasked with conducting it.[115]   Shortly thereafter, Fox told a BBC interviewer that his meeting with Boulter in Dubai was a chance event, which occurred when he

---

[112] Rupert Neate, The Guardian (June 20, 2011), *3M Countersues as MRSA Row Becomes Toxic*, http://www.guardian.co.uk/society/2011/jun/20/3m-countersues-mrsa-superbug-row, attached at Ex. J-2; Rupert Neate, The Guardian (June 27, 2011), *Government Weighs Into "Blackmail" Row Over 3M and MRSA Test*, http://www.guardian.co.uk/business/2011/jun/27/government-3m-blackmail-row-mrsa, a copy of which is attached at Ex. J-3.

[113] Jonathan Russell, Telegraph (Aug. 9, 2011, 5:45 a.m.), *Liam Fox Denies Involvement In Dispute Between 3M and Porton Capital*, http://www.telegraph.co.uk/finance/8689691/Liam-Fox-denies-involvement-in-dispute-between-3M-and-Porton-Capital.html, a copy of which is attached at Ex. J-4.

[114] Rupert Neate, The Guardian (Oct. 7, 2011), *Liam Fox, His Adviser, And An Irregular Meeting In Dubai*, http://www.guardian.co.uk/politics/2011/oct/07/liam-fox-adviser-meeting-dubai, a copy of which is attached at Ex. J-6.

[115] *Id.*

and Boulter happened to be sitting at nearby restaurant tables.[116]   That assertion, however, was

immediately challenged by Boulter, who said:

> The fact that a meeting was going to happen was pre-arranged in
> April.  A meeting with the MoD doesn't happen by chance.  I'm
> sure I wouldn't have just got to meet him [Fox] unless I'd been
> pre-briefed.[117]

After that statement, Fox again flipped-flopped, telling the U.K. House of Commons that, "With

respect to my meeting with Mr. Boulter in Dubai in June 2011, I accept that it was wrong to meet

with a commercial supplier without the presence of an official."[118]

On October 14, 2011, as a result of the "influence peddling scandal" that had arisen when

3M's lawsuit had revealed that Boulter had met Fox in Dubai and based his extortion demands to

3M on the discussions held at that meeting, Fox was forced to resign as U.K. Minister of

Defence.[119]   In the days since Fox's resignation, Boulter has been attempting to revise history in

an effort to obfuscate his role in this scandal.  For example, Boulter recently stated, contrary to

his e-mails to 3M's attorney, that he did not discuss Buckley's knighthood during his meeting

---

[116] Rupert Neate, The Guardian (Oct. 8, 2011), *Businessman Met Fox's Friend Two Months Before "Chance" Dubai Meeting*, http://www.guardian.co.uk/politics/2011/oct/08/liam-fox-dubai-meeting-chance, a copy of which is attached at Ex. J-8.

[117] Rupert Neate, The Guardian (Oct. 8, 2011), *Emails and Video Footage File Pressure on Beleaguered Liam Fox*, http://www.guardian.co.uk/politics/2011/oct/08/ emails-video-footage-liam-fox, a copy of which is attached at Ex. J-9.

[118] James Kirkup, Telegraph (Oct. 9, 2011), *Liam Fox on Adam Werritty:  I Was Wrong and I Am Sorry*, http://blogs.telegraph.co.uk/news/jameskirkup/100109702/liam-fox-on-adam-werritty-i-was-wrong- and-i-am-sorry, a copy of which is attached at Ex. J-10.

[119] Rupert Neate, The Guardian (Oct. 14, 2011), *How Adam Werritty's Role As Self-Styled Adviser to Liam Fox Unravelled*, http://www.guardian.co.uk/politics/2011/ oct/14/adam-werritty-liam-fox-unravelled, a copy of which is attached at Ex. J-12.

with Fox, but rather did so at another meeting he had on the same day with another, unnamed official.[120]

## D.   The High Court's Judgment

On November 7, 2011, the High Court handed down a Approved Judgment resolving the issues in the London Litigation, and awarding Claimants just $1,299,808 in damages, an amount at least $30 million less than what Defendants attempted to extort from 3M before trial.[121]  The High Court further held that "there was no failure to exercise such [diligent] care in relation to the U.S. clinical trials . . . . I accordingly find that the conduct of these trials involved no breach of the obligation diligently to seek regulatory approval."[122]  In reaching this conclusion, the London court also rejected the Claimants' allegations that 3M mishandled the BacLite clinical trials by:  (i) using the wrong comparator in the clinical trials; (ii) improperly deciding not to conduct a pre-clinical study; (iii) failing to reasonably ensure that clinical sites used the proper incubation temperature; and (iv) failing to correctly monitor the trial sites.[123]

Importantly, the High Court found that BacLite "would never have been a commercial success and [that] future sales of the product would have been limited."[124]  It also determined that the evidence was that BacLite: (i) was not "robust" and was "too sensitive to minor changes in environment or deviations from the 'ideal' operating protocol;" (ii) required more "hands on" time than what many laboratories wanted; (iii) was not actually a "same day" test as its value proposition required; (iv) was of limited use to real-world laboratories because of the batch-

---

[120]  *See*  http://www.guardian.co.uk/society/2011/jun/20/3m-countersues-mrsa-superbug-row (last visited, Oct. 22, 2011), a copy of which is attached at Ex. J-2.

[121]  See Approved Judgment, ¶ 349.  A copy of the Approved Judgment is attached as Ex. A hereto.

[122]  Approved Judgment, ¶ 140.

[123]  *See id* at ¶¶ 109, 112, 118, 128, 139.

[124]  *Id.* at ¶ 296.

testing required to be economical, and was only validated for use with a particular type of swab that could be used with only two body sites; (v) had "poor" sales; and (vi) was being "squeezed" out its value niche because its competitors—all of which were already being used by the very customers to whom 3M was trying to sell BacLite—were becoming faster and cheaper.[125]

The foregoing findings establish that Defendants defamatory *per se* allegations that 3M's removal of BacLite from the market led to "thousands" of MRSA-related deaths were as intentionally outrageous as they were in knowingly false.   When Defendants published these malicious misrepresentations, they knew that 3M's failure to successfully market BacLite was directly attributable to the fact that BacLite, given its lack of robustness, could not commercially compete with other MRSA-screening tests that were widely available and *already being used* by potential BacLite customers.[126]   Defendants also knew that, given these facts, BacLite's removal from the market by 3M could not have resulted in any hospital or clinic lacking the capability of screening for MRSA in a timely manner.   That is why, tellingly, Defendants have never cited to *any* evidence that a single MRSA-related infection or death resulted from 3M's decision to cease BacLite's sale.   Nor will Defendants ever do so, because no such evidence exists.

## E.     The Damage Done

While the full-extent of the harm Defendants' have inflicted on 3M awaits further discovery and factual development, it appears that Defendants have acted on their threats to interfere with 3M's existing business relationships with the U.K. Government.[127]   3M's annual sales to the Ministry of Defense from 2009 to 2011 on annualized basis, have dropped a

---

[125] *See id.* at ¶¶ 259, 261, 264-267, 278-279, 282-283, 295.

[126] *See id.* at ¶ 296.

[127] *See* Declaration of Lorna Manning in Support of 3M Company's Motion to Strike Defendants' Special Motion to Dismiss and Cross-Motion for Discovery and Continuance, dated Oct. 31, 2011 ("Manning Dec."), attached hereto as Ex. K; *see also* Amended Compl. ¶¶ 113-14.

staggering 50%.   3M's annual sales to the U.K. "Central Government" have dropped approximately 43% over the same period.   In addition, 3M is now aware of at least three prospective contracts with the MoD, collectively worth over £2.5 million ($4.0 million) that have been delayed or denied because of Defendants' conduct.[128]   Thus, the still-developing evidence draws a straight line from Davis and Boulter, to the illicit meeting between Fox and Boulter in Dubai, to blackmail threats against 3M, and finally to recent and dramatic losses suffered by 3M in its existing business with the U.K. government.   These facts, as discussed below, highlight 3M's need for further discovery to establish the scope and true purpose of Defendants' and others' wrongful conduct toward 3M.

## F.   The Procedural History Of This Action

After Defendants communicated their threats to 3M's counsel, 3M acted quickly to address that blackmail in the only effective way—by bringing it to light and seeking appropriate judicial remedies.   Thus, on June 19, 2011, 3M filed a complaint in New York state court against Harvey Boulter, Porton Capital Technology Funds, and Porton Capital, Inc., service of which was accepted by counsel on behalf of all.[129]   Subsequent to that filing, 3M continued to investigate the facts surrounding the conspiracy, especially as it related to Davis and his firm's roles in orchestrating Defendants' conspiracy, including the waging of a false and defamatory media campaign against 3M and participating in the ultimate act of blackmail that precipitated this action.

The Defendants in the New York action responded on July 14, 2011, by moving to dismiss, largely on personal jurisdiction and forum *non conveniens* grounds, with a one-page

---

[128] Amended Compl. ¶¶ 113-14.

[129] *See* Complaint and Demand for Jury, filed June 19, 2011, N.Y. Sup. Ct. Index No. 651708/2011.

legal sufficiency argument at the end.[130]  By then, 3M had developed substantial facts regarding

Lanny Davis' involvement in defendants' conspiracy.  Therefore, instead of opposing the New

York Defendants' motion to dismiss, 3M filed an amended complaint on July 21, 2011, that

added Davis and his firms as party-defendants, asserted a commercial defamation claim, and

expanded the factual allegations with newly-discovered facts that established the existence of the

conspiracy among all of the named New York defendants.[131]

All of the New York defendants moved to dismiss the amended complaint on August 19,

2011, based, once again, on lack of personal jurisdiction, *forum non conveniens* and, in cursory

fashion, failure to state a claim.[132]  Although 3M maintained that New York was a convenient

forum in which to adjudicate its claims, that the New York court had personal jurisdiction over

all defendants, and that its complaint therein more than adequately alleged claims upon which

relief could be granted, 3M elected for the sake of expediency to dismiss the New York action

without prejudice[133] and refile it in Washington, D.C.—where jurisdiction is assured because the

Davis Defendants have their principal places of business there.  Indeed, in their motion to

dismiss the New York suit, Defendants conceded that Washington, D.C. is a "convenient

available forum[] in which 3M may bring its claims."[134]

---

[130] *See* Memorandum of Law in Support of Defendants' Motion to Dismiss Complaint, filed July 14, 2011, N.Y. Sup. Ct. Index No. 651708/2011 (attached hereto as Ex. L).

[131] *See* First Amended Complaint, filed July 21, 2011, N.Y. Sup. Ct. Index No. 651708/2011 (attached hereto as Ex. M).

[132] *See* Memorandum of Law in Support of Defendants' Motion to Dismiss First Amended Complaint, filed August 19, 2011, N.Y. Sup. Ct. Index No. 651708/2011 (attached hereto as Ex. N).

[133] *See* Plaintiff 3M Company's Memorandum of Law in Support of Its Motion for an Order of Voluntary Discontinuance Without Prejudice Pursuant to C.P.L.R. 3217(b), filed September 19, 2011, N.Y. Sup. Ct. Index No. 651708/2011 (attached hereto as Ex. O).

[134] Memorandum of Law in Support of Defendants' Motion to Dismiss First Amended Complaint, filed August 19, 2011, N.Y. Sup. Ct. Index No. 651708/2011, at 28 (attached hereto as Ex. L).

3M filed this action on August 24, 2011. The motions to dismiss to which this Consolidated Opposition responds are the first ones filed by Defendants (in either action) that assert non-cursory legal sufficiency arguments.

## III.

## SUMMARY OF OPPOSITION

This Consolidated Opposition addresses the arguments made both in the Davis Defendants' Motion and in the Porton Defendants' Motion.

**A.    Personal Jurisdiction**

At the threshold, the Porton Defendants erroneously argue that this Court lacks personal jurisdiction over them because no jurisdiction exists under the D.C. statute providing for long-arm jurisdiction, and any exercise of personal jurisdiction over them by this Court would not comport with due process. In fact, this Court has personal jurisdiction over the Porton Defendants for two reasons. First, the D.C. long-arm statute extends personal jurisdiction to co-conspirators, and 3M has adequately alleged that the Porton Defendants conspired with the Davis Defendants in D.C. Second, the D.C. long-arm statute extends personal jurisdiction to those who transact business within D.C. through their agents, and 3M has adequately alleged that the Porton Defendants acted in D.C. through their agents, the Davis Defendants.

**B.    Sufficiency Of 3M's Claims**

Defendants also erroneously argue that 3M has failed to state a claim because: (1) 3M's claim for tortious interference with prospective business relationships and economic advantage does not identify conduct by Defendants intended to cause harm to 3M, and does not identify the resulting damages; (2) 3M's claim for commercial defamation does not identify any false or defamatory statements made by Defendants, and any such statements are privileged; (3) 3M's claim for intimidation does not allege injury resulting from Defendants' threats, and such threats

are immune from liability because they were privileged; and (4) 3M's claims for conspiracy and aiding and abetting are not based on an underlying tort.

Defendants' arguments fail for four reasons. <u>First</u>, 3M states a claim for tortious interference with business relationships and economic advantage because 3M has: (a) identified specific acts by which Defendants tortiously interfered with 3M's business relationships and opportunities; and (b) identified specific lost opportunities. <u>Second</u>, 3M's claim for defamation is proper because 3M has: (a) pleaded the elements of commercial defamation, including that the statements in question constituted defamation *per se*; (b) pleaded actual malice; (c) specifically identified defamatory statements made by Defendants; (d) pleaded the basis for its allegations that those statements were untrue; (e) pleaded common law malice sufficient to defeat Defendants' claims of privilege; (f) established that Defendants' statements were not entitled to First Amendment protection to the extent that they concerned a sham petition to the FDA; and (g) established that Defendants did not assert valid privileges. <u>Third</u>, 3M's claim for intimidation is proper because: (a) 3M pleaded all of the elements of the U.K. tort of intimidation; and (b) neither the U.K. "without prejudice privilege" nor the privilege established by Federal Rule of Evidence 408 shields Defendants' threats from liability. <u>Fourth</u>, 3M sufficiently pleaded its claims for conspiracy and aiding and abetting. Accordingly, Defendants' motions should be denied.

