**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | | |
|---|---|---|
| 3M COMPANY, | : | Civil Action No. |
| | : | **1:11-CV-01527-RLW** |
| | : | |
| Plaintiff, | : | |
| | : | |
| - v - | : | |
| | : | |
| HARVEY BOULTER, | : | |
| PORTON CAPITAL TECHNOLOGY FUNDS, | : | |
| PORTON CAPITAL, INC., LANNY DAVIS, | : | |
| LANNY J. DAVIS & ASSOCIATES, PLLC and | : | |
| DAVIS-BLOCK LLC, | : | |
| | : | |
| Defendants. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**3M COMPANY'S CONSOLIDATED RESPONSE TO THE SPECIAL MOTIONS TO
DISMISS FILED BY DEFENDANTS LANNY DAVIS, LANNY J. DAVIS &
ASSOCIATES, PLLC AND DAVIS-BLOCK LLC AND PORTON CAPITAL
TECHNOLOGY FUNDS AND PORTON CAPITAL, INC.**

Kenneth J. Pfaehler
David I. Ackerman
SNR DENTON US LLP
1301 K Street NW
Suite 600, East Tower
Washington, D.C.  20005-3364
Telephone:  (202) 408-6468
Facsimile:  (202) 408-6399

William A. Brewer III
Michael J. Collins
Kenneth N. Hickox, Jr.
Robert W. Gifford
BICKEL & BREWER
767 Fifth Avenue, 50th Floor
New York, New York  10153
Telephone:  (212) 489-1400
Facsimile:  (212) 489-2384

**ATTORNEYS FOR PLAINTIFF 3M COMPANY**

## TABLE OF CONTENTS

**Page**

I.  PRELIMINARY STATEMENT ...................................................1

II.  RELEVANT FACTUAL AND PROCEDURAL HISTORY ...........................2

    A.  BacLite Was Not A Commercially Viable Product...........................2

    B.  Davis Is Brought On To Plan, Coordinate, And Implement Defendants' Conspiracy. ....................................................3

    C.  Defendants' Defamatory Media Campaign ...............................4

    D.  Defendants Repeat Their Defamatory Statements In A Sham FDA "Citizens' Petition." ....................................................6

    E.  Defendants "Buy" Private Access To the U.K. Secretary Of Defence In Order To Obtain His Assistance In Their Scheme To Coerce 3M Into Paying Them A Windfall. ...............................................8

    F.  Defendants Threaten To Directly Interfere With 3M's Business Interests In The U.K. ..........................................................8

    G.  The High Court's Judgment Vindicates 3M. .............................11

    H.  The Damage Done ....................................................12

    I.  The Procedural History Of This Action ..................................12

III.  SUMMARY OF OPPOSITION ...............................................13

IV.  ARGUMENTS AND AUTHORITIES ...........................................14

    A.  Relevant Legal Standards ..............................................14

        1.  Defendants' initial burden to make a prima facie showing that the challenged speech or conduct is in furtherance of the right of advocacy on issues of public interest....................................14

        2.  Plaintiff's burden to establish a likelihood of success on the merits .........15

    B.  Under No Circumstances Does The Act Apply To 3M's Claims For Tortious Interference, Intimidation, Civil Conspiracy And Aiding And Abetting................................................................18

    C.  Defendants' Defamatory Statements Were Directed Primarily Toward Protecting Their Commercial Interests, And Not Intended To Advocate On Issues Of Public Interest. ...............................................23

    D.  3M Is Likely To Succeed On The Merits Of Its Claims......................25

        1.  3M's intimidation claim............................................25

        2.  3M's Tortious Interference with Existing and Prospective Business Advantage Claims. ..............................................29

       3.     3M's Commercial Defamation Claims. ....................................................30

       4.     3M's aiding and abetting and civil conspiracy claims.............................37

  E.    In The Alternative, 3M Is Entitled To Discovery Before The Special Motions To Dismiss Can Be Granted. ...................................................38

       1.     3M is entitled to the discovery permitted by Fed. R. Civ. P. 56(d). ..........38

       2.     Specific discovery needed by 3M to respond to the Special Motion.........40

  F.    Defendants' Request For Attorney's Fees Should Be Denied.............................44

V.    CONCLUSION....................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*ABB Daimler-Benz Transp. (North America), Inc. v. National R.R. Passenger Corp.*,
  14 F.Supp.2d 75 (D.D.C. 1998) ................................................................................38

*Aeroplate Corp. v. Arch Ins. Co.*,
  CV- F 06-1099 AWI SMS, 2006 U.S. Dist. LEXIS 82180 (E.D. Cal. Nov. 8, 2006) ...........39

*Agee v. Muskie,*629
  F.2d 80 (D.C. Cir. 1980) ......................................................................................2

*Armenian Assembly of Am., Inc. v. Cafesjian*,
  692 F. Supp. 2d 20 (D.D.C. 2010) ...........................................................................43

*Benic v. Reuters Am.*,
  357 F. Supp. 2d 216 (D. D.C. 2004) ........................................................................42

*Bradford v. Judson*,
  12 So.3d 974 ...................................................................................................17

*Carr v. Brown*,
  395 A.2d 79 (D.C. 1978) ......................................................................................30

*Casco Marina Dev ., L.L.C. v. District of Columbia Redevelopment Land Agency*,
  834 A.2d 77 (D.C. 2003) ......................................................................................29

*Cohen v. Brown*,
  173 Cal.App.4th 302 (Cal. App. 2009) .....................................................................20

*Columbia First Bank v. Ferguson*,
  665 A.2d 650 (D.C. 1995) .................................................................................14, 43

*CSX Transp. v. Williams*,
  2005 U.S. Dist. LEXIS (D.D.C. Apr. 22 2005) ...........................................................2

*CTN Cash and Carry Ltd. v. Gallaher Ltd.*
  [1994] ...........................................................................................................26

*Curiel v. P.O.D.*,
  No. B177898, 2005 WL 1774424 (Cal.App. 2d Dist. July 28, 2005) ....................................15

*Dean v. AFGE*,
  549 F. Supp. 115 (D.C. 2008) ................................................................................45

*Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*,
  365 U.S. 127 (1961) ..........................................................................................44

*El-Hadad v .United Arab Emirates*,
  496 F.3d 658 (D.C. Cir. 2007) ("[B]ad faith vitiates the common interest privilege
  under District of Columbia law.") .......................................................................43

*Flatley v. Mauro*,
  139 P.3d 2 (Cal. App. 2006) .........................................................................20, 42

*Foray v. Novroske*,
  334 N.E. ...........................................................................................................36

*Ganem v. Heckler*,
  746 F.2d 844 (D.C. Cir. 1984) ............................................................................25

*General Hosps. of Humana, Inc. v. Baptist Med. Sys., Inc.*,
  1984 WL 1492 (E.D. Ark. Oct. 10, 1984) ..........................................................24

*Globetrotter Software, Inc. v. Elan Computer Group, Inc.*,
  63 F.Supp.2d 1127 (N.D. Cal. 1999) ..................................................................20

*Godwin v Uzoigwe*
  [1993] Fam Law 65 (CA) ...................................................................................26

*Guilford Transp. Indus. v. Wilner*,
  760 A.2d 580 (D.C. 2000) ..................................................................................34

*Haig v. Agee*,
  453 U.S. 280 (1981) .............................................................................................2

*Halberstam v. Welch*,
  705 F.2d 472 (D.C.Cir.1983) ..............................................................................37

*Hometown Props. v. Fleming*,
  680 A.2d 56 (R.I. 1996) ......................................................................................22

*Hutchinson v. Proxmire*,
  443 U.S. 111 (1979) ...........................................................................................43

*In Estiverne v. Times-Picayune, L.L.C.*,
  950 So. 2d 858 (La. App. 4th Cir. 2006) ............................................................17

*In re Bah*,
  321 B.R. 41 (9th Cir. 2005) ................................................................................38

*Ingber v. Ross*,
  479 A.2d 1256 (D.C. 1984) ................................................................................31

*International Telecomms. Satellite Org. v. Colino*,
   CIV. A. Nos. 88–1266(RCL), 87–2749(RCL), 1992 WL 93129 (D.D.C. Apr. 15,
   1992) ......................................................................................................................37

*Jankovic v. Int'l Crisis Group*,
   593 F.3d 22 (D.C. Cir. 2010) ....................................................................................43

*Jewett v. Capital One Bank*,
   113 Cal.App.4th 805 (Cal. App. 2d Dist. 2003) .......................................................15

*Kahn v. Parsons Global Servs., Ltd.*,
   428 F.3d 1079 (D.C. Cir. 2005) ................................................................................38

*Klayman v. Judicial Watch, Inc.*,
   No. 06-670 (CKK), 2007 U.S. Dist. LEXIS 3197 (D.D.C. Jan. 17, 2007)...............43

*Kurwa v. Harrington, Foxx, Dubrow & Canter, LLP*,
   146 Cal.App.4th 841 (Cal.App. 2d Dist. 2007) ...................................................20, 24

*Language Line Servs. v. Language Servs. Assocs., LLC*,
   2011 U.S. Dist. LEXIS 124836 (N.D. Cal. Oct 13, 2011).......................................22

*Liberty Lobby, Inc. v. Rees*,
   852 F.2d 595 (D.C.Cir.1988) ...............................................................................35, 36

*Louisiana Crisis Assistance Ctr. v. Alexandria Marzano-Lesnevich*,
   No. 11:2102, 2011 WL 5878159 (E.D.La. Nov. 23, 2011)("Louisiana courts have
   specifically noted the similarities between article 971 and California's anti-SLAPP
   and have looked to California case law when there is no precedential Louisiana
   authority on point.")........................................................................................... passim

*Mandelkorn v. Patrick*,
   359 F.Supp. 692 (D.D.C. 1973) .................................................................................38

*Mann v. Quality Old Time Svc., Inc.*,
   120 Cal. App. 4th 90 (Cal. App. 2004)........................................................... passim

*Margolis v. Gosselin*,
   1996 Mass. Super. LEXIS 335 (Mass. Super. Ct. May 22, 1996)..........................22

*Mark Marketing Servs., LLC v. Geoplast S.p.A.*,
   753 F. Supp. 2d 141 (D.D.C. 2010) ..........................................................................30

*Martin Marietta Corp. v. Evening Star Newspaper Co.*,
   417 F.Supp. 947 (D.D.C. 1976) .................................................................................31

*Martin v. Malhoyt*,
   830 F.2d 237 (D.C. Cir. 1987).................................................................................39

*McFarlan v. Sheridan Square Press*,
   91 F.3d 1501 (D.C. Cir. 1996) ........................................................................42

*Metzler v. Rowell*,
   547 S.E. 2d 311 (Ga. App. 2001) .....................................................................22

*Meyerson v. Hurlbut*,
   98 F.2d 232 (D.C. Cir. 1938) ...........................................................................31

*Mindy's Cosmetics., Inc. v. Dakar*,
   611 F3d. 590 (9th Cir. 2010) ...........................................................18, 29, 30, 37

*Moldea v. New York Times*,
   22 F.3d 310 (D.C. Cir. 1994) ...........................................................................34

*Muir v. Navy Federal Credit Union*,
   529 F.3d 1100 (D.C. Cir. 2008) .......................................................................30

*N.A.A.C.P. v. Claiborne Hardware Co.*,
   458 U.S. 886 (1982) ........................................................................................44

*Nat'l R.R. Passenger Corp. v. Veolia Transp. Servs., Inc.*,
   592 F. Supp. 2d 86 (D.D.C. 2009) ...................................................................30

*Navellier v. Sletten*,
   29 Cal.4th 82 (Cal. 2002) .................................................................................16

*NCRIC, Inc. v. Columbia Hosp. For Women Med. Ctr., Inc.*,
   957 A.2d 890 (D.C. 2008) ................................................................................29

*New.Net, Inc., v. Lavasoft*,
   356 F. Supp. 2d 1090 (C.D. Cal. 2004) ...........................................................22

*New York Studio, Inc. v. Better Bus. Bureau of Alaska*,
   No. 3:11-cv-05012-RBL, 2011 U.S. Dist. LEXIS 62567 (W.D. Wash. June 13, 2011) .........22

*New York Times v. Sullivan*,
   376 U.S. 254 (1964) ........................................................................................35

*OAO Alfa Bank v. Center for Public Integrity*,
   387 F.Supp.2d 20 (D.D.C. 2005) .....................................................................35

*Oasis West Realty, LLC v. Goldman*,
   250 P.3d 1115 (Cal. 2011) ....................................................................... passim

*OBG v. Allan*
   [2007] .............................................................................................................26

*Parsi v. Daioleslam*,
   595 F.Supp.2d 99 (D.D.C. 2009) .................................................................................35, 36

*Paul v. Smith*,
   No. B213299, 2009 WL 4895025 (Cal. App. 2d Dist. Dec. 21, 2009)...................................15

*Rivero v. American Federation of State, County & Municipal Employees, AFL–CIO*,
   105 Cal.App.4th 913 (Cal. App. 2003)..................................................................................24

*Rogers v. Home Shopping Network, Inc.*,
   57 F. Supp. 2d 973 (C.D. Cal. 1999) ..............................................................................38, 43

*Schoendorf v. U.D. Registry, Inc.*,
   97 Cal.App.4th 227 (Cal.App. 2d Dist. 2002) ......................................................................17

*Scott-Blanton v. Universal City Studio Prods. LLP*,
   593 F. Supp. 2d 171 (D.C. 2009)...........................................................................................44

*Solers, Inc. v. Doe*,
   977 A.2d 941 (D.C. 2009) .........................................................................................29, 31, 43

*Southern Air Transport, Inc. v. American Broadcasting Cos., Inc.*,
   670 F.Supp. 38 (D.D.C. 1987)..........................................................................................31, 32

*St. Amant v. Thompson*,
   390 U.S. 727 (1968)..........................................................................................................35, 42

*Stark v. Zeta Phi Beta Sorority, Inc.*,
   587 F.Supp.2d 170 (D.D.C. 2008) .........................................................................................31

*Tennebaum v. Ariz. City Sanitary Dist.*,
   2011 U.S. Dist. LEXIS 84427 (D. Ariz. Jul. 29, 2011) .........................................................20

*The Washington Post v. Robinson*,
   935 F.2d 282 (D.C. Cir. 1991).................................................................................................2

*Thomas v. News World Commc'ns.*,
   681 F.Supp. 55 (D.D.C. 1988)................................................................................................35

*Thorne v. District of Columbia*,
   Civil Action No. 06-1204, 2006 U.S. Dist. LEXIS 91438 (D.C. Dec. 19, 2006)...................39

*U.S. v. American Tel. & Tel. Co.*,
   524 F.Supp. 1336 (D.D.C. 1981).............................................................................................24

*Washington Times Co. v. Bonner*,
   86 F.2d 836 (D.C. Cir. 1936).................................................................................................43

*Williams v. Dist. of Columbia,*
   9 A.3d 484 ...........................................................................................................31

*Williams v. Federal Nat. Mortg. Ass'n,*
   No. 05-1483(JDB), 2006 WL 1774252 (D.D.C. June 26, 2006) ...........................................30

STATUTES

28 U.S.C. § 1782, Feb. 18, 2011 .........................................................................................25

Cal. Civ. Code. § 425.16(b)(1) .........................................................................................16

Cal. Civ. Code. § 425.16(b)(2) .........................................................................................16

D.C. Code § 1-206.02(4) .................................................................................................13

D.C. Code §§ 16-5501 .......................................................................14, 15, 19, 21, 23

D.C. Code § 16-5502 ...........................................1, 13, 14, 15, 17, 21, 25, 39, 44

La. Code Civ. Proc. art. 971(A)(1) ...................................................................................16

OTHER AUTHORITIES

21 CFR § 10.30 ...............................................................................................................6

Fed. R. Civ. P. 12 ...............................................................................2, 18, 22, 37

Fed. R. Civ. P 26 ............................................................................................................40

Fed. R. Civ. P. 56 ...........................................................1, 18, 19, 25, 38, 39

Fed. R. Civ. P. 44.1 .......................................................................................................25

Restatement (Second) of Torts 577 (1977) .......................................................................31

Restatement (Second) of Torts § 598 .........................................................................41, 43

Plaintiff 3M Company ("3M") respectfully submits its Consolidated Response to the Special Motions to Dismiss filed by Defendants Lanny Davis ("Davis"), Lanny J. Davis & Associates, PLLC and Davis-Block, LLC (collectively the "Davis Defendants") and Porton Capital Technology funds and Porton Capital, Inc. (collectively the "Porton Defendants") (all Defendants collectively "Defendants"), as follows:

## I.

### PRELIMINARY STATEMENT

In an attempt to cloak their malicious and tortious conduct toward 3M under the guise of the "public interest," Defendants' Special Motions to Dismiss relies heavily on their self-serving "spin" about the facts of this case and their erroneous characterizations of the governing legal principles. To demonstrate that it is likely to succeed on the merits of its claims in this matter, and thereby defeat the special motions to dismiss, 3M need only proffer facts that are legally sufficient for a jury to find for 3M on those causes of action. As demonstrated herein, even on the limited facts known today—before any discovery has been taken in this matter—3M has easily met this minimal burden.