## IV.

## <u>ARGUMENT AND AUTHORITIES</u>

Defendants' arguments suffer from a recurring defect. Instead of testing whether 3M's pleading provides a basis for the exercise of this Court's personal jurisdiction over them and states claims upon which relief can be granted, Defendants misleadingly pull selected facts from 3M's complaint and attempt to explain them away with their own self-serving version of events.

Assessed under the correct legal standards, however, and taken as a whole and in a light most favorable to 3M, the complaint pleads facts establishing this Court's personal jurisdiction over all Defendants, and states claims for defamation, tortious interference, and intimidation against all Defendants.

**A.    This Court Has Personal Jurisdiction Over The Porton Defendants.**

   **1.    The legal standard**

As an initial matter, while 3M has the burden to make a *prima facie* showing that this Court has personal jurisdiction over Defendants,[135] that burden "is only a minimal [one.]"[136]  To make such a showing, 3M need only allege "specific facts on which personal jurisdiction can be based."[137]  Although this Court may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction,[138] "any factual discrepancies with regard to the existence of personal jurisdiction . . . must be resolved in favor of [3M]."[139]  In this Court, "personal jurisdiction must be determined by reference to District of Columbia law,"[140] and the

---

[135] *See Day v. Corner Bank (Overseas) Ltd.*, 789 F. Supp. 2d 150, 155 (D.D.C. 2011); *FC Inv. Grp. LC v. IFX Mkts., Ltd.*, 529 F.3d 1087, 1092 (D.C. Cir. 2008); *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005).

[136] *Water & Sand Int'l. Capital, Ltd. v. Capacitive Deionization Tech. Sys., Inc.*, 563 F. Supp. 2d 278, 282 (D.D.C. 2008) (citing *Jacobsen v. Oliver*, 201 F. Supp. 2d 93, 104 (D.D.C. 2002)).

[137] *Id.* (citing *Moore v. Motz*, 437 F. Supp. 2d 88, 90–91 (D.D.C. 2006)).

[138] *See id.* (citing *Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005)); *United States v. Philip Morris Inc.*, 116 F. Supp. 2d 116, 120 n. 4 (D.D.C. 2000) (noting that the court "may receive and weigh affidavits and any other relevant matter to assist it in determining the jurisdictional facts.").

[139] *Dean v. Walker*, 756 F. Supp. 2d 100, 102 (D.D.C. 2010); C*rane v. New York Zoological Society*, 894 F.2d 454, 456 (D.C. Cir. 1990) (In determining whether a basis for personal jurisdiction exists, "factual discrepancies appearing in the record must be resolved in favor of the plaintiff.").

[140] *McDaniel v. FEDITC LLC*, 2011 WL 5822144, * 2 (D.D.C. Nov. 18, 2011) (citing *U.S. v. Ferrara*, 54 F.3d 825, 828 (D.C. Cir. 1995)); *see also Jia Di Feng v. See-Lee Lim,* 786 F.Supp.2d 96, 101-02 (D.D.C. 2011); *Koteen v. Bermuda Cablevision, Ltd.*, 913 F.2d 973, 974 (D.C. Cir. 1990).

Court "may . . . exercise jurisdiction over a nonresident defendant under the District of Columbia 'long-arm' statute."[141]

Although the Porton Defendants embark on a winding discussion of the law of personal jurisdiction in federal courts,[142] 3M's original complaint appropriately put Defendants on notice that 3M is asserting jurisdiction over them based on the agency and conspiracy provisions of the D.C. long-arm statute.[143]   Accordingly, 3M addresses the Porton Defendants' arguments concerning those bases of personal jurisdiction below.

### 2. __This Court has personal jurisdiction over the Porton Defendants because they are co-conspirators with the District of Columbia Davis Defendants.__

The D.C. long-arm statute extends personal jurisdiction to defendants who act "directly or by an agent, as to a claim for relief arising from the person's transacting any business in the District of Columbia."[144]   D.C. courts "consider conspiracy jurisdiction a form of long-arm jurisdiction in which the defendant's 'contact' with the forum consists of the acts of the defendant's co-conspirators within the forum."[145]   Acts that are "undertaken within the forum by one co-conspirator in furtherance of an alleged conspiracy may subject a non-resident co-conspirator to personal jurisdiction under the long-arm statute."[146]

---

[141] *McDaniel v. FEDITC LLC*, 2011 WL 5822144, * 2 (D.D.C. Nov. 18, 2011) (citing *U.S. v. Ferrara*, 54 F.3d 825, 828 (D.C. Cir. 1995)); *see also Jia Di Feng v. See-Lee Lim*, 786 F.Supp.2d 96, 101-02 (D.D.C. 2011); *Koteen v. Bermuda Cablevision, Ltd.*, 913 F.2d 973, 974 (D.C. Cir. 1990).

[142] Porton Defendants' Motion, at 9-23.

[143] Compl. ¶¶ 12-13; *see also* Amended Compl. ¶¶ 15-19.

[144] D.C. Code § 13-423(a)(1).

[145] *Youming Jin v. Ministry of State Sec.*, 335 F. Supp. 2d 72 (D.D.C. 2004)); *see also Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1030-31 (D.C. Cir. 1997) (applying conspiracy theory of personal jurisdiction to long-arm statute's "transacting business" provision); *Edmond v. United States Postal Serv. Gen. Counsel*, 949 F.2d 415, 424-25 (D.C. Cir. 1991) (discussing application of conspiracy theory of personal jurisdiction to long-arm statute's "causing tortious injury in the District" provision).

[146] *Jung v. Ass'n of American Med. Colls.*, 300 F. Supp. 2d 119, 140 (D.D.C. 2004).

As further discussed below, to successfully plead the existence of a conspiracy under D.C. law, 3M need only provide "some circumstantial facts . . . to support an inference that the defendants engaged in not merely parallel conduct, but rather agreed to . . . engage in [the conspiracy]."[147]   As courts have repeatedly recognized, the nature of conspiracies often makes it impossible to describe their precise details at the pleading stage and, therefore, plaintiff should be permitted discovery rather than be subjected to dismissal of the complaint.[148]   As a result, it is sufficient that an agreement between co-conspirators can be inferred from the underlying facts pleaded in the complaint.[149]

Here, as made clear in both the original and amended complaints, the Porton Defendants were participants in a conspiracy, directed by the Davis Defendants from D.C., that was formed

---

[147] *City of Moundridge v. Exxon Mobil Corp.*, 250 F.R.D. 1, 5 (D.D.C. 2008).   In D.C., the elements of a conspiracy are:  (1) an agreement between two or more persons; (2) to participate in an unlawful act, or in a lawful act in an unlawful manner; and (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement (4) pursuant to, and in furtherance of, the common scheme.  *See Executive Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 738 (D.C. 2000)); *Weishapl v. Sowers*, 771 A.2d 1014, 1023 (D.C. 2001).

[148] *See* 5 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure (Second) § 1233 (1990) (internal citations omitted); *see also ABB Daimler-Benz Transp. (North America), Inc. v. National R.R. Passenger Corp.*, 14 F. Supp. 2d 75, 86 (D.D.C. 1998) ("There are inherent difficulties in the pleading of a conspiracy, for by its very nature it involves agreement and questions of intent not accessible to Plaintiff.") (citing *Mandelkorn v. Patrick*, 359 F. Supp. 692, 697 (D.D.C. 1973)).

[149] *See Wiggins v. District Cablevision, Inc.*, 853 F. Supp. 484, 497-98 (D.D.C. 1994) ("An agreement may be inferred from the underlying facts . . . Proof of a tacit understanding is sufficient to show agreement. As one court has stated: '[I]n most cases the court will have to infer a conspiracy from indirect evidence, it must initially look to see if the alleged joint tortfeasors are pursuing the same goal- although performing different functions—and are in contact with one another. The circumstances of each case dictate what other specific evidence may be useful in inferring agreement.'"); *Halberstam v. Welch*, 705 F.2d 472, 481 (D.C. Cir. 1983) ("In sum, we expect that the relationships between the actors and between the actions (e.g., the proximity in time and place of the acts, and the duration of the actors' joint activity) are relevant in inferring an agreement in a civil conspiracy action. There may well be other significant factors in individual cases."); *cf. Graves v. United States*, 961 F. Supp. 314, 321 (D.D.C. 1997) (dismissing claim where plaintiff merely alleged that his former employer "colluded" with the Department of Education to keep him underemployed, without putting forth "any facts showing the existence or establishment of an agreement"); *Brady v. Livingood*, 360 F. Supp.2d 94, 104 (D.D.C. 2004) (dismissing conspiracy claim where "plaintiff put[] forth no facts suggesting that the defendants were acting in concert in furtherance of a shared goal [.]"").

in or about early 2011 to coerce 3M into paying tens of millions of dollars to which Defendants were not entitled, or else suffer serious consequences to 3M's business interests and the personal interests of 3M's CEO.[150]  3M has alleged facts demonstrating that the Davis Defendants directed this conspiracy from their D.C. offices,[151] from whence: (i) they issued knowingly and maliciously false press releases and statements;[152] (ii) directed and facilitated threatening correspondence to 3M's attorney;[153] (iii) directed and coordinated with Tetra Strategy to pay for improper access to the U.K. Minister of Defence for the purpose of improperly pressuring 3M;[154] and (iv) directed sham activities—such as the filing of the FDA citizen's petition and the hiring of fake protestors—that were intended to cloak Defendants' other self-serving and illegal acts with the appearance of purported public issue advocacy despite the lack of any real "public interest"[155]

For their part, the Porton Defendants knowingly participated with the Davis Defendants in these improper activities by: (i) disseminating false statements in coordination with Davis;[156] (ii) obtaining, in consultation and conjunction with the Davis Defendants and Tetra Strategy, purported assurances from the U.K. Minister of Defence that 3M would be punished for not paying tens of millions of dollars to settle the London Litigation;[157] and (iii) directly communicating threats of intimidation and blackmail, previously discussed with and approved by

---

[150] Compl. ¶¶ 68-76; Amended Compl. ¶¶ 80-94.

[151] Compl. ¶¶ 13, 57; Amended Compl. ¶¶ 17, 65.

[152] Compl. ¶¶ 57-64; Amended Compl. ¶¶ 64-77.

[153] Compl. ¶¶ 68-75; Amended Compl. ¶¶ 87-93.

[154] Amended Compl. ¶¶ 80-82.

[155] Compl. ¶¶ 64-65; Amended Compl. ¶¶ 76-79

[156] Compl. ¶¶ 57-64; Amended Compl. ¶¶ 64-77.

[157] Compl. ¶¶ 68-75; Amended Compl. ¶¶ 80-83, 95-104.

the Davis Defendants, to 3M's counsel.[158]   These allegations are more than sufficient to meet 3M's requirement to allege "acts undertaken within the forum by one co-conspirator in furtherance of an alleged conspiracy,"[159] only one of which is necessary to impute personal jurisdiction over all members of the conspiracy.[160]

The Porton Defendants are, therefore, subject to long-arm jurisdiction in D.C. because they were engaged in a conspiracy with, among others, their agents and co-conspirators, the Davis Defendants, who are unquestionably D.C. actors (and have not challenged personal jurisdiction).[161]   Despite the Porton Defendants' vague objections that 3M's complaint offers "nothing but . . . bald, conclusory allegations to support its conspiracy theory,"[162] the fact is that 3M's original Complaint—and certainly its Amended Complaint—contain substantial and specific factual allegations of Defendants' "role in the conspiracy, when the conspiracy was formed, and what its terms were."[163]   At minimum, 3M has met its obligation under D.C. law to identify "the conspiracy as well as the overt acts within the forum taken in furtherance of the conspiracy"[164] in order to establish personal jurisdiction over the Porton Defendants.

---

[158] Compl. ¶¶ 68-75; Amended Compl. ¶¶ 84-93.

[159] *Jung*, 300 F. Supp. 2d at 140.

[160] *See Jung*, 300 F. Supp. 2d at 141 ("So long as any one co-conspirator commits at least one overt act in furtherance of the conspiracy in the forum jurisdiction, there is personal jurisdiction over all members of the conspiracy.").

[161] *Youming Jin v. Ministry of State Sec.*, 335 F. Supp. 2d 72 (D.D.C. 2004) ("Because the District of Columbia long-arm statute provides for jurisdiction over persons acting directly and their agents, courts deem the defendant's co-conspirator the defendant's 'agent.'") (citing *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1031 (D.C. Cir. 1997)).

[162] Porton Defendants' Motion, at 16.

[163] *Compare id.*

[164] *See id.* (citing *Jungquist v. Sheik Sultan Bin Khalifa Al Nahyan,* 115 F.3d 1020, 1031 (D.C. Cir. 1997). To prevail on a theory of conspiracy jurisdiction, courts traditionally require a prima facie showing of (1) a conspiracy (2) in which the defendant participated or agreement to join the conspiracy and (3) a co-conspirator's overt act within the forum, subject to the long-arm statute and in furtherance of

**3.    This Court also has personal jurisdiction over the Porton Defendants because they acted through their agents, the Davis Defendants, in the District of Columbia.**

Under the D.C. long-arm statute, a foreign corporation is also subject to personal jurisdiction in D.C. if, among other things, the corporation has "transact[ed] any business" in the District via an agent.[165]   The "acts of a corporation's agent may create personal jurisdiction over the corporation in the District."[166]   To determine whether a party is an agent for jurisdictional purposes, the court looks to the entire relationship for evidence of mutual consent and a sufficient degree of control exercised by the principal.[167]   An agency relationship is the "fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act."[168]   As detailed in the previous section and further described in the original and amended complaints, the Porton Defendants engaged the Davis Defendants as their agents in D.C. to do the very acts that form the basis of 3M's claims and, as a result, the Porton Defendants are subject to personal jurisdiction in D.C.