To the extent, however, that this Court determines 3M has not carried that burden, then under D.C. Code § 5502(a) (the "Anti-SLAPP Act"), and as a matter of federal law, 3M is permitted discovery equivalent to that to which it would be entitled under Fed. R. Civ. P. 56. Accordingly, 3M has also demonstrated that it is entitled to certain, targeted discovery necessary to permit 3M to respond to, and disprove, the special motions. Federal courts have consistently held that such discovery is mandated when a nonmovant is faced with a dispositive motion before any discovery has been taken—especially when, as is the case here, that motion raises disputed issues of motive, intent, knowledge, or credibility. Accordingly, this Court should deny

Defendants' special motions to dismiss, or in the alternative, grant 3M's request for targeted discovery that will enable it to defeat the motions.

## II.

## RELEVANT FACTUAL AND PROCEDURAL HISTORY[1]

The relevant facts of this action for conspiracy, intimidation, tortious interference, and defamation are described at more length in 3M's memorandum in opposition to Defendants' respective motions to dismiss pursuant to Rule 12, incorporated herein by reference, and in the Declarations submitted herewith.  As shown below, 3M has offered sufficient evidence of each of its claims to meet its burden to show that it is "likely to succeed on the merits" as to each one.

### A.   BacLite Was Not A Commercially Viable Product.

In 2008, 3M purchased Acolyte, the manufacturer of a medical test called BacLite, from the Porton Defendants.[2]  3M and Acolyte's shareholders (which included the Porton Defendants) agreed to a contingent "earn out" structure under which 3M made an up-front payment and also promised to pay those former Acolyte shareholders an earn out payment based on BacLite sales in 2009.[3]  The earn out structure compensated the Porton Defendants *only* if BacLite proved to be a commercial success.[4]  3M was required by the parties' agreement to "actively market"

---

[1]    To the extent that certain facts discussed herein are derived from news articles, this Court may take judicial notice of such facts.  *See CSX Transp. v. Williams*, 2005 U.S. Dist. LEXIS, * 2-3 (D.D.C. Apr. 22 2005) (taking judicial notice of testimony of U.S. government official quoted in *The Washington Post*); *see also The Washington Post v. Robinson*, 935 F.2d 282, 291-92 (D.C. Cir. 1991) (citing *Agee v. Muskie*, 629 F.2d 80, 81 n. 1, 90 (D.C. Cir. 1980), *r'vd on other grounds*, *Haig v. Agee*, 453 U.S. 280 (1981) (taking judicial notice of facts published in a newspaper).  In any event, these facts support 3M's request for targeted because, if true, they are sufficient to defeat the Special Motions to Dismiss.

[2]    *See* Maloney Decl. ¶ 5.

[3]    *See* Maloney Decl. ¶ 5.

[4]    *See* Maloney Decl. ¶ 5.

BacLite, and to diligently seek regulatory approval in the United States, Canada, and Australia,[5] but had no obligation to improve the product.[6]

Although 3M devoted substantial resources to marketing BacLite, the product failed nine clinical trials required for U.S. Food and Drug Administration (the "FDA") approval, and proved to be a commercial disaster.[7]  By the end of 2008, BacLite's middle-market niche had collapsed because its faster competitors were getting cheaper, and the less expensive competitors were getting faster.[8]  In light of BacLite's failure, 3M offered Porton and other Acolyte shareholders a reasonable sum for permission to stop marketing BacLite.[9]  Porton and the others refused to agree, and instead sued 3M in the U.K. High Court in London in December 2008, seeking damages in excess of $50 million (the "London Litigation").  The High Court ultimately concluded, in November 2011, that 3M had to pay Claimants less than $1.3 million.[10]

**B.**     **Davis Is Brought On To Plan, Coordinate, And Implement Defendants' Conspiracy.**

In early 2010, Boulter began paying U.K. lobbying firm, Tetra Strategy, £10,000 per month in connection with his efforts to obtain money from 3M.[11]  Then, in late 2010 or early 2011, Boulter brought on Davis, a self-proclaimed media relations specialist, to plan, coordinate,

---

[5]     *See* Maloney Decl. ¶ 6.

[6]     *See* Declaration of Robert W. Gifford ("Gifford Decl.") Ex. ll (Approved Judgment in the High Court of Justice Queens Bench Division Commercial Court, No: 2008 Folio No. 877 (Porton Capital Technology Funds et. al v. 3M Company), [2011] EWHC 2895 (Nov. 7, 2011) ("Approved Judgment")).

[7]     *See* Maloney Decl. ¶ 7.

[8]     *See* Maloney Decl. ¶ 8.

[9]     The Porton Defendants were required by that agreement not to unreasonably withhold such consent. Maloney Decl. ¶ 9.

[10]     *See* Gifford Decl. Ex. ll (Approved Judgment, at ¶ 349); Maloney Decl. ¶ 15.

[11]     *See* Gifford Decl. Ex. ff (Rupert Neate, The Guardian (Oct. 9, 2011), *Revealed: How Lobbyists Were Paid To Set Up Meeting With Fox*); *see also* http://www.tetra-strategy.co.uk/about.

and implement a tortious conspiracy between Defendants to:[12]  (1) embark on a disparaging media campaign that spread deliberately false and defamatory statements about 3M's decision to cease marketing BacLite;[13] (2) submit a sham "citizens' petition" to the FDA which contained knowingly false claims about 3M's handling of BacLite;[14] and (3) put into motion a plan to directly interfere with 3M's significant existing and prospective business interests with the U.K. government by, among other things, "buying" access to high-level Ministry of Defence officials, including former U.K. Secretary of Defense Dr. Liam Fox ("Fox"), through Tetra Strategy.[15] Defendants' tortious scheme had nothing to do with advocacy on issues of public interest, but was instead crafted solely to advance Defendants' own private commercial agenda of coercing 3M into paying them tens of millions of dollars that Defendants knew they did not deserve, and which they realized they would never be able to obtain by lawful means.[16]

## C.    **Defendants' Defamatory Media Campaign**

By March 2011, Defendants' defamatory media campaign was in full swing.[17]  For example, Boulter and Davis accused 3M of having lied to the FDA (a criminal act, if it were true) about a "secret report" that supposedly disclosed failures in 3M's clinical trial methods, even though they knew that 3M had never hidden any information from the FDA, and never had any obligation to provide the report—which Boulter, and possibly Davis, had already seen—to

---

[12]    *See* Maloney Decl. ¶ 24.  At the time, Davis was a partner in McDermott, Will & Emery, LLP, the firm then heading Claimants' prosecution of the London Litigation.

[13]    *See* Maloney Decl. ¶ 24.

[14]    *See* Maloney Decl. ¶ 26-27.

[15]    *See* Gifford Decl. Ex. ff (Rupert Neate, The Guardian (Oct. 9, 2011), Revealed: How Lobbyists Were Paid To Set Up Meeting With Fox ("Indeed, . . . Tetra introduced its client to Adam Werrity in March 2011 . . . . The purpose of the introduction was to brief the MoD on the litigation.")).

[16]    *See* Maloney Decl. ¶ 24.

[17]    *See* Maloney Decl. ¶ 25.

the FDA.[18]   They also maliciously and falsely told the public that 3M had purchased Acolyte with the intention of abandoning BacLite in favor of another MRSA-related technology that 3M was developing.[19]   They made these statements even though they knew that Claimants (including Defendants Porton Capital, Inc. and Porton Capital Technology Funds) had already abandoned this claim in the London Litigation because discovery had proven it to be completely unsupported by the evidence.[20]   Indeed, the U.K. High Court awarded 3M the costs it incurred to litigate this baseless claim.[21]

In an especially scurrilous allegation, Defendants repeatedly asserted that 3M put "thousands and thousands" of lives at risk by taking BacLite off the market, ultimately resulting in the deaths of some patients.[22]   Defendants knew that this claim was both false and ludicrous. Specifically, they knew that the very reason BacLite had been a commercial failure was the availability of other MRSA screening tests that were preferred by all potential clients for BacLite.   In particular, Defendants knew that genetic and chromogenic agar tests for MRSA screening continued to be available, and were being widely used by hospitals and clinics—even

---

[18]   *See* Gifford Decl. Ex. A (*Allegations Against 3M Corporation of Possible "Negligence and Recklessness" by The Porton Group, the Equity Partner of the British Ministry of Defence, for "Botched" U.S. Testing of Lifesaving Device to Detect the MRSA "Superbug"/Staph Infection*, PR NEWSWIRE, May 11, 2011).   Davis began his improper efforts to use the FDA to push his and Boulter's wrongful scheme on January 19, 2011, when he filed an Application in the United States District Court for the District of Maryland seeking document discovery from the FDA about BacLite's regulatory approval process, as well as the deposition testimony of FDA Commissioner Margaret Hamburg.   *See* https://ecf.mdd.uscourts.gov/doc1/09313471946 [Doc. #1].   This request was immediately opposed by the FDA as baseless in both law and fact, and has gone nowhere.   *See https://ecf.mdd.uscourts.gov/ doc1/09313471946 [Doc. # 10].*

[19]   *See* Gifford Decl. Ex. A (*Allegations Against 3M Corporation of Possible "Negligence and Recklessness" by The Porton Group, the Equity Partner of the British Ministry of Defence, for "Botched" U.S. Testing of Lifesaving Device to Detect the MRSA "Superbug"/Staph Infection*, PR NEWSWIRE, May 11, 2011).

[20]   *See* Gifford Decl. Ex. ll (Approved Judgment ¶ 5); Maloney Decl. ¶¶ 17-18.

[21]   *See* Gifford Decl. Ex. ll (Approved Judgment).

[22]   *See* Gifford Decl. Ex. P ((Lanny J. Davis, Esq., International Press Conference at the Ivy Hotel in Minneapolis, Minnesota (May 11, 2011), at 35-36 (emphasis added)).

those that were also using BacLite.[23]  That is why Defendants cannot cite to any evidence that a single infection or death from MRSA has been linked to the unavailability of BacLite.  Nor can they cite to any evidence that a single patient has gone without effective MRSA screening because 3M's stopped selling BacLite.

**D.  Defendants Repeat Their Defamatory Statements In A Sham FDA "Citizens' Petition."**

Despite the lack of any genuine public concern about BacLite's removal from the market, Defendants furthered their scheme on May 6, 2011, by filing a sham citizen's petition with the FDA, requesting that the FDA "investigate 3M."[24]  The Petition falsely and maliciously blamed BacLite's poor performance in the clinical trial on misconduct by 3M motivated by 3M's alleged desire to promote what Defendants falsely asserted to be a competing MRSA detection product called "FastMan."[25]  Defendants also falsely stated that "Acolyte was sold to 3M for a relatively small down payment of 10 million pounds sterling—with another £41 million pounds to be paid out through the end of 2009."[26]  Defendants knew, however, that Porton was entitled, under the parties' agreement, only to receive an amount based on the actual sales of BacLite, of which £41 million was the maximum possible payout, not a guaranteed amount.[27]  In addition, Defendants wrongly claimed that "hospital patients in Europe, the U.S., Canada, and Australia are not able to gain the protection of BacLite's ability to detect deadly MRSAs within hours, rather than days,

---

[23]  *See* Gifford Decl. Ex. ll (Approved Judgment ¶ 259, 261, 264-67, 278-79, 282-83, 295); Maloney Decl. ¶¶ 22, 27.

[24]  *See* Gifford Decl. Ex. rr (Citizen's Petition Pursuant to 21 CFR § 10.30 to the Secretary of Health and Human Services and the Food and Drug Administration Requesting an Investigation of the 3M Corporation and Its Conduct in the BacLite Clinical Trial "A Covered Clinical Study" (May 6, 2011) ("Cit. Pet.")); Maloney Decl. ¶ 27.

[25]  *See* Gifford Decl. Ex. rr (Cit. Pet).; Maloney Decl. ¶ 27.

[26]  *See* Gifford Decl. Ex. rr (Cit. Pet); Maloney Decl. ¶ 27.

[27]  *See* Maloney Decl. ¶ 27.

as a result of 3M's inexplicable conduct in botching the U.S. clinical trials."[28]   That statement

was knowingly false because Defendants knew that, even when BacLite was being marketed by

3M, it competed against genetic MRSA tests that provided results in one hour or less—far more

quickly than BacLite.[29]   It is undisputed that such tests not only continue to be available, but

have become more widespread in use as they have become cheaper.[30]   Indeed, the availability of

such tests was one of the reasons that 3M rightly determined BacLite was not commercially

viable.[31]

Defendants also repeated their knowingly false claim that 3M intentionally botched the

BacLite clinical trials and abandoned BacLite in order to bolster the market opportunities of

another 3M product, FastMan, and that 3M's decision to withdraw BacLite from the market "led

to countless unnecessary infections and deaths."[32]   Defendants made no effort to comply with

their certification requirement in the sham citizen's petition, which requires that "[t]he

undersigned certifies that, to the best knowledge and belief of the undersigned, this petition

includes all information and views on which the petition relies, and that it includes representative

---

[28]   *See* Gifford Decl. Ex. rr (Cit. Pet); Maloney Decl. ¶ 27.