---

the conspiracy. *See Youming Jin v. Ministry of State Sec.*, 335 F. Supp. 2d 72 (D.D.C. 2004); *Edmond v. United States Postal Service General Counsel*, 949 F.2d 415, 428 (D.C. Cir. 1991).

[165]  *See Gonzalez v. Internacional De Elevadores, S.A.*, 891 A.2d 227, 232 (D.C. 2006) (citing D.C. Code § 13-423(a)(1) (2001)).  Further, the claim must arise from the business transacted in D.C., the defendant must have minimum contacts with D.C., and the Court's exercise of personal jurisdiction would not offend traditional notions of fair play and substantial justice. *See Orellana v. CropLife Intern.*, 740 F. Supp. 2d 33, 38 (D.D.C. 2010) (citing *Atlantigas Corp. v. Nisource, Inc.*, 290 F. Supp. 2d 34, 42 (D.D.C. 2003)).

[166]  *See Schwartz v. CDI Japan, Ltd.*, 938 F. Supp. 1, 7 (D.D.C. 1996) (citing *Chase v. Pan–Pacific Broadcasting, Inc.*, 617 F. Supp. 1414, 1424 (D.D.C. 1985).

[167]  *See Schwartz v. CDI Japan, Ltd.*, 938 F. Supp. 1, 7 (D.D.C. 1996) (citing *Johnson v. Bechtel Assoc. Professional Corp.*, 717 F.2d 574, 580 (D.C. Cir. 1983), *rev'd on other grounds sub nom, Washington Metro. Area Transit Auth. v. Johnson*, 467 U.S. 925 (1984).

[168]  *See Schwartz v. CDI Japan, Ltd.*, 938 F. Supp. 1, 7 (D.D.C. 1996) (citing Restatement (Second) of Agency Section 1(1) (1958)).

The Porton Defendants do not dispute that the Davis Defendants were acting as their agents.[169]   Instead, choosing to selectively ignore key allegations of the complaint, they misleadingly assert that "the Porton Defendants' only connection with D.C. is that it is the place of business of a law firm that they hired to correspond with the FDA regarding a public health matter."[170]   Defendants' effort fails, however, because—as the Porton Defendants' own cited authorities (the *Atlantigas* and *Naartex* cases), specifically hold—the "government contacts" exception to jurisdiction does not apply when plaintiff "makes credible and specific allegations that the defendants had used the [federal] proceedings as an instrumentality" of their wrongdoing.[171]   In this matter, 3M has specifically pleaded facts, each based on credible direct evidence and public sources, that demonstrate that Defendants' "citizen's petition" to the FDA was a sham effort never intended or expected to achieve a favorable outcome from the agency, but only intended as an instrumentality of the coercive scheme Defendants were mounting against 3M.

In any event, the Porton Defendants' reliance on the "government contacts" exception to D.C. long-arm jurisdiction is unavailing because 3M has alleged that Defendants, acting through the Davis Defendants in D.C. and at their direction, effected various actions in furtherance of their conspiracy to extort from 3M that had nothing to do with the FDA petition.[172]   Because the Davis Defendants' actions, as agents for the Porton Defendants, included a variety of D.C.-based

---

[169] *See* Porton Defendants' Motion, at 16-17.

[170] *Id.* at 17.  As discussed in Section II.B.4, above, this is a prime example of how the Defendants are attempting to shield all of the actions they took in furtherance of their private conspiracy to extort money from 3M by pretending it was related, in some roundabout way, to their sham FDA petition—and therefore immune from civil liability.

[171] *Atlantigas Corp. v. Nisource, Inc.*, 209 F. Supp. 2d 34, 44 (D.D.C. 2003); *see also Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 787 (D.C. Cir. 1983).

[172] *See, e.g.*, Compl. ¶¶ 71-72, 75; Amended Compl. ¶¶ 84-93 (e-mail); Amended Compl. ¶¶ 80-83 (coordinating with Tetra); Compl.¶¶ 57-64; Amended Compl. 64-77 (issuing knowingly and maliciously false press releases and statements).

conduct completely unrelated to anything having to do with "seeking redress of grievances from the Executive Branch or the Congress," the "government contacts" exception to D.C. long-arm jurisdiction does not apply to them.[173]

Accordingly, this Court has personal jurisdiction over the Porton Defendants.[174]

**B.    D.C. Law Governs 3M's Claims For Civil Conspiracy, Aiding And Abetting, Tortious Interference With Existing And Prospective Business Advantage, And Commercial Defamation; U.K. Law Applies To 3M's Claim for Intimidation.**

Defendants do not dispute that U.K. law governs 3M's intimidation claim.[175]   Nor do Defendants dispute that D.C. law governs 3M's claims for defamation, conspiracy, and aiding and abetting.[176]   Regarding 3M's tortious interference claim, however, the Porton Defendants (but not the Davis Defendants) suggest that this Court should apply U.K. law.[177]   That argument is without merit.

---

[173] *Atlantigas Corp. v. Nisource, Inc.*, 209 F. Supp. 2d 34, 44 (D.D.C. 2003).

[174] Aside from the Porton Defendants' erroneous challenge to personal jurisdiction, none of Defendants argue that this Court is an improper forum.  Indeed, the Davis Defendants have previously conceded that this Court is the proper place for this action.  Memorandum of Law in Support of Defendant's Motion to Dismiss First Amended Complaint, Supreme Court of New York, New York County at p.6 (Aug. 19, 2011).  The Court should give great deference to the plaintiff's choice of forum (*see Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 256 (1981), *Mutambara v. Lufthansa German Airlines*, No. 02-0827, 2003 WL 1846083 at *2 (D. D.C. Mar. 24, 2003)) and to overcome the presumption in favor of the plaintiff's forum, a defendant must prove the existence of a superior forum (*see El-Fadl v. Centr. Bank of Jordan*, 75 F.3d 668, 678 (D.C. Cir. 1996)).  Indeed, under the factors enumerated in 28 U.S.C. § 1404, DC is the most convenient forum for all of the witnesses and parties.

[175] *See* Davis Defendants' Motion, at 19-20 (arguing under U.K. law); Porton Defendants' Motion, at 24-27 (same).

[176] *See* Davis Defendants' Motion, at 10-19 (arguing defamation claim under D.C. law); *id.* at 31 (arguing conspiracy and aiding and abetting under D.C. law); Porton Defendants' Motion, at 31-43 (arguing defamation, conspiracy, and aiding and abetting under D.C. law).

[177] *Compare* Porton Defendants' Motion, at 27-28, *with* Davis Defendants' Motion, at 20-22 (arguing D.C. law).

A federal court exercising diversity jurisdiction applies the choice of law rules of the forum state.[178]  In determining what law will govern, District of Columbia courts consider each claim separately.[179]  In doing so, this Court's first step is to determine whether the substantive laws of D.C. actually differ from those of any other potentially relevant jurisdictions.[180]  If it does not, then D.C. law should be applied as to that claim, because there is no true conflict.[181]

The Porton Defendants simply skip this step and assume without analysis, a conflict between U.K. and D.C. law.[182]  As described by the Porton Defendants, U.K. law countenances a claim for "unlawful means," which occurs when a defendant "wrongfully interferes with the actions of a third party in which the plaintiff had an economic interest, with the intention of thereby causing loss to the plaintiff."[183]  English law is not in conflict with D.C. law, which recognizes the tort of interference with prospective business advantage.  The elements of that claim are:  (i) the existence of a prospective advantageous business transaction; (ii) defendants'

---

[178] *See Young Women's Christian Ass'n v. Allstate Ins. Co. of Canada*, 275 F.3d 1145, 1150 (D.C. Cir. 2002); *Liberty Mut. Ins. Co. v. Travelers Indem. Co.*, 78 F.3d 639, 642 (D.C. Cir. 1996) (*citing Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941).

[179] *Bailey v. J&B Trucking Servs.*, 590 F. Supp. 2d 4, 10 (D.D.C. 2008) (*quoting D.C. v. Coleman*, 667 A.2D 811, 816 (D.C. 1995) (A choice of law analysis involves "examination of the various jurisdictional interests as applied to the various distinct issues to be adjudicated."); *Sloan v. Urban Title Services, Inc.*, 689 F. Supp. 2d 94, 105 (D.D.C. 2010) ("Dependent upon the facts and legal claims at issue in a particular case, different law may apply to different issues in a lawsuit.") (citing *Jaffe v. Pallotta TeamWorks*, 374 F.3d 1223, 1228 (D.C. Cir. 2004)).

[180] *Long v. Sears Roebuck & Co.*, 877 F. Supp. 8, 11 (D.D.C. 1995) (holding that the Court must determine whether there is a genuine conflict between the laws of the involved jurisdictions or whether there is a "false conflict") (citing *Eli Lilly & Co. v. Home Ins. Co.*, 764 F.2d 876, 882 (D.C. Cir. 1985), cert. denied, 479 U.S. 1060 (1987)).

[181] *See Sloan v. Urban Title Services, Inc.*, 689 F. Supp. 2d 94, 105 (D.D.C. 2010) ("Where no true conflict exists, a court applies the law of the District of Columbia by default."); *see also Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 79 (D.D.C. 2010) (refusing to apply choice of laws analysis because the laws of the two relevant nations were the same); *contra Mazza v. Mazza*, 475 F.2d 385 (D.C. Cir. 1973) (applying a conflict of laws analysis because the laws of the two relevant jurisdictions differed).

[182] *See* Porton Defendants' Motion at 27-31.

[183] *Id.*

knowledge of the prospective transaction; (iii) intentional interference with the prospective transaction; and (iv) resulting damages.[184]   Indeed, the Porton Defendants describe the U.K. tort as the "English counterpart of the tort of interference with business relations."[185]   They do not attempt to distinguish the U.K. and D.C. torts, nor does the English law practitioner on whose declaration the Porton Defendants rely.   Indeed, as established by Stephen Auld Q.C. in the declaration accompanying this Consolidated Opposition, 3M's factual allegations would be sufficient to make out the U.K. tort of unlawful means (and indeed, the tort of unlawful means conspiracy).[186]

Accordingly, D.C. law governs 3M's claim for tortious interference with existing and prospective business advantage.

## C.    3M Has Adequately Pleaded Each Of Its Claims.

Defendants also assert various objections to the manner in which 3M has pleaded its claims for tortious interference with prospective business advantage or economic opportunity, defamation, intimidation, conspiracy, and aiding and abetting.   As detailed below, however, each of these arguments is unavailing.

### 1.    The legal standard

"It is axiomatic that [a] motion to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6), is subject to rigorous examination."[187]   Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the dismissal of an action where a complaint fails "to state a claim upon

---

[184] *See NCRIC, Inc. v. Columbia Hospital For Women Medical Center, Inc.*, 957 A.2d 890, 900, 900 n.16 (D.C. 2008).

[185]   *See* Porton Defendants' Motion to Dismiss, at 29 (quoting the declaration of an English law practitioner).

[186] *See* Declaration of Stephen Auld Q.C., attached hereto as Ex. P (the "Auld Decl.").

[187] *Southern Air Transport, Inc. v. American Broadcasting Cos., Inc.*, 670 F. Supp. 38, 40-41 (D.D.C. 1987) (citied by the Davis Defendants).

which relief can be granted."[188]   This Court recently reviewed the pertinent standard of review on a motion to dismiss, and noted that the "factual allegations presented in [the complaint] must be presumed true and should be liberally construed in plaintiff's favor."[189]  The pleading rules are "not meant to impose a great burden on a plaintiff,"[190] and plaintiff must be given every favorable inference that may be drawn from the allegations of fact.[191]   A complaint need only contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," and "detailed factual allegations" are not necessary.[192]   Thus, a plaintiff may survive a Rule 12(b)(6) motion even if, unlike the case here, "recovery is very remote and unlikely," so long as the facts alleged in the complaint "raise a right to relief above the speculative level."[193]

**2.    3M has sufficiently pleaded its claim for tortious interference with existing and prospective business advantage and economic opportunity.**

In order to state a claim under D.C. law for tortious interference with business relations, 3M must allege: (i) the existence of a prospective advantageous business transaction; (ii) Defendants' knowledge of the prospective transaction; (iii) intentional interference with the prospective transaction; and (iv) resulting damages.[194]   A "business expectation" may broadly

---

[188] *Robinson v. Securitas Servs., Inc.*, No. 11–451 (JEB), 2011 WL 4936999, at *1 (D.D.C. Oct. 18, 2011).

[189] *Id.* (citing *Leatherman v. Tarrant Cty. Narcotics & Coordination Unit*, 507 U.S. 163, 164 (1993)).

[190] *Id.* (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)).

[191] *See id.* (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 584 (2007)).

[192] Plaintiff need only put forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 555 and *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009)).

[193] *Id.* (citing *Twombly*, 550 U.S. at 555).

[194] *NCRIC, Inc. v. Columbia Hospital For Women Medical Center, Inc.*, 957 A.2d 890, 900, 900 n.16 (D.C. 2008) (setting forth elements); *Casco Marina Development, L.L.C. v. District of Columbia Redevelopment Land Agency*, 834 A.2d 77, 84 (D.C. 2003) ("The elements of tortious interference with prospective business advantage mirror those of interference with a contract.  To prevail, however, a plaintiff obviously need not demonstrate the existence of a contract, but merely a prospective

consist of a future contract or an opportunity to obtain customers,[195] so long as the expectation is "commercially reasonable to anticipate."[196]  To sustain its claim at the pleading stage, 3M need only show "that the interference was intentional and that there was resulting damage,"[197] and is "not required to provide specific information regarding the business expectancy in its complaint."[198]

Here, 3M has adequately pleaded that:  (a) it had prospective business opportunities with the U.K. Government in general and, specifically, with the MoD;[199] (b) that Defendants were aware of those opportunities and intentionally acted to interfere with them by seeking and participating in improper back-room meetings with the U.K. Minister of Defence to cause the U.K. Government to terminate 3M's business opportunities;[200] and (c) those actions caused

---

advantageous business transaction."); *see also Command Consulting Group, LLC v. NeuralIQ, Inc.*, 623 F. Supp. 2d 49, 51-52 (D.D.C. 2009) (citing *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002); *Bennett Enters. v. Domino's Pizza, Inc.*, 45 F.3d 493, 499 (D.C. Cir. 1995)); *see also Casco Marina Dev., L.L.C. v. D.C. Redev. Land Agency*, 834 A.2d 77, 84 (D.C. 2003).