[29]   *See* Gifford Decl. Ex. ll *(*Approved Judgment, ¶ 259, 261, 264-67, 278-79, 282-83, 295); Maloney Decl. ¶ 27.

[30]   *See* Maloney Decl. ¶ 27*; see also* Gifford Decl. Ex. ii (U.K. Parliament: Daly Hansard Written Answers: MRSA Screening (In response to questions from Tom Watson, a Member of Parliament, also directly tied to Tetra Strategy, the U.K. Ministries of Health and Defence stated that there are "many laboratory methods available to national health service hospitals to detect [MRSA]."   He also mentioned that these tests "have been available for many years and are capable of detecting the emergence of a new MRSA…"   This statement was made weeks before Defendants made their misrepresentations in press conferences and press releases.)).

[31]   *See* Gifford Decl. Ex. ll (Approved Judgment, ¶ 296); Maloney Decl. ¶ 27).

[32]   *See* Gifford Decl. Ex. rr (Cit. Pet.); Maloney Decl. ¶ 27.

data and information known to the petitioner which are unfavorable to the petition."[33]

Defendants knowingly omitted all facts unfavorable to their allegations in the citizen's petition.[34]

**E.    Defendants "Buy" Private Access To the U.K. Secretary Of Defence In Order To Obtain His Assistance In Their Scheme To Coerce 3M Into Paying Them A Windfall.**

At the same time, Davis and Boulter were also embarking on an ambitious scheme to conspire with others to illegally interfere with 3M's existing and prospective business with the U.K. government.  They asked Tetra Strategy for its assistance in obtaining a private meeting with then Secretary of Defence Fox.[35]  Their plan was to "buy" access to, and influence with, the highest levels of the British government.[36]  Those efforts finally paid off on June 16, 2011, when Fox met with Boulter at a restaurant in the luxury Shangri-La Hotel in Dubai.[37]  It was disclosed by the Ministry of Defence that "no government officials were present at the 16 June meeting and no minutes were taken, which is against protocol."[38]

**F.    Defendants Threaten To Directly Interfere With 3M's Business Interests In The U.K.**

Almost immediately after this meeting, Davis, Boulter, and others put the final phase of their conspiracy into motion—the illegal scheme to intimidate and coerce 3M into paying over

---

[33]    *See* Gifford Decl. Ex. rr (Cit. Pet.); Maloney Decl. ¶ 27.

[34]    *See* Gifford Decl. Ex. ll (Approved Judgment, ¶ 121, 259, 261, 264-67, 278-79, 282-83, 295); Maloney Decl. ¶ 27.

[35]    *See* Gifford Decl. Ex. ff (Rupert Neate, The Guardian (Oct. 9, 2011), *Revealed: How Lobbyists Were Paid To Set Up Meeting With Fox); see also* http://www.tetra-strategy.co.uk/about ("Tetra Strategy — Bringing the Science of influence and opinion to the Art of strategic communications.").

[36]    *See* Gifford Decl. Ex. ff (Rupert Neate, The Guardian (Oct. 9, 2011), *Revealed: How Lobbyists Were Paid To Set Up Meeting With Fox).*

[37]    *See* Gifford Decl. Ex. aa (Rupert Neate, The Guardian (June 27, 2011), *Government Weighs Into "Blackmail" Row Over 3M and MRSA Test).*

[38]    *See* Gifford Decl. Ex. L (James Kirkup, Telegraph (Oct. 9, 2011), *Liam Fox on Adam Werritty: I Was Wrong and I Am Sorry).*

$30 million to the Porton Defendants, and others, that was wholly underserved. Specifically, Davis initiated an unsolicited call to 3M's legal counsel on June 17, 2011, which was followed immediately by an e-mail, addressed to both 3M's counsel and Boulter, ostensibly granting Davis's "permission" for 3M's counsel to speak directly to Boulter.[39] Davis noted in a follow-up e-mail to 3M's counsel—also addressed to Boulter—that "I know your [Boulter's] meeting with UK Minister of Defense Dr Liam Fox has given you even stronger reason not to come down very [sic] in $34m position."[40] From these undisputed facts, it is apparent that Davis and Boulter had planned, coordinated, and discussed what Boulter would communicate to 3M's attorney prior to Boulter's own telephone call and e-mails.

Shortly thereafter, Boulter also called 3M's attorney.[41] He stated that he was authorized to speak on behalf of all of the U.K. Claimants, including Ploughshare.[42] He also mentioned his Dubai meeting with Fox, and alleged that Fox had authorized him to speak on behalf of the Ministry of Defence.[43] Boulter then told 3M's counsel there would be "consequences" if 3M did not immediately settle the London Litigation, that Fox had indicated there would also be repercussions for Buckley's knighthood.[44] The conversation, however, ended abruptly because of a lack of cell service—before 3M's attorney was able to respond.[45]

---

[39]   Brewer Decl. ¶ 5; *see* Gifford Decl. Ex. H (The e-mail).

[40]   Brewer Decl. ¶ 5; *see* Gifford Decl. Ex. H (The e-mail).

[41]   Brewer Decl. at ¶ 7.

[42]   *See id.*

[43]   *See id.*

[44]   *See id.*

[45]   *See id.*

Boulter followed-up with two e-mails, sent on June 18 and 19, 2011.[46]   These communications unambiguously and directly threatened interference with 3M's business interests in the U.K. unless 3M paid Porton $30 million or more, ostensibly in settlement of the London Litigation.[47]   In the mistaken belief that it would intimidate 3M's Chairman and CEO, Boulter also threatened Buckley's pending investiture as a Knight Bachelor by Her Majesty Queen Elizabeth.[48]   Specifically, Boulter declared in his e-mail of June 18, 2011, that:

> [A]s a result of my meeting today [with Fox] you ought to understand that [U.K. Prime Minister] David Cameron's Cabinet might very shortly be discussing the rather embarrassing situation of George's knighthood.  It was discussed today. Governments are big and sometimes decisions in one part are not well coordinated.[49]

Boulter also demanded a settlement of the London Litigation of "$30 mn+."[50]   At the same time, however, Boulter conceded that this figure had no basis in the actual merits of the case, noting that it had "little to do with the case in the Court," but was instead "about losing face."  He added that "[f]rom my side . . . whether this is $5mn or $35mn it is small beer.  We manage $700mn and many of our investors call $5mn a rounding error."

Boulter also articulated his specific threats to 3M's business interests with the British government.[51]   Declaring that he was "being asked, and [had] been given the sole authority by the [British Ministry of Defence] to settle on behalf of them," he further stated that "I had 45 minutes with Dr. Liam Fox, the British Defence Minister on our current favourite topic."  Boulter then claimed that, while 3M might prevail on the merits in the London Litigation, it will

---

[46]   *See id.* at ¶ 8; *see* Gifford Decl. Ex. E, F (The e-mails.).

[47]   Brewer Decl. ¶ 8; *see* Gifford Decl. Ex. E, F (The e-mails.).

[48]   Brewer Decl. ¶ 8; *see* Gifford Decl. Ex. E, F (The e-mails.).

[49]   Brewer Decl. ¶ 8; *see* Gifford Decl. Ex. E, F (The e-mails.).

[50]   Brewer Decl. ¶ 8; *see* Gifford Decl. Ex. E, F (The e-mails.).

[51]   Brewer Decl. ¶ 8; *see* Gifford Decl. Ex. E, F (The e-mails.).

have won the battle, but lost the war, because the Ministry of Defence would likely react by taking steps to deprive 3M of its ability to pursue its business interests with the U.K. government.  Specifically, Boulter asserted that 3M's trial victory in the London Litigation "might leave [the British government] quietly seething, with ramifications for a while – they have memories like elephants."  On the other hand, if 3M were to settle the case for "$30mn+ you will allow [the MoD] to internally save face."

Boulter imbued these threats with a sense of urgency, noting that  "[f]rom next week [M]onday there are politics that will likely remove any further chance of settlement."[52]  He underscored this urgency in a follow-up e-mail to 3M's counsel on June 19, 2011.[53]  In that communication, Boulter pressed 3M for immediate capitulation to Defendants' demands that very day, claiming that he needed to "tell something to Dr. Fox's office on Sunday night."[54]  He also warned 3M of the "political consequences" that would occur beginning Monday.   In addition, he warned against not responding—or as he put it, giving "a 'radio silence' message"— because Dr. Fox "is the Secretary of Defence and will not expect that."[55]

## G.      The High Court's Judgment Vindicates 3M.

On November 7, 2011, the High Court handed down a Reasoned Judgment resolving the issues in the London Litigation, and awarding Claimants just $1,299,808 in damages, an amount at least $30 million less than what Defendants attempted to extort from 3M before trial.[56]  The High Court further held that "there was no failure to exercise such [diligent] care in relation to the U.S. clinical trials . . . . I accordingly find that the conduct of these trials involved no breach

---

[52]   Brewer Decl. ¶ 8; *see* Gifford Decl. Ex. E, F (The e-mails.).

[53]   Brewer Decl. ¶ 8; *see* Gifford Decl. Ex. E, F (The e-mails.).

[54]   Brewer Decl. ¶ 8; *see* Gifford Decl. Ex. E, F (The e-mails.).

[55]   Brewer Decl. ¶ 8; *see* Gifford Decl. Ex. E, F (The e-mails.).

[56]   *See* Gifford Decl. Ex. ll (Approved Judgment, ¶ 349); Maloney Decl. ¶ 15.

of the obligation diligently to seek regulatory approval."[57]   Importantly, the High Court found that BacLite "would never have been a commercial success and [that] future sales of the product would have been limited,"[58] in part because BacLite was being "squeezed" out of its value niche by its competing products, all of which were already available to, and being used by, the customers to whom 3M was trying to sell BacLite.[59]   These findings establish that Defendants defamatory *per se* allegations that 3M's removal of BacLite from the market led to "thousands" of MRSA-related deaths were as intentionally outrageous and knowingly false.

## H.   The Damage Done

3M's sales to the Ministry of Defense from 2009 to 2011 on an annualized basis, have dropped a staggering 50 percent.   3M's annual sales to the U.K. "Central Government" have dropped approximately 43% over the same period.   In addition, 3M is now aware of at least three prospective contracts with the MoD, collectively worth over £2.5 million ($4.0 million) that have been delayed or denied because of Defendants' conduct.[60]

## I.   The Procedural History Of This Action

After Defendants communicated their threats to 3M's counsel, 3M acted quickly to address the blackmail in the only effective way—by bringing it to light.   On June 19, 2011, 3M filed a complaint in New York state court against defendants Harvey Boulter, Porton Capital Technology Funds and Porton Capital, Inc., service of which was accepted by counsel on behalf of all of the Boulter Defendants.   3M then filed an amended complaint on July 21, 2011, adding the Davis Defendants and the commercial defamation claim, and detailing new facts about

---

[57]   *See* Gifford Decl. Ex. ll (Approved Judgment, ¶ 140); Maloney Decl. ¶ 22.

[58]   *See* Gifford Decl. Ex. ll (Approved Judgment, ¶ 296); Maloney Decl. ¶ 22.

[59]   *See* Gifford Decl. Ex. ll (Approved Judgment, ¶¶ 259, 261, 264-67, 278-79, 282-83, 295); Maloney Decl. ¶ 22.

[60]   Manning Decl. ¶¶ 3-7.

Defendants' conspiracy that had come to light as a result of the media coverage that ensued from the original complaint.  All defendants moved to dismiss the amended complaint on August 19, 2011, pleading lack of personal jurisdiction, *forum non conveniens* and, in cursory fashion, failure to state a claim.  Given Defendants' concession that Washington, D.C. is a "convenient available forum[] in which 3M may bring its claims," for the sake of expediency 3M elected to voluntarily dismiss the New York action without prejudice and refile it in Washington, D.C., on August 24, 2011.  In response, Defendant Davis filed a special motion to dismiss pursuant to D.C. Code section 16-5502 on October 6, 2011.[61]  On October 31, 2011, 3M made a motion to strike the special motion to dismiss on the grounds that the Anti-SLAPP Act[62] violated the D.C. Home Rule Act,[63] to which Davis Defendants responded.[64]  On December 2, 2011, Defendant Porton Capital Technology Funds and Porton Capital, Inc. filed a special motion to dismiss pursuant to D.C. Code section 16-5502.[65]  3M now submits this memorandum in opposition to Defendants' Special Motions to Dismiss.

## III.

## SUMMARY OF OPPOSITION

Defendants erroneously argue that 3M's claims should be dismissed pursuant to the D.C. Anti-SLAPP Act because:  (1) 3M's claims allegedly arise from conduct protected by the Act;

---

[61]   Memorandum of Defendants Lanny Davis, Lanny J. Davis & Associates, PLLC and Davis-Block LLC in Support of Special Motion to Dismiss, filed October 6, 2011, Civil Action No. 1:11-CV-01527-RLW ("Davis's Special Motion to Dismiss").

[62] D.C. Code § 5502(a) ("Anti-SLAPP Act").

[63] *See* D.C. Code § 1-206.02(4).

[64]   Memorandum of Defendants Lanny Davis, Lanny J. Davis & Associates, PLLC and Davis-Block LLC in Opposition to 3M's Motion to Strike Special Motion to Dismiss, filed November 29, 2011, Civil Action No. 1:11-CV-01527-RLW. ("Davis's Opposition to Motion to Strike").

[65]   Special Motion to Dismiss by Porton Capital Technology Funds and Porton Capital, Inc. Pursuant to D.C. Code § 5502, with Incorporated Memorandum of Law, filed December 2, 2011, Civil Action No. 11-cv-1527-RLW ("Porton Special Motion to Dismiss").

and (2) 3M is unlikely to succeed on its claims.  Defendants also seek fees and costs under the Act.

Defendants' arguments are without merit for at least the following reasons.  <u>First</u>, the Act does not apply to 3M's claims for tortious interference, intimidation, civil conspiracy, and aiding and abetting.  <u>Second</u>, the Act does not apply to 3M's claim for commercial defamation because those statements were directed primarily toward protecting Defendants' commercial interests, and not intended to advocate on issues of public interest.  <u>Third</u>, 3M can demonstrate that it is likely to succeed on the merits of its claims.  <u>Fourth</u>, 3M is entitled to discovery before the special motions can be granted.  Additionally, there is no basis for an award of fees and costs. Accordingly, this Court should deny Defendants' special motions or, in the alternative, grant 3M the requested discovery.

**IV.**

**<u>ARGUMENTS AND AUTHORITIES</u>**

**A.**     **<u>Relevant Legal Standards</u>**

**1.**     **<u>Defendants' initial burden to make a prima facie showing that the challenged speech or conduct is in furtherance of the right of advocacy on issues of public interest.</u>**

In bringing a special motion to dismiss under the Act, the movant has the initial burden of making a "prima facie showing that the claim at issue arises from an act in furtherance of the right of advocacy on issues of public interest."[66]  While an "[i]ssue of public interest" nominally means "an issue related to health or safety . . . or a good, product, or service in the marketplace," the Act expressly does not protect "statements directed primarily toward protecting the speaker's *commercial interest*,"[67] as distinguished from statements "commenting on or sharing information

---

[66]   D.C. Code § 16-5502(b).