[195] *See Nat'l R.R. Passenger Corp. v. Veolia Transp. Servs., Inc.,* 592 F. Supp. 2d 86, 98 (D.D.C. 2009) (*citing Carr v. Brown*, 395 A.2d 79, 84 (D.C. 1978)).

[196] *Browning*, 292 F.3d at 242; *see also Carr v. Brown*, 395 A.2d 79, 84 (D.C. 1978) (observing that business expectancies that are "commercially reasonable to anticipate, are considered to be property and therefore protected from unjustified interference").

[197] *Solers, Inc. v. Doe*, 977 A.2d 941, 948 (D.C. 2009) (holding that complaint stated sufficient facts to survive dismissal under *Twombly* or previous standard where plaintiff "(1) identif[ied] itself as a 'for-profit' corporation, (2) state[d] that the false statements ... [implied] that its business ethics were improper and untrustworthy ... [and that it] lacked fundamental financial integrity and honesty and (3) allege[d] that, as a result of [defendant's] actions, plaintiff 'has been deprived of its good commercial reputation, subject[ed] to contempt and ... others within [its] industry [have been deterred] from dealing with it…  in an amount to be proven at trial ... [and] has caused damage to [plaintiff's] prospective advantageous business opportunities."), *quoting Kreuzer, D.M.D. v. George Washington University*, 896 A.2d 238, 247 (D.C. 2006).

[198] *Muir v. Navy Federal Credit Union*, 529 F.3d 1100, 1108 (D.C. Cir. 2008) (applying the *Twombly* pleading standard); *see also v. Federal Nat. Mortg. Ass'n*, 2006 WL 1774252, *8 (D.D.C. June 26, 2006).

[199] *See* Compl. ¶¶ 81, 91, 95; Amended Compl. ¶¶ 6, 90, 112-14, 135-37.

[200] *See* Compl. ¶¶ 71-72, 78-81; Amended Compl. ¶¶ 6, 90, 80-104, 112-14, 135-39.

damage to 3M.[201]  In the Amended Complaint, 3M has gone even further by describing millions

of pounds in U.K. Government business and specific opportunities that Defendants' actions

prevented 3M from receiving[202]—even though this level of specificity is not required at this stage

of the litigation.[203]

Finally, although this Court should, for the reasons discussed above, apply D.C. law to

this claim, 3M's pleadings would nonetheless be adequate even if assessed under U.K. law.[204]

### 3.    3M has sufficiently pleaded its claim for commercial defamation.

#### a.    3M has pleaded the elements of commercial defamation.

To assert a legally sufficient claim for commercial defamation, 3M must demonstrate

that:  (i) Defendants made false and defamatory statements about 3M; (ii)  Defendants published

those statement without privilege to at least one third party; (iii) Defendants' fault in publishing

those statements amounted to at least negligence; and (iv) either the statements were actionable

as a matter of law or their publication caused 3M special harm.[205]

---

[201] Compl. ¶¶ 80-82; Amended Compl. ¶¶ 6, 90, 112-14, 140-42.

[202] Amended Compl. ¶¶ 6, 90, 112-14.

[203] *See Muir*, 529 F.3d at 1108; *Williams v. Federal Nat. Mortg. Ass'n*, 2006 WL 1774252, *8 (D.D.C. June 26, 2006) (holding that identification of "third parties with which [plaintiff] had a business relationship or expectancy" would be sufficient to state a claim for tortious interference with prospective business relationship); *cf. Mark Marketing Servs., LLC v. Geoplast S.p.A.*, 753 F. Supp. 2d 141, 163 (D.D.C. 2010) (dismissing claim for tortious interference with business relationship where complaint was "*devoid of any factual content* that would allow this Court to reasonably infer that [plaintiff] had prospective transactions") (emphasis added).

[204] 3M has alleged that Defendants wrongfully, with the intent of damaging 3M, interfered with the actions of a third party by seeking and participating in improper back-room meetings with the U.K. Minister of Defence to cause the U.K. Government to terminate 3M's business opportunities.  *See* Compl. ¶¶ 71-72, 78-81; Amended Compl. ¶¶ 6, 90, 80-104, 112-14, 135-39.   3M had an economic interest with the U.K. Government, including with the MoD.  *See* Compl. ¶¶ 81, 91, 95; Amended Compl. ¶¶ 6, 90, 112-14, 135-37.   These actions caused 3M to lose millions of pounds of business. *See* Compl. ¶¶ 80-82; Amended Compl. ¶¶ 6, 90, 112-14, 140-42.

[205]  *See Williams v. Dist. of Columbia*, 9 A.3d 484, 493 (D.C. 2010).

A statement that tends to injure plaintiff in its business or profession by indicating that plaintiff lacks knowledge, skill, honesty, character, and integrity constitutes defamation *per se*, and is actionable as a matter of law.[206]  Furthermore, statements are defamatory *per se* under D.C. law, and thus do not require other proof of special damages, if they:  (a) charge commission of a crime of moral turpitude; (b) charge affliction with a serious contagious disease; (c) charge unfitness or lack of integrity for an office or employment; or (d) prejudice the plaintiff in his or her trade or business.[207]  A statement is defamatory *per se* as to a corporation if it prejudices the prospective business opportunities for the corporation.[208]  For example, statements that impugn a corporation's business ethics may be defamatory *per se*.[209]

In addition, a corporation such as 3M properly alleges special damages by pleading that "the corporation is one for profit, and the matter tends to prejudice it in the conduct of its

---

[206]  *See Ingber v. Ross*, 479 A.2d 1256, 1268 (D.C. 1984) ("[Defendant's] statements imputed to [Plaintiff] 'a lack of knowledge and skill in dentistry and a lack of honesty, character and integrity which tended to injure [Plaintiff's] reputation in the community and were calculated to cause harm to [Plaintiff's] reputation.'. . . [T]he slander clearly tended to injure [Plaintiff] in his profession and thus constituted slander per se.") (citations omitted);  *see also Ihebereme v. Capital One, N.A.*, 730 F.Supp.2d 40, 55 (D.D.C. 2010) (a statement is defamatory "if it tends to injure the plaintiff in his or her trade, profession or community standing or lower him in the estimation of the community");  *Stark v. Zeta Phi Beta Sorority, Inc.*, 587 F.Supp.2d 170, 175 (D.D.C. 2008) (same).

[207]  *See Meyerson v. Hurlbut*, 98 F.2d 232, 233 (D.C. Cir. 1938) (to be actionable as defamation *per se*, the statements "must 'import a charge that the party has been guilty of a criminal offense involving moral turpitude, or that the party is infected with a contagious distemper,' or they must be 'prejudicial in a pecuniary sense to a person in office or to a person engaged as a livelihood in a profession or trade.'");  *see also* Restatement (Second) of Torts 577 (1977) ("One who publishes matter defamatory to another in such a manner as to make the publication a slander is subject to liability to the other although no special harm results if the publication imputes to the other: (a) a criminal offense . . . (b) a loathsome disease . . . [or] (c) matter incompatible with his business, trade, profession[.]").

[208]  *Id.*

[209]  *See Solers, Inc. v. Doe*, 977 A.2d 941, 949 (D.C. 2009) (because corporation has no personal reputation, statements may be defamatory *per se* against it with questions about the company's business ethics or financial soundness) (citing *Martin Marietta Corp. v. Evening Star Newspaper Co.*, 417 F.Supp. 947, 955 (D.D.C. 1976)).

business or to deter others from dealing with it."[210]   The prejudice to the corporation's business

need not be specifically pleaded.[211]   It is sufficient for a corporate plaintiff to allege, for example,

that defendants' conduct "prejudiced [the corporation] in the conduct of its business" or deprived

it of its "good commercial reputation."[212]

Here, 3M has alleged that Defendants, acting both individually and through their co-

conspirators, made false and defamatory statements about 3M to third parties, including

representations that 3M's decision to stop marketing BacLite led to the affliction and death of

thousands of people,[213] that 3M had abandoned BacLite in order to promote a competing

product,[214] and that 3M had misled the FDA,[215] among others.   For each of these statements, 3M

has also alleged that Defendants had specific knowledge that those statements were false.[216]

Because Defendants' false statements about 3M impugned the company's business ethics,

prejudiced it in the conduct of its business, and constituted accusations of federal fraud,[217] the

---

[210] *Southern Air Transport, Inc. v. American Broadcasting Cos., Inc.*, 670 F.Supp. 38, 41 (D. D.C. 1987) (cited by Defendants).

[211] *See Solers v. Doe*, 977 A.2d 941, 949 (D.C. 2009) (upholding a complaint where the plaintiff amended "its complaint to (1) identify itself as a 'for-profit' corporation, (2) state that the 'false statements ... [imply] that its business ethics were improper and untrustworthy ... [and that it] lacked fundamental financial integrity and honesty[,]' and (3) allege that, as a result of Doe's actions, Solers 'as been deprived of its good commercial reputation, subject[ed] to contempt and ... others within [its] industry [have been deterred] from dealing with it.'   The amended complaint also asserts that 'Doe's misconduct has caused cognizable harm in an amount to be proven at trial ... [and] has caused damage to Solers' prospective advantageous business opportunities.'").

[212] *Id.* (finding allegations sufficient to state a claim for commercial defamation).

[213] *See* Compl. ¶ 60; Amended Compl. ¶¶ 66, 70, 108, 111.

[214] *See* Compl. ¶ 58; Amended Compl. ¶¶ 67, 78.

[215] *See* Compl. ¶ 62; Amended Compl. ¶¶ 66, 74-75.

[216] *See* Compl. ¶¶ 57-65; Amended Compl. ¶¶ 66-75, 78, 108.

[217] Compl. ¶ 62; Amended Compl. ¶¶ 66, 74.   Defendants' statements that 3M misled the FDA constitute accusations of federal fraud pursuant to 18 U.S.C. § 1001 (defining offense for one who, with respect to any matter within the jurisdiction of the executive branch of the Government, "knowingly and willfully . . . (1) falsifies, conceals, or covers up by any trick, scheme or device a material fact; [or] (2) makes any materially false, fictitious, or fraudulent statement or representation.").

statements are defamatory *per se*.[218]   Additionally, 3M has alleged that it is a for-profit corporation whose profits were diminished by the defendants' defamatory statements that harmed its reputation.[219]   Accordingly, 3M has sufficiently pled its defamation claims.

### b.   3M has pleaded actual malice.

Although Defendants have not argued that 3M is a public figure for the purposes of pleading defamation (and under D.C. law, it is unclear that 3M is such a public figure), 3M's pleadings nonetheless meet any heightened standard that might apply to public figures.  If 3M is considered a public figure, then to prevail on its defamation claim, it would also need to establish that Defendants made the defamatory statements with actual malice, that is, with knowledge that they were false or with reckless disregard of whether they were was false or not.[220]   To satisfy this requirement, it is sufficient to allege "that the defendant in fact entertained serious doubts" as to the truth of the publication or acted "with a high degree of awareness of . . . its probable falsity."[221]   "Of course, '[w]hether a defendant published a statement with actual malice is normally a question of fact for the jury.'"[222]

Thus, to survive a motion to dismiss, 3M need only allege that Defendants published the defamatory statements with actual malice—that is, that Defendants knew, or recklessly should

---

[218] *See, e.g. Solers, Inc. v. Doe*, 977 A.2d 941, 949 (D.C. 2009); *Martin Marietta Corp. v. Evening Star Newspaper Co.*, 417 F.Supp. 947, 955 (D.D.C. 1976)

[219] *See* Compl. ¶¶ 15-20, 81, 106-07. Insofar as the original Complaint could be read as lacking an assertion that Defendants' statements harmed 3M's reputation in a way that affected 3M's profits—an allegation that appears on the face of the original Complaint—3M has added specific statements to that effect in the Amended Complaint.  *See* Amended Compl. ¶¶ 20-25, 112, 143-52.

[220] *See Thomas v. News World Commc'ns.*, 681 F.Supp. 55, 65 (D.D.C. 1988) (citing *New York Times v. Sullivan*, 376 U.S. 254, 280 (1964)).

[221] *See OAO Alfa Bank v. Center for Public Integrity*, 387 F.Supp.2d 20 (D.D.C. 2005) (citing *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)).

[222] *Parsi v. Daioleslam*, 595 F.Supp.2d 99, 106 (D.D.C. 2009) (citing *Liberty Lobby, Inc. v. Rees*, 852 F.2d 595, 598 (D.C.Cir.1988)).

have known, that their statements were false.[223] 3M has, in fact, alleged actual malice[224] and, thus, does not need to further prove damages.[225]  At minimum, the issue of malice is a factual one "for the jury," and 3M's claim should not be dismissed at this early stage of litigation.

        c.      **3M has sufficiently identified Defendants' defamatory statements.**

Although the Porton Defendants were apparently able to discern the statements 3M is alleging to be defamatory from the original complaint and assert their defenses (albeit flawed ones) thereto, the Davis Defendants claim to be so stymied by the allegations in 3M's complaint that they "cannot prepare a defense."[226]  Of course, the Davis Defendants have no difficulty asserting a smorgasbord of defenses, including that the statements were purportedly "supported by evidence in the London litigation."[227]  Although the Davis Defendants' defenses fail to justify dismissal at this stage of the litigation—and, indeed, are based on provably false allegations—it

---

[223] *See National Fed'n. of Fed. Employees v. American Fed'n. of Gov't. Employees*, No. 933-73, 1973 WL 1194, at *1 (D.D.C. July 18, 1973).