[67]   D.C. Code § 16-5501(3) (emphasis added).

about a matter of public significance," which are protected.[68]   Accordingly, even statements

related to public health and safety, a judicial proceeding, or petitioning the government are not

protected if they were intended primarily to protect the speaker's private, commercial interests

and not to advocate on an issue of public concern.[69]   Thus, a bare allegation that plaintiff's claim

arises from a chain of activity that at some point involved the exercise of a person's First

Amendment rights does not mean that an anti-SLAPP law applies to that case or action.[70]

### 2.   Plaintiff's burden to establish a likelihood of success on the merits

If Defendants successfully meet their burden under the Act, then the burden shifts to 3M

to establish that its "claim is likely to succeed on the merits."[71]   If 3M meets that burden, the

motion "shall be denied."[72]

D.C. courts have yet to consider the standard by which to judge whether a plaintiff has

shown its claims are "likely to succeed on the merits," but courts in California and Louisiana—

---

[68]   *Id.*

[69]   *See* D.C. Code §§ 16-5501(1), (3).  The following types of commercial interests have been found to not arise from a matter of public interest for the purposes of an Anti-SLAPP Act in other jurisdictions: (i) statements about a particular business; (ii) private negotiations; and (iii) business disputes.  *See Jewett v. Capital One Bank*, 113 Cal.App.4th 805, 815 (Cal. App. 2d Dist. 2003) (". . . allow such solicitations the protection of [the anti-SLAPP act] by virtue of the fact that they touch upon matters of general public interest would eviscerate the unfair business practices laws."); *Paul v. Smith*, No. B213299, 2009 WL 4895025, at *5 (Cal. App. 2d Dist. Dec. 21, 2009) (private negotiations are not a matter of public interest.); *Curiel v. P.O.D.*, No. B177898, 2005 WL 1774424, at *3 (Cal.App. 2d Dist. July 28, 2005) ("Read in context, the heart of the interference cause of action is P.O.D.'s claim that Curiel's allegedly wrongful competition . . . caused Atlantic to withdraw its pending offer to increase substantially the amounts due to P.O.D. under the existing contract, and to force P.O.D. to accept the less favorable deal later offered by Atlantic. In short, the cause of action is not based on Curiel's protected speech or petitioning activity.").

[70]   *See Paul v. Smith*, No. B213299, 2009 WL 4895025, at *5 n.6 (Cal. App. 2d Dist. Dec. 21, 2009) ("Although private contract negotiations might, in a but-for causation sense, be viewed as an "act in furtherance of a person's right to petition or free speech," the anti-SLAPP Act is not properly stretched to encompass a claim merely because the conduct from which it arises is in a chain of activity that ultimately leads to the exercise of a person's First Amendment rights.").

[71]   *See* D.C. Code § 16-5502(b).

[72]   *See id.*

two states with anti-SLAPP statutes that are worded similarly to the Act[73]—have done so.  In California, a plaintiff can defeat a special motion to dismiss by showing "a probability that plaintiff will prevail on the claim."[74]  In Louisiana, a plaintiff will prevail if it establishes "a probability of success on the claim."[75]  Given the essential similarity of the "probability" standards used in the California and Louisiana Acts to the D.C. Act's "likely to succeed" standard, the jurisprudence of those states is instructive.[76]

The showing of a "probability of success" has been described as merely establishing that a claim has "minimal merit."[77]  In turn, a plaintiff can show "minimal merit" by substantiating, through competent and admissible evidence, that its claim is "legally sufficient."[78]  Although the Anti-SLAPP Act does not address the type of evidence that may be considered,[79] it does allow

---

[73]  *See* Cal. Civ. Code. § 425.16(b)(1) (special motion to dismiss is granted, "unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."); La. Code Civ. Proc. art. 971(A)(1) (special motion to strike is granted, "unless the court determines that the plaintiff has established a probability of success on the claim.").

[74]  *See* Cal. Civ. Code. § 425.16(b)(1).

[75]  *See* La. Code Civ. Proc. art. 971(A)(1).

[76]  *See, e.g., Louisiana Crisis Assistance Ctr. v. Alexandria Marzano-Lesnevich*, No. 11:2102, 2011 WL 5878159, at *7 (E.D.La. Nov. 23, 2011)("Louisiana courts have specifically noted the similarities between article 971 and California's anti-SLAPP and have looked to California case law when there is no precedential Louisiana authority on point."); *see also Mann v. Quality Old Time Svc., Inc.*, 120 Cal. App. 4th 90, 105 (Cal. App. 2004) (describing the California anti-SLAPP act's "probability" standard as a determination of whether the plaintiff can establish a "Likelihood of Success on the Merits.").

[77]  *See Oasis West Realty, LLC v. Goldman*, 250 P.3d 1115, 1125 (Cal. 2011); *Navellier v. Sletten,* 29 Cal.4th 82, 89, 95 & n. 11 (Cal. 2002) ("On reconsideration, therefore, the Court of Appeal should consider whether plaintiffs' fraud and contract claims have the minimal merit required to survive an anti-SLAPP motion.").

[78]  *See Oasis West Realty, LLC*, 250 P.3d at 1125.

[79]  The type of evidence considered in California and Louisiana is governed by statute. California law instructs the court to consider "the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based."  Cal. Civ. Code. § 425.16(b)(2).  Louisiana law requires the court to consider "the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based." La. Code. Civ. Proc. art 971(A)(2).

for targeted discovery,[80] and both California and Louisiana have recognized that declarations are sufficient to support plaintiff's burden.[81]   In considering the sufficiency of plaintiff's showing, California courts "neither weigh credibility nor compare the weight of the evidence" but "accept as true the evidence favorable to the plaintiff and evaluate the defendants' evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law."[82]

Under California law, to show that she is likely to succeed on the merits of a claims, a plaintiff "is not required to prove the specified claim to the trial court . . . the appropriate inquiry is whether the plaintiff has stated and substantiated a legally sufficient claim."[83]   Likewise, in Louisiana, courts will deny a special motion to dismiss when there are disputed issues of material fact.[84]   The standard for assessing this evidence, under both states' analogous anti-SLAPP laws, is equivalent to the "standard used in determining motions for nonsuit, directed verdict, or summary judgment."[85]   "Direct evidence is unnecessary [if the Plaintiff] proffers sufficient evidence for such an inference of the cause of action being alleged to have occurred."[86]

---

[80]   D.C. Code § 16-5502(c)(2) ("When it appears likely that targeted discovery will enable the plaintiff to defeat the motion and that the discovery will not be unduly burdensome, the court may order that specialized discovery be conducted.").

[81]   *See Louisiana Crisis Assistance Ctr.* 2011 WL 5878159, at *7 (denying special motion based on declarations submitted by plaintiff); *Schoendorf v. U.D. Registry, Inc.*, 97 Cal.App.4th 227, 236 (Cal.App. 2d Dist. 2002) (denying special motion based on plaintiff's "pleadings and affidavits.").

[82]   *See Oasis West Realty, LLC,* 250 P.3d at 1120.

[83]   *Mann v. Quality Old Time Serv.*, 120 Cal. App. 4th 90, 105 (Cal. App. 4th Dist. 2004).

[84]   *See Louisiana Crisis Assistance Ctr,* 2011 WL 5878159, at *8 (citing *Bradford v. Judson*, 12 So.3d 974, 984 (La. App. 2d Cir. 2009) (reversing trial court's ruling granting summary judgment and special motion to strike)).

[85]   *See Schoendorf,* 97 Cal.App.4th at 236 ("[T]he test is similar to the standard applied to evidentiary showings in summary judgment motions. . . . [T]he pleadings frame the issues to be decided."); *In Estiverne v. Times-Picayune, L.L.C.*, 950 So. 2d 858, 860 (La. App. 4th Cir. 2006) (granting special motion to dismiss where plaintiff failed to carry the summary judgment burden of producing "evidence of sufficient quality and quantity to demonstrate that he will be able to meet his burden of proof at trial.").

[86]   *See Oasis West Realty, LLC,* 250 P.3d at 1120.

Accordingly, a plaintiff may defeat a special motion to dismiss by making a "prima facie showing of facts to sustain a favorable judgment if the evidence submitted . . . is credited."[87]

It is also important to note that the anti-SLAPP statute was not intended to be used against lawsuits which are partially valid, but which also contain a claim or theory which is somehow legally deficient or otherwise barred by the First Amendment.[88]   Thus, if 3M demonstrates a likelihood of success on the merits as to any of its causes of actions, then the entire special motion should be denied.[89]

## B.     Under No Circumstances Does The Act Apply To 3M's Claims For Tortious Interference, Intimidation, Civil Conspiracy And Aiding And Abetting.

Defendants contend that the Act applies to 3M's tortious interference claims because: (i) their actions to influence Secretary Fox and other U.K. government officials to interfere with 3M's business interests was "connected" to the London Litigation and their right to "petition" the U.K. government; (ii) the discussions and conduct giving rise to 3M's claims concerned "issues of public interests;" (iii) jurisdictions have applied their Anti-SLAPP statutes to such claims; and (iv) Davis himself had no "commercial interest" in any Porton Defendant.[90]   Each of these assertions is legally and factually without merit.

When Defendants acted to tortiously interfere with 3M's business interests, they had no pending "petition" before the U.K. government.  Moreover, it is unreasonable for Defendants to contend, as they have here, that Boulter's private, off-the-record meeting with the former U.K.

---

[87]   *Mindy's Cosmetics., Inc. v. Dakar*, 611 F3d. 590, 599 (9th Cir. 2010).

[88]   *See Louisiana Crisis Assistance Ctr.*, 2011 WL 5878159, at *12.

[89]   *See id.* at *12-17 ("A defendant has other procedural tools to eliminate meritless theories, as opposed to meritless lawsuits, such as a normal motion to strike pursuant to Rule 12(f) or a motion for summary judgment under Rule 56. Thus, for purposes of satisfying the secondary burden of demonstrating a probability of success on the merits, if a plaintiff can demonstrate a probability of success as to any part of its claim, then the cause of action has at least some merit, and the special motion to strike must be denied" as to all claims.).

[90]   Davis's Response to Special Motion to Dismiss at 30-32.

Secretary of Defence at a luxury hotel in Dubai—which Defendants obtained as a result of paying a "public relations" firm £10,000 per month, which Davis himself helped plan and coordinate, and which was found to violate U.K. government protocol—constituted the type of "petitioning" activity protected by the Act.  Defendants have certainly not cited to any case law to support that contention.

It also wrong to characterize Boulter's discussions with Fox and other government officials as being "in connection with an issue under consideration or review by a . . . judicial body."[91]  The statements were not submitted by Claimants to support their claims in the London Litigation, nor were they public speech concerning that lawsuit.  Moreover, according to Boulter, his discussion with Fox centered on reaching an agreement that, if 3M did not pay the Porton Defendants and others over $30 million, then: (i) Fox and others in the U.K. government would retaliate by taking steps to cease or reduce 3M's business relationships with the government; and (ii) would urge a reversal of the recent decision to award 3M CEO George Buckley ("Buckley") a knighthood.[92]  Unsurprisingly, Defendants have failed to submit any evidence that either of these issues were raised or considered in the London Litigation.  Boulter's subsequent conversations with, and e-mails to, 3M's attorney about the meeting with Fox—which were planned, discussed, and coordinated with Davis ahead of time—were specifically intended by Defendants to communicate their extortionate threats to interfere with 3M's business, and thereby coerce and intimidate 3M into paying tens of millions of dollars that Defendants knew

---

[91]    *Id.* at 31 (citing D.C. Code § 16-5501(1)(b)).

[92]    *See e.g., See* Gifford Decl. Ex. W (Rupert Neate, *3M Countersues as MRSA Row Becomes Toxic*, THE GUARDIAN, June 20, 2011); Brewer Decl. ¶¶ 7, 8; Gifford Decl. Ex. E, F (The e-mails).

they were not entitled to.[93]   Defendants cannot reasonably contend that extortion demands, made

with lip service to "settling" a pending lawsuit, are the type of "speech" protected by the Act.[94]

Equally implausible is Defendants' assertion that the communications at issue—all of

which were planned, coordinated, and discussed with Davis—concerned "issues of public

interest" as contemplated by the Act.[95]   "[T]he focus of the anti-SLAPP statute must be on the

specific nature of the speech rather than on generalities that might be abstracted from it," because

otherwise "nearly any claim could be sufficiently abstracted to fall within the anti-SLAPP

statute."[96]   After all, extortion is not a constitutionally protected form of free speech.[97]   Thus,

even assuming *arguendo* that MRSA and the fate of BacLite were issues of public concern,

Defendants have not carried their burden of establishing a prima facie case that either of these

topics were discussed at Boulter's private meeting with Fox, or during Defendants' private

communications with 3M's attorney in which they communicated their threats to interfere with

---

[93]    *See* Brewer Decl. ¶¶ 7, 8; Gifford Decl. Ex. E, F (The e-mails).

[94]    *See Tennebaum v. Ariz. City Sanitary Dist.*, 2011 U.S. Dist. LEXIS 84427, at *12-14 (D. Ariz. Jul. 29, 2011) (defamatory statements made in a letter sent by legal counsel for sanitary district to customers are not protected by anti-SLAPP act if they violated state statute against election activities by sanitary district officials); *Cohen v. Brown*, 173 Cal.App.4th 302, 306-11 (Cal. App. 2009) (denying motion to strike a civil extortion claim under anti-SLAPP act where attorney threatened to file a complaint with the state bar if another attorney did not endorse a joint settlement check over to him).

[95]    *See* Davis's Response at 31.

[96]    *Mann*, 120 Cal.App.4th at 110 (anti-SLAPP did not cover claims that defendant tortiously interfered with plaintiff's business by filing false reports to government agencies about plaintiff); *see also Kurwa v. Harrington, Foxx, Dubrow & Canter, LLP*, 146 Cal.App.4th 841, 848-50 (Cal.App. 2d Dist. 2007) (anti-SLAPP statute does not protect statements made in a letter to HMO in which defendant encouraged HMO to terminate existing contract and sign with defendant's company, because the letter was intended to affect only private conduct, and the "identity of the doctors who own the . . . service provider under the contract to the HMO is simply not a matter of widespread public interest."); *Globetrotter Software, Inc. v. Elan Computer Group, Inc.*, 63 F.Supp.2d 1127, 1130 (N.D. Cal. 1999) (the "issue of public interest" test is not met by statements of one company regarding the conduct of a competitor company," and to hold otherwise would mean that "any lawsuit alleging trade libel, false advertising or the like in the context of commercial competition would be subject to attack as a SLAPP suit.").

[97]    *Flatley v. Mauro*, 139 P.3d 2, 21 (Cal. App. 2006) (denying anti-SLAPP special motion to dismiss, and noting that "[e]xtortion is not a constitutionally protected form of free speech.").