[224] *See, e.g.,* Original Complaint ¶ 59 ("Defendants knew that these allegations – which articulate their conspiracy theory that 3M scuttled BacLite in favor of another product called 'Fastman' – were false when they made them. Indeed a judge in the U.K. proceedings had already dismissed those allegations when discovery of the parties' respective internal documents failed to support Defendants' theory."); *id.* ¶ 61 ("Defendants knew that the foregoing statements were false when made.  A principal reason why BacLite was not commercially viable was that other products on the market were far more effective at detecting MRSA than BacLite.  While 3M certainly hoped to develop a better and more commercially viable product, it was knowingly false and reckless for the Defendants to repeatedly publicly assert that 3M's decision was "life-and-death" "betrayal" of patients."); *id.* ¶ 59 ("Of course Defendants knew that there was no "secret" report at the time they made these statements, just as they knew that 3M never withheld any material information concerning BacLite from the FDA and had appropriately informed the FDA of all required information – even up to the point that 3M decided not to continue with BacLite. Nevertheless. Defendants made these false and defamatory statements to the press as part of their campaign to disparage 3M and force it to offer the Porton Defendants an undeserved settlement in the U.K. lawsuit.").

[225] *See Moss v. Stockard*, 580 A.2d 1011, 1033 n. 40 (D.C. 1990) (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349-50 (1974)).

[226] Davis Defendants' Motion, at 12.  Notably, Davis does not deny that he made any one of the statements pleaded in the Complaint.

[227] *Id.* at 18.

48

is clear that 3M's pleadings sufficiently informed them of the statements on which 3M bases its claims.

In any event, 3M has met its pleading burden.  To overcome a motion to dismiss, plaintiff need only provide the "substance of the alleged defamatory statement," some means of identification of the speaker, and an approximate time frame when the statements were made.[228] As the Davis Defendants themselves acknowledge, this Court "has not required a heightened pleading standard for defamation,"[229] and instead requires only that the allegations "provide the opposing party with opportunity to prepare responsive pleadings."[230]  3M's original complaint easily met this burden.[231]  However, for the avoidance of doubt, the Amended Complaint contains additional specifics regarding each of the defamatory statements made by Defendants.[232]

The Davis Defendants (but not the Porton Defendants) assert that it is "particularly confounding" that 3M used "ellipses" and "portions of statements" to identify the defamatory representations on which 3M bases its claims.[233]  But D.C. courts do not require pleading *in haec verba*.[234]  Plaintiff need only plead "the substance of the alleged defamatory statement."[235] Nevertheless, to move this litigation forward and minimize dispute, 3M has added to its

---

[228] *See Williams v. District of Columbia*, 9 A.3d 484 (D.C. 2010) (holding complaint was sufficient where it alleged the substance of the alleged defamatory statement, i.e., that the plaintiff was "terminated for 'embezzlement,'" "identif[ied] by employment the persons to whom the statement was allegedly made," and identified a two week time frame when the statements were made).

[229] *See* Davis Defendants' Motion, at 11.

[230] *See Tressler v. AMTRAK*, 2011 U.S. Dist. LEXIS 51329, at *11 (D.D.C. May 13, 2011).

[231] Compl. ¶¶ 57-65, 101-107.

[232] *See* Amended Compl. ¶¶ 64-79.

[233] Davis Defendants' Motion, at 13.

[234] *Hoffman v. Hill and Knowlton, Inc.*, 777 F.Supp. 1003, 1005 (D.D.C. 1991) (cited by Davis Defendants) (*in haec verba* pleading is merely "favored").

[235] *Williams v. District of Columbia*, 9 A.3d 484 (D.C. 2010) (holding that the complaint was sufficient under *Twombly* where it "alleged the substance of the alleged defamatory statement, i.e., that the plaintiff was 'terminated for "embezzlement."'").

Amended Complaint specifics about Defendants' defamatory statements in an effort to reduce confusion.[236]

### d.   Defendants' defamatory statements are not mere opinion or hyperbole, but are provably false statements of fact.

Defendants do not attempt in their motions to argue the truth of their statements but, instead assert that their statements cannot be actionable because they were mere opinion or "rhetorical hyperbole."[237]   Under D.C. law, it is settled that "there is not a wholesale defamation exception for anything that might be labeled as 'opinion' [and] simply couching a statement in terms of opinion . . . should not serve to protect the statement."[238]   Nor must a statement be strictly false in a formal sense in order to be actionable—rather, even "an opinion on a matter of public concern is actionable if it has a 'provably false *factual connotation*.'"[239]

In both its original and amended complaint, 3M clearly identifies statements made by Defendants that, at minimum, convey a false factual connotation.  For example, Defendants well knew, based on the documents exchanged in the London Litigation and even the preliminary findings of the London court, that there was absolutely no support for their statements that 3M abandoned BacLite because it was trying to develop a competing product.[240]   Nonetheless, Defendants continued to sound that theme in the press with a specific intent to make 3M appear

---

[236]  *See* Amended Compl. ¶¶ 64-79.

[237]  Davis Defendants' Motion, at 13-15; Porton Defendants' Motion, at 33-40.

[238]  *See Coles v. Washington Free Weekly, Inc.*, 881 F.Supp. 26, 31-32 (D.D.C. 1995) (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18-20 (1990) (internal quotation marks omitted); *see also Washington v. Smith*, 80 F.3d 555, 556 (D.C. 1996).

[239]  *Milkovich*, 497 U.S. at 18-20 (emphasis added); *see also Coles*, 881 F.Supp. at 31-32. Defendants cite *Moldea v. New York Times* (22 F.3d 310, 316-17 (D.C. Cir. 1994)) and *Guilford Transp. Indus. v. Wilner* (760 A.2d 580, 596 (D.C. 2000)) for the proposition that an opinion is only actionable if it implies a provably false fact, but these cases do not so hold as both arise out of actions for defamation based on published book reviews that disliked the reviewed book, an arena in which one court acknowledged that "spirited critiques" are expected.  *Moldea*, 22 F.3d at 313-14.

[240]  Compl. ¶ 59; Amended Compl. ¶¶ 67-69, 78.

to be engaged in unethical business practices and callous to the health of potential MRSA victims.[241]   Likewise, Defendants repeatedly accused 3M of causing the deaths of MRSA victims even though Defendants knew—well before they ever filed suit in London—that the *reason* BacLite was a commercial failure was that hospitals and other health providers were using other, *superior MRSA tests* that were cheaper and/or faster than BacLite.[242]   Further, Defendants accused 3M of misleading the FDA by withholding information,[243] even though Defendants knew that 3M was no longer seeking regulatory approval for BacLite and, thus, had absolutely no obligation to make further submissions to the FDA.[244]   The other alleged defamatory statements each convey equally false facts.[245]

Defendants attempt to paper over the false factual statements described in the complaints by relying on phrases like "could have" and "might be" which, according to them, automatically immunized their statements from liability.[246]   The Porton Defendants go so far as to argue that because Defendants couched their false statements as "questions to be answered by the FDA," those thinly-veiled accusations were automatically "non-defamatory as a matter of law"[247] without regard to their truth.   Those arguments are specious and ignore D.C. and Supreme Court precedent.[248]   In fact, Defendants' public appeals for listeners to read the citizen's petition itself

---

[241] Compl. ¶¶ 57-65; Amended Compl. ¶¶ 67-69, 78.

[242] Compl. ¶¶ 58, 59, 61; Amended Compl. ¶¶ 70-73, 78, 111.

[243] Compl. ¶ 62; Amended Compl. ¶¶ 66, 74-75.

[244] Compl. ¶ 63; Amended Compl. ¶ 75.

[245] *See* Amended Compl. ¶¶ 64-79.

[246] *See, e.g.,* Davis Defendants' Motion, at 14; Porton Defendants' Motion, at 35.

[247] Porton Defendants' Motion, at 37.

[248] *See Coles v. Washington Free Weekly, Inc.*, 881 F.Supp. 26, 31-32 (D.D.C. 1995) (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18-20 (1990).

made the sting of their false allegations all the worse because, in the citizen's petition,[249] Defendants dropped their pretense of expressing doubt about 3M's conduct and baldly stated that:

> [T]he loss of a proven technology for the detection of MRSA has led to countless unnecessary infections and death.[250]

Taking Defendants' public statements either on their own, or in conjunction with the more strongly-worded citizen's petition, the import is crystal clear:  3M caused the deaths of many killed people in order to advance a different product, and did so by illegally hiding information from the FDA.  These statements are objectively verifiable as patently false and defamatory *per se* and, under the circumstances described in the Amended Complaint, were far from harmless "rhetorical hyperbole."[251]

### e.    Defendants' defamatory statements were not privileged.

As their fallback position, Defendants attempt to shield their defamatory statements with several variations of "privilege" arguments based on the fair comment privilege, the common

---

[249] 3M does not assert a cause of action based on the statements made in the FDA citizen's petition themselves, but Defendants' reference to the contents of that petition in their defamatory media statements is relevant to the question of whether Defendants' public statements involved a "provably false factual connotation."

[250] *See id.* at 38 (touting Defendants' "request that their listeners draw their own conclusions").

[251] The Porton Defendants also conclude that Defendants' press conferences and press releases were effecting the same function as a columnist on an "Op-Ed" page.  *See* Porton Defendants' Motion, at 38-39.  Even if this apples-to-oranges comparison were true, "there is no wholesale exemption from liability in defamation for statements of 'opinion.'"  *Carpenter v. King*, 792 F.Supp.2d 29, 35 (D.D.C. 2011) (Such statements "can be actionable if they imply a provably false fact, or rely upon stated facts that are provably false. Thus, this court must look closely at the challenged articles and not rule simply on the ground that it is opinion pieces that are at issue."); *Condit v. Dunne*, 317 F.Supp.2d 344, 363 (S.D.N.Y. 2004) ("The statement's publication on the Op Ed page of the New York Times 'does not automatically insulate the author from liability for defamation.'") (quoting *Brian v. Richardson*, 87 N.Y.2d 46, 53, 637 N.Y.S.2d 347, 660 N.E.2d 1126, 1131 (N.Y. 1995)).

interest privilege, and the public interest privilege.[252]  Each of Defendants' privilege arguments is premised on the erroneous assumption that, because Defendants made a superficial effort to tie their attacks on 3M to a public health issue by references to the London Litigation (in which they sought to vindicate only their own commercial interests) and the sham FDA petition (filed for the sole purpose of creating the appearance that they were somehow acting on the public's behalf), Defendants were entitled to fill those public statements with any kind of false factual representation they wanted.  Those contentions, , are without factual or legal merit.

> **(1)    3M has pleaded, and will establish, that Defendants acted with malice, which negates any claim of privilege.**

As an initial matter, this Court need not examine the specifics of Defendants' particular privilege arguments because each of them fails for the reason that, as pleaded in 3M's complaint, Defendants acted with malice in making their defamatory statements, which pleading allegation is sufficient to defeat a claim of qualified privilege.[253]  Common law malice (as distinguished from the "actual malice" standard discussed above with respect to the defamation of public figures) "requires only a showing that the "statement [was] published . . . with reckless or callous

---

[252] *See* Davis Defendants' Motion, at 17-19 (invoking variants of the fair comment privilege, common interest privilege, and public interest privilege); Porton Defendants' Motion, at 41-42 (joining the Davis Defendants' arguments, in particular with respect to the fair comment privilege).

[253] *See Washburn v. Lavoie*, 437 F.3d 84, 91 (D.C. Cir. 2006) ("A showing of 'excessive publication or express malice' can destroy a qualified privilege.); *Caudle v. Thomason*, 942 F.Supp. 635, 640 (D.D.C. 1996) (denying a motion to dismiss a qualified privilege because "assuming, without deciding, that these privileges are applicable here, in light of the fact that plaintiff has alleged malice, defendant is not entitled to a dismissal of the complaint. Indeed, plaintiff has alleged bad faith and ill will on the part of defendant with some specificity, and of course, the facts alleged in the complaint must be taken to be true at this stage in the proceedings. If proven at trial, such malice would be sufficient to overcome the privileges. For that reason, the Court is unable to say at this early stage in the proceedings that the plaintiff will be unable to prove any facts upon which he could prevail at trial."); *Clampitt v. American University*, 957 A.2d 23, 43 (D.C. 2008) (Court denied a motion to dismiss because "Clampitt's Complaint alleged that Ladner had specifically approved the financial and budgetary recommendations made by Plaintiff 'concerning station operations' and knew that the claims of financial mismanagement reported in the press were 'without foundation,' but 'publicly' terminated her in a manner that would lead the public to conclude that Clampitt was responsible for financial mismanagement.  We think that, taken in their entirety, the assertions in the Complaint sufficiently alleged that Ladner acted in bad faith.").

disregard for its effect upon the reputation of the plaintiff."[254]   Allegations of improper motive (*i.e.* bad faith), also suffice to assert a claim of malice.[255]   Whether or not Defendants acted with malice is a factual question that is appropriate for a jury to decide, not one properly resolved on a motion to dismiss.[256]

Here, 3M has more than adequately alleged that Defendants made their defamatory statements with malice and in bad faith.[257]   Indeed, the entire thrust of 3M's claim is that Defendants *knew* they were making allegations for public consumption that had been rejected by

---

[254] *See Payne v. Clark*, 25 A.3d 918, 925 (D.C. 2011) ("Malice, in the context of a qualified privilege, is the equivalent of bad faith. It is the doing of an act without just cause or excuse, with such a conscious indifference or reckless disregard as to its results or effects upon the rights or feelings of others as to constitute ill will.") (citing *Mosrie v. Trussell*, 467 A.2d 475, 477 (D.C. 1983)).

[255] *See Clampitt*, 957 A.2d at 13 (rejecting claim of privilege where plaintiff asserted that statements were made in "bad faith.").

[256] *See Catalyst & Chem. Servs., Inc. v. Global Ground Support*, 350 F.Supp.2d 1, 21 (D.D.C. 2004) ("The issue of whether a party abused the privilege by acting with malice, recklessness, or dishonesty is a question of fact for the jury."); *Coleman v. American Broad. Cos., Inc.*, No. 84-1594, 1985 WL 365 (D.D.C. June 18, 1985) ("[W]hile the existence of the privilege is a question of law for the court, whether it was abused by the defendant, is a question of fact for the jury.").