3M's business interests.[98]  Defendants' actionable speech and conduct were not directed toward efforts to bring BacLite back to the market in order to advance the public's presumed interest in effective screening for MRSA, but rather toward obtaining a windfall payment from 3M that would line Defendants' own pockets.[99]

Put another way, Defendants were primarily seeking to protect their own private commercial interests, and thus their speech and conduct is not protected by the Act.[100]  Davis contends that this argument lacks merit against him because 3M has not alleged that he had commercial interests in "any Porton defendant, the MoD, Ploughshare, BacLite, the London Litigation or the FDA petition."[101]  To the contrary, 3M contends that Davis: (i) was Boulter's paid agent in all relevant matters and at all relevant times; (ii) conspired with the Porton Defendants, and others, to coordinate, plan, and advise Boulter in both obtaining a private meeting with Fox, and with regard to the nature of the discussions at that meeting; (iii) conspired with the Porton Defendants to set-up and facilitate Boulter's conversations and e-mails with 3M's attorney for the express purpose of giving Boulter the opportunity to communicate his extortion demands to 3M; (iv) coordinated, provided advice concerning, and discussed the nature of those communications with the Porton Defendants before they were initiated; and (v) intended that Boulter communicate his extortionate threats to 3M's attorney in order to advance his, and his client's, commercial interests.[102]  In short, 3M can show facts that establish that Davis

---

[98]   *See* D.C. Code § 16-5502(b).

[99]   *See e.g.,* Gifford Decl. Ex. W (Rupert Neate, *3M Countersues as MRSA Row Becomes Toxic*, THE GUARDIAN, June 20, 2011*); Brewer Decl. ¶¶ 7, 8; Gifford Decl. Ex. E, F (The e-mails).

[100]   *See* D.C. Code § 16-5501(3).

[101]   Davis's Response at 32.

[102]   *See, e.g.,* Gifford Decl. Ex. ff (Rupert Neate, The Guardian (Oct. 9, 2011), *Revealed: How Lobbyists Were Paid To Set Up Meeting With Fox* ("Indeed, . . . Tetra introduced its client to Adam Werrity in March 2011 . . . . The purpose of the introduction was to brief the MoD on the litigation"));

conspired with the Porton Defendants to plan, direct, implement, and personally participate in an illegal scheme to extort tens of millions of dollars in payments from 3M that Davis knew his clients could never receive through lawful means.[103]

Accordingly, the cases from other jurisdictions cited by Defendants as support for their contention that the Act applies to 3M's tortious interference claims are inapposite.  In each case, the court found that the relevant anti-SLAPP act applied because the allegedly actionable statements came directly from a public discussion concerning matters of general public interest, or from documents submitted in direct support of a petition to the government or in an ongoing judicial proceeding.[104]  None of these criteria are met here.

---

Gifford Decl. Ex. Z (Rupert Neate, The Guardian (Oct. 8, 2011), *Emails and Video Footage Pile Pressure on Beleaguered Liam Fox*, ("Tetra Strategy began working to arrange a meeting between Boulter and Fox or Werrity as early as March 25, 2011)); Gifford Decl. Ex. aa (Rupert Neate, The Guardian (June 27, 2011), *Government Weighs Into "Blackmail" Row Over 3M and MRSA Test);* Gifford Decl. Ex. W (Rupert Neate, *3M Countersues as MRSA Row Becomes Toxic*, THE GUARDIAN, June 20, 2011 (Boulter admitting discussing Buckley's Knighthood in Dubai)); *see also* Brewer Decl. ¶¶ 7, 8; Gifford Decl. Ex. E, F (The e-mails).

[103]  To the extent, therefore, that Davis seeks to apply the Fed. R. Civ. P. 12(b)(6) standard, the allegations in the Amended Complaint, when taken in a light most favorable to 3M, are sufficient to defeat the Special Motion to Dismiss on this issue. *See Louisiana Crisis Assistance Ctr.,* 2011 WL 5878159, at *9 (noting that, when a special motion to dismiss challenges the legal sufficiency of the claims made in a complaint, neither Louisiana nor California courts will determine that issue in a manner inconsistent with Fed. R. Civ. P. 12(b)(6)).

[104]  *See Language Line Servs. v. Language Servs. Assocs., LLC*, 2011 U.S. Dist. LEXIS 124836, at *21-23 (N.D. Cal. Oct 13, 2011) (claim stemmed from allegations made in a request by movant for injunctive relief); *Metzler v. Rowell*, 547 S.E. 2d 311, 314-15 (Ga. App. 2001) (claim based on statements made in "a letter written by an attorney for parties to a petition to intervene, directed to the owner of the land in litigation and a developer actually performing work on that land."); *Margolis v. Gosselin*, 1996 Mass. Super. LEXIS 335, at *5-6 (Mass. Super. Ct. May 22, 1996) (claim arose from a public solicitation of signatures to effect action on the part of Department of Environmental Protection); *Hometown Props. v. Fleming*, 680 A.2d 56, 58 (R.I. 1996) (claim arose from Defendants' communications with various state and federal governmental officials regarding environmental concerns related to plaintiff's activities); *see also New York Studio, Inc. v. Better Bus. Bureau of Alaska*, No. 3:11-cv-05012-RBL, 2011 U.S. Dist. LEXIS 62567, at *10-12 (W.D. Wash. June 13, 2011) (claim arose from a press release that did not name any particular company, but had general cautions about activities in which a party happened to be involved); *New.Net, Inc., v. Lavasoft*, 356 F. Supp. 2d 1090, 1105-06 (C.D. Cal. 2004) (claim arose from statements made by the party about general legal issues in an internet discussion group).

Finally, because 3M's claims for intimidation, civil conspiracy, and aiding and abetting all arise from the same underlying improper, and unprotected, conduct by Defendants—*i.e.* their joint action to intimidate and coerce 3M into paying them tens of millions of dollars in undeserved payments—those claims also do not fall within the Act's purview.

## C.   Defendants' Defamatory Statements Were Directed Primarily Toward Protecting Their Commercial Interests, And Not Intended To Advocate On Issues Of Public Interest.

The Special Motions to Dismiss should also be denied as to 3M's defamation claims because Defendants' actionable statements were not "acts in furtherance of the right of advocacy on issues of public interest," but rather "statements directed primarily toward protecting the speaker's commercial interests," and thus not protected by the Act.[105]   The Davis Defendants essentially argue that, because Defendants' defamatory statements all allegedly concerned the "MRSA bacterium, 3M's failure to obtain FDA approval for a  [Baclite]," and an "issue under executive and judicial review: the London trial and the FDA Citizens' Petition," they automatically fall within the ambit of the Act's protection for acts in furtherance of advocacy in the public interest.[106]

That assertion ignores the Act's exclusion for "statements directed primarily toward protecting the speaker's commercial interests rather than commenting on or sharing information about a matter of public significance."[107]   In this case, Defendants have made intentionally false statements whose only possible purpose was to advance Davis's and the Porton Defendants' commercial interests, because they knew them to be false when made.  For example, Defendants knew, based on the documents exchanged in the London Litigation, that their claims that 3M

---

[105]   *See* D.C. Code §§ 16-5501(1), (3).

[106]   *See* Davis's Special Motion to Dismiss at 21-22.

[107]   D.C. Code § 16-5501((3).

abandoned BacLite because it was trying to develop a competing product were false.[108]
Likewise, Defendants repeatedly accused 3M of causing the deaths of MRSA victims even
though they knew well before they ever filed suit in London, that the *reason* BacLite was a
commercial failure was that hospitals and other health providers were *already* using other,
*superior MRSA tests* that were alternatively cheaper or faster than BacLite.[109]

The mere fact that these false claims were repeated in an FDA citizens' petition does not
automatically wrap them in the aura of the "public interest."[110]   To the contrary, Defendants'
inclusion of these objectively false facts in their submission to a government agency is evidence
that it was not brought in good faith, and was a sham aimed solely at advancing Defendants'
commercial interests—*i.e.* forcing 3M to pay over $30 million that the Porton Defendants did not
deserve.[111]   Nor does the fact that some of the defamatory statements referenced the London
Litigation mean that they are covered by the Act as comments on matters of "public interest."
The FDA itself concluded when, in opposing Defendants' attempt to secure discovery from the
FDA to "aid" the London Litigation, the lawsuit was a private-party dispute over contract

---

[108]   *See* Gifford Decl. Ex. ll (Approved Judgment,  ¶ 5); Maloney Decl. ¶¶ 17-18.

[109]   *See* Gifford Decl. Ex. ll (Approved Judgment, ¶¶ 259, 261, 264-67, 278-79, 282-83, 295); Maloney Decl. ¶¶ 21, 27.

[110]   *See Kurwa v. Harrington, Foxx, Dubrow & Canter, LLP*, 146 Cal.App.4th 841, 848-49 (Cal.App. 2d Dist. 2007) (while a letter ostensibly concerned a provision of health care, which is a matter of public interest, the letter itself was not a matter of public interest for the purposes of the Anti-SLAPP statute); *Rivero v. American Federation of State, County & Municipal Employees*, *AFL–CIO*, 105 Cal.App.4th 913, 924–25 (Cal. App. 2003) (holding that it would "sweep too broadly" to say that a statement at issue concerned an unlawful workplace activity engaged in by an employee at a publicly financed institution is a matter of public interest for the purposes of the Anti-SLAPP statute).

[111]   *See General Hosps. of Humana, Inc. v. Baptist Med. Sys., Inc.*, 1984 WL 1492, at *5 (E.D. Ark. Oct. 10, 1984) ("A different sort of activity which also falls within the sham exception is one which attempts to influence the government through subversive means. Examples might include . . . misrepresentation where it is known that the government is likely to rely on those misrepresentations . . . ."); *U.S. v. American Tel. & Tel. Co.*, 524 F.Supp. 1336, 1362 (D.D.C. 1981) ("The sham exception clearly applies to attempts to influence governmental action through overtly corrupt conduct, such as . . . misrepresentations, which are not normal and legitimate exercises of the right to petition but are subversions of the integrity of the process.").

obligations, and that neither the FDA nor "the publi[c] . . . ha[d] a stake in the outcome of that case."[112]

**D.       3M Is Likely To Succeed On The Merits Of Its Claims.[113]**

Even if this Court were to determine that Defendants have made a prima facie case that their actionable conduct was covered by the Act, their Special Motions to Dismiss should nevertheless be denied because 3M has carried its burden of establishing that it is likely to succeed on the merits of each of its claims.

**1.       3M's intimidation claim.**

Because the Davis Defendants assume that U.K law applies to the intimidation claims, 3M will not perform a choice of law analysis as it agrees that the law of the U.K. applies to this claim.[114]  The attached expert legal opinion by Stephen Auld Q.C., an English Barrister and Queen's Counsel, explains in detail the scope and elements of the English tort of intimidation.[115] Succinctly put, under the applicable law of England and Wales, there are two different forms of the tort of intimidation:  (1) intimidation of a person that causes injury (two-party intimidation)

---

[112]   *See* FDA's Opposition to Porton Capital Inc.'s Application for an Order Directing Margaret A. Hamburg, M.D., in her Official Capacity as Commissioner of the United States Food and Drug Administration, to Provide Discovery Under 28 U.S.C. § 1782, Feb. 18, 2011, a copy of which is attached hereto at Ex. nn, at 3.

[113]   Rather than performing an analysis of whether 3M is likely to succeed on the merits of its claims, the Porton Defendants contend that 3M has already conceded this point in its Motion to Strike. *See* Porton Defendants' Motion to Dismiss, at 3.  This argument misunderstands 3M's discovery request, which seeks only the discovery to which it would be entitled under Fed. R. Civ. P. 56(d) and D.C. Code § 16-5502(c)(2).

[114]   3M incorporates the choice of law analysis for why U.K. law applies to this claim from 3M's Consolidated Response to Defendants' Motion to Dismiss, at § IV.B, filed contemporaneously with this Response.

[115]   *See* Declaration of Stephen Auld Q.C., attached hereto as Exhibit mm (the "Auld Decl."). Pursuant to Rule 44.1 of the Federal Rules of Civil Procedure, this Court, "in determining foreign law, may consider any relevant material or source, including testimony, whether or not . . . admissible under the Federal Rules of Evidence." *Ganem v. Heckler*, 746 F.2d 844, 854 (D.C. Cir. 1984) (noting that "written or oral expert testimony accompanied by extracts from foreign legal material is the basic method by which foreign law is proved.").  Copies of U.K. legal opinions cited by Mr. Auld will be provided as a courtesy.

and (2) intimidation of a person that causes injury to another (three-party intimidation).[116] *Two-party intimidation*, which is the variety shown by 3M, arises when (i) defendant illegitimately threatens plaintiff that, unless plaintiff takes or refrains from a course of action, defendant will perform an act; and (ii) as a result of that threat, loss is caused to plaintiff.  As Auld explains, the precise contours of this tort are not clear and, in an oft-cited decision, Lord Steyn said in the *Godwin* case that: "[whilst] the actionability of two-party intimidation is not in doubt, there is very little guidance in the deciding cases on the requirements of this tort."[117]  The *Godwin* Court observed that "coercion is of the essence of the [two-party intimidation] tort."[118]  Lord Steyn subsequently held, in a case decided the following year, that "a threat may be illegitimate when coupled with a demand for payment even if the threat is one of lawful action."[119]  The threat does not need to be unlawful, only illegitimate.[120]  Auld describes the requirements for the tort of two-party intimidation as the "civil law equivalent of blackmail."[121]  Importantly, plaintiff may suffer harm for intimidation even if it does not capitulate to the blackmailer's demand; plaintiff incurs intimidation damages by taking steps to mitigate or forestall the effect of a blackmail threat.[122]

Based on the above, and according to Auld, 3M has shown a likelihood of success on the merits of its claim for intimidation because:  (i) Defendants' threats "with regard to [3M's] U.K. business interests and Mr. Buckley's investiture as a Knight Bachelor, which are also alleged to

---

[116]  *See OBG v. Allan* [2007] UKHL 21; [2008] 1 AC 1 at [7] and [25].

[117]  *Godwin v Uzoigwe* [1993] Fam Law 65 (CA).

[118]  *Id.*

[119]  *CTN Cash and Carry Ltd. v. Gallaher Ltd.* [1994] 4 All ER 714, 718.

[120]  *Id.*

[121]  *See* Auld Decl. at 7, 9, 12.

[122]  *See id.* at 10 (concluding that where plaintiff "takes (costly) steps to mitigate the effect of the threat should it be carried out, the plaintiff should be able to recover the cost of those steps by way of damages.").

be '*egregious and wrongful*' . . . constitutes an allegation of an illegitimate threat;"[123] (ii) 3M's allegation that "the intention behind the threats was to cause [3M] to settle the London lawsuit for more than it was worth . . . . constitutes an allegation that the intention behind the threats was to coerce [3M] into taking a course of action;"[124] and (iii) that 3M has adequately alleged resultant damages to satisfy the U.K. substantive elements.[125]

As a co-conspirator, Davis would be liable for the acts of his other co-conspirators even if he was not a direct party to the extortionate communications.[126] Moreover, the facts demonstrate that:  (i) immediately after the meeting between Fox, Werrity, and Boulter in Dubai,[127] which Davis participated in arranging,[128] Davis placed an unsolicited phone call to 3M's counsel suggesting that he speak directly with Boulter;[129] (ii) this was immediately followed with an e-mail addressed to 3M's counsel and Boulter, ostensibly to grant Davis's permission for 3M's counsel to speak directly to Boulter;[130] (iii) shortly thereafter, Boulter communicated that given

---

[123]   *Id.*

[124]   *Id.*

[125]   *Id.* at 11 (expressing no opinion whether 3M's pleadings meet U.S. procedural requirements.)