[257] *See, e.g.,* Original Compl. ¶ 57 ("Davis launched multiple disparaging and false press releases from his Washington, D.C. offices, each of which was intended to defame 3M, damage its good will and thereby to exert pressure on 3M and its CEO.  These press releases falsely, disparagingly, and maliciously claimed, among other things, that 3M had dropped BacLite out of 'bad faith,' had dealt dishonestly with the FDA, and therefore endangered "thousands" of lives."); *id.* ¶ 60 ("Davis and the Porton Defendants also attempted to create pressure on 3M and Buckley by falsely accusing them of being responsible for the deaths of MRSA victims.  The statements made were intentional[], false[], and malicious[].");  *id.* ¶ 63 ("Defendants made these false and defamatory statements to the press as part of their campaign to disparage 3M and force it to offer the Porton Defendants and undeserved settlement in the U.K. lawsuit."); Amended Compl. ¶ 69 ("The statements, therefore, were never meant to advocate on issues of public health, to advance the public interest, or to make honest comment on issues that were the subject of a judicial proceeding.  Instead, they were meant to extract tens of millions of dollars in payments to Claimants in the BacLite Litigation that Defendants knew were unjustified, and would never be obtained through the judicial process."); *id.* ¶ 71 ("Davis and the other Defendants made the foregoing statements solely to advance the commercial interests of the Davis Defendants and their clients, the Porton Defendants, and not to advocate on behalf of any public health issue, to advance the public interest, or to make legitimate comment on a matter at issue in a judicial proceeding.  Specifically, these statements were intended to coerce 3M into paying tens of millions of dollars to Claimants in the BacLite Litigation that Defendants knew was undeserved."); *id.* ¶ 75 ("Defendants nevertheless repeatedly made these false and defamatory statements in various media to further their wrongful scheme to disparage 3M and force it to offer the Porton Defendants an undeserved settlement in the BacLite Litigation.").

the London court (or had been shown to be false by the documents previously produced in that proceeding), with the *intent* that those statements would cause a public outcry against 3M that would induce 3M to pay Defendants to stop their improper media campaign.

> **(2)** **Defendants are not entitled to First Amendment protection for their defamatory statements because the "public interest" they allegedly advanced is based solely on Defendants' sham effort to "petition" the federal government.**

Defendants declare that their defamatory statements are not be actionable because they advanced the "public interest."[258]   In essence, they argue that, because they knowingly inserted various untrue and disparaging statements into a "citizen's petition" to a federal agency, any and all subsequent or accompanying statements to the public repeating, referring to, or expanding upon the statements in that petition cannot be actionable.[259]  Defendants are wrong.

Citizens who exercise their First Amendment right to petition the federal government for redress are typically immune from certain types of liability, such as antitrust liability, for statements they make in furtherance of that petition.[260]  D.C. courts have not, however, held that

---

[258]  *See* Davis Defendants' Motion, at 19 (invoking First Amendment "right to petition," and arguing that both their citizen's petition to the FDA, as well as "comments made to the public concerning it" are "specifically permitted and protected under the First Amendment."); Porton Defendants' Motion, at 4 (claiming statements "are all exempt from liability under the First Amendment.").

[259]  *Id.*

[260]  *See Council For Responsible Nutrition v. Hartford Cas. Ins. Co.*, No. 06-1590(RMC), 2007 WL 2020093, at *6 n.4 (D.D.C. July 12, 2007); *see also Nader v. Democratic Nat'l. Committee*, 567 F.3d 692, 696 (D.C. Cir. 2009) ("*Noerr* and *Pennington* are antitrust cases, but they stand for the proposition that when a person petitions the government for redress, the First Amendment prohibits any sanction on that action—for instance, a Sherman Act penalty for anticompetitive behavior—so long as the petition was in good faith."); *Nader v. The Democratic Nat'l. Committee*, 555 F.Supp.2d 137, 156 (D.D.C. 2008) ("The *Noerr-Pennington* doctrine holds that defendants who petition the government for redress of grievances, 'whether by efforts to influence legislative or executive action or by seeking redress in court,' are immune from liability for such activity under the First Amendment.").

this so-called *Noerr-Pennington* doctrine immunizes a speaker from common law tort liability[261] and, for that reason alone, Defendants' argument has no application to this action.

More importantly, the limited immunity from defamation for those petitioning the government extends only to those who petition in good faith.[262]  It is, therefore, subject to a well-recognized "sham" exception that bars a party from invoking its protection where it petitioned the government with the intention of using that petition as part of a scheme of "threats, intimidation, and other coercive measures."[263]  The presumption of immunity is dispelled when the petitioning activity "is objectively baseless," or "is brought with the specific intent to further wrongful conduct through the use [of] the governmental process—as opposed to the outcome of that process."[264]  Because "the purpose of the privilege is to encourage candid legislative input, it

---

[261] *Compare Acosta Orellana v. CropLife Intern.*, 711 F.Supp.2d 81, 119 n. 34 (D.D.C. 2010) ("The Noerr–Pennington doctrine was adopted originally in the federal antitrust law arena, and its applicability in this jurisdiction with regards to common law torts remains ambiguous.") *with Whelan v. Abell*, 48 F.3d 1247, 1254 (D.C.Cir.1995) (merely assuming that Noerr–Pennington reaches common law torts, and even then only "in some sense"); *Nader v. The Democratic Nat'l. Committee*, 555 F.Supp.2d 137, 156 (D.D.C. 2008) (stating that the "doctrine's provenance lies in the field of antitrust law, but its reach has since then been extended to include common-law torts such as malicious prosecution and abuse of process."); *see also Acosta Orellana v. CropLife Intern.*, 711 F.Supp.2d 81, 119 n. 34 (D.D.C. 2010) ("The CropLife Defendants do not provide any legal authority from this jurisdiction stating that the doctrine necessarily applies to state common law tort claims, and the Court's efforts have not located any such authority. However, because the Court finds for the CropLife Defendants on other grounds, it is unnecessary to reconcile this seeming point of ambiguity.").

[262] *See Nader v. The Democratic Nat'l. Committee*, 555 F.Supp.2d 137, 156 (D.D.C. 2008) (citing *Neumann v. Reinforced Earth Co.*, 594 F.Supp. 139, 142 (D.D.C. 1984)).

[263] *See Council For Responsible Nutrition v. Hartford Cas. Ins. Co.*, No. 06-1590(RMC),2007 WL 2020093, at *6 n.4 (D.D.C. July 12, 2007); *Jones v. Louisiana State Bar Ass'n*, 738 F.Supp.2d 74, 80 (D.D.C. 2010) ("An exception to that immunity is recognized where the defendants' activity is a "sham" for threats, intimidation, and other coercive measures, primarily to harass or discriminate against the plaintiff[ ].); *cf. Jones v. Louisiana State Bar Ass'n*, 738 F.Supp.2d 74 (D.D.C. 2010) (rejecting plaintiff's reliance on sham exception where "none of the allegations even remotely suggest that the [d]efendants used that petitioning activity as a "sham" for the purpose of intimidating or harassing plaintiff or otherwise discriminating against him.").

[264] *See Nader v. The Democratic Nat'l. Committee*, 555 F.Supp.2d 137, 156 (D.D.C. 2008) (citing *Prof'l Real Estate Investors," Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 60-61 (1993)); *see, e.g., In re Flonase Antitrust Litig.*, Nos. 08-3149, 08-3301, 09-1638, 2011 WL 2162898 at *8-9 (E.D. Pa. June 2, 2011), *citing Noerr*, 365 U.S. at 144.

is necessary that all privileged statements be 'contemplated in good faith' and 'seriously considered' to bear on potential legislative action."[265]  The "hallmark of a sham [is] the absence of any genuine intent to achieve the governmental result that was ostensibly being sought."[266]  In determining the petitioner's motive, courts acknowledge that ostensibly-valid petitioning activity "may be considered as having been done to give effect to [an] unlawful scheme."[267]  In any event, the "question of whether a petition is a sham is generally a question of fact for the jury."[268]

The sham doctrine has been applied, in particular, to FDA citizen's petitions.[269]  To receive the First Amendment protections afforded genuine petitioning activity, a citizen's petition must have "not just *some* likelihood of success," but rather a chance "higher than the likelihood of success required to obtain a temporary restraining order."[270]  Thus, a claim based on

---

[265] *See Webster v. Sun Co., Inc.* 731 F.2d 1, 5 (D.C. Cir. 1984).

[266] *See* ABA Antitrust Section, Monograph No. 19, The *Noerr-Pennington* Doctrine (1993), at 74; citing *Indian Head*, 486 U.S. 492, 502.  *International Motor Contest Ass'n., Inc. v. Staley*, 434 F.Supp.2d 650, 679 (N.D. Iowa 2006) (Only "sham" lawsuits fall outside the Noerr-Pennington cloak of immunity, that is, "only where a defendant's resort to the courts is accompanied or characterized by illegal and reprehensible practices such as perjury, fraud, conspiracy with or bribery of government decision makers, or *misrepresentation*, or is so clearly baseless as to amount to an abuse of process."  Therefore, because the defendants have made numerous allegations that IMCA's lawsuit is subjectively motivated by bad faith, the defendants have sufficiently pleaded the requirements for an exception to Noerr-Pennington immunity.); *General Hosps. of Humana, Inc. v. Baptist Med. Sys., Inc.*, 1984 WL 1492, at *5 (E.D. Ark. October 10, 1984) ("A different sort of activity which also falls within the sham exception is one which attempts to influence the government through subversive means. Examples might include attempts to bribe government officials, misrepresentation where it is known that the government is likely to rely on those misrepresentations, and use of patents obtained by fraud."); *U.S. v. American Tel. & Tel. Co.*, 524 F.Supp. 1336, 1362 (D.D.C. 1981) ("The sham exception clearly applies to attempts to influence governmental action through overtly corrupt conduct, such as bribes or misrepresentations, which are not normal and legitimate exercises of the right to petition but are subversions of the integrity of the process.").

[267] *See Kobe, Inc. v. Dempsey Pump Co.*, 198 F.2d 416, 425 (10th Cir. 1952); *see also Mach-Tronics v. Zirpoli*, 316 F.2d 820 (9th Cir. 1963) (state court action for theft of trade secrets).

[268] *Flonase.*, 2011 WL 2162898 at *8; *see also Indep. Taxicab Drivers' Emps. v. Greater Hous. Transp. Co.*, 760 F.2d 607, 612 (5th Cir. 1985).

[269] *See, e.g., Flonase*, 2011 WL 2162898 at *8-9, *citing Noerr*, 365 U.S. at 144.

[270] *Id.* (emphasis in original).

a sham FDA petition survives summary judgment where there is "an open question . . . whether there was a realistic chance that [the petition] would succeed on its merits."[271]

Here, as pleaded in 3M's Amended Complaint, the FDA petition was merely a "cover" invoked by Defendants to give weight to their defamatory statements about 3M in the press, and they had no reasonable expectation that the FDA would grant the requested relief.[272]   For all of Defendants' posturing, their petition to the FDA in fact had no reasonable chance of success— nor does it appear that Defendants expected success, as they made no attempt to follow up on the petition (as to which the FDA has taken no action), nor did Defendants take any of the follow-up steps promised in their petition.[273]

Moreover, allegations that the relief requested by the citizen's petition is not within the usual remedies granted by the FDA are sufficient to establish the sham exception.[274]   The relief requested in Defendants' citizen's petition is unusual, if not unprecedented.  Defendants were not asking the FDA to scrutinize questionable clinical data offered by a drug manufacturer to support regulatory approval of a potentially dangerous drug—instead, Defendants were asking the FDA to second-guess a manufacturer's *poor* clinical results and to dictate practices that might *help the manufacturer* achieve regulatory approval.[275]   That, of course, is not the FDA's function.  The FDA is charged with ensuring that the products that do make it to market are safe, not ensuring

---

[271] *Id.* at 13.

[272] Amended Compl. ¶ 17, 66.

[273] *Id.*

[274] *In re Flonase Antitrust Litig.*, 2011 WL 2162898 at *9 (holding, on summary judgment, that expert testimony explaining that the relief requested in the citizen's petition was not a usual practice of the FDA was enough evidence to defeat summary judgment on the sham exception issue).

[275] Crt. Pet. 1-3.

that allegedly useful products are not abandoned.[276]   Because Defendants' citizen's petition "request[ed] relief contrary to existing law and precedent," no reasonable person could expect that the Davis petition was likely to succeed on the merits.[277]

In fact, the only purpose Defendants have made of the petition is to tout it at every opportunity by referring to it in press releases,[278] calling a press conference for the purposes of repeating its allegations,[279] and publishing it on a website they created for the express purpose of defaming 3M.[280]   Apparently believing that nothing in the petition could ever be actionable, Defendants' disparagement of 3M goes even further in the petition, in some respects, than in Defendants' public statements.   For example, Defendants bluntly state in the petition that 3M's decision to cease development of BacLite killed people—even though Defendants knew that was false.[281]   The petition also falsely states that 3M abandoned BacLite in order to develop another MRSA detection product,[282] that 3M owed the BacLite investors £41 million for 2009,[283] and that

---

[276] *See Improving Public Health: Promoting Safe and Effective Drug Use*, U.S. Food and Drug Admin., *available at* http://www.fda.gov/AboutFDA/CentersOffices/OfficeofMedicalProductsand Tobacco/CDER/WhatWeDo/default.htm; FDA Fundamentals, U.S. Food and Drug Admin., *available at* http://www.fda.gov/AboutFDA/Transparency/Basics/ucm192695.htm.   Although the FDA makes public the data from clinical trials once a drug or device is approved, clinical trial data is kept confidential when the drug or device is not ultimately brought to market.   *See* Michael A. Rogawski and Howard J. Federoff, *Disclosure of Clinical Trial Results When Product Development Is Abandoned*, 102cm29 Science & Translational Medicine (2011), *available at* http://works.bepress.com/michael_rogawski/40 (advocating a change in this policy in order to promote greater scientific knowledge).