[126]   *See infra* IV.D.4.

[127]   *See* Gifford Decl. Ex. L (James Kirkup, Telegraph (Oct. 9, 2011), *Liam Fox on Adam Werritty: I Was Wrong and I Am Sorry* (Fox told the U.K. House of Commons that, "With respect to my meeting with Mr. Boulter in Dubai in June 2011, I accept that it was wrong to meet with a commercial supplier without the presence of an official.")).

[128]   *See* Brewer Decl. ¶ 7; Gifford Decl. Ex. E, F (The e-mails).

[129]   *See id.*

[130]   *See id.*  As noted by Harvard Professor Freedman: "In almost fifty years working and consulting with lawyers all over the country, I am unaware of a single instance in which a lawyer has given such consent.  The occasion for Davis' unique action in this case was an effort to avoid making the extortionate communication himself, which would violate the ethical rule forbidding a lawyer to engage in conduct that the lawyer knows is criminal or fraudulent.  In fact, however, Davis thereby violated another part of the same ethical rule, which forbids a lawyer to assist a client in conduct that the lawyer knows is criminal or fraudulent.  In enabling Boulter to communicate directly with Brewer, and encouraging Brewer to discuss the matter with Boulter, Davis set the extortionate threat in motion.  Davis thereby assisted Boulter in conduct that Davis, an experienced and sophisticated lawyer, had to have

his recent discussions with the Ministry of Defence there would be "consequences,"[131] and threatened to directly interfere with 3M's business interests in the U.K. and Buckley's pending investiture as a Knight Bachelor unless 3M paid Porton at least $30 million to settle the London litigation.[132] Davis's reference to the Dubai meeting in his e-mail to 3M's attorney's is direct evidence that Davis discussed with Boulter what to tell 3M's attorney about that meeting.[133] The timing of these communications, on the eve of trial in the London Litigation, compounds their incriminating nature.

Davis contends that the U.K. government had a right to cease its doing business with 3M,[134] but even if that were true, Defendants certainly did not have the right to independently *procure* such a stoppage unless 3M acceded to their demands.[135] Davis also erroneously argues that 3M must have actually been coerced into settlement in order to prevail on an intimidation claim.[136] The gravamen of the U.K. intimidation claim, however, is that 3M was compelled to

---

known was criminal, thereby violating ethical rules." Gifford Decl. Ex. kk (Expert Witness Report of Monroe Freedman, at 6).

[131] *See* Brewer Decl. ¶¶ 7, 8; Gifford Decl. Ex. E, F (The e-mails).

[132] *See* Brewer Decl. ¶¶ 7, 8; Gifford Decl. Ex. E, F) (The e-mails).

[133] This is evidenced by Davis's follow up email to 3M's counsel, also addressing Boulter—that "I know your [Boulter's] meeting with UK Minister of Defense Dr. Liam Fox has given you even stronger reason not to come down very [sic] in $34m position." *See* Brewer Decl. ¶¶ 7; Gifford Decl. Ex. E, F (The e-mails).

[134] Davis's Special Motion to Dismiss, at 37.

[135] *See, e.g.,* Gifford Decl. Ex. ff (Rupert Neate, The Guardian (Oct. 9, 2011), *Revealed: How Lobbyists Were Paid To Set Up Meeting With Fox* ("Tetra introduced its client to Adam Werrity in March 2011 . . . . The purpose of the introduction was to brief the MoD on the litigation")); Gifford Decl. Ex. Z (Rupert Neate, The Guardian (Oct. 8, 2011), *Emails and Video Footage Pile Pressure on Beleaguered Liam Fox*, ("Tetra Strategy began working to arrange a meeting between Boulter and Fox or Werrity as early as March 25, 2011")); Gifford Decl. Ex. aa (Rupert Neate, THE GUARDIAN (June 27, 2011), *Government Weighs Into "Blackmail" Row Over 3M and MRSA Test);* Gifford Decl. Ex. W (Rupert Neate, *3M Countersues as MRSA Row Becomes Toxic*, THE GUARDIAN, June 20, 2011 (Boulter admitting discussing Buckley's Knighthood in Dubai)); *see also* Brewer Decl. ¶¶ 7, 8; Gifford Decl. Ex. E, F (The e-mails).

[136] Davis's Special Motion to Dismiss, at 37.

take steps, and thereby to incur significant expenses, in an effort to mitigate Defendants' threats to tortiously interference with the company's business with the U.K. government.(as ultimately did) and George Buckley's knighthood.[137]   3M can show that it did precisely this—not the least by filing this action, for the purpose of ending Defendants' misconduct by exposing it to public scrutiny.

Accordingly, 3M has proffered sufficient evidence to show that its claim for intimidation has a likelihood of success on the merits.[138]

### 2.    3M's Tortious Interference with Existing and Prospective Business Advantage Claims.

To establish tortious interference with business relations, 3M must show: (i) the existence of a prospective advantageous business transaction; (ii) Defendants' knowledge of the prospective transaction; (iii) intentional interference with the prospective transaction; and (iv) resulting damages.[139]   To sustain its claim, 3M need only show "that the interference was intentional and that there was resulting damage."[140] Defendants wrongly contend that 3M has failed to identify a valid business relationship or expectancy because it has not alleged some type of mutual understanding of an expected contract between the parties.[141]   This contention, however, ignores recent jurisprudence holding that a "business expectation" may broadly consist

---

[137]   *See* Auld Decl. at 10 (concluding that where plaintiff "takes (costly) steps to mitigate the effect of the threat should it be carried out, the plaintiff should be able to recover the cost of those steps by way of damages.").

[138]   *See Mindy's Cosmetics,* 611 F3d. at 599; *Mann*, 120 Cal. App. 4th at 105; *Oasis West Realty*, 250 P.3d at 1120; *Louisiana Crisis Assistance Ctr.*, 2011 WL 5878159, at *8.

[139]   *NCRIC, Inc. v. Columbia Hosp. For Women Med. Ctr., Inc.*, 957 A.2d 890, 900, 900 n.16 (D.C. 2008) (setting forth elements); *Casco Marina Dev ., L.L.C. v. District of Columbia Redevelopment Land Agency*, 834 A.2d 77, 84 (D.C. 2003).

[140]   *Solers, Inc. v. Doe*, 977 A.2d 941, 948 (D.C. 2009).

[141]   Davis's Special Motion to Dismiss, at 39.

of a future contract or an opportunity to obtain customers,[142] so long as the expectation is "commercially reasonable to anticipate."[143]   In fact, the D.C. Circuit Court recognizes that 3M is "not required to provide specific information regarding the business expectancy in his complaint."[144]   In any event, 3M can and has shown prospective business opportunities with the U.K. government in general, and specifically with the MoD, which it has lost as a result of Defendants' improper conduct.[145]   It has also specifically identified millions of pounds in U.K. government business that it has lost as a direct and proximate result of Defendants' tortious interference, even though this level of specificity is not required at this stage of the litigation.[146]

Accordingly, 3M has proffered sufficient evidence that states "legally sufficient" claims for tortious interference, and the Special Motions to Dismiss should be denied.[147]

### 3.      3M's Commercial Defamation Claims.

To succeed on a defamation claim, 3M must demonstrate that:  (1) Defendants made false and defamatory statements about the 3M; (2)  Defendants published those statement without

---

[142]   *See Nat'l R.R. Passenger Corp. v. Veolia Transp. Servs., Inc.,* 592 F. Supp. 2d 86, 98 (D.D.C. 2009) (*citing Carr v. Brown*, 395 A.2d 79, 84 (D.C. 1978)).

[143]   *Browning*, 292 F.3d at 242; *see also Carr v. Brown*, 395 A.2d 79, 84 (D.C. 1978) (observing that business expectancies that are "commercially reasonable to anticipate, are considered to be property and therefore protected from unjustified interference").

[144]   *Muir v. Navy Federal Credit Union*, 529 F.3d 1100, 1108 (D.C. Cir. 2008) (applying the *Twombly* pleading standard); *see also Williams v. Federal Nat. Mortg. Ass'n*, No. 05-1483(JDB), 2006 WL 1774252, *8 (D.D.C. June 26, 2006).

[145]   Manning Decl. ¶¶ 3-7

[146]   Manning Decl. ¶¶ 3-7; *Muir*, 529 F.3d at 1108; *Federal Nat. Mortg. Ass'n*, 2006 WL 1774252, at *8 (identification of "third parties with which [plaintiff] had a business relationship or expectancy" would be sufficient to state a claim for tortious interference with prospective business relationship); *cf. Mark Marketing Servs., LLC v. Geoplast S.p.A.*, 753 F. Supp. 2d 141, 163 (D.D.C. 2010) (dismissing claim for tortious interference with business relationship where complaint was "*devoid of any factual content* that would allow this Court to reasonably infer that [plaintiff] had prospective transactions") (emphasis added).

[147]   *See Mindy's Cosmetics,* 611 F3d. at 599; *Mann*, 120 Cal. App. 4th at 105; *Oasis West Realty*, 250 P.3d at 1120.

privilege to at least one third party; (3) Defendants' fault in publishing those statements amounted to at least negligence; and (4) either the statements were actionable as a matter of law, or that their publication caused 3M special harm.[148]   Moreover, a statement that tends to injure the plaintiff in his profession by indicating that he lacks knowledge, skill, honesty, character, and integrity constitutes defamation *per se*, and is actionable as a matter of law.[149]   Statements are defamatory *per se* under D.C. law, and thus do not require other proof of special damages, if they:  (1) charge commission of a crime of moral turpitude; (2) charge affliction with a serious contagious disease; (3) charge unfitness or lack of integrity for an office or employment; or (4) prejudice the plaintiff in his or her trade or business.[150]   A statement is defamatory *per se* as to a corporation if it prejudices the prospective business opportunities for the corporation, for example, impugning its business ethics.[151]   A corporation makes a sufficient showing of special damages by alleging and proving that "it" is one for profit, and the matter tends to prejudice it in the conduct of its business, [] to deter others from dealing with it,"[152]  or deprive it of its "good

---

[148]   *See Williams v. Dist. of Columbia*, 9 A.3d 484, 493 (D.C. 2010).

[149]   *See Ingber v. Ross*, 479 A.2d 1256, 1268 (D.C. 1984) ("Defendants' statements were slander *per se* because they imputed to Plaintiff "a lack of knowledge and skill in dentistry and a lack of honesty, character and integrity which tended to injure [plaintiff's] reputation in the community and were calculated to cause harm to [plaintiff's] reputation.".  (citations omitted); *Stark v. Zeta Phi Beta Sorority, Inc.*, 587 F.Supp.2d 170, 175 (D.D.C. 2008) (same).

[150]   *See Meyerson v. Hurlbut*, 98 F.2d 232, 233 (D.C. Cir. 1938); *see also* Restatement (Second) of Torts 577 (1977) ("One who publishes matter defamatory to another in such a manner as to make the publication a slander is subject to liability to the other although no special harm results if the publication imputes to the other: (a) a criminal offense . . . (b) a loathsome disease . . . [or] (c) matter incompatible with his business, trade, profession[.]").

[151]   *See Solers, Inc. v. Doe*, 977 A.2d 941, 949 (D.C. 2009) (because corporation has no personal reputation, statements may be defamatory *per se* against it with questions about the company's business ethics or financial soundness) (citing *Martin Marietta Corp. v. Evening Star Newspaper Co.*, 417 F.Supp. 947, 955 (D.D.C. 1976)).

[152]   *Southern Air Transport, Inc. v. American Broadcasting Cos., Inc.*, 670 F.Supp. 38, 41 (D.D.C. 1987).

commercial reputation."[153]  Here, 3M can show that Defendants, acting both individually and

through their co-conspirators, made false and defamatory statements about 3M to third parties,

including that: (1) 3M's decision to stop marketing BacLite led to the infection from MRSA, and

death, of "thousands" of people;[154] (2) 3M abandoned BacLite in order to promote a competing

product;[155] and (3) 3M intentionally misled the FDA regarding the conduct of its U.S. clinical

trials for BacLite.[156]

---

[153]  *Id.*

[154]  *See* Gifford Decl. Ex. J (Lanny J. Davis, Esq., International Press Conference at the Ivy Hotel in Minneapolis, Minnesota, at 35-36 (May 11, 2011) ("But a five-hour -- a five-year leap ahead that would have occurred had 3M gotten the FDA to approve by simply redoing the tests that were done in Europe and achieve 95 percent starting in 2007, '8, '9, '10, and '11, thousands and thousands and thousands of people who died might be alive today had there been a BacLite before MicroPhage.")); Gifford Decl. Ex. P (*Allegations Against 3M Corporation of Possible "Negligence and Recklessness" by The Porton Group, the Equity Partner of the British Ministry of Defence, for "Botched" U.S. Testing of Lifesaving Device to Detect the MRSA "Superbug"/Staph Infection*, PR NEWSWIRE, May 11, 2011. ("Hospital patients in Europe, the U.S., and all over the world could have been unnecessarily exposed to MRSAs and possibly exposed to life-and-death risk."); *id.* ("The famous U.S. 3M Corporation today was alleged by the private equity partner of the British Ministry of Defence, the Porton Group [i.e. Davis, himself], to have exhibited 'negligence and possible recklessness putting lives at risk' due to 3M's 'botched' 2007 clinical trials of a medical device called 'BacLite,' which can detect within five hours the presence of the potentially deadly MRSA/staph 'superbug.'")).

[155]  *See* Gifford Decl. Ex. O (*As Trial to Begin This Week, Pressure Increases on 3M to Come Clean About Failure to Market Life-Saving Medical Technology*, PR NEWSWIRE, June 13, 2011, ("the decision to shelve BacLite" was a result of "3M's bad faith" and was an attempt to "evad[e]" investors.)). Lanny J. Davis & Associates was the source for the press release.  *Id.* Davis made similar statements at press conferences, which then repeated in news reports. *See* Gifford Decl. Ex. C (Arundhati Parmar, *British firm says 3M sabotaged a superbug detecting device*, MINNPOST.COM, May 17, 2011, ("3M sabotaged the trial because it was developing a more expensive molecular test to detect MRSA internally called the Simplexa and wanted it to be the first to reach the market.")).

[156]  *See* Gifford Decl. Ex. P (*Allegations Against 3M Corporation of Possible "Negligence and Recklessness" by The Porton Group, the Equity Partner of the British Ministry of Defence, for "Botched" U.S. Testing of Lifesaving Device to Detect the MRSA "Superbug"/Staph Infection*, PR NEWSWIRE, May 11, 2011 (Davis accused 3M in a press release of "failing to disclose a secret internal technical committee report on testing errors" to the FDA.)); *id.* (listing members of Davis' firm and Tetra Strategy as sources for making inquiries); *id.* (Davis falsely stated in a press release that "a secret report by an 11-member internal 3M technical committee that confirmed 3M testers had made fundamental errors that led to unacceptable 50% reliability results."); *id.* (Davis falsely asserted that in a press release that 3M "failed to disclose to FDA the contents of [a] secret technical report" about BacLite."); Gifford Decl. Ex. J (Lanny J. Davis, Esq., International Press Conference at the Ivy Hotel in Minneapolis, Minnesota, at 29 (May 11, 2011) (Davis accused 3M at a press conference of "hiding the technical report" and suggested that this meant 3M must have been "motivated by other things besides selling BacLite under the contract.")).