[277] *See Louisiana Wholesale Drug Co., Inc. v. Sanofi-Aventis*, 2008 WL 4580016 at *4 ("No reasonable pharmaceutical manufacturer could have expected Advantis's Citizen Petition to succeed on the merits because Aventis ignored the law by requesting relief that was contrary to existing law and precedent.").

[278] *See* Compl. ¶ 57-65; Amended Compl. ¶¶ 66-75.

[279] *See* Compl. ¶¶ 57-65; Amended Compl. ¶¶ 66-75.

[280] *See* Compl. ¶ 65; Amended Compl. ¶ 77.

[281] Cit. Pet. at 5 (stating that the loss of BacLite "has led to countless unnecessary infections and deaths").

[282] Cit. Pet. at ¶ 4 (claiming "3M seemed bent on sabotaging FDA approval . . .").

3M had withheld information from the FDA.[284]   Misstatements of fact in a petition to a government agency are indicia that the petition is not brought in good faith and is a sham.[285]

Citizen's petitions are intended by the FDA to be brought in good faith and, accordingly, FDA regulations require that the petition "includes representative data and information known to the petitioner *which are unfavorable to the petition.*"[286]   Although Defendants made that certification in their citizen's petition,[287] they knew that it contained the half-truths and outright false statements described above.   They also failed to include any information "unfavorable to the petition," despite possessing such information (which had already been cited by the London court).[288]   Here's 3M's allegations, in the Amended Complaint,[289] of "facts to show that the petition [Defendants] filed made statements that [they] knew were contradicted by data and information, and that [Defendants] knowingly excluded such information," were sufficient to plead that the citizen's petition was a sham.[290]

In short, even though 3M has elected not to assert defamation claims based on the statements contained in the petition itself, it is clear that Defendants did not file the petition in

---

[283] Cit. Pet. at 4 ([I]n February 2007, Acolyte was sold to 3M for a relatively small down payment of 10 million pounds Sterling – with another 41 million pounds to be paid out through the end of 2009).

[284] Cit. Pet. at 4 (claiming 3M "seemed bent on sabotaging FDA approval.").

[285] *See General Hosps. of Humana, Inc. v. Baptist Med. Sys., Inc.*, 1984 WL 1492, at *5 (E.D. Ark. October 10, 1984) ("A different sort of activity which also falls within the sham exception is one which attempts to influence the government through subversive means. Examples might include . . . misrepresentation where it is known that the government is likely to rely on those misrepresentations"); *U.S. v. American Tel. & Tel. Co.*, 524 F.Supp. 1336, 1362 (D.D.C. 1981) ("The sham exception clearly applies to attempts to influence governmental action through overtly corrupt conduct, such as bribes or misrepresentations, which are not normal and legitimate exercises of the right to petition but are subversions of the integrity of the process.").

[286] 21 C.F.R. 10.30 (emphasis added).

[287] Cit. Pet. at 5.

[288] Compl. ¶ 59; Amended Compl. ¶ 78.

[289] Amended Compl. ¶ 78.

[290] *In re Flonase Antitrust Litig.*, No. 08-CV-3301, 692 F.Supp.2d 524, 537 (E.D. Pa. 2011).

order to vindicate any genuine First Amendment right.  To the extent that they seek to cloak their public statements "concerning it" in an absolute privilege based on the right to petition,[291] that effort must be rejected.

### (3)   Defendants have not asserted any other valid privileges.

Defendants also assert three varieties of qualified privilege, each based on the assumption that their statements were connected with a concern for the *bona fide* public interest—which, for the reasons described in the previous two sections, they were not.  The asserted privileges are: (1) "fair comment on matters of public interest;"[292] (2) the "common interest privilege;"[293] and (3) a privilege for "statements made to someone who may act in the public interest," *i.e.* law enforcement agencies.[294]  Each of those arguments is without merit.

<u>First</u>, fair comment applies only to opinions, not misstatements of fact.[295]  The comment must be on a matter of public interest, and "facts upon which the opinion is based must be stated or they must be known or readily available to the persons to whom the comment or criticism is addressed, as in the case of a newspaper criticism of a play or a review of a book.."[296]  In this case, 3M alleges that Defendants' statements were, themselves, misstatements of fact,[297] to which the privilege for fair comment does not apply.

<u>Second</u>, "to come within the protection of the 'common interest' privilege, the statement must have been (1) made in good faith, (2) on a subject in which the party communicating has an

---

[291] Davis Defendants' Motion, at 19.

[292] Davis Defendants' Motion, at 17.

[293] *Id.* at 18.

[294] *Id.* at 18-19.

[295] *See Fisher v. Washington Post Co.*, 212 A.2d 335, 337 (D.C. 1965).

[296] *Id.* at 338; *see also Lane v. Random House, Inc.*, 985 F.Supp.141, 150 (D. D.C. 1995).

[297] *See* Compl. ¶¶ 57-65; Amended Compl. ¶¶ 64-79.

interest, or in reference to which he has, or honestly believes he has, a duty to a person having a corresponding interest or duty, (3) to a person who has such a corresponding interest."[298]   The privilege does not apply where there has been "excessive publication"—that is, publication to those without a common interest in the information communicated or a publication not reasonably calculated to protect or further such interest.[299]   Defendants have the burden of proving the elements of the common interest privilege,[300] but have not attempted to do so (except to assert that the public had some "legitimate interest" in MRSA).[301]   Nor do Defendants explain what duty they claim to have owed the public to apprise them of Defendants' commercial dispute with 3M, or how the public at large has a corresponding interest.  As discussed above, even the FDA did not have an interest in whether BacLite was brought to market (only an interest in making sure that any such product actually introduced into the market was safe).[302]   Pub simply, Defendants have not met their burden of establishing the existence of a common interest with the public.

Third, Defendants' statements are not immunized by the so-called "law enforcement privilege," which is a subset of the common interest privilege and may apply "when a statement about suspected wrongdoing is made in good faith to law enforcement authorities."[303]   As with the common interest privilege, the law enforcement privilege does not apply when publication is

---

[298] *Moss v. Stockard*, 580 A.2d 1011, 1024 (D.C. 1990); *see also Cloonan*, 602 F.Supp.2d at 32 ("Finally, even assuming that the MSPB appeal is the 'proceeding' at issue, Stein fails to demonstrate how each of the individuals to whom the Letter is addressed or copied have an interest in or connection to the proceeding."); *Finkelstein, Thompson & Loughran v. Hemispherx Biopharma, Inc.*, 774 A.2d 332, 342 (D.C. 2001); *Messina v. Krakower*, 439 F.3d 755 (D.C. Cir. 2006)

[299] *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 858 (D.C. Cir. 2006).  The privilege also does not apply where the speaker acted with malice or in bad faith, as Defendants did here.  *Id.*

[300] *Id.*

[301] Davis Defendants' Motion, at 18.

[302] *See supra* note 2, and accompanying text.

[303] *See Columbia First Bank v. Ferguson*, 665 A.2d 650, 655 (D.C. 1995).

made to persons other than law enforcement personnel[304]—as was the case with respect to Defendants' press releases and public comments.

4.    **3M has sufficiently pleaded its claim for intimidation under U.K. law.**

    a.    **3M has alleged all the elements of intimidation.**

Defendants erroneously argue that 3M has failed to allege the elements of intimidation under U.K. law which, as discussed above, all parties agree governs that claim.[305]   U.K. law recognizes civil liability for the tort of intimidation (*i.e.* blackmail, which is the alleged underlying wrongful act),[306] for which D.C. does not have a civil tort analogue.[307]   As a result, there is a true conflict between D.C. law and U.K. law.[308]   To effect D.C.'s governmental interest analysis, this Court must evaluate the governmental policies underlying the laws at issue, and determine which jurisdiction's policy would be more advanced by the application of its law to the facts of the case under review.[309]   As a matter of policy, the U.K. has an interest in deterring schemes of intimidation and extortion aimed at U.K. citizen (George Buckley) and a company

---

[304] *See Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 858 (D.C. Cir. 2006).

[305] *See* Porton Defendants' Motion, at 24-25; Davis Defendants' Motion, at 19-20

[306] *See* Porton Defendants' Motion, at 24.

[307] *See Chandler v. James*, 783 F.Supp.2d 33, 42 (D.D.C. 2011) ("Mr. Chandler's claims asserting "intimidation" and "coercion" against the [Defendant] will also be dismissed, as there are no such torts recognized under District of Columbia common law.").

[308] *See generally Askew v. Meridian Imaging Solutions, Inc.*, 601 F.Supp.2d 173, 176-77 (D.D.C. 2009) (recognizing that when one jurisdiction applies a cause of action to an unlawful activity, while the other does not, there is a true conflict, and, as a result, the court must perform a modified governmental interests analysis); *Association of Merger Dealers, LLC v. Tosco Corp.*, 167 F.Supp.2d 65, 72-73 (D.D.C. 2001) (A true conflict exists "between the law on associational standing of the various jurisdictions that may have an interest in this case," because one of the jurisdictions recognizes it exists and the other does not.).

[309] *See Drs. Groover, Christie & Merritt, P.C. v. Burke*, 917 A.2d 1110, 1117 (D.C. 2007); *Reed v. Philip Morris, Inc.*, No. Civ. 96-5070, 1999 WL 33714707, at *19 (D.C. Super. Ct. 1999).

that does significant business in the U.K. and with the U.K. Government (3M).  Therefore, this Court should recognize U.K. law as to 3M's intimidation claim.[310]

The attached expert legal opinion of Stephen Auld Q.C., an English barrister and Queen's Counsel,[311] explains in detail the scope and elements of the English tort of intimidation. Succinctly put, under the applicable law of England and Wales, there are two different forms of the tort of intimidation:  (1) intimidation of a person that causes injury (two-party intimidation) and (2) intimidation of a person that causes injury to another (three-party intimidation).[312]  *Two-party intimidation*, which is the variety alleged by 3M, arises when (i) defendant illegitimately threatens plaintiff that, unless plaintiff takes or refrains from a course of action, defendant will perform an act; and (ii) as a result of that threat, loss is caused to plaintiff.  As Auld explains, the precise contours of this tort are not clear and, in an often-cited decision, Lord Steyn said in the *Godwin* case that: "[whilst] the actionability of two-party intimidation is not in doubt, there is

---

[310] It does not matter that D.C. law applies to the other claims given the lack of true conflicts, because D.C. courts analyze each claim separately.  *See Sloan v. Urban Title Servs., Inc.*, 689 F.Supp.2d 94, 105 (D.D.C. 2010) ("Dependent upon the facts and legal claims at issue in a particular case, different law may apply to different issues in a lawsuit.") (citing *Jaffe v. Pallotta TeamWorks*, 374 F.3d 1223, 1228 (D.C.Cir.2004)).  Additionally, 3M's claims arising out of the same common scheme should be brought together in the interest of judicial economy.  *See generally Stevenson v. Severs*, 158 F.3d 1332, 1332 (D.C. Cir. 1998) ("In deciding whether to exercise its discretion to try the remaining cause of action, the Supreme Court has directed district courts to consider . . . judicial economy . . .").

[311] *See* Declaration of Stephen Auld Q.C., attached hereto as Ex. P (the "Auld Decl.").  Pursuant to Rule 44.1 of the Federal Rules of Civil Procedure, this Court, "in determining foreign law, may consider any relevant material or source, including testimony, whether or not . . . admissible under the Federal Rules of Evidence." *Ganem v. Heckler*, 746 F.2d 844, 854 (D.C. Cir. 1984) (noting that "written or oral expert testimony accompanied by extracts from foreign legal material is the basic method by which foreign law is proved.").  For the Court's convenience, copies of the British legal opinions relied on by Mr. Auld will be provided to the court in a separate binder.

[312] According to Stephen Auld, *three-party intimidation* arises where the defendant unlawfully threatens a third party that, unless the third party takes or refrains from a course of action which has an effect on the plaintiff, defendant will perform an act and, as a result of the threat, loss is caused to the plaintiff.  Three-party intimidation is no longer applied as an independent tort, and appears now to have been subsumed into a general tort of "causing loss by unlawful means," *i.e.*, causing loss to a plaintiff by the use of unlawful means in relation to a third party.  *OBG v. Allan* [2007] UKHL 21; [2008] 1 AC 1 at [7] and [25].

very little guidance in the deciding cases on the requirements of this tort."[313]   The *Godwin* court observed that "coercion is of the essence of the [two-party intimidation] tort."   Lord Steyn subsequently held, in a case decided the following year, that "a threat may be illegitimate when coupled with a demand for payment even if the threat is one of lawful action."[314]   The threat does not need to be unlawful, but only illegitimate.[315]   Auld describes the requirements for the tort of two-party intimidation as the "civil law equivalent of blackmail."[316]   Importantly, plaintiff may suffer harm for intimidation even if it does not capitulate to the blackmailer's demand; plaintiff incurs intimidation damages by taking steps to mitigate or forestall the effect of a blackmail threat.[317]

Based on the foregoing, and according to Auld, 3M has properly alleged a cause of action for the tort of two-party intimidation (in the original complaint, on which Auld based his opinion) by alleging that:  (1) Defendants' threats "with regard to [3M's] U.K. business interests and Mr. Buckley's investiture as a Knight Bachelor, which are also alleged to be '*egregious and wrongful*' . . .  constitutes an allegation of an illegitimate threat;"[318] (2) "the intention behind the threats was to cause [3M] to settle the London lawsuit for more than it was worth . . . . constitutes an allegation that the intention behind the threats was to coerce [3M] into taking a course of action;"[319] and (3) 3M has sustained resultant damages.[320]

---

[313] *Godwin v. Uzoigwe* [1993] Fam Law 65 (CA); *see also*

[314] *CTN Cash and Carry Ltd. v. Gallaher Ltd.* [1994] 4 All ER 714, 718.

[315] *Id.*

[316] *See* Auld Decl. at 7, 9, 12.

[317] *See id.* at 10 (concluding that where plaintiff "takes (costly) steps to mitigate the effect of the threat should it be carried out, the plaintiff should be able to recover the cost of those steps by way of damages.").