The Davis Defendants assert, without citation to any evidence, that their challenged statements are factually undisputed.[157]  In fact, 3M has alleged, and specifically shown, how and why each of Defendants' defamatory statements are false.  For example, Davis contends that he never said that 3M acted in "bad faith," nor used the word "sabotage" to describe 3M's conduct toward BacLite.[158]   However, a press release issued by Davis and the other Defendants unambiguously states that "the decision to shelve BacLite" was a result of "3M's bad faith" and was an attempt to "evad[e]" investors.[159]  In addition, Defendants' citizens' petition, verified by Davis, uses the word "sabotaging" and "sabotaged" in describing 3M's actions toward BacLite.[160]

Davis also argues that, because there were 94,000 new cases of MRSA infections in the U.S. in 2005, his statements that 3M's abandonment of BacLite caused MRSA victims to contract the disease and die by the thousands was "substantially true."[161]  That head-scratching logic fails the straight-face test.  Davis and the other Defendants knew these allegations were patently false because MRSA screening tests other than BacLite were always available for widespread use.  That is why Defendants cannot cite to a single hospital or clinic—whether a former or potential user of BacLite—that has claimed it was unable to effectively screen for MRSA without access to BacLite.

---

[157]   Davis's Special Motion to Dismiss, at 30.

[158]   Davis's Special Motion to Dismiss, at 29.

[159]   *See* Gifford Decl. Ex. O (*As Trial to Begin This Week, Pressure Increases on 3M to Come Clean About Failure to Market Life-Saving Medical Technology*, PR NEWSWIRE, June 13, 2011).

[160]   *See* Gifford Decl. Ex. rr (Cit. Pet. at 5 ("Indeed, the facts are so replete with 3M's patent missteps that certainly, the watchful eye of FDA regulators may only conclude that 3M seemed bent on sabotaging FDA approval . . . .")); *id.* ("Finally, 3M overtly sabotaged continued use of BacLite in Europe by demanding the removal and return of BacLite devices from hospitals").

[161]   Davis's Special Motion to Dismiss, at 31.

Finally, Davis asserts that he never actually claimed that BacLite withheld any information from the FDA concerning its conduct of the U.S. clinical trials for BacLite, but only that the FDA "*may* have been misled" by 3M if it had not been given the BacLite Technical report.[162]   In his public statements to the media about the FDA citizens' petition, however, Davis stated that its purpose was to "ask the Food and Drug Administration . . . if information was withheld from them, misleading a federal agency . . . we suggest that the withholding of this technical committee report from the FDA constitutes potentially misleading the FDA . . . ."[163] There can be no doubt that these statements were specifically intended to communicate to the public that 3M had misled the FDA with regard to its conduct in the U.S. clinical trials for BacLite.  A statement need not be strictly false in order to be actionable as defamation—rather, even "an opinion on a matter of public concern is actionable if it has a 'provably false *factual connotation*.'"[164]  Moreover, Davis, as someone who has advised corporations—including 3M— on FDA procedures,[165] must have known, before making this allegation, that 3M was under no obligation to submit the BacLite Technical Report to the FDA in the first instance, and thus could never have "misled" the FDA as to that report.[166]

If 3M is considered a public figure, then to prevail on its defamation claim, it would also need to establish that Defendants made the defamatory statements with actual malice—*i.e.* with

---

[162]   Davis's Response at 32.

[163]   *Id.* at n. 4.

[164]   *Milkovich*, 497 U.S. at 18-20 (emphasis added); *see also Coles*, 881 F.Supp. at 31-32. Defendants cite *Moldea v. New York Times*, 22 F.3d 310, 316-17 (D.C. Cir. 1994)) and *Guilford Transp. Indus. v. Wilner*, 760 A.2d 580, 596 (D.C. 2000)) for the proposition that an opinion is only actionable if it implies a provably false fact, but these cases do not so hold as both arise out of actions for defamation based on published book reviews where the author disliked the reviewed book, an arena in which one court acknowledged that "spirited critiques" are expected.  *Moldea*, 22 F.3d at 313-14.

[165]   *See* Maloney Decl. ¶ 30.

[166]   *See* Maloney Decl. ¶ 30; Gifford Decl. Ex. jj (U.S. Food and Drug Admin).

knowledge that it was false or with reckless disregard as to its truth.[167]   Actual malice is established where it is shown that "the defendant in fact entertained serious doubts" as to the truth of the publication or acted "with a high degree of awareness of . . . its probable falsity."[168] Importantly, "whether a defendant published a statement with actual malice is normally a question of fact for the jury."[169]

3M, in fact, can show actual malice.  3M has made a sufficient showing that Defendants knew their statements were false when they made them.  When they claimed 3M had ulterior financial motives for not pursuing BacLite,[170]   Defendants knew that they themselves had already concluded this claim was unsupported by the evidence.[171]   Similarly, Defendants knew that BacLite's removal from the market could not have put lives at risk because there were a myriad other products available, and widely used, to screen for MRSA.[172]   Indeed, the U.K. Ministries of Health and Defence had confirmed this fact weeks before Defendants made them,

---

[167]   *See Thomas v. News World Commc'ns.*, 681 F.Supp. 55, 65 (D.D.C. 1988) (citing *New York Times v. Sullivan*, 376 U.S. 254, 280 (1964)).

[168]   *See OAO Alfa Bank v. Center for Public Integrity*, 387 F.Supp.2d 20 (D.D.C. 2005) (citing *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)).

[169]   *Parsi v. Daioleslam*, 595 F.Supp.2d 99, 106 (D.D.C. 2009) (citing *Liberty Lobby, Inc. v. Rees*, 852 F.2d 595, 598 (D.C.Cir.1988)).

[170]   *See* Gifford Decl. Ex. O (*As Trial to Begin This Week, Pressure Increases on 3M to Come Clean About Failure to Market Life-Saving Medical Technology*, PR NEWSWIRE, June 13, 2011 ("A press release issued by Davis from his Washington, D.C. offices falsely stated that "the decision to shelve BacLite" was a result of "3M's bad faith" and was an attempt to "evad[e]" investors")); Gifford Decl. Ex. C (Arundhati Parmar, *British firm says 3M sabotaged a superbug detecting device*, MINNPOST.COM, May 17, 2011 ("Davis stated at press conference in March 2011 that "3M sabotaged the trial because it was developing a more expensive molecular test to detect MRSA internally called the Simplexa and wanted it to be the first to reach the market."")).

[171]   *See* Gifford Decl. Ex. ll (Approved Judgment, ¶ 5); Maloney Decl. ¶¶ 17, 18.

[172]   *See* Maloney Decl. ¶¶ 22, 27.

in response to questions put to them by a cohort of Defendants.[173]  Yet, they publicly, and falsely

declared that BacLite's removal from the market caused widespread infection and death from

MRSA.[174]  Davis has not submitted any evidence that, before he made the extraordinary claims

he made any effort to establish their veracity.  Establishing actual malice is a question of fact for

the jury, and is generally inappropriate to consider at this stage of the litigation, but Davis's

allegations were extraordinarily serious and plainly intended to paint 3M in a particularly

notorious light.[175]  While failure to investigate is not, standing alone, evidence of bad faith,

"there must be some justification" for such failure.[176]  "Purposeful avoidance of the truth" can

amount to actual malice, and on these facts, it is reasonable to conclude that Davis did exactly

that.[177]

Finally, to the extent that the Davis Defendants have asserted in their Special Motion to

Dismiss that 3M is unlikely to prevail on its defamation claims because any defamatory

---

[173]   On February 28 and March 2, 2011, the U.K. Ministries of Health and Defence responded to the queries of Tom Watson, a Member of the British Parliament quoted in Defendants' press releases,  as follows:

**M.P. Watson:** To ask the Secretary of State for Health what assessment he has made of the capacity of methods of screening against the MRSA bacterium used by NHS hospitals to detect new strains of the infection; and if he will make a statement.

**Ministry of Health:** *Many laboratory methods are available to national health service hospitals to detect Methicillin-resistant Staphylococcus aureus (MRSA)* and these meet the European Commission standards for safety, quality and performance. NHS trust laboratories use simple tests to detect MRSA. *These tests have been available for many years and are capable of detecting the emergence of a new MRSA on this basis.*

Gifford Decl. Ex. ii (U.K. Ministries of Health and Defence Response) (emphasis added).

[174]   *See* Maloney Decl. ¶ 27.

[175]   *Parsi v. Daioleslam*, 595 F.Supp.2d 99, 106 (D.D.C. 2009) (citing *Liberty Lobby, Inc. v. Rees*, 852 F.2d 595, 598 (D.C.Cir.1988)); *see also*

[176]   *Foray v. Novroske*, 334 N.E.ed 79, 88 (Ill. App. 1975).

[177]   *Parsi*, 595 F.Supp. at 108 (denying summary judgment on defamation claims and ordering discovery "to determine what Defendant knew" when he made the challenged statements.); *see also Milkovich*, 497 U.S. at 18-20 ("opinion on a matter of public concern is actionable if it has a 'provably false factual connotation.'").

statements made by Defendants were privileged, the legal fallacy of that contention is addressed in 3M's Consolidated Response in Opposition to Defendants Motions to Dismiss pursuant to Rule 12(b)(6), which is being filed contemporaneously with this Response.[178]   Accordingly, because 3M has proffered sufficient evidence to state "legally sufficient" claims for defamation, the Special Motions to Dismiss should be denied.[179]

### 4.      3M's aiding and abetting and civil conspiracy claims.

The Davis Defendants assert that 3M cannot prevail on its claims for aiding and abetting and conspiracy because D.C. does not recognize the tort of aiding and abetting.  They also allege that, even if such a claim was recognized, 3M could not succeed on either that claim, or its causes of action for civil conspiracy, because it cannot establish the necessary underlying torts.[180]  Defendants are wrong.  The D.C. Circuit has predicted that aiding and abetting tortious conduct would be independently recognized as a tort in this district.[181]  At the very least, courts in D.C. have found that one who aids and abets is vicariously liable for all injuries caused by the primary actor.[182]  Moreover, as detailed above, 3M is likely to succeed on the tort claims for tortious interference, intimidation, and defamation that underlie its aiding and abetting and civil conspiracy causes of action.  In any event, the secret nature of conspiracies makes it impossible

---

[178]   *See* Consolidated Response to Motion to Dismiss, at § IV.C.3.e.

[179]   *See Mindy's Cosmetics*, 611 F3d. at 599; *Mann*, 120 Cal. App. 4th at 105; *Oasis West Realty*, 250 P.3d at 1120; *Louisiana Crisis Assistance Ctr.*, 2011 WL 5878159, at *8.

[180]   Davis's Special Motion to Dismiss at 40.

[181]   *See Halberstam v. Welch*, 705 F.2d 472, 479 (D.C.Cir.1983) (The "existence of the civil conspiracy action [in the District] suggests a high probability that the legal rationale underlying aiding-abetting would also be accepted.").

[182]   *See International Telecomms. Satellite Org. v. Colino*, CIV. A. Nos. 88–1266(RCL), 87–2749(RCL), 1992 WL 93129, at *14 (D.D.C. Apr. 15, 1992) ("As an aider and abettor, as opposed to a prime actor, Colino is vicariously liable to INTELSAT for all injury caused by the wrongdoing of the primary actors.").

for 3M to know all the details internal to a conspiracy at this early stage, and thus it should be granted targeted discovery before its conspiracy claim is dismissed.[183]

### E.    In The Alternative, 3M Is Entitled To Discovery Before The Special Motions To Dismiss Can Be Granted.

#### 1.    3M is entitled to the discovery permitted by Fed. R. Civ. P. 56(d).[184]

Because the Act has only been in effect for a few months, this Court has not yet had the opportunity to determine what discovery should be available to Plaintiffs.  Other federal courts, however, looking at analogous discovery provisions in other jurisdiction's anti-SLAPP statutes, have concluded that a "special motion" in federal court brought under a state anti-SLAPP act must be treated as a motion for summary judgment under Rule 56.[185]   Accordingly, the plaintiff must be allowed discovery—to the same extent it would allowed under Rule 56(d)—before the special motion is granted.[186] This Court, likewise, has a long tradition of affording a party the "reasonable opportunity to complete discovery" before responding to a dispositive evidentiary motion.[187]   Even the D.C. Office of Attorney General agrees that 3M should be given any

---

[183]   *See* 5 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure (Second) § 1233 (1990) (internal citations omitted); *see also ABB Daimler-Benz Transp. (North America), Inc. v. National R.R. Passenger Corp.*, 14 F.Supp.2d 75, 86 (D.D.C. 1998) ("There are inherent difficulties in the pleading of a conspiracy, for by its very nature it involves agreement and questions of intent not accessible to Plaintiff.") (citing *Mandelkorn v. Patrick*, 359 F.Supp. 692, 697 (D.D.C. 1973)).

[184]   For an even more thorough discussion of this issue, 3M respectfully refers this Court to 3M's briefing in support of its Motion to Strike.

[185]   *See, e.g., In re Bah*, 321 B.R. 41, 45 n.6 (9th Cir. 2005) ("[I]f a defendant makes a motion to strike under the anti-SLAPP statute based on a failure of proof or evidence, the motion must be treated as though it is a motion for summary judgment and discovery must be developed sufficiently to permit summary judgment under Rule 56."); *Rogers v. Home Shopping Network, Inc.*, 57 F. Supp. 2d 973, 981 (C.D. Cal. 1999) (citing Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Civil Practice & Procedure*, § 2741, at p. 422 (3d ed. 1988)) (same); *Metabolife*, 264 F.3d at 846 (federal courts "should not scrutinize Plaintiff's evidence of facts uniquely within the Defendants' control before ordering discovery to enable Plaintiff to meet its burden of opposing Defendants' anti-SLAPP motions").

[186]   *Id.*

[187]   *Kahn v. Parsons Global Servs., Ltd.*, 428 F.3d 1079, 1087 (D.C. Cir. 2005) ("The court has long recognized that a party . . . needs a 'reasonable opportunity' to complete discovery before responding to a summary judgment motion and that 'insufficient time or opportunity to engage in

discovery it would be otherwise permitted under the Federal Rules of Civil Procedure.[188]  Indeed, because its had *no* opportunity for discovery prior to the filing the Special Motions to Dismiss, 3M need not even make the typical showing required by Rule 56(d) as to its need for such evidence.[189]

Davis's motion is replete with self-serving factual assertions that his statements defaming 3M, as well as his actions to further the conspiracy to intimidate and extort 3M into paying tens of millions of dollars, were either "substantially true," not made with "actual malice," were made in advocacy on behalf of an issue of public interest, or were otherwise privileged.[190]  Few, if any, of these assertions are supported by citations to any sources verifying their validity.[191] Accordingly, should this Court find that 3M has failed to make out a legally sufficient claim as to any of its causes of action, it should deny the Special Motions to Dismiss without prejudice, and permit 3M to take targeted discovery that is entitled to.[192]

---

discovery' is cause to defer decision on the motion."), *quoting Martin v. Malhoyt*, 830 F.2d 237, 256 (D.C. Cir. 1987).