[318] *Id.*

[319] *Id.*

Defendants argue that 3M's pleading is legally insufficient because it "does not allege that any defendant successfully compelled 3M to 'do some act,'" and therefore 3M cannot show damages.[321]   As explained by Mr. Auld, however, the U.K. intimidation claim alleges that 3M was compelled to take steps, and thereby to incur significant expenses, in an effort to mitigate the pernicious result that would occur if Defendants made good on their threats to interfere with 3M's business opportunities in the U.K. (as apparently they did) and George Buckley's knighthood.[322]   As Mr. Auld determined after evaluating Defendants' argument, 3M's allegations satisfy the elements of intimidation.[323]

Accordingly, 3M's claim for intimidation should not be dismissed at this stage of the litigation.

### b.   The "without prejudice privilege" and Federal Rule of Evidence 408 do not shield Defendants' threats from liability.

The Porton Defendants (but not the Davis Defendants) also erroneously argue that their threatening communications to 3M's counsel were immune from liability because "settlement discussions . . . are subject to a strict privilege" under U.K. law.[324]   Although the Porton Defendants acknowledge that this common law privilege—called the "without prejudice" rule,

---

[320] *Id.* at 11 (expressing no opinion whether 3M's pleadings meet U.S. procedural requirements.)

[321] Porton Defendants' Motion, at 24-25; *see also* Davis Defendants' Motion, at 19-20 (arguing that "3M has failed to plead that it was actually coerced and incurred damages as a result.").   In this regard, the Davis Defendants rely on the U.K. case, *Berezovsky v. Abramovich*, [2011] All ER (D) 253 (Feb), but as Mr. Auld explains, the Court of Appeals in the *Berezovsky* case was not required to determine the elements of intimidation (because the were agreed to, for purposes of appeal, by the parties) and, in any event, that case is subject to further argument on these issues, with a decision not expected before the summer of 2012.  *See* Auld Decl. at 8-9.

[322] *See* Auld Decl. at 10 (concluding that where plaintiff "takes (costly) steps to mitigate the effect of the threat should it be carried out, the plaintiff should be able to recover the cost of those steps by way of damages.").

[323] *See id.* at 11.

[324] Porton Defendants' Motion, at 26.

which is somewhat similar in effect to Federal Rule of Evidence 408—is "subject to certain exceptions,"[325] their papers are conspicuously silent as to what those exceptions are.

The without prejudice rule prevents negotiations that are genuinely aimed at settlement from being given in evidence.[326]   As U.K. courts have explained, two rationales underpin the without prejudice privilege:  (i) "parties should be encouraged so far as possible to settle their disputes without resort to litigation;" and (ii) such settlements are more likely "[o]n the basis of an express or implied contract between the parties that their communications made in the course of settlement negotiations should not be admissible in evidence should negotiations prove unsuccessful."[327]   However, the House of Lords (the highest U.K. judicial body) has recognized eight exceptions to the rule, one of which exists "where the exclusion of without prejudice evidence would act as a cloak for perjury, blackmail or other 'unambiguous impropriety.'"[328] Clearly then, the U.K. "without prejudice privilege" has no applicability to 3M's intimidation claim against Defendants.

The Porton Defendants also speciously assert, without citation to any supporting case law, that their threatening communications to 3M's counsel were protected by Federal Rule of Evidence 408 because those threats constituted "conduct or statements made in compromise negotiations" regarding a disputed claim.[329]   To the contrary, D.C. law makes clear that although settlement conversations are generally inadmissible to prove liability or amount, they are

---

[325] *Id.* at 27.

[326] *Rush & Tompkins Ltd v. GLC,* [1988] 3 All ER 737.

[327] *Cutts v. Head*, [1984] Ch 290.

[328] *Unilever plc v. The Procter & Gamble Co.*, [2001] 1 All ER 783.

[329] *See* Porton Defendants' Motion, at 27 (discussing Fed. R. Evid. 408(a)(2)).

admissible "when the evidence is offered for another purpose,"[330] such as to establish an independent violation apart from the underlying claim that was the subject of the correspondence.[331]

Here, 3M alleges that Defendants' communications were not part of any settlement effort because negotiations had ceased,[332] and that even if the threats are considered to have been made in the course of ongoing negotiations, they were in furtherance of Defendants' effort to blackmail 3M.[333]  Consequently, the threats were not privileged statements under Rule 408.

### 5.     3M has sufficiently pleaded claims of conspiracy and aiding and abetting.

Defendants incorrectly argue that 3M's claims for conspiracy and aiding and abetting fail because both causes of action require an underlying tort, which 3M has not alleged.[334]  The Davis Defendants also erroneously argue that aiding and abetting is simply not a recognized theory in D.C.[335]  These arguments are without merit for the reasons discussed below.

---

[330] *See Carney v. American University*, 151 F.3d 1090, 1095 (D.C. Cir. 1998) (citing Fed. R. Evid. 408).

[331] *See Carney v. American Univ.*, 151 F.3d 1090, 1095-96 (D.C. Cir. 1998) ("Rule 408 is inapplicable when the claim is based upon some wrong that was committed in the course of settlement discussions; e.g., libel, assault, breach of contract, unfair labor practice, and the like.") (citing 23 Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 5314, at 282 (1980)); *see, e.g., id.* at 1096 ("Carney offered the settlement correspondence not to prove that the University discriminated against her, but to show that the University committed an entirely separate wrong by conditioning her benefits on a waiver of her rights. The letters were therefore admissible.").

[332] *See* Compl. ¶¶ 68-76; Amended Compl. ¶¶ 80-104.

[333] *See* Compl. ¶¶ 68-76; Amended Compl. ¶¶ 80-104.  The Porton Defendants appear also to argue that forward-looking statements, during settlement negotiations, about the effects of litigation on one's adversary are not "automatically" blackmail, but that argument only highlights the possibility that such threats *can* be actionable.  *See* Porton Defendants' Motion, at 27 (citing *Merrill Lynch, Inc. v. Raffa*, [2001] 1 I.L.Pr. 31).  Indeed, the cited decision goes on to acknowledge that "threat[s] made to continue the litigation by means of false evidence" would make such statements "objectionable." *Id.*  Defendants' threats to 3M's counsel, especially when viewed in light of Defendants' campaign of defamatory attacks against 3M, constituted precisely such "objectionable" conduct.

[334] *See* Davis Defendants' Motion, at 22; Porton Defendants' Motion, at 42-43.

[335] *See* Davis Defendants' Motion, at 22.

a.   **Conspiracy**

To state a claim for civil conspiracy, 3M need allege only (1) an agreement between two or more persons; (2) to participate in an unlawful act, or in a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement (4) pursuant to, and in furtherance of, the common scheme.[336]   Because the secret nature of conspiracies makes it impossible for a plaintiff to know the details internal to a conspiracy at the pleading stage, the pleader typically should be allowed to obtain discovery.[337]

Here, 3M adequately pleaded an agreement among Defendants to injure 3M,[338] and the Amended Complaint goes even further by adding specific facts of meetings, arranged by Tetra Strategy and the Davis Defendants, in which the Porton Defendants reached an agreement with U.K. Government officials to impede 3M's business opportunities.[339]   These allegations are more than sufficient to plead the existence of an agreement.[340]

---

[336] *See Executive Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 738 (D.C. 2000)).

[337] *See* 5 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure (Second) § 1233 (1990) (internal citations omitted); *see also ABB Daimler-Benz Transp. (North America), Inc. v. National R.R. Passenger Corp.*, 14 F.Supp.2d 75, 86 (D.D.C. 1998) ("There are inherent difficulties in the pleading of a conspiracy, for by its very nature it involves agreement and questions of intent not accessible to Plaintiff.") (citing *Mandelkorn v. Patrick*, 359 F.Supp. 692, 697 (D.D.C. 1973)).

[338] *See* Compl. ¶¶ 1, 13, 50, 57, 68, 74, 78-79, 115.

[339] *See* Amended Compl.¶¶ 5, 40-41, 80-104.

[340] *See Wiggins v. District Cablevision, Inc.*, 853 F.Supp. 484, 497-98 (D.D.C. 1994) ("An agreement may be inferred from the underlying facts . . . Proof of a tacit understanding is sufficient to show agreement. As one court has stated: '[I]n most cases the court will have to infer a conspiracy from indirect evidence, it must initially look to see if the alleged joint tortfeasors are pursuing the same goal—although performing different functions—and are in contact with one another. The circumstances of each case dictate what other specific evidence may be useful in inferring agreement.'") (citing *Halberstam v. Welch*, 705 F.2d 472, 477, 481 (D.C. Cir. 1983)); *Halberstam v. Welch*, 705 F.2d 472, 481 (D.C. Cir. 1983) ("In sum, we expect that the relationships between the actors and between the actions (e.g., the proximity in time and place of the acts, and the duration of the actors' joint activity) are relevant in inferring an agreement in a civil conspiracy action. There may well be other significant factors in individual cases."); *see, e.g., Wiggins v. District Cablevision, Inc.*, 853 F.Supp. 484, 497-98 (D.D.C. 1994) (Denying a motion to dismiss where "Plaintiff . . . allege[d] that defendants 'conspired together to maliciously interfere with and violate plaintiff's rights to employment.' . . . [P]laintiff also has alleged

In addition, 3M has pleaded the existence of an underlying tort,[341] and that the Defendants' agreement was to participate in those unlawful activities.[342]  Defendants took overt acts in furtherance of the common scheme to injure 3M,[343] resulting in substantial damages.[344]  As a result, 3M has met its burden to allege the existence of a civil conspiracy among Defendants to coerce 3M.[345]  Finally, even if this Court were to conclude that a principal and agent cannot conspire together, all Defendants are individually liable for the tortious conduct they individually committed against 3M.

### b.   Aiding and abetting

To state a claim for aiding and abetting under D.C. law, 3M must allege: (1) a wrongful act causing an injury by a party aided by defendant; (2) defendant's knowledge of his role as part of an overall illegal or tortious activity at the time that he provided assistance; and (3) defendant's knowing and substantial assistance in the principal violation.[346]

---

facts that support at least an inference of an agreement to participate in a scheme to tortiously interfere with Mr. Wiggins' employment contract.").

[341] *See supra* § IV.C. 2-4 (3M has more than adequately pleaded: (1) intimidation and blackmail under U.K. law; (2) tortious interference with existing and prospecting business advantage; and (3) commercial defamation.).

[342] *See* Compl. ¶¶ 1, 13, 50, 57, 68, 74, 78-79, 115; Amended Compl. ¶¶ 1, 5-6, 17, 80-104, 171-74.

[343] *See* Compl. ¶¶ 1, 13, 50-53, 57-65, 70-76, 116; Amended Compl. ¶¶ 1, 5-6, 17, 64-104, 171-74.

[344] *See* Compl. ¶¶ 81-82, 98, 106; Amended Compl. ¶¶ 6, 112-14, 171-75.

[345] *See Riggs v. Home Builders Institute*, 203 F.Supp.2d 1, 25-26 (D.D.C. 2002). (The complaint alleges that "each and every one of the defendants combined together, agreed and conspired with one another to terminate Mr. Riggs' employment . . . [and that the defendants] committed overt unlawful acts in furtherance of the conspiracy ... including but not limited to HBI's wrongfully and tortiously terminating Mr. Riggs' employment [and that such conspiratorial acts] directly and proximately caused plaintiff to suffer [various injuries.] . . . Dismissal is warranted only if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'").

[346] *Ungar v. Islamic Republic of Iran*, 211 F.Supp.2d 91, 99 (D.D.C. 2002) (quoting *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983).

Aiding and abetting is a theory of vicarious liability for an underlying tort and, as discussed above, 3M has successfully alleged underlying torts.[347]  3M has alleged wrongful acts by parties aided by the Porton Defendants, Davis Defendants, and Boulter respectively, that caused injuries to 3M.[348]  3M has further alleged that the Porton Defendants, Davis Defendants, and Boulter, each had knowledge of their respective roles as parties to the tortious activity to which they provided assistance,[349] and provided substantial assistance in injuring 3M.[350]  Therefore, 3M has adequately pleaded liability for aiding and abetting.

## V.

## CONCLUSION

For all the above-stated reasons, 3M respectfully requests that this Court deny the motions to dismiss filed by the Davis Defendants and the Porton Defendants, respectively, and grant 3M all other relief to which it is entitled.

---

[347] *McWilliams Ballard, Inc. v. Broadway Mgmt. Co., Inc.*, 636 F.Supp.2d 1, 7 n. 7 (D.D.C. 2009) ("Finally, plaintiff adequately alleges . . . aiding and abetting.   [This] claim . . . [is] 'a means for establishing vicarious liability for [an] underlying tort,' and plaintiff has stated a valid fraud claim that forms the basis for these derivative claims.") (internal citations omitted).

[348] *See* Compl. ¶¶ 1, 57-82, 109; Amended Compl. ¶¶ 64-104, 166-67.

[349] *See* Compl. ¶¶ 1, 50-51, 58-65, 68-79, 110-11; Amended Compl. ¶¶ 64-104, 166-68.

[350]  *See* Compl. ¶¶ 1, 50-51, 58-65, 68-79, 111; Amended Compl. ¶¶ 64-104, 166-70.

Respectfully submitted,


By:    /s/Kenneth J. Pfaehler
       Kenneth J. Pfaehler
       David I. Ackerman
       **SNR DENTON US LLP**
       1301 K Street NW
       Suite 600, East Tower
       Washington, D.C.  20005-3364
       Telephone:  (202) 408-6468
       Facsimile:  (202) 408-6399


       William A. Brewer III
       Michael J. Collins
       Kenneth N. Hickox, Jr.
       Robert Gifford
       **BICKEL & BREWER**
       767 Fifth Avenue, 50th Floor
       New York, New York  10153
       Telephone:  (212) 489-1400
       Facsimile:  (212) 489-2384
       **ATTORNEYS FOR PLAINTIFF**
       **3M COMPANY**