[188]   *See Brief of Intervenor The District of Columbia* at 31 n.20 (filed on  Nov. 29, 2011) ("In any event, the First Circuit's analysis in *Godin* [*v. Schenks*, 629 F.3d 79 (1st Cir. 2010)] illustrates that any concern this Court may have about the operation of the discovery provisions is best reflected by the Court's applying the Act's discovery provisions such that they do not conflict in the Court's view with any required discovery rule [sic] under the Federal Rules.").

[189]   *See Aeroplate Corp. v. Arch Ins. Co.*, CV- F 06-1099 AWI SMS, 2006 U.S. Dist. LEXIS 82180, at *24-25 (E.D. Cal. Nov. 8, 2006) (denying special motion to dismiss under California's anti-SLAPP statute before non-movant had any opportunity for discovery, even though opposing party had not shown with particularity what evidence discovery would make available, because "the Supreme Court's holding in *Liberty Lobby* makes clear that, where there has been no discovery—as is the case here—then the court is required to grant the request of the nonmoving party to stay or continue the [dispositive] motion to allow for discovery."); *accord Thorne v. District of Columbia,* Civil Action No. 06-1204, 2006 U.S. Dist. LEXIS 91438, at *18-19 (D.C. Dec. 19, 2006).

[190]   *See* Davis's Special Motion to Dismiss at 21-40.

[191]   *Id.*

[192]   *See* D.C. Code § 16-5502(c)(2); Fed. R. Civ. P. 56(d); Declaration of Kenneth N. Hickox, Jr. in Support of 3M's Response To Defendants' Special Motions to Dismiss ("Hickox Decl.") ¶ 7.

2.      **Specific discovery needed by 3M to respond to the Special Motion.**

The Special Motions were filed before a conference under Fed. R. Civ. P 26(f). Accordingly, neither party has yet engaged in any discovery in this lawsuit.[193]  In addition, after Davis filed his Special Motion, 3M made a reasonable attempt to obtain relevant discovery by requesting that he agree to limited discovery aimed at responding to the motion without the need to petition the Court, but that request was refused.[194]

Accordingly, and as detailed in the Hickox Declaration, 3M should be provided the opportunity to serve interrogatory requests, requests for production, and requests for admissions on Defendants.  3M also seeks to take the depositions of Davis, Boulter, Werrity, and a corporate representative of Tetra Strategy.[195]   3M expects that the requested discovery will generate evidence sufficient to defeat the Special Motions to Dismiss.  Such discovery will show that defamatory statements and tortious conduct identified in the Complaint were: (i) not protected by the Act because they were not made or taken in furtherance of the right of advocacy on issues of public interest;[196] (ii) not protected by the Act because they were directed primarily toward protecting the speaker's commercial interests;[197] (iii) knowingly false when made, not substantially true, and/or made with reckless disregard for their truth or falsity;[198] (iv) made with

---

[193]   *Id.* ¶¶ 3-4.

[194]   *See* Letter from W. Brewer to R. Mullady, dated Oct. 10, 2011, a copy of which is attached at Ex. oo; Letter from R. Mullady to W. Brewer, dated Oct. 11, 2011, attached at Ex. pp; *see also* Hickox Decl. ¶ 8.

[195]   *See*, *generally*, Hickox Decl.

[196]   Davis asserts that "there can be no serious dispute that the statements about which 3M complains qualify as 'act[s] in furtherance of the right of advocacy on issues of public interest.'" *See* Special Motion at 21-23.  3M's requested discovery will establish that all of Davis's wrongful conduct and statements were made primarily in furtherance of his, his clients', and/or others' commercial interests, and thus not protected by the Act.  *See* Hickox Decl. ¶ 6.

[197]   *Id.*

[198]   Defendants state, without support, that the facts and contentions being challenged in the Complaint are "indisputable," incapable of "serous dispute," not in "doubt," "essentially undisputed,"

actual malice;[199] and/or (iii) not otherwise privileged.[200]   The requested discovery may be in the possession of Defendants or identified third-parties, such as Werrity and Tetra Strategy.[201]

In particular, 3M's requested targeted discovery will establish that Defendants' communications to 3M's legal counsel on June 18 and 19, 2011,[202] were intended primarily to protect Defendants' commercial interests, and not to advocate on issues of public interest.   It will also show:  (i) Defendants acted in concert to make the challenged communications for an illegal purpose (*i.e.,* to extort, intimidate and coerce 3M); (ii) Defendants sought access to Fox  in order to influence the British government to assist them in that tortious scheme (iii) whether Boulter, as he claimed to 3M's attorney, discussed with Fox threats to 3M's business interests and George Buckley's knighthood; and (iv) Defendants acted on their threats to interfere with 3M's existing and future business relationships with the U.K. government.[203]

---

"substantially true," and that "3M cannot possibly prove [Davis's] statements are false or not substantially true.   *See* Davis's Special Motion to Dismiss, at 11, 21-22, 29, 31.   3M's requested discovery will establish that, as to as each of the challenged statements, Davis knew that the statements were actually false and/or materially false, and that their falsity went beyond "technicalities."  *See* Hickox Dec. ¶ 6 n. 4.

[199]   Defendants assert, without support, that the "facts establish" that Davis did not subjectively know that his defamatory statements were false.  *See* Davis's Special Motion to Dismiss, at 30.   3M's requested discovery will show that Davis, when he made the defamatory statements identified in the Complaint, subjectively knew that they were false, made with them with reckless disregard for their truth or falsity, made no attempt to confirm their truth or falsity, and made them with the subjective intent to cause harm to 3M.

[200]   Davis contends that his statements are protected by the fair comment privilege, the common interest privilege,  and privilege provided for statements to law enforcement authorities under the Restatement (Second) of Torts § 598. *See* Davis's Special Motion to Dismiss, at 33-35.   3M's requested discovery will show that that these privileges do not apply because the defamatory statements—including those made within the FDA filing—were made in bad faith, with the intention to harm 3M, not made to advance any public interest, and were not intended to be made on behalf of any person or entity other than Davis and his clients.  *See*  Hickox Dec. ¶ 6.

[201]   *See* Hickox Dec. ¶ 7.

[202]   *See* Gifford Decl. Ex. E, F (The e-mails).

[203]   *See id.* That Davis might not have been a party to the telephone conversation between 3M's counsel and Boulter, or copied on Boulter's e-mail of June 18 e-mail, is irrelevant because 3M intends to show that Davis conspired with and assisted Boulter to plan, devise, and communicate those threats to

3M's targeted discovery will, in addition, prove that Davis either knew his allegations that 3M sabotaged BacLite in favor of FastMan was neither "substantially true" nor "essentially undisputed,"[204] but was made with knowing falsehood, with reckless for its truth or falsity.[205] Targeted discovery will also establish that Davis's assertion that "thousands of people" died of MRSA-related causes because BacLite was removed from the market were knowingly false, or Davis was willfully blind to their truth or falsity.[206]  It will further show that Davis was aware of, or was willfully blind to, the fact that not a single former or potential customer of BacLite was unable to conduct effective MRSA screening because it could not buy the device, and that not a single MRSA-related infection or death was caused by BacLite's unavailability.[207]

Davis contends that, because the "actual malice" standard will apply to 3M's defamation claim, that claim cannot succeed because 3M cannot prove by clear and convincing evidence that, when Davis made them, he either knew that they were false or uttered them with "reckless disregard" for their truth or falsity.[208]  The Supreme Court has held that, because the question of malice implicates a defendant's state of mind, it "does not readily lend itself to summary

---

3M. *See* Gifford Decl. Ex. E, F, G, H (The e-mails);  *see also Flately*, 139 P. 3d at 21 (noting conduct not covered by anti-SLAPP statute where shown to be illegal); *see also* Hickox Decl. ¶ 7.

[204]   Davis's Special Motion to Dismiss, at 24, 29-33.  "'Substantially true' means that the 'gist' of the statement is true or that the statement is substantially true, as it would be understood by its intended audience." *Benic v. Reuters Am.*, 357 F. Supp. 2d 216, 221 (D. D.C. 2004).

[205]   Hickox Decl. ¶¶ 6-7.   It is undisputed that, at that time, Davis was a partner in the Washington, D.C., office of McDermott, which was Claimants' then solicitors in the London Litigation. Also resident in that office was McDermott partner Anthony Soccarras, then a key member of Claimants' litigation team.

[206]   Davis's Special Motion to Dismiss at 31; Hickox Decl. ¶¶ 6-7.

[207]   Hickox Decl. ¶ 7.

[208]   Davis's Special Motion to Dismiss, at 28 (citing *McFarlan v. Sheridan Square Press*, 91 F.3d 1501, 1515 (D.C. Cir. 1996)). The test for "actual malice" is a subjective one, requiring evidence that Davis "in fact entertained serious doubts" as to the truth of his statements, or acted "with a high degree of awareness of . . . [their] probable falsity."  *Id.* (citing *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)).

disposition" in any circumstance.[209]   3M's request for targeted discovery to disprove this assertion is, therefore, especially important because Davis's special motion to dismiss "raises latent fact issues such as motive, intent, knowledge, or credibility and the moving party has exclusive control over those facts."[210]

Targeted discovery will further show that Davis is not entitled to invoke the fair comment privilege because his defamatory utterances were misstatements of fact, and thus neither opinion nor "fair comment."[211]   Likewise, such discovery will show that Davis cannot invoke the common interest privilege because his defamatory statements were published in bad faith, which is the equivalent of malice, without regard to whether the listener shared Davis's interest in the purported public matter at issue.[212]   Discovery will also prove that Davis's defamatory statements in connection with the citizens' petition were made in bad faith, and thus not protected by the privilege set forth in *Restatement (Second) of Torts* § 598.[213]   Finally, 3M's requested discovery will show that Davis's claim to the protection of the First Amendment's

---

[209]   *Hutchinson v. Proxmire*, 443 U.S. 111, 120 n.9 (1979).

[210]   *Rogers v. Home Shopping Network, Inc.*, 57 F. Supp. 2d 973, 981 (C.D. Cal. 1999).

[211]   *See Jankovic v. Int'l Crisis Group*, 593 F.3d 22, 29 (D.C. Cir. 2010) ("a conclusion based on a misstatement of fact is not protected by the privilege") (citing *Washington Times Co. v. Bonner*, 86 F.2d 836, 841 n.4 (D.C. Cir. 1936); *Klayman v. Judicial Watch, Inc.*, No. 06-670 (CKK), 2007 U.S. Dist. LEXIS 3197, at *60-*61 (D.D.C. Jan. 17, 2007) ("fair comment defense . . does not extend to misstatements of fact") (internal citations and quotation marks omitted).

[212]   *El-Hadad v .United Arab Emirates*, 496 F.3d 658 (D.C. Cir. 2007) ("[B]ad faith vitiates the common interest privilege under District of Columbia law."); *Armenian Assembly of Am., Inc. v. Cafesjian*, 692 F. Supp. 2d 20, 49 (D.D.C. 2010) (rejecting application of common interest privilege where "publication [was] not reasonably calculated to protect or further the interest.").

[213]   *Columbia First Bank v. Ferguson*, 665 A.2d 650, 655 (D.C. 1995) (qualified privilege exists only when a statement about suspected wrongdoing is made in good faith to law enforcement authorities). Davis erroneously claims the Restatement protects speech made to "someone who may act in the public interest."   In fact, the privilege covers only statements "to a public officer or a private citizen who is authorized or privileged to take action if the defamatory matter is true."  Restatement (Second) of Torts § 598.  The First Amendment has never protected defamatory or libelous utterances and writings. *Solers, Inc. v. Doe*, 977 A.2d 941, 951 (D.C. 2009) ("Certain classes of speech, including defamatory and libelous speech, are entitled to no Constitutional protection.") (citation omitted)).

right to petition as to defamatory statements made in the FDA citizens' petition is unavailing because, when Davis filed the petition, he knew that it contained false and intentionally disparaging allegations about 3M, and that he was motivated to file the petition by a desire to intimidate and coerce 3M into paying a large settlement in the London Litigation.[214]

## F.    Defendants' Request For Attorney's Fees Should Be Denied.

Because Defendants' have not made their prima facie showing that the statements and actions at issue arise from a matter of public interest, Defendants are not entitled to costs and attorneys' fees.   Even if the court finds that the issues before this Court arise from a matter of public interest, 3M has established that it is likely to succeed on the merits of at least one of its claims,[215] and, as a result, the entire Anti-SLAPP motion should be dismissed rendering costs and attorneys' fees to Defendants improper.   Additionally, if this Court awards 3M discovery to establish its likelihood of success on the merits, the consideration of costs and attorneys' fees would be inappropriate at this time.   Furthermore, the award of costs and attorneys' fees is permissive.[216]   As demonstrated herein, 3M has asserted its claims in good faith.   Therefore, costs and attorneys fees should not be awarded to Defendants.

---

[214]   A person's First Amendment right to petition the government does not immunize tortious conduct purportedly done in the course of exercising that right.   *See Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144 (1961) (defendant could be liable for "a publicity campaign, ostensibly directed toward influencing governmental action, [which] is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor[.]").   The Supreme Court has acknowledged that the *Noerr* doctrine applies to torts and claims outside of the antitrust context.   *See, e.g., N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886 (1982) (the right to petition does not immunize boycotters from liability for violent conduct).

[215]   *See supra* § IV.A.2.

[216]   "The court may award a moving party who prevails, in whole or in part, on a motion brought under § 16-5502 or § 16-5503 the costs of litigation, including reasonable attorney fees." 16-5504(a). While the Act is thus silent as to what standard to use in determining whether to award fees, when similar fee shifting provisions in other statutes have been considered, this Court has considered such nonexclusive factors as "frivolousness, motivation, objective unreasonableness . . . and the need in particular circumstances to advance considerations of compensation and deterrence." *Scott-Blanton v. Universal City Studio Prods. LLP*, 593 F. Supp. 2d 171, 174 (D.C. 2009) (considering discretionary fee

## V.

## CONCLUSION

For all the above-stated reasons, 3M respectfully asks this Court to deny Defendants'

special motions to dismiss, and grant 3M such other relief as this Court deems just and equitable.

Respectfully submitted,

By:   /s/Kenneth J. Pfaehler
Kenneth J. Pfaehler
David I. Ackerman
**SNR DENTON US LLP**
1301 K Street NW
Suite 600, East Tower
Washington, D.C.  20005-3364
Telephone:  (202) 408-6468
Facsimile:  (202) 408-6399

William A. Brewer III
Michael J. Collins
Kenneth N. Hickox, Jr.
Robert Gifford
**BICKEL & BREWER**
767 Fifth Avenue, 50th Floor
New York, New York  10153
Telephone:  (212) 489-1400
Facsimile:  (212) 489-2384
**ATTORNEYS FOR PLAINTIFF**
**3M COMPANY**

5258257.8
2124-06

---

award under the Copyright Act); *see also Dean v. AFGE*, 549 F. Supp. 115, 124 (D.C. 2008) (considering discretionary fee award under Title VII).