UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

3M COMPANY,                                      :        Civil Action No.
                                                 :        1:11-CV-01527-RLW
                                                 :
              Plaintiff,                          :
                                                 :
        - v -                                    :
                                                 :
HARVEY BOULTER,                                  :
PORTON CAPITAL TECHNOLOGY FUNDS,                 :
PORTON CAPITAL, INC., LANNY DAVIS,               :
LANNY J. DAVIS & ASSOCIATES, PLLC and            :
DAVIS-BLOCK LLC,                                 :
                                                 :
              Defendants.                         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## DECLARATION OF ROBERT W. GIFFORD

I, Robert W. Gifford, declare under penalty of perjury pursuant to 28 U.S.C.
§ 1746, as follows:

1.      I am over the age of eighteen years and have never been convicted of a
felony or a crime involving moral turpitude. I am fully competent and qualified in all
respects to make this Declaration. The facts set forth herein are true and correct and,
unless otherwise qualified, are within my personal knowledge.

2.      I am counsel with the law firm Bickel & Brewer, located in Dallas, Texas.
Bickel & Brewer represents the 3M Company ("3M") in the above-captioned matter.

3.      Attached hereto are true and correct copies of the following documents:

Exhibit A:    *Allegations Against 3M Corporation of Possible
              "Negligence and Recklessness" by The Porton Group, The
              Equity Partner of the British Ministry of Defence, for
              "Botched" U.S. Testing of Lifesaving Device to Detect the
              MRSA "Superbug"/Staph Infection*, PR NEWSWIRE, May
              11, 2011, http://www.prnewswire.co.uk/cgi/news/release
              ?id=320610.

Exhibit B:      Andrew Jack, *Secret Meetings And Blackmail Claims*,
                FINANCIAL TIMES, October 7, 2011, http://www.ft.com/intl
                /cms/s/0/e4742f0c-f110-11e0-b56f-00144feab49a.html#
                axzz1buufSTDR.

Exhibit C:      Arundhati Parmar, *British Firm Says 3M Sabotaged a
                Superbug Detecting Device*, MINNPOST.COM, May 17,
                2011, http://www.minnpost.com/medcitynews/2011/05/17
                /28349/british_firm_says_3m_sabotaged_a_superbug_dete
                cting_device; Arundhati Parmar, *3M counters 'sabotage'
                charge with 'blackmail' lawsuit*, MEDCITY NEWS, June
                21, 2001, http://www. medcitynews.com/2011/06/3m-
                counters-sabotage-charge-with-blackmail-lawsuit/.

Exhibit D:      Ben Geoghegan, *PM Demands Liam Fox MoD Inquiry
                Answers On Monday*, BBC, October 8, 2011, http://www.
                bbc.co.uk/news/uk-politics-15228545.

Exhibit E:      Email from Boutler to Brewer, dated June 18, 2011.

Exhibit F:      Email from Boutler to Brewer, dated June 19, 2011.

Exhibit G:      Email from Davis to Brewer and Boutler, dated June 17,
                2011.

Exhibit H:      Email from Davis to Brewer, dated June 8, 2011, and 3M's
                attorney's response.

Exhibit I:      *House of Commons Written Answers 28 February 2011*,
                http://services.parliament.uk/hansard/Commons/ByDate/20
                110228/writtenanswers/part014.html.

Exhibit J:      *International Press Conference at the Ivy Hotel in
                Minneapolis, Minnesota*, May 11, 2011, http://www.mrsa-
                injustice.com/wordpress/Press-Conference/Press
                ConferenceTranscript.pdf.

Exhibit K:      James Hohmann and Dan Berman, *Lanny Davis under fire
                from 3M*, POLITICO, July 11, 2011, http://www.politico.
                com/news/stories/0711/59691.html.

Exhibit L:      James Kirkup, *Liam Fox on Adam Werritty: I Was Wrong
                and I Am Sorry*, TELEGRAPH, October 9, 2011,
                http://blogs.telegraph.co.uk/news/jameskirkup/100109702/l
                iam-fox-on-adam-werritty-i-was-wrong-and-i-am-sorry.

Exhibit M:      Janet Moore, *Suit claims 3M Muffed Approval for Superbug test*, STAR TRIBUNE, May 10, 2011, http://www.startribune.com/business/121599274.html.

Exhibit N:      Jonathan Russell, *Liam Fox Denies Involvement In Dispute Between 3M and Porton Capital*, TELEGRAPH, August 9, 2011, http://www.telegraph.co.uk/finance/8689691/Liam - Fox-denies-involvement-in-dispute-between-3M-and-Porton-Capital.html.

Exhibit O:      Lanny J. Davis & Associates, *As Trial to Begin This Week, Pressure Increases on 3M to Come Clean About Failure to Market Life-saving Medical Technology*, PR NEWSWIRE, June 13, 2011, http://www.prnewswire.com/news-releases/as-trial-to-begin-this-week-pressure-increases-on-3m-to-come-clean-about-failure-to-market-life-saving-medical-technology-123761319.html.

Exhibit P:      Lanny J. Davis, *International Press Conference Advisory — Allegations Against 3M Corporation of Possible "Negligence and Recklessness" in Testing of Proven "Superbug"/Staph ("MRSA") Infection Detection Device — U.S. FDA Investigation and Public Hearing Sought*, PR NEWSWIRE, May 11, 2011, http://www.bloomberg.com /apps/news?pid=conewsstory&tkr=MMM:AR&sid=aNzw5 rcRrPyQ

Exhibit Q:      *Liam Fox Dubai Business Meeting "not an accident,"* BBC, October 11, 2011, http://www.bbc.co.uk/news/uk-politics-15263287.

Exhibit R:      *Liam Fox row: Werritty 'described as a special adviser'* BBC, Oct. 11, 2011, http://www.bbc.co.uk/news/uk-politics-15263284.

Exhibit S:      Oliver Wright, *Fox Feels Heat As New Claim Casts Doubt On MoD Denial*, INDEPENDENT, Oct. 8, 2011, http://www.independent.co.uk/news/uk/politics/fox-feels-heat-as-new-claim-casts-doubt-on-mod-denial-2367349.html.

Exhibit T:      Porton Group, *3M Forced to Pay for Breach of Obligations Over MRSA – High Court*, PR NEWSWIRE, November 7, 2011, http://www.prnewswire.com/news-releases/3m-forced-to-pay-for-breach-of-obligations-over-mrsa---high-court-133366753.html.

Exhibit U:      Porton Group, *Lawsuit Claims 3M Scotched Governments MRSA test*, PR NEWSWIRE, June 15, 2011, http://www.prnewswire.co.uk/cgi/release?id=324289.

Exhibit V:      Robert Booth, *Harvey Boulter: I Assumed Adam Werrity Was an Mod Man*, THE GUARDIAN, October 10, 2011, http://www.guardian.co.uk/politics/2011/oct/10/harvey-boulter-adam-werrity-mod.

Exhibit W:      Rupert Neate, *3M Countersues as MRSA Row Becomes Toxic*, THE GUARDIAN, June 20, 2011, http://www .guardian.co.uk/society/2011/jun/20/3m-countersues-mrsa-superbug-row.

Exhibit X:      Rupert Neate, *3M Sued for Neglecting New Anti-Superbug Test Developed in UK*, THE GUARDIAN, June 11, 2011, http://www. guardian.co.uk/society/2011/jun/12/3m-sued-for-neglecting-anti-superbug-test.

Exhibit Y:      Rupert Neate, *Businessman Met Fox's Friend Two Months Before "Chance" Dubai Meeting*, THE GUARDIAN, Oct. 8, 2011, http://www.guardian.co.uk/politics/ 2011/oct/08/liam-fox-dubai-meeting-chance.

Exhibit Z:      Rupert Neate, *Emails and Video Footage Pile Pressure on Beleaguered Liam Fox*, THE GUARDIAN, Oct. 8, 2011, http://www.guardian.co.uk/politics/2011/oct/08/emails-video-footage-liam-fox.

Exhibit aa:     Rupert Neate, *Government Weighs Into "Blackmail" Row Over 3M and MRSA Test*, THE GUARDIAN, June 27, 2011, http://www.guardian.co.uk/business/2011/jun/27/governme nt-3m-blackmail-row-mrsa.

Exhibit bb:     Rupert Neate, *Harvey Boulter: I Met Adam Werrity in April 2011*, THE GUARDIAN, October 8, 2011, http://www.guardian.co.uk/politics/2011/oct/08/liam-fox-harvey-boulter-adam-werritty.

Exhibit cc:     Rupert Neate, *How Adam Werritty's Role As Self-Styled Adviser to Liam Fox Unravelled*, THE GUARDIAN, Oct. 14, 2011, http://www.guardian.co.uk/politics/2011/oct/14/adam -werritty-liam-fox-unravelled.

Exhibit dd:     Rupert Neate, *Liam Fox, His Adviser, And An Irregular Meeting In Dubai*, THE GUARDIAN, Oct. 7, 2011, http://www. guardian.co.uk/politics/2011/oct/07/liam-fox-adviser-meeting-dubai.

Exhibit ee:     Rupert Neate, *Liam Fox's Friend Set Up Crucial Legal Meeting*, THE GUARDIAN, Aug. 18, 2011, http://www.guardian.co.uk/politics/2011/aug/18/liam-fox-friend-set-up-crucial-legal-talks.

Exhibit ff:     Rupert Neate, *Revealed: How Lobbyists Were Paid To Set Up Meeting With Fox*, THE GUARDIAN, October 9, 2011, http://www.guardian.co.uk/politics/2011/oct/09/liam-fox-meeting-lobbyists-werritty-boulter.

Exhibit gg:     *Timeline: Events That Led to Fox Resignation*, SKY.COM, Oct. 15, 2011, http://news.sky.com/home/politics/article/16089239.

Exhibit hh:     Tom Lynden, *British Company Calls on FDA to Investigate 3M Over BacLite MRSA-Detecting Device*, MYFOX9, May 11, 2011, http://www.myfoxtwincities.com/dpp/news /3m-baclite-mrsa-lawsuit-may-10-2011.

Exhibit ii:     U.K. Parliament: Daly Hansard Written Answers: MRSA Screening, http://www.publications.parliament.uk/pa/cm201011/cmhansrd/cm110302/text/110302w0002.htm#11030292000907

Exhibit jj:     *Improving Public Health: Promoting Safe and Effective Drug Use*, U.S. Food and Drug Admin., http://www.fda.gov/AboutFDA/CentersOffices/OfficeofMedicalProductsandTobacco/CDER/WhatWeDo/default.htm; FDA Fundamentals, U.S. Food and Drug Admin., http://www.fda.gov/AboutFDA/Transparency/Basics/ucm192695.htm.

Exhibit kk:     Expert witness report of Monroe H. Freedman and Curriculum Vitae.

Exhibit ll:     Porton Capital Technology Funds v. 3M UK Holdings Limited, 2008 Folio No. 877 (Q.B. 2011) (*Approved Judgment*).

Exhibit mm:     Affidavit of Stephen Auld Q.C. Regarding Points of English Law Relevant to Defendants' Motion to Dismiss, dated October 28, 2011.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 15, 2011.

_____
Robert W. Gifford

5258153.4
2124-06

# Exhibit A



EDITION: U.S.                Register | Sign In          Search News & Quotes          Sub

| Home | Business | Markets | World | Politics | Technology | Opinion | Money | Life & Culture | Pictures | Video |


**SPDR**
STATE STREET GLOBAL ADVISORS
*Precise in a world that isn't.*   ▶ ▓▓ **LEARN MORE**

ARTICLE



ERIN BURNETT
*OUT**FRONT***

NEW TO PRIMETIME
**WEEKNIGHTS**
7ET
CNN

**MORE REUTERS RESULTS FOR:**
"infection detection device reuters may 10 2011"

**Follow Reuters**

Facebook    Twitter    RSS    YouTube

**READ**

1  Italian deputies in fist fight over reforms
   8:02am EDT

2  Nazi jokes, wrath at Germans highlight Greek despair
   8:42am EDT

3  Worst California biker feud in decade erupted at Starbucks
   3.12pm EDT

4  New risk for Occupy Wall Street: less media interest
   ▣ VIDEO▶
   25 Oct 2011

5  Steve Jobs Wanted Jon Stewart to Help Prove Fox News Was 'Incredibly Destructive'
   6:06am EDT

**DISCUSSED**

**291**  Obama to announce help on housing, student loans

**159**  Gaddafi captured as he fled Sirte: NTC official
Login or register            Latest from My Topics

## International Press Conference Advisory -- Allegations Against 3M Corporation of Possible "Negligence and Recklessness" in Testing of Proven "Superbug"/Staph ("MRSA") Infection Detection Device -- U.S. FDA Investigation and

\* Reuters is not responsible for the content in this press release.

Tue May 10, 2011 2:43pm EDT

International Press Conference Advisory -- Allegations Against 3M Corporation of Possible "Negligence and Recklessness" in Testing of Proven "Superbug"/Staph ("MRSA") Infection Detection Device -- U.S. FDA Investigation and Public Hearings Sought

PR Newswire

May 10

WHEN:     WEDNESDAY, MAY 11th

          9:30 AM (0930) CENTRAL DAYLIGHT TIME

          10:30 AM (1030) EASTERN DAYLIGHT TIME

          3:30 PM (1530) U.K. TIME

CALL-IN
NUMBERS:

          U.S. CALLERS: 1-866-690-4243

          EUROPEAN CALLERS: 1-707-595-2672

          BACK-UP IF DIFFICULTY CALLING IN: 1-612-548-3440

WHERE:    Hotel Ivy, Mozart Room, 201 South 11th Street, Minneapolis, MN 55415

WHO:      Robert R. Hopper, Robert R. Hopper & Associates, Minneapolis, MN

          Lanny J. Davis, Lanny J. Davis & Associates, Washington, D.C. (Former White House Special Counsel)

SUBJECT:  ALLEGATIONS AGAINST 3M CORPORATION OF POSSIBLE "NEGLIGENCE AND RECKLESSNESS" IN TESTING OF PROVEN ANTI-"SUPERBUG"/STAPH ("MRSA") INFECTION DETECTION DEVICE -- U.S. FOOD AND DRUG ADMINISTRATION INVESTIGATION AND PUBLIC HEARINGS SOUGHT

          *LETTER TO U.S. FDA PLUS PUBLIC PETITION FOR INVESTIGATION AND HEARINGS AND DOCUMENTS SUPPORTING ALLEGATIONS TO BE RELEASED AND POSTED AT www.MRSA-INJUSTICE.com*

          FOR FURTHER INFORMATION CALL:

figure in a broad U.S. crackdown on insider trading at hedge funds.

CONTINUE READING

| Wall Street climbs as euro plan details emerge | Demand drives Ford, Boeing results | S&P 500 |
|---|---|---|
| » More Top News | » More Top Videos | 12.40 |

S&P 500
12.40
1,241.45·
+1.01%

TR US
INDEX
1.54
113.14
+1.38%

**MOST POPULAR**

**Clues to Gaddafi's death concealed from public view**

**New risk for Occupy Wall Street: less media interest** | ▶ VIDEO

**Two young boys found locked in kennel in Nebraska home**

**Netflix Stock Plunge: Will Reed Hastings' Hubris Bring Down an Internet Meteor?**

**Eurozone aims to ramp up rescue fund, details deferred** | ▶ VIDEO

**UPDATE 6-Police scuffle with protesters in Oakland march**

**ANALYSIS & OPINION**



**Facebook makes us embrace creepy**
By Kevin Kelleher
We are learning to love Facebook's invasion of our private lives. We're learning to stop worrying that our faces, our thoughts, our conversations with family and friends are becoming data-mining fodder for advertisers.
Full Article

Herrup: Are firms really hijacking Wall St. protests?

» More Analysis & Opinion

**TODAY IN PICTURES**



**Editor's choice**
A selection of our best photos from the past 24 hours.

View Slideshow

Int'l Indices

NIKKEI
8,748.47

HANG SENG
19,066.54

» Markets

---

EDITION  US                                                                    Back to top

| Reuters.com | Business | Markets | World | Politics | Technology | Opinion | Money | Pictures | Videos | Site Index |
|---|---|
| Legal | Bankruptcy Law | California Legal | New York Legal | Securities Law |
| Support & Contact | Contact Us | Advertise With Us |
| Account Information | Register | Sign In |
| Connect with Reuters | Twitter   Facebook   LinkedIn   RSS   Podcast   Newsletters   Mobile |
| About | Privacy Policy | Terms of Use |

Thomson Reuters is the world's leading source of intelligent information for businesses and professionals

| Our Flagship financial information platform incorporating Reuters Insider | An ultra-low latency infrastructure for electronic trading and data distribution | A connected approach to governance, risk and compliance | Our next generation legal research platform | Our global tax workstation |
|---|---|---|---|---|

Thomsonreuters.com

About Thomson Reuters

Investor Relations

Careers

Contact Us

Thomson Reuters is the world's largest international multimedia news agency, providing investing news, world news, business news, technology news, headline news, small business news, news alerts, personal finance, stock market, and mutual funds information available on Reuters.com, video, mobile, and interactive television platforms. Thomson Reuters journalists are subject to an Editorial Handbook which requires fair presentation and disclosure of relevant interests.

NYSE and AMEX quotes delayed by at least 20 minutes. Nasdaq delayed by at least 15 minutes. For a complete list of exchanges and delays, please click here

Login or register                    Latest from
                                     My Topics

International Press Conference Advisory - Allegations Against J.M. Corporation - Possibl. Page 2 of 3

Case 1:19-cv-01624-RLW - Document 45 - Filed 11/2015 - Page 10 of 190

**86** Fraud case leaves California
Democrats scrambling

WATCHED

 Video purports to show
Gaddafi capture
Mon, Oct 24 2011

 Sirte bodies buried in mass
grave, Libya vows probe
Tue, Oct 25 2011

 Chinese robots display ping-
pong prowess
Sun, Oct 23 2011

U.S. MEDIA:

Robert R. Hopper & Associates: (763) 476-5809
robertr.hopper@gmail.com

Maddie Melendez: (202) 756-8530
mmelendez@lannyjdavis.com

EUROPEAN MEDIA:
Catherine Nicholls: +44-7789-644-979
catherine@tetra-strategy.co.uk

/PRNewswire -- May 10, 2011/

SOURCE Lanny J. Davis & Associates

Videos you may like:              by Taboola     Sponsored links

 **Deadly Afghan tanker blast**
Wed, Oct 26 2011

**MRSA Staff Infection?**
MRSA Staff Infection Facts & Myths.
What your doctor Won't Tell You.
www.staph-infection-resources.com

 **Shooting suspect in custody**
Thu, Oct 13 2011

**Arrested for Assault?**
Board Certified Attorneys with over 50
years of combined experience
www.hunesranchclub.com

 **Video purports to show
Gaddafi capture**
Mon, Oct 24 2011

**Medical Expert Witnesses**
Find the Right Injury Expert Matched to
Your Litigation Needs
www.RoundTableGroup.com

AdChoices ▷

Comments (0)

This discussion is now closed. We welcome comments on our articles for a
limited period after their publication.

Ads by Marchex

 5.7% per month in ETFs w/ Proven System
Trade Only 5-10 Minutes Per Night. Easier Than Forex or Options, No Hype/Fluff.
ETFtradingcourse.com

 Buying Gold Made Easy
Goldline - It's Simple To Buy Gold. FREE Gold Investment Kit -Act Now!
GoldlineGold.com

 Hot Penny Stock Up 32% -Next Pick Coming
Discover why smart investors are turning to Research Driven Alerts for hot picks
ResearchDrivenAlerts.com

 Home Insurance Quotes
Protect Your Home Today. Fast, Free & No Obligation Quotes.
www.QuoteWhiz.com/homeinsurance

## MORE FROM REUTERS

### Ex-Goldman director Gupta charged in insider case

NEW YORK - Rajat Gupta, who sat on the
boards of some of America's most prestigious
companies, was arrested and charged on
Wednesday with being the "illegal eyes and
ears" for his friend Raj Rajaratnam, the central

Login or register          Latest from
                           My Topics

TOP NEWS

 **Eurozone aims to ramp
up rescue fund, details
deferred**
BRUSSELS/ROME - Euro zone
leaders intend to multiply the
capacity of their rescue fund
around fourfold to one trillion euros but details of how they
plan to draw a line under Europe's worsening debt crisis will
not be nailed until next month, sources said | Video

Freddie Mac CEO to resign, regulator says

TOP VIDEOS


**German lawmakers back
Merkel**

MARKETS

US Indices

DOW
179.14
11,885.76
+1.53%

NASDAQ
19.96
2,658.38
+0.76%

**Exhibit B**

ft.com/frontpage  US    All times are London time

# FINANCIAL TIMES



**Surprisingly sturdy**
US Treasuries have had a banner year



**Is America Working?**
FT series: Job-devouring technology vs the worker

**Gillian Tett** Crisis fuels debate on capital controls
**Jeffrey Sachs** How America is strangling the state
**Gary Silverman** Bright lights, big political problems

Highlights    Short View: Retreat feared    Business locations in France    FT Seasonal Appeal: Sightsavers    In depth: Eurozone in crisis

From **GLOBAL ECONOMY** 10:01pm

## IMF chief warns over 1930s-style threats

### Lagarde speaks out against isolation



Noyer takes swipe at British economy    Business blog Noyer should behave like a central banker    Move to limit scope of eurozone treaty
Miliband content to wait for vindication

---

From **COMPANIES** 10:20pm

## RIM co-chiefs' salaries cut to $1 each amid crisis

Troubled group warns of delay in next generation of devices

Rival devices weaken the BlackBerry addiction
RIM warns of weak demand for PlayBook
RIM offers mobile management software

From **COMPANIES** 10:40pm

## Goldman runs into sukuk hurdle

Experts say bond structure might break sharia law

Banks savour sharia-compliant opportunity
Goldman to invest in US trading technology group

**GLOBAL MARKET OVERVIEW** from **MARKETS** 9:21pm

## Firmer euro and US data encourage bulls

Asian stocks drop back into 'bear' market territory

FedEx results boost Wall Street
Spain exceeds target in bond auction

From **WORLD** 7:27pm

## Spoils of Iraq war evade US and UK

Washington 'did not push hard enough' for investment

Changing of the guard in Iraq
US marks end to nearly nine years in Iraq
US troops leave Iraq with 'heads high'

---

### More news

Chirac convicted in corruption trial

SEC appeals judge's ruling on Citi settlement

Chiquita to stop use of tar sands oil

Deutsche Bank puts €2bn price tag on unit

Lehman estate sues for control of Archstone

### Video series: America's IT skills gap



The US jobless rate rises while demand for skilled workers remains high: is education failing American industry?

---

From **WORLD** 5:31pm

## Deal near on $200bn US stimulus

Fears ease over full-blown crisis caused by political gridlock

US jobless claims drop to three-year low    US Treasuries Surprisingly sturdy



From **COMPANIES** 10:40pm

## Corzine counters CME chief's testimony

Duffy repeats claim that former MF Global head knew of transfer

MF Global a concern of NY Fed since 2009    CME chief alleges Corzine aware of transfers    MF Global staff to maintain Corzine defence

From **COMPANIES** 2:55pm

## Morgan Stanley to cut 1,600 jobs

Employees in fixed-income unit likely to suffer significant lay-offs

Morgan Stanley books $1.8bn loss    Asian investors win right to sue Morgan Stanley



From **COMPANIES** 11:19pm

## Zynga IPO opens at top of price range

Offering values social network gaming group at $7bn

Michael Kors shares jump 21% on debut    Zynga eyes growth paths as IPO pricing looms

From **COMPANIES** 11:50pm

## Robinson to step down as NY Times chief

No immediate successor named at newspaper group

Women at the Top Janet Robinson    Digital subscriptions boost New York Times

Multimedia

**MATERIAL WORLD**



Michael Kors' successful IPO suggests that celebrity sells stocks as well as clothes

**MARKETS VIDEO**



Hernan Cristerna of JPMorgan and Adrian Cattley of Citi look back on the year's M&A deals

**WORLD WEEKLY PODCAST**



The eurozone crisis following Cameron's treaty veto - plus the Durban climate conference

# Exhibit C


**MinnPost.com**
A THOUGHTFUL APPROACH TO NEWS

## British firm says 3M sabotaged a superbug detecting device

**By Arundhati Parmar** | Published Tue, May 17 2011 8:43 am

A British company is alleging that diversified conglomerate 3M Co. sabotaged a device that it sold to the St. Paul company in favor of bringing 3M's own, more expensive solution to the market.

Five years ago, the Porton Group sold 3M a potential breakthrough device called the BacLite, which uses a special fluorescent light to detect the antibiotic-resistant superbug called the MRSA, according to a report by Fox News Twin Cities.

Porton Group had achieved 95 percent success in detecting MRSA in European clinical trials, but when 3M performed the trials, they were only 50 percent effective. The attorneys for the British company allege that 3M botched the trial by keeping the bacteria below body temperature. The company wants the U.S. Food and Drug Administration to investigate and for 3M to release internal documents.

The attorneys also charge that the reason 3M sabotaged the trial was because it was developing a more expensive molecular test to detect MRSA internally called the Simplexa and wanted it to be the first to reach the market.

However, a 3M spokesperson told Fox 9 that BacLite was "not fully developed and ready to market" and "failed to meet its label claims."

Meanwhile, the FDA has given a third company — Microphage, a Colorado company — approval for the first MRSA test in the United States.

According to the Mayo Clinic, MRSA first surfaced in hospitals where it was found to cause serious bloodstream infections often in people who were sick. Now there are varieties of MRSA that occur outside hospitals, too. These infections typically affect the skin of otherwise healthy individuals, such as student athletes.

Like what you just read? Support high-quality journalism in Minnesota by becoming a member of MinnPost.

Advertisement:

# Exhibit D

 **NEWS**

# UK POLITICS

---

**8 October 2011** Last updated at 17:48 ET

# PM demands Liam Fox MoD inquiry answers on Monday

**Prime Minister David Cameron wants the initial findings of a Ministry of Defence inquiry into Defence Secretary Liam Fox on his desk on Monday.**

Mr Fox has come under fire over claims about his working relationship with his best man, Adam Werritty, who has no official role in government.

On Friday, Mr Fox ordered a MoD inquiry into whether their relationship had breached the **ministerial code.**

Mr Cameron has now asked the cabinet secretary to examine the report.

The ministerial code requires ministers to ensure there is no conflict between their public duties and private interests.

Questions followed claims that the defence secretary gave Mr Werritty, 34, a former flatmate and best man at Mr Fox's 2005 wedding, access to the MoD and allowed him to go on foreign trips with him.

Mr Werritty also allegedly brokered a Dubai meeting in June with businessmen as Mr Fox was returning from a visit to British troops in Afghanistan.

The defence secretary and the businessmen reportedly discussed technology that allows service

personnel to make encrypted phone calls home.

The MoD said no officials had been present but one attendee at the meeting said he had been under the impression everyone had been security cleared. Mr Werritty had no such clearance.

The defence secretary was in Libya's capital, Tripoli, for talks with the Libyan National Transitional Council (NTC), on Saturday.

When questioned about the allegations regarding his links to Mr Werritty, Mr Fox said defence industry representatives had asked for the meeting in Dubai "when they happened to be sitting at a nearby table in a restaurant".

"It's not that unusual. But these questions are reasonable questions for people to ask and I don't mind that. That is what you get in a democratic society," he said.

Mr Fox said it was right for questions to be asked of his conduct, adding that was why he had asked for an inquiry and he "will stand by whatever the findings are".

However, later on Saturday, email correspondence **seen by the Guardian** appeared to call into question Mr Fox's version of events regarding the Dubai meeting by suggesting there had been a certain amount of planning to get it organised.

It prompted a spokesman for the defence secretary to clarify that Mr Fox had been referring to Mr Werritty and not himself having been at the impromptu restaurant meeting.

Shadow defence secretary Jim Murphy said "fresh questions" had been raised about the working links between Mr Fox and Mr Werritty.

"This issue has gone from being embarrassing to being controversial and has now moved way beyond that. This will cause alarm bells to start ringing even more loudly in Downing Street," Mr Murphy said.

He added: "The secretary of state's version of events appear to be unravelling and he now has even bigger questions to answer."

The MoD inquiry was initially commissioned by Mr Fox and is being carried out by the top civil servant at the MoD who had been due to report in two weeks.

As well as visiting Mr Fox's office 14 times in a year-and-a-half, the defence secretary confirmed on Friday that Mr Werritty used to carry business cards which said he was an adviser to Mr Fox.

He said he had told Mr Werritty it was "unacceptable" to carry such cards.

On Saturday **the Times suggested another business card had surfaced,** which it claimed Mr Werritty used to suggest he worked in Mr Fox's office in the Commons.

Cabinet ministers are allowed to appoint special advisers, with the rules about their role and the procedure outlined in the ministerial code. For example, all appointments require the prior written approval of the prime minister.

It is not clear whether Mr Werritty went through these steps before he called himself an adviser.

## More UK Politics stories



**UK 'to observe EU negotiations' [/news/uk-politics-16209414]**
The UK is asked to play a role in "technical discussions" over a proposed new EU fiscal pact despite refusing to sign up to the agreement.
**Labour wins Feltham by-election [/news/uk-politics-16187493]**
**Ex-MPs to repay expenses costs [/news/uk-politics-16203947]**



**BBC © 2011** The BBC is not responsible for the content of external sites. Read more.

**Exhibit E**

| From: | Harvey Boulter <Harvey.Boulter@portongroup.com> |
| To: | Harvey.Boulter@portongroup.com; WAB@bickelbrewer.com |
| Date: | 6/18/2011 3:16 AM |
| Subject: | Re: Harvey meet Bill - Bill meet Harvey. |

Dear Bill

I said I would write up the conversation from our side. As I said I would not normally be reaching out to you at this point however this morning, in dubai, I had 45 minutes with Dr Liam Fox, the British Defence Minister on our current favourite topic.

In summary, our dispute actually has little to do with the case in the Court, the opening statements are done and as discussed you will make headway next week as we will the week after. It is about losing face.

Government sold Acolyte to 3M after a great pitch that they were going to commercialise it. 3M, in their view, broke the trust relationship. It is unfortunate, on discovery, that George had his DNA on that decision and it now puts Gov in an awkward situation publicly.

As such they feel that you should do the right thing. I can tell you that even at USD20-25mn you will leave them not feeling great about the whole episode. In the end maybe your QC gets a judgement of GBP1mn - he will rightly tell you he got you a great result - a battle win - but 3M may lose the war (sorry figure of speech). It might leave Gov quietly seething, with ramifications for a while - they have memories like elephants.

At headline of $30mn+ you will allow MoD to internally save face. IF it were to settle 3M would need to do an immediate charm offensive - my recommendation. The British generally are silent when they are upset - I am sure you realise this.

Of course a settlement might not be possible, but as a result of my meeting today you ought to understand that David Cameron's Cabinet might very shortly be discussing the rather embarrassing situation of George's knighthood. It was discussed today. Government's are big and sometimes decisions in one part are not well coordinated.

I am being asked, and have been given the sole authority by the MoD to settle on behalf of them.

From next week monday there are politics that will likely remove any further chance of settlement. We will both be committed to the end.

From my side, I don't hold a grudge, whether this is $5mn or $35mn it is small beer. We manage $700mn and many of our investors call $5mn a rounding error.

I said to Dr Fox I would try, I have done so. I expect I know the answer.

With kind regards

Harvey

Harvey Boulter
CEO, Porton Group
Mobile: +97150 788 0588
E-Mail: harvey.boulter@portongroup.com

Empower your Business with BlackBerry® and Mobile Solutions from Etisalat

**Exhibit F**



**William Brewer**

**From:** Harvey Boulter <Harvey.Boulter@portongroup.com>
**To:** "wab@bickelbrewer.com" <wab@bickelbrewer.com>
**Date:** 6/19/2011 3:25 AM

Bill

I need to tell something to Dr Fox's office on Sunday night prior to the commencement of his week Monday.

I don't really want to give a 'radio silence' message as he is Secretary of Defence and will not expect that. I am trying to manage all the dynamics carefully, please let me know what if anything I can say.

Regards

Harvey

Harvey Boulter
CEO, Porton Group
Mobile: +97150 788 0588
E-Mail: harvey.boulter@portongroup.com

This email contains confidential information and is intended only for the intended recipient. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.

--- Scanned by eMail Protection Services
http://www.harding-group.com/eps.html ---

# Exhibit G

**From:**      "Lanny J. Davis" <ldavis@lannyjdavis.com>
**To:**        WAB@bickelbrewer.com; harvey.boulter@portongroup.com
**Date:**      6/17/2011 10:08 AM
**Subject:**   Harvey meet Bill - Bill meet Harvey.

Even if there is no settlement--which appears unlikely for now, as it appears the gap is too large (approx $34 million vs $14 m (maybe) all in, including legal fees - I still believe you two should meet each other next week in UK.

Perspectives on the case so far appear to be 180 degrees apart - we think Porton had good day and 3M a bad day yesterday when 3M presented its best defense, Bill thinks exactly the reverse - ie, it's Rashomon all over again.

However, I believe you should meet and talk because, first, you are both good people, no BS, and know how to do business, not just make arguments, and I am certain you will like each other; second, you can talk about me and not worry about hurting my feelings; and third, without offending the other, each of you can state your strongly held positions on the strength of the legal case of Porton and 3M, respectively, and perhaps, narrow the gap somewhat.

Harvey - I believe Bill is a great lawyer, nice guy, and whether you reach a number or not (and I know your meeting with UK Minister of Defense Dr Liam Fox has given you even stronger reason not to come down very in $34m position), I think your discussion can be productive -- at least better understanding the respective parties; perceptions.

So Bill - this email constitutes my waiver and consent as Porton's attorney to your meeting with my client's CEO without me being present.

Best wishes and good luck to you both--

Cell phones are below ---

Lanny

Harvey's cell: + 971 50 788 0588

Bill's cell: + (214) 704-3674

--- Scanned by eMail Protection Services
http://www.harding-group.com/eps.html ---

**Exhibit H**

**From:**     William Brewer
**To:**       Davis, Lanny J.
**Date:**     6/9/2011 9:32 AM
**Subject:**  Re: Response /Settlement 408 understanding

Lanny,

We gave it a shot.  We're not inclined to respond given the distance between us. See you in London.
We'll be at the Lanesborough.

Have a good flight.

Bill

>>> "Lanny J. Davis" <ldavis@lannyjdavis.com> 6/8/2011 11:37 PM >>>
Hi Bill -- just talked to Harvey Boulter. He  would rather litigate for anything less than $33 million total--
which is 60% of what he thinks the case is worth+70% of attorneys fees. Since he thinks his billionaire
Saudi investors want justice - a few million won't matter.

But never isn't a word I believe in. So let's keep talking--lets schedule call for Friday.

Regards,

Lanny--- Scanned by eMail Protection Services
http://www.harding-group.com/eps.html ---

# Exhibit I

# www.parliament.uk

───────────────────────────────────────────────

Site search

- [Accessibility](#)
- [Email alerts](#)
- [RSS feeds](#)
- [Contact us](#)

**Site search**

1. Search

[Search]

───────────────────────────────────────────────

**Primary navigation**

- [Home](#)
- [Parliamentary business](#)
- [MPs, Lords & offices](#)
- [About Parliament](#)
- [Get involved](#)
- [Visiting](#)
- [Education](#)

- [House of Commons](#)
- [House of Lords](#)
- [What's on](#)
- [Bills & legislation](#)
- [Committees](#)
- [Publications & records](#)
- [Parliament TV](#)
- [News](#)
- [Topics](#)

You are here: [Parliament home page](#) > [Parliamentary business](#) > [Publications and Records](#) > [Hansard](#) > [Commons Debates](#) > Daily Hansard - Written Answers
[Previous Section](#)
[Index](#)
[Home Page](#)

───────────────────────────────────────────────

## Housing Benefit: Greater London

**Mr Simon Burns:** Responsibility for delivering local health services lies with the national health service locally. The re-development of acute and community hospital facilities in Cumbria is a matter for the local NHS in Cumbria. Cumbria primary care trust and the north Cumbria university hospitals NHS trust are best placed to advise on the current position of any proposed developments locally.

## Human Papilloma Virus

**Sir Peter Bottomley:** To ask the Secretary of State for Health (1) if he will estimate the average cost to the NHS of treating a case of laryngeal papilloma; [42055]

(2) which wart viruses cause laryngeal papilloma. [42056]

**Anne Milton:** The genital warts that cause laryngeal papilloma are a result of the Human papilloma virus. Laryngeal papilloma is most commonly seen among young children and is transmitted from mother to baby at birth.

Information is not collected on the average cost to the national health service of treating a case of laryngeal papilloma.

## Leeds General Infirmary: Heart Diseases

**Julian Sturdy:** To ask the Secretary of State for Health what reports he has received on the future of the child heart surgery unit at Leeds General Infirmary. [42684]

**2 Mar 2011 : Column 496W**

**Mr Simon Burns:** A review of children's heart surgery services, known as the Safe and Sustainable programme, is being carried out within the national health service by the NHS national specialised commissioning team. We have been regularly updated on progress and briefed on the options for future children's heart surgery services which are due to go out to public consultation from 28 February until 1 July 2011. These options can be found at:

www.specialisedservices.nhs.uk/news/view/25

## MRSA: Screening

**Mr Watson:** To ask the Secretary of State for Health what assessment he has made of the capacity of methods of screening against the MRSA bacterium used by NHS hospitals to detect new strains of the infection; and if he will make a statement. [42983]

**Mr Simon Burns:** Many laboratory methods are available to national health service hospitals to detect Methicillin-resistant Staphylococcus aureus (MRSA) and these meet the European Commission standards for safety, quality and performance. NHS trust laboratories use simple tests to detect MRSA. These tests have been available for many years and are capable of detecting the emergence of a new MRSA on this basis.

## National Drug Treatment Monitoring System

# Exhibit J

1
2
3
4          INTERNATIONAL PRESS CONFERENCE
5             Wednesday, May 11, 2011
6           9:30 a.m. Central Daylight Time
7          Ivy Hotel, Minneapolis, Minnesota
8
9    Presenters:  Robert R. Hopper, Esq.
                  Lanny J. Davis, Esq.
10
11
12
13   Produced by:  James Woitalla, RDR
                   Sheila Smith, RPR
14
15
16
17
18
19
20
21
22
23
24
25

1          MR. HOPPER:  Okay.  Good morning.

2     I'm Randy Hopper.  I'm an attorney from

3     Minneapolis, and I represent the Porton

4     Group, a private equity fund based in

5     Dubai and in London, who were investors

6     in BacLite, which is the subject matter

7     of why we've called this press

8     conference this morning.

9          And in particular, what did 3M do

10    is the question, what did 3M do with

11    respect to the clinical trials on

12    BacLite after it bought the company from

13    Acolyte, which was the company created

14    by the British government and by Porton

15    Group to take the technology forward in

16    the detection of MRSA.

17         BacLite was -- and you're going to

18    hear more about this from my

19    distinguished colleague, Lanny Davis,

20    and my co-counsel in this matter, who is

21    from Washington, D.C., and you're going

22    to hear more from Lanny in a few moments

23    about exactly what happened factually in

24    this case.

25         But what I want to do is set the

1          backdrop for you on that, and I want to
2          be clear about what we're doing today.
3               We're announcing this morning that
4          we're filing a petition with the FDA.
5          That petition will be filed pursuant to
6          federal law.
7               The questions that are raised in
8          that petition are questions that we feel
9          that all stakeholders, not just the
10         investors and not just those who
11         invested their money in this venture,
12         but the public at large, because -- as a
13         stakeholder, because this issue related
14         to BacLite and the fact that this
15         product never made it to market raises
16         very serious questions of public health.
17              The reason it does is because, as
18         you may know, MRSA is a very widespread,
19         very, very serious problem, and it's an
20         issue of infection control, especially
21         in hospitals, and it's a problem that's
22         actually spreading at great speed.
23              BacLite was a product that was
24         based on technology developed by the
25         Ministry of Defense in the British

1          government.  That's why Porton Group,

2          our client, teamed up with the British

3          government to bring this technology to

4          market.

5               BacLite became state-of-the-art

6          technology at the time it was introduced

7          in the market, and then it obtained its

8          approvals from the EU for distribution

9          and sales in the UK and across Europe.

10              BacLite was the first rapid,

11         accurate, and economic diagnostic

12         medical device into the marketplace for

13         the detection of MRSA.

14              3M came along in 2006 and

15         essentially, you might say, put a

16         full-court press on Acolyte to sell the

17         business to them.  After a long series

18         of negotiations, Acolyte agreed to sell

19         the company to 3M because it felt that

20         3M had the best global reach through its

21         medical companies in order to introduce

22         BacLite to the US, Canadian, and

23         Australian markets.

24              One very pivotal, very critical

25         provision within the contract in the

1       buy/sell agreement with Acolyte was that

2       3M agreed to obtain the approvals in the

3       US market and in the Canadian and

4       Australian markets here from the FDA to

5       get the product to market.

6           The questions that we're raising in

7       the petition to the FDA are critical,

8       and they need answers.  They're

9       questions, as I mentioned a moment ago,

10      not only that the investors need, but

11      that the public needs.

12          The questions that need to be

13      answered are questions of what happened

14      during the clinical trial, why did 3M

15      not use the same comparative solution

16      that was used so successfully in the EU

17      and that was approved in the EU and,

18      very importantly, that once the product

19      was at market, was obtaining a

20      95-percent reliability results.

21          That's unbelievable success for a

22      medical device.  Some of you who know me

23      know that I've been involved in medical

24      device and drug litigation for close to

25      25 years and have dealt with all types

1          of defective medical products.

2               To have a product to be approved

3          into the marketplace, forgetting about

4          what you may think about the EU approval

5          system, when it -- as the old saying

6          goes, when the rubber met the road, that

7          was the result.

8               And furthermore, hospitals and

9          doctors were enthusiastic and elated

10         about the fact that they had BacLite

11         available to deal with this serious

12         problem of MRSA.

13              That's a question that we're asking

14         the FDA to answer, to have it provide,

15         to ask as a question and we want 3M to

16         answer, what happened in that clinical

17         trial and why did they decide to use a

18         different comparative solution as

19         compared to the one in the EU that was

20         found to be so successful.

21              Number two, another very important

22         question, what were 3M's financial

23         interests and what was their involvement

24         with FastMan/Simplexa?

25              As a part of the pre-approval

1          process at the FDA, when any applicant

2          submits a PMA or a 510(k), as it's

3          referred to under federal law, to seek

4          approval to get a medical device to

5          market, certain financial disclosures

6          have to be made.

7               Very critical, very critical to the

8          announcement that we're making today and

9          to the petition that we're bringing to

10         the FDA's attention is what did they

11         disclose to the FDA and what did the FDA

12         know about their involvement with

13         FastMan/Simplexa?

14              Because you've got to keep your eye

15         on the ball here.  There's a significant

16         relationship between BacLite and

17         FastMan/Simplexa, and I'm going to,

18         later, when I come back to the podium,

19         draw the connection there.

20              Lanny's going to come up now, and

21         Lanny's going to provide much of the

22         factual background to the situation that

23         we're dealing with on BacLite and why

24         we're going forward to file this

25         petition with the FDA.

1         Lanny Davis.

2         MR. DAVIS:  Good morning.  Facts

3    are stubborn things.  They can be

4    evaded, but they can't be deleted.

5         I'd like to welcome a

6    representative of 3M here today, who is

7    an attorney and who I have a great deal

8    of respect for as an attorney.

9         And the first two points on facts

10   that have been denied in this morning's

11   newspapers, I hope that we welcome the

12   response from the representative of 3M

13   to a fact that has been denied.

14        So in this morning's newspapers we

15   are told by a spokesperson for 3M that

16   3M did not refrigerate or incubate the

17   assay dish, or it's called a Petri dish,

18   testing to see whether there was a

19   presence of the superbug in the fall of

20   2007, when it was trying to obtain FDA

21   approval.

22        It said in the newspapers this

23   morning, "We did not refrigerate."

24        And, of course, our statement,

25   which is a fact, is that the 11-member

1          technical committee, in a report not

2          made public to this date by 3M of 3M,

3          stated that one of the reasons why the

4          3M tests received only 50-percent

5          reliability as opposed to the European

6          testing, which received European Union

7          approval to save lives using this

8          device, BacLite, which achieved

9          95-percent approval.

10             The question is, why 50 percent,

11         when 3M conducted these tests so that

12         Americans could get the benefit of this

13         detection system of this deadly superbug

14         versus -- 50 percent that 3M was only

15         able to achieve.

16             Well, we don't have to rely on

17         Porton, my client's, word on this.  We

18         can rely on the 11-member written

19         technical committee report, still

20         secret, still non-disclosed, which

21         found, according to the published

22         pleadings -- that's all I have available

23         to me -- filed in the United Kingdom as

24         part of the litigation, that the

25         committee found that the temperature of

1        the dish where the superbugs were
2        supposed to be growing in order to test
3        whether BacLite worked was incubated at
4        a temperature that was too low and
5        therefore impeded the growth of the
6        superbug.
7            Even a layperson knows that if you
8        put something at a temperature that's
9        too low, it may actually impede the
10       growth of what may be growing at 98.6 in
11       the human body.
12           Now, the newspaper report today
13       denied, denied that that had happened.
14       I haven't read the technical committee
15       report, because it has not been made
16       public, but I have read what 3M
17       attorneys have said on the issue.
18           And so I'm quoting directly from
19       paragraph 35, page 13, of the defense
20       put in by 3M, which is public, in the
21       United Kingdom.
22           So after the denial in today's
23       newspapers in Minneapolis that there was
24       any refrigeration problem, here's what
25       3M said, and I'm quoting:

1         "The testing carried out for and
2     reported in the BACLITE TECHNICAL
3     REPORT" -- that's in capitals, that is
4     the secret report not made public by 3M
5     -- "found evidence that running the
6     assay," which is the solution where
7     you're growing these superbugs, "at
8     35 degrees centigrade," which is below
9     the 37 degrees recommended, "affected
10    performance."
11        So we have 3M today in the
12    newspaper saying it didn't refrigerate
13    at all, much less denying that it
14    refrigerated at the wrong temperature,
15    at least implying that, and we have 3M's
16    lawyers saying that it was refrigerated.
17        The second fact that can't be
18    deleted or erased is the other line in
19    the newspapers this morning that this
20    was buyer's remorse -- that is, BacLite
21    didn't work.  After buying BacLite,
22    after Mr. George Buckley, the chairman
23    and the CEO personally was involved in
24    buying this product through an
25    intermediary and approaching the British

 1          Government that invented it, it was
 2          buyer's remorse.  They decided it didn't
 3          work very well.
 4               So fact:
 5               Fact one:  In 2007, on its Web
 6          site, 3M published, touting the
 7          reliability and effectiveness of the
 8          product that they now say didn't work.
 9          That's a matter of public record and is
10          in the documents that will be available
11          on the Web site.
12               And I'll be announcing -- perhaps
13          Randy will have the Web site available
14          for us to announce to everyone.
15               So, number one, 3M itself in 2007
16          touted the very product they're now
17          saying didn't work.
18               Number two, in November of 2007, in
19          Germany, at a conference led by a 3M
20          manager, it continued to tout the
21          effectiveness.
22               And guess what?  It cited the
23          results of the European Union test
24          results with 95-percent reliability at
25          the very moment that it was not getting

1          those results in its own testing because
2          of the problems that it had encountered
3          with the 50-percent reliability.
4                So in Germany it's telling
5          everybody 95 percent, the product works,
6          in November '07; while in America, in
7          November '07, it discovers that
8          50-percent reliability will never pass
9          muster.  That's a fact.
10               Fact three:  3M decided not to do
11         it again.  They're touting 95 percent in
12         Europe, they're touting the product
13         working in Europe; their own people, 11
14         of them, publish a report describing all
15         of the errors made in their testing that
16         led to 50 percent; they keep that report
17         secret, and then they decide not to try
18         again, a life-saving product.
19               So my question to my colleague in
20         and friend from 3M is, will you today
21         make public that technical report so
22         that the people of Minneapolis, the
23         people of America, and the people of
24         Europe can know what is in that report
25         and they can make the decision whether

1           or not the test results in America were

2           botched and whether or not in fact 3M

3           had a product that worked at a

4           95-percent reliability level and decided

5           not to market it and perhaps save lives

6           in America?

7                Will you make that report public?

8                (Pause.)

9                UNIDENTIFIED SPEAKER:  Are you

10          talking to me, sir?

11               MR. DAVIS:  Yes, I am, ma'am.

12               UNIDENTIFIED SPEAKER:  Mr. Davis,

13          we've never met before.  We've never

14          spoken before.  We've never been in the

15          same --

16               MR. DAVIS:  Are you from 3M?

17               UNIDENTIFIED SPEAKER:  I am not.

18          I've never been in same room with you

19          before.  I do not represent 3M in your

20          dispute.

21               You have made errors in your

22          assumptions, and I would appreciate you

23          stop harassing me and go on with

24          whatever presentation you want to make.

25               MR. DAVIS:  I apologize.

1           Is there anyone here from 3M?  I

2      was told that you were from the 3M

3      Corporation.

4           UNIDENTIFIED SPEAKER:  Then you had

5      incorrect information.

6           MR. DAVIS:  Are you from a news

7      organization?

8           UNIDENTIFIED SPEAKER:  No.

9           MR. DAVIS:  Who do you represent?

10          UNIDENTIFIED SPEAKER:  I don't have

11     to tell you.

12          MR. DAVIS:  You don't have to tell

13     me.

14          So we're in a room filled with the

15     media, and transparency is our

16     watchword, so we have somebody here who

17     is not a member of the press who I was

18     informed came from 3M.

19          So my apologies.  I'm sorry that

20     you don't choose to disclose why you're

21     here or who you're representing, but

22     that's your right.

23          So let me then address my question

24     not to you but to Mr. Buckley.

25          Mr. Buckley, if you're watching

1          television tonight, there is a technical

2          committee report that you've kept

3          secret.  You wanted to buy BacLite to

4          save lives.  In Europe, 95-percent

5          reliability found this superbug.

6              I interviewed a doctor from a major

7          hospital in the United Kingdom, with a

8          witness on the phone, who said the

9          following to me, Mr. Buckley:

10             "I used this product.  I found the

11         superbug.  I saved lives in my hospital.

12         And in the end of April -- in the end of

13         2008 a representative of 3M" -- your

14         company -- "came to me and pulled the

15         device out of my hospital even though I

16         said that I wanted to keep it, that it

17         worked, that it saved lives."

18             So the statement that this product

19         didn't work is contradicted by your own

20         literature that you posted in 2007 by

21         the testimony of this doctor and other

22         doctors.

23             And so my question, Mr. Buckley, is

24         will you release the technical committee

25         report by your own people that described

1          a test that could have saved lives had

2          you marketed this product in the United

3          States, that was being supervised by the

4          Food and Drug Administration and that

5          was described in this written report,

6          according to the public pleadings, as

7          having been botched by several errors,

8          including the use of the wrong

9          temperature in an incubator at below the

10         levels that were acceptable, including

11         the use of the wrong solution, that

12         achieved 95 percent in Europe, which was

13         originally proposed by FDA -- approved

14         by FDA after 3M proposed this same

15         solution that achieved 95 percent?

16              You changed that solution and used

17         a different one after FDA had approved

18         using the same solution that achieved

19         95 percent, and you achieved 50 percent.

20              So I ask once again, why not

21         publicly disclose?  We have somebody

22         here who I mistakenly thought was from

23         your company.  I would have welcomed you

24         having somebody here to describe to us

25         why keep that report secret.

1          So, finally, my message to anybody
2     listening is that we're not talking
3     about he says/she says, who's right in
4     litigation, and we're not talking about
5     people being evil or people acting in
6     bad faith.
7          We're talking about poor judgment,
8     and we allege that poor judgment was
9     used when the tests, according to the 3M
10    technical committee, were botched in the
11    United States so that American hospitals
12    don't have the benefit of this product
13    that can detect this deadly superbug
14    that killed more people than AIDS in the
15    last year.
16         And so we ask the Food and Drug
17    Administration, because it supervised
18    these tests, has jurisdiction, if
19    information was withheld from them,
20    misleading a federal agency; and we
21    suggest that the withholding of this
22    technical committee report from the FDA
23    constitutes potentially misleading the
24    FDA as to what really went wrong on
25    these tests.

1       We ask the FDA in the name of both

2       their own jurisdiction as well as in the

3       name of public health to investigate

4       this matter.

5       Thank you.

6       MR. HOPPER:  Thank you, Lanny.

7       I've been working as a lawyer and

8       I've been in this line of work for a

9       long time, 25 years.  I've been involved

10      in almost every major medical device

11      case and every major drug case in the

12      last 20 plus years.

13      Lawyers are very sensitive to

14      facts, as you heard my colleague say.

15      Facts guide us and facts lead us as

16      lawyers.  Facts are what are presented

17      to tribunals, to courts, and in this

18      case to the FDA, who had jurisdiction

19      over the application to bring a medical

20      device to market.

21      And as you heard my colleague say,

22      the facts are what we want to present

23      and go forward with here today.  And

24      what we're asking you is to take a hard

25      look at it and consider and see if you

1          draw the same conclusions that we're
2          drawing.
3               Because I think the facts speak
4          loudly here.  I think the facts here are
5          compelling and they're provocative.
6               And as lawyers, that's what we want
7          to do in this rightful, legally-based
8          approach to the FDA that we have.
9               We're asking the FDA, based on
10         federal law, to take this up with an
11         administrative proceeding.  We're asking
12         the FDA to hold a hearing in the matter.
13              In fact, we're asking the FDA,
14         pursuant to federal law, because they
15         have the opportunity and the right to do
16         so in their own regulations, to hold a
17         public hearing so that evidence and so
18         testimony can come forward and so the
19         facts can be presented to the proper
20         tribunal with the proper jurisdiction.
21              We're asking the FDA, pursuant to
22         federal law -- and there's a basis in
23         the regulations -- to investigate what
24         3M's financial dealings were with
25         respect to FastMan and Simplexa.

1          And we're asking the FDA to enter
2      into and engage in these international
3      cooperation agreements, which they've
4      had in place now since back as early as
5      2003, and renewed for various reasons
6      and for a distinct purpose with the EU
7      and the UK.
8          And when we go forward from here,
9      our clients are asking us to go to the
10     EU and to go to the UK and to petition
11     them and ask them to get involved, and
12     through these international cooperation
13     agreements they have a basis to
14     cooperate with the FDA in this
15     investigation.
16         So we're going worldwide with this,
17     and we're going to get to the bottom of
18     this and we're going to ask the FDA in
19     its jurisdiction to step in.
20         The jurisdiction has something
21     called "good clinical practice
22     guidelines," and they have something
23     called a "bioresearch compliance
24     monitoring program" specifically for the
25     purpose of looking at trials and looking

1           at the data and looking at the

2           performance and looking at the conduct.

3           That's where they have the oversight in

4           the role as a regulator, and we're

5           invoking that authority.

6               Everything we're doing here and

7           we're announcing today and as we're

8           going forward in this petition is based

9           on fact and not accusations, and it's

10          based on federal law.  And we're well

11          within the law and well within the

12          practice guidelines that a lawyer

13          undertakes to do this.

14              The British government and the

15          taxpayers, along with Porton Group, and

16          all those who have suffered from MRSA

17          who could have avoided exposure but for

18          the decision by 3M to abandon it and to

19          refuse to seek approval from the FDA,

20          we're going forward on their behalf,

21          too.

22              We're all looking for answers,

23          we're all waiting for answers to these

24          important questions.  We hope the FDA

25          will assert its jurisdiction and will go

1           forward and ask the questions.

2                These facts are compelling, these

3           facts are provocative.  Justice needs to

4           be done for the investors, for the

5           British government, for the British

6           taxpayers, and for the public at large.

7                So I believe on that point

8           Mr. Davis and I are -- we'd like to turn

9           this over to any questions that you may

10          have here from those members of the

11          media who are present today.

12               I welcome you.  I thank you for

13          taking your time to come and look at

14          very important matters.

15               So we're open for questions from

16          those here in the room at this point,

17          and then we're going to proceed to turn

18          it over to people who have questions who

19          are kind enough to call in from around

20          the world.

21               MR. LYDEN:  Mr. Hopper, do you

22          believe that 3M bought BacLite with the

23          simple intention of shutting it down

24          because they had Simplexa already in a

25          product line?

1          MR. HOPPER:  Well, that's exactly
2     what comes within the ambit of our
3     questions that we're providing to the
4     FDA.
5          We think that the FDA, who had
6     jurisdiction over the 510(k) approval
7     process, has within their rights and
8     under the law to find an answer to that
9     question.
10         We believe, we believe that there
11    is a very significant relationship
12    between 3M's apparent investment and
13    their involvement and their financial
14    interests in FastMan/Simplexa and with
15    the purchase of BacLite, and we want to
16    uncover more about what that
17    relationship was, what did 3M know, when
18    did they know it, what did they do, what
19    did they say, and what did they disclose
20    pursuant to mandate of law of FDA
21    regulation, and we're going the ask the
22    FDA to answer that.
23         MR. LYDEN:  A quick follow-up:  Did
24    Porton Group know that 3M had an
25    investment in FastMan/Simplexa?

```
 1            MR. HOPPER:  Lanny?
 2            MR. DAVIS:  Yes.  We knew about --
 3       Let's -- to explain to the
 4       listening audience around the world,
 5       there are three different -- and now
 6       more than three different technologies
 7       for finding the superbug.
 8            The FastMan product that you're
 9       referring to had been developed but not
10       perfected by 3M before they bought
11       BacLite.
12            The FastMan technology uses
13       molecular analysis in order to detect
14       whether it's a superbug, which is, by
15       the way, a staph infection immune to
16       antibiotic.  If you get it, it can kill
17       you.  And sometimes the only way to save
18       your life is to amputate limbs.
19            So we knew about that they were in
20       the process of developing it.  The
21       problem was it was too expensive for a
22       hospital to use.  No hospital could
23       afford to use the FastMan molecular
24       technology at the point that they bought
25       BacLite.
```

1           Now, BacLite uses

2    photofluorescence, believe it or not,

3    from the firefly.  The British

4    government Industry of Defense was

5    looking for ways to detect anthrax using

6    the technology of the firefly, how does

7    the firefly work its way into lighting

8    up.

9           And through that technology they

10   discovered they could detect this

11   superbug within five hours and do it

12   very inexpensively.

13          So the combination of rapidity and

14   inexpensiveness is what led Mr. Buckley

15   himself to send an intermediary to the

16   British government and Porton, the

17   equity investors -- the company was

18   called Acolyte -- and say, "We want to

19   buy you.  We're not going to pay you

20   much up front, but give us three years

21   and we'll sell your product and get

22   regulatory approval using diligence" --

23   that's the word they used in the

24   contract -- "and we will actively

25   market" -- those are the words they used

1          in the contract -- "and you'll get paid
2          over the next three years."
3               So they had FastMan in the process
4          of development.  It looks like they
5          wanted to buy BacLite as a transition
6          until they could finish their
7          development of FastMan.  I don't know
8          that; it just looks that way.
9               And now they have Simplexa, which
10         is a further advance, I am told by
11         reading their Web site, on the molecular
12         technology side.
13              Just recently, and in fact in the
14         last several days, another product has
15         been announced that uses viruses to
16         detect the superbug.
17              So five years ago we had the answer
18         with fluorescent light, and we still
19         think that it's an answer.
20              My question to 3M, I ask
21         Mr. Buckley to please reveal your
22         technical report.  Let me maybe ask --
23         you'll be more persuasive -- for you to
24         try to get the answer why didn't you
25         redo your tests?

1              In less than a year you had bought
2         this company, promising to actively
3         market for three years -- even if what
4         you said in the newspapers this morning,
5         meaning your spokesman, that this was a
6         bad product that didn't work, denying
7         your own literature and denying the
8         facts of what people were telling you in
9         their hospitals, why didn't you redo the
10        tests in November 2007?
11             And to really answer the most
12        compelling mystery to me is why couldn't
13        you at least wait until the end of your
14        contract before you announced a joint
15        venture with Quest, which I believe is a
16        local diagnostic company here in
17        Minneapolis, to develop FastMan?
18             That announcement, according to
19        3M's public papers filed in the UK
20        litigation, was made in May or June of
21        2009.  The purchase contract committed
22        to actively marketing this product to
23        the end of 2009; yet they couldn't wait.
24        They had to actually jump the gun and
25        announce the development of FastMan even

1           before their three-year commitment was

2           over.

3                And, finally, as to buyer's

4           remorse, let me point out that there was

5           some due diligence that a company like

6           3M is supposed to do about a product

7           before it buys.  That due diligence

8           looked at the results of the European

9           trials that achieved 95-percent

10          reliability.

11               And for us to be told in this

12          morning's newspapers that they

13          discovered the product wasn't any good

14          when they touted it throughout 2007, had

15          done due diligence, and then failed

16          achieve anything better than 50-percent

17          results and won't tell us the reasons

18          why because they're hiding the technical

19          report leads us to the suspicion that

20          they were motivated by other things

21          besides selling BacLite under the

22          contract.

23               MR. HOPPER:  Fred?

24               UNIDENTIFIED SPEAKER:  Mr. Hopper,

25          why don't you just sue 3M?  If you have

1          all the facts to back it up, then why

2          don't you just sue?

3               MR. HOPPER:  Well, we're looking at

4          all our options right now.  We're

5          meeting with our client not long after

6          this announcement today.

7               We want the FDA to assert its

8          jurisdiction, because it's a critical

9          partner in this on behalf of the public

10         and on behalf of the public health to

11         ask these questions that we're raising.

12              And we're going to look at that,

13         options related to litigation.  We know

14         how to do that.  We know how to go down

15         that path if that's the right path to

16         take, and our client will give us the

17         signal and direction if that's the way

18         he wants to go.

19              UNIDENTIFIED SPEAKER:  But you are

20         suing in Britain?

21              MR. HOPPER:  That litigation is

22         pending, has been underway and is

23         scheduled tentatively to go to trial in

24         the summer.

25              UNIDENTIFIED SPEAKER:  Is the issue

1          whether you have standing here in the US

2          because it's a Dubai/British concern?

3               MR. HOPPER:  No.  No, there's no

4          issue of standing.  We think there's a

5          way for a court to take jurisdiction

6          over 3M Corporation, who is domiciled

7          and has nexus with the US.

8               UNIDENTIFIED SPEAKER:  What if the

9          FDA denies your request?

10              MR. HOPPER:  It's within the FDA's

11         discretion to go forward and undertake

12         the investigation.  It's within their

13         discretion to do nothing.

14              But practice has it that the FDA

15         will provide us with some response as to

16         whether they will go forward or not.

17              But let me say this as a footnote

18         to that:  One of the most important

19         parts of this process and one of the

20         main reasons why this legally-based

21         vehicle is available to petition the

22         FDA, Reg, is because it creates an

23         opportunity for notice to the FDA, not

24         dissimilar to the way whistleblowers can

25         come forward and indicate to the

1       government where there may be fraud,
2       where those type of actions -- a qui tam
3       action, it's called legally -- that a
4       whistleblower lawsuit can be filed.
5           There are any number of avenues
6       like this, and it's within the purview
7       of the FDA to have created this
8       administrative petitioning process so
9       that people who have facts and who have
10      a reason to bring notice of things like
11      this can and do come forward to the FDA.
12          And we're taking -- we're taking
13      advantage of that opportunity, it's
14      within our rights to do that, and the
15      FDA has in its discretion the
16      opportunity to decide what to do with
17      it.
18          UNIDENTIFIED SPEAKER:  Mr. Davis
19      mentioned or referred to the blood test
20      the FDA just gave approval to, it's a
21      MRSA test, a couple days ago.
22          MR. HOPPER:  Right.
23          UNIDENTIFIED SPEAKER:  But I don't
24      want to put too fine a point on this,
25      but how important was it for someone to

1          be the first to market with a cheap MRSA
2          test?
3                MR. HOPPER:  Yeah.
4                UNIDENTIFIED SPEAKER:  And do you
5          believe this was the motive 3M had for
6          sabotaging, in your words, the 3M
7          clinical trials?
8                MR. HOPPER:  I believe you're
9          referring to the MicroPhage, Inc. --
10               UNIDENTIFIED SPEAKER:  Right.
11               MR. HOPPER:  -- blood culture test
12         that was just approved, I think, on
13         Friday or Monday, or the notice of it
14         was just made on Monday.
15               I think it's a great bellwether of
16         the fact that BacLite was ready to go
17         and in fact did go in the European
18         market and that it was ready to go but
19         for the 510(k) approval here in the US.
20               If you go back and search back
21         through articles in the scientific
22         literature and in the scientific
23         community journals, you'll see that the
24         only thing standing between BacLite and
25         the US market was the completion of the

1          clinical trial on BacLite.

2              And I think it's very, very telling

3          -- and that's why I use the word

4          "bellwether" -- I think it's a

5          bellwether in the fact that BacLite

6          would have been in the market and for

7          now on several years would have saved

8          many lives, potentially, of people who

9          were supposed to MRSA.

10             MR. DAVIS:  Let me just add the

11         coincidence of MicroPhage's

12         announcement.

13             First of all, we wish them well,

14         because they are in the US market and

15         they are announcing an innovative method

16         using viruses that reproduce themselves,

17         as I understand the quick reading

18         yesterday, that allow them to detect

19         MRSA within five hours.  Interesting

20         that it's the same number that BacLite

21         uses, within five hours.

22             We don't know how expensive

23         MicroPhage is.  I couldn't find the

24         price per patient.

25             And the great advantage of BacLite

1          is it's so inexpensive that the doctor
2          that I interviewed, with somebody on the
3          telephone taking notes -- and this is in
4          the literature that all of you have
5          under Tab G, there's notes from an
6          anonymous doctor -- he said, "Look, this
7          was so inexpensive to use, I could test
8          every patient before they were allowed
9          to be exposed to any other patient, and
10         within five hours I could know whether
11         they were carriers who could kill
12         somebody or not.  And if we found them
13         to be carriers, we would obviously
14         segregate them and keep them away from
15         everybody."
16             So MicroPhage has not indicated yet
17         whether it is comparable to BacLite in
18         price.  It looks like its comparable in
19         speed.
20             But a five-hour -- a five-year leap
21         ahead that would have occurred had 3M
22         gotten the FDA to approve by simply
23         redoing the tests that were done in
24         Europe and achieve 95 percent starting
25         in 2007, '8, '9, '10, and '11, thousands

1          and thousands and thousands of people

2          who died might be alive today had there

3          been a BacLite before MicroPhage.

4               And we don't yet know whether

5          MicroPhage is inexpensive enough to be

6          widely used, but we certainly, on

7          grounds of US public health, welcome the

8          MicroPhage development.  We're just

9          sorry that it wasn't BacLite.

10              I know the British government --

11              By the way, for those of you who

12         are 3M shareholders listening to this,

13         the British government is on record

14         extremely angry at the 3M Corporation's

15         behavior.  There is a quote in your

16         package from the CEO of a wholly-owned

17         subsidiary of the British Ministry of

18         Defense.

19              Now, UK sells a lot of products to

20         the British government.  It sells a lot

21         of products in Europe.

22              MR. HOPPER:  You mean US.

23              MR. DAVIS:  3M sells a lot of

24         products --

25              MR. HOPPER:  Right.

1          MR. DAVIS:  -- to the UK government
2     and in Europe.  The UK government has
3     expressed anger towards 3M for its
4     behavior.
5          And Mr. Pete Hotten, the CEO of the
6     wholly-owned subsidiary of the British
7     Ministry of Defense, expresses himself
8     very strongly on the record today saying
9     that 3M breached its obligation to its
10    partners.
11         So 3M can blame everybody and can
12    change the subject, but it can't avoid
13    the facts that its partners, the British
14    government, are angry with them; that
15    the test results were 50 percent when
16    they did the tests, 95 percent when the
17    European Union approved these tests; and
18    that their own people, 11 people, filed
19    a report that clearly indicated major
20    mistakes were made.
21         And if I were a 3M shareholder -- I
22    know there was just a shareholder
23    meeting recently in the city -- I would
24    have asked Mr. Buckley, "If you can't
25    get it right when in Europe they got

1          95 percent and the FDA approved using

2          the same approach used in Europe and you

3          decided to use a different approach and

4          then you couldn't even incubate at the

5          right temperature, how do we have faith

6          that you're going to be able to develop

7          other new products and take advantage of

8          this type of a potentially multi-billion

9          dollar market in detecting MRSAs?"

10             UNIDENTIFIED SPEAKER:  How much is

11         BacLite per patient?  It says in the

12         literature it's 7 Pounds.  Do you --

13             My conversion -- I'm off on my

14         conversion of Pounds to dollars.  What

15         is that per patient?

16             MR. DAVIS:  And those would be in

17         2007 Pounds.

18             UNIDENTIFIED SPEAKER:  So today --

19             MR. DAVIS:  It would probably be

20         about --

21             UNIDENTIFIED SPEAKER:  -- in

22         dollars --

23             MR. DAVIS:  Probably about 10 to 12

24         dollars per patient.

25             UNIDENTIFIED SPEAKER:  Per patient.

1          MR. DAVIS:  But the development of

2     BacLite, I am told by the people who

3     were responsible for the development of

4     BacLite, today would be reduced down to

5     a nominal -- I mean the original

6     developmental cost was much higher.  Now

7     it would be -- as we know, in all

8     technology the price drops; I am told

9     now that it would be a negligible cost.

10         Once the equipment is installed and

11    the kits are delivered and people are

12    trained and all those costs are sunk,

13    the actual cost of using BacLite is

14    switching on the light and waiting five

15    hours.

16         So the incremental cost today would

17    be -- would be quite small to a

18    hospital.

19         And Lord Ara Darzi of the House of

20    Lords issued a report recommending that

21    the entire national health system in

22    England pre-screen every patient for

23    MRSA.

24         And that report, that is in your

25    materials, would have been the basis for

1          widespread sales of BacLite had 3M not

2          failed so miserably in its testing.

3               And had 3M not pulled the plug in

4          2008 -- they had another year to go in

5          their contract -- even if you believe

6          them that they thought that this was a

7          bad product that customers didn't want,

8          notwithstanding their saying the

9          opposite on their own Web site, then why

10         give up so quickly?  You had another two

11         years to go.  Why not keep going?  Why

12         not redo the tests?

13              It's a life and death product.

14         MicroPhage obviously has seen the value

15         of this marketplace; why, 3M, did you

16         walk away and pull the plug?

17              That's why the British government

18         is so unhappy with you.  And they're a

19         pretty good customer, and Europeans are

20         pretty unhappy, who wanted this product.

21              "Why" is a very good question for a

22         public corporation to be required to

23         answer.

24              UNIDENTIFIED SPEAKER:  You've got

25         three calls in the queue on the phone.

1          MR. HOPPER:  Any other questions?

2          (No response.)

3          Thank you all again for coming here

4     today.  We have I believe questions over

5     the phone, so we'd like to turn this

6     over to the operator to queue those up.

7          OPERATOR:  At this time I'd like to

8     remind everyone in order to ask a

9     question, please press star and the

10    number 1 on your telephone keypad.

11         (Pause.)

12         Again, if you would like to ask a

13    question, press star 1 on the telephone

14    keypad.

15         (Pause.)

16         There are no questions queued up on

17    the phone at this time.

18         MR. HOPPER:  Thank you.

19         MR. DAVIS:  Wait a minute.

20         MR. HOPPER:  Yeah.

21         MR. DAVIS:  I wanted to announce to

22    everyone the Web site address for all

23    the materials, including the documents

24    that I have referred to that contradict

25    what 3M said today publicly, can be

1   found at the following Web site:

2   www.mrsa -- M-R-S-A -- hyphen,

3   Injustice, I-N-J-U-S-T-I-C-E -- dot com

4   -- www.mrsa-injustice.com.

5    And you will find on that Web site,

6   probably right now, the copy of the

7   letter sent to the FDA, the exhibit to

8   that letter which tells the factual

9   chronology and contains references to

10   documents.  The documents that are

11   referenced will be in a series of

12   lettered tabs from A through the letter

13   N, as in "Nellie," attached to

14   Exhibit A.

15    Thirdly, the citizens' petition

16   that Mr. Hopper has referred to that has

17   been filed with the FDA.

18    And finally, the press release that

19   we have sent out in which we make

20   allegations, voice suspicions, but make

21   no factual accusations of wrongdoing.

22    In fact, indeed, as you've heard me

23   today, I'm simply asking 3M not to admit

24   to wrongdoing, because we don't know

25   whether they did anything wrong.  I'm

1          asking Mr. Buckley personally turn the

2          lights on, go transparent, disclose

3          everything to the media, to the public,

4          to the FDA, and specifically the

5          technical advisory committee report as

6          to what happened and what went wrong in

7          November of 2007 so that today hospitals

8          do not have BacLite in America as a

9          product.

10          UNIDENTIFIED SPEAKER:  Mr. Davis,

11          you mentioned Mr. Buckley a couple times

12          by name.  But I'm just wondering, to

13          what extent do you believe he was

14          personally involved in this decision to

15          buy BacLite, to cancel the clinical

16          trial, or to not do another clinical

17          trial?  To what extent do you believe

18          that was Mr. Buckley's call that he was

19          making?

20          MR. DAVIS:  Well, I say

21          Mr. Buckley's name with great respect.

22          He is a -- a citizen of -- of the United

23          Kingdom.  He should be sensitive about

24          the reactions of the government of -- of

25          Great Britain.

1            And I think this was a personal --
2       we know, as a matter of fact, that he
3       contacted an intermediary to approach
4       the British government to sell BacLite
5       and the company that owned it, Acolyte,
6       along with our client, the equity
7       investors, that Mr. Buckley was
8       personally involved in initiating the
9       contact.  Beyond that, we don't know.
10           But as chairman and CEO of the
11      company, if he were the CEO of a company
12      where he got 50-percent reliability,
13      having invested money and promised an
14      important constituency, the British
15      government, and then broken his promise,
16      then he would have had to report to his
17      superior as to why that test was failed.
18           The problem in the 3M corporation
19      governance structure is that
20      Mr. Buckley's superior is Mr. Buckley.
21           He's the chairman and the CEO,
22      which is contrary to corporate
23      governance rules that most good
24      government -- corporate governance
25      experts will say is a bad thing -- not

1           because Mr. Buckley is a bad person,
2           he's a good person -- but because
3           everybody needs a check and a balance.
4               And there should be a different
5           chairman and CEO, in the views of some
6           experts of corporate governance.   In
7           this case, we know that Mr. Buckley
8           presided over, was the CEO at the time
9           that the plug was pulled after one year,
10          a little more than a year.   We were
11          notified, "We're getting out of the
12          market," even though they promised a
13          three-year, quote, active market.
14              Their excuse was, as we read in
15          today's papers, it was a bad product.
16          But, as I said, they contradicted that
17          when they posted their own Web site
18          materials, and the evidence contradicts
19          that.
20              But in any event, Mr. Buckley was
21          involved in soliciting and convincing
22          the British government and our equity
23          client investors to sell BacLite on the
24          promise that 3M would in good faith
25          "actively" -- was the word used --

1          market and to get regulatory approval

2          with "diligence" -- that was the word

3          used -- in the United States, Canada,

4          and Australia.

5              And we know they failed in the

6          United States, and didn't redo.  They

7          never even tried in Canada.  They never

8          even tried in Australia.  They just

9          pulled the plug in a little more than a

10         year.

11             Thank you all.

12             MR. HOPPER:  Thanks.

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit K

# POLITICO

## Lanny Davis under fire from 3M

By: James Hohmann and Dan Berman
July 22, 2011 06:11 PM EST

Lanny Davis, one of Washington's best-known damage-control experts, is playing defense himself, caught in an overseas imbroglio marked by charges and counter-charges of industrial espionage, libel and even blackmail.

Just months after Davis battled questions over his representation of an Ivory Coast strongman, industrial giant 3M is coming after him, saying he's part of a conspiracy to force the Minnesota-based company to pay millions of dollars to settle a lawsuit.

One of the company's accusations: that Davis's client Harvey Boulter threatened to scuttle the planned knighthood of 3M's CEO.

"Davis' track record … reveals his willingness to take on whatever client is willing to pay him top dollar, apparently with little concern for whether his public statements are, in fact, true," 3M states in a **complaint** filed in New York on Thursday. "It now appears that Davis' unprincipled approach was precisely what the Boulter Defendants sought in their campaign against 3M."

Davis, who represented former President Bill Clinton during the Monica Lewinsky scandal, says he was just doing his job to defend a client he felt was wronged by 3M.

"It's all untrue. It's all just scurrilous personal attack and the lawyer that wrote the complaint didn't even do his homework to find the public facts that contrast the allegations," Davis told POLITICO. "It's about changing the subject and personally attacking someone and it's not anything more than that.

"I only take clients where I can tell the truth, put the facts out. That's what I do for a living, ever since President Clinton," he added.

The New York Times first reported on the lawsuit against Davis. In 2007, 3M purchased a product called BacLite, a diagnostic test for the hospital bacterial infection called MRSA. The product was initially developed by a subsidiary of the British Ministry of Defense and jointly owned with Porton Capital. They sold BacLite with the belief that 3M would develop and market it, and the sales agreement entitled them to a cut of the revenue if the product took off.

But 3M discontinued efforts to sell BacLite the next year on the grounds that it wasn't commercially viable. After it did not push for regulatory approval in the U.S., Porton accused 3M of not being diligent and sued for damages.

Enter Davis, a fixture on cable TV who has developed a reputation for his willingness to work for controversial clients. Last December, he stopped representing the illegitimate leader of the Ivory Coast after 10 days as the U.S. government heightened pressure on the regime.

"What I do for a living is crisis management," Davis said. "So people ask me, am I sorry that I defend people that are in trouble having a hard time getting the facts out? No. Is that a controversial line of work? Yes. But I think I have the ability to get facts out and do it successfully."

He added, "It means sometimes I'm part of the controversy because I'm trying to help."

Porton hired Davis as an outside counsel, and he immediately went to work, writing a column attacking 3M CEO George Buckley for ditching a "life-saving device."

On May 11 he held a press conference in Minneapolis to announce the filing of a "citizen's petition" with the Food and Drug Administration that called for an investigation into 3M's clinical trials of BacLite. And on June 13, Davis issued a press release touting the "international pressure" on the conglomerate to "come clean" over pulling the plug on BacLite.

Davis also helped create a web site called **mrsa-injustice.com** with links to his statements and the FDA petition.

William A. Brewer III, a partner at Bixel & Brewer and counsel for 3M, said Davis is leading "a frenzied effort to mislead the public." He added, "Naturally, we find the publicity campaign tasteless and terribly inappropriate."

But as Davis ratcheted up pressure, he said 3M reached out to him about settlement negotiations. In his telling, the company was willing to pay in the low $20 million range to make the problem go away but his client wanted in the $30 million range.

Davis brokered an introduction between Boulter, the Porton CEO, and Brewer, the 3M lawyer.

"I rarely let my clients talk to opposing lawyers without me being on the phone, but we have a confidentiality agreement and you're an adult so go ahead and make the call," Davis said he told Boulter.

Not long before the exchange, it was announced that the Queen would bestow knighthood upon the British-born CEO of 3M, George Buckley.

Enter Minister of Defense Liam Fox. In a June 18 email Boulter wrote to Brewer that he had a 45-minute meeting in Dubai with Fox. Settling for $30 million, Boulter explained, would allow Fox to "save face." Even if 3M won in court, Boulter wrote that Buckley might "win the battle" but "lose the war."

"Of course a settlement might not be possible, but as a result of my meeting today you ought to understand that [Prime Minister] David Cameron's Cabinet might very shortly be discussing the rather embarrassing situation of George's knighthood," Boulter wrote. "It was discussed today. Government's [sic] are big and sometimes decisions in one part are not well coordinated."

That threat has 3M screaming mad.

"It appears that there has been a well-orchestrated campaign to pressure 3M into paying tens of millions of dollars – a campaign which apparently culminated in the demands that were placed upon the company during the weekend of June 18, 2011," Brewer, 3M's lawyer, in a statement.

Davis said he did not read the email before Boulter sent it, and he didn't think twice about it until he learned about the blackmail lawsuit from the Guardian newspaper.

3M lawyers note that the email did not explicitly say it was confidential. Even if it did, that kind of email wouldn't be legitimate or protected under applicable law, they argue.

Lee Wolosky, who is representing Davis, the Porton Group and its CEO, Boulter, has already filed a motion to dismiss the New York **complaint.**

"The last resort of litigants who face an uphill battle is to create distractions, that's what's happening here," said Wolosky, a partner with Boies, Schiller & Flexner.

For his part, Boulter has filed a defamation claim against Buckley and Brewer, accusing both of libeling him. He demands "an unequivocal apology for the deliberate mischaracterization of a good faith settlement discussion."

The private equity boss calls it "patently absurd" that he could interfere with Buckley's knighthood.
"As far as I am aware the only other person to have lost a knighthood was Robert Mugabe, the dictator in charge of Zimbabwe, so I doubt Mr. Buckley has too much to worry about at this stage," Boulter said in a statement. "I leave it to others, of course, to decide whether Mr. Buckley deserves a knighthood."

Fox, the Minister of Defense, has distanced himself from the whole matter. The ministry told the Guardian last month that Fox and Boulter met about something else entirely. "At no point did he enter into any discussion about this legal case, nor was there any mention of anyone's knighthood," the ministry told the paper.

Davis said in an interview that the subject came up "at the very end."

Meanwhile, with his reputation under fire from 3M over the Ivory Coast, Davis defended his work, saying that, in fact, he represented not Gbagbo personally, but the country's ambassador in Washington. Davis noted that then-State Department spokesman P.J.Crowley had praised Davis' work, and that he resigned from the account after 10 days because Gbagbo refused to take a call from President Barack Obama.

When it came to 3M, though, Davis' PR campaign rubbed one established victims group the wrong way.

Jeanine Thomas, founder of the Chicago-based MRSA Survivors Network, balked when someone she had never heard of emailed her out of the blue to ask if she'd come to London to protest against 3M outside the courthouse for not developing BacLite.

"I'm really upset about anybody trying to use [MRSA] victims, or [MRSA] advocates, because we've had to fight for our legitimacy," she said. "It was just very distasteful."

A protest was held outside the courthouse on the day that legal proceedings in the case began, and pictures of less than a dozen young demonstrators in matching "MRSA JUSTICE" T-shirts were posted on the website created by Davis.

The **caption** described them as "a group of people affected" by MRSA, including "people who had lost family members to the injection."

Thomas, in turn, called them "pretend protestors."

"Everybody was suspicious of what was happening there, that that was not a true protest," she said. "Everyone in the UK and myself, we suspected that those were not true protestors. Where were they before that? Nobody had seen them. …They're not legitimate, and they're only used for certain purposes."

For his part, Davis points out that Thomas's group has received money from 3M.

"She's not disclosing and she's not being transparent," he said. "Ask her to disclose all her members…We are completely transparent…Our web site was put up by us as a place for people like you to go so that I don't have to go email you all the things I've done in the past."

Thomas said 3M sponsored MRCA awareness days the last two years, but she hasn't taken any money since early 2010. Thomas added she's not taking either side in the legal dispute.

© 2011 POLITICO LLC



**Exhibit L**



**PROGRESSIVE**   **GET YOUR FREE QUOTE NOW!**   Enter ZIP Code: [        ] Get Your Free Quote

Wednesday 26 October 2011 | Blog Feed | All feeds

Website of the Telegraph Media Group with breaking news, sport, business, latest UK and world news. Content from the Daily Telegraph and Sunday Telegraph newspapers and video from Telegraph TV.

[ Submit Query ]

- Home
- News
- Sport
- Finance
- Comment
- Blogs
- Culture
- Travel
- Lifestyle
- Fashion
- Tech

- Dating
- Offers
- Jobs

- UK
- World
- Politics
- Obituaries
- Education
- Earth
- Science
- Defence
- Health News
- Royal Family
- Celebrities
- Weird News

Blogs Home » News » Politics » **James Kirkup**

# James Kirkup

**James Kirkup is a Political Correspondent for the Daily Telegraph and telegraph.co.uk. Based at Westminster, he has been a lobby journalist since 2001. Before joining the**

**Telegraph he was Political Editor of the Scotsman and covered European politics and economics for Bloomberg.**



# Liam Fox on Adam Werritty: I was wrong and I am sorry

By James Kirkup Politics Last updated: October 9th, 2011

83 Comments Comment on this article

This statement has just been issued by Liam Fox, the Defence Secretary, regarding his dealings with Adam Werritty.

Statement:

*"I accept that it was a mistake to allow distinctions to be blurred between my professional responsibilities and my personal loyalties to a friend. I am sorry for this.*

*"At no stage did I or my Department provide classified information or briefings to Mr Werritty or assist with his commercial work – let alone benefit personally from this work.*

*"Nevertheless, I do accept that given Mr Werritty's defence related business interests, my frequent contacts with him may have given an impression of wrongdoing, and may also have given third parties the misleading impression that Mr Werritty was an official adviser rather than simply a friend.*

*"I have learned lessons from this experience.*

*"I accept that with the benefit of hindsight I should have taken much greater care to ensure that any meetings with Adam Werritty, at which defence and security related issues were raised, were properly attended by officials and recorded – to protect myself and the Government from any suggestion of wrongdoing.*

*"With respect to my meeting with Mr Boulter in Dubai in June 2011, I accept that it was wrong to meet with a commercial supplier, without the presence of an official.*

*"I have apologised to the Prime Minister and agreed with my Permanent Secretary to put in place new procedures to ensure that this does not happen again.*

*"My Permanent Secretary will report her interim findings to the Cabinet Secretary tomorrow. It is important that this process is allowed to run its course. I will answer all questions in the House of Commons."*

(Statement ends.)

This raises a great many questions, which we'll explore elsewhere.

In the meantime, I can't decide whether this is a last, desperate roll of the dice by someone who thinks the game is up, or the act of a man who confidently believes he's drawing a line under a media row. I'm leaning towards the latter interpretation, but the judgement that counts comes tomorrow.

X Share & bookmark

Delicious

Facebook

Google

Messenger

Reddit

Recent Posts

Twitter

- Europe's financial crisis. The end of an era?

Digg   October 26th, 2011 16:58

115 Comments

Fark  • EU referendum: David Cameron's troublesome children

October 26th, 2011 16:26

LinkedIn  8 Comments

- Col Gaddafi is dead. David Cameron gets his man

Google Buzz  October 20th, 2011 16:01

124 Comments

StumbleUpon  • Liam Fox: I blame the media

October 19th, 2011 16:41

Y! Buzz  54 Comments

What are these?  • Liam Fox resigns: where does the MOD go from here?

October 14th, 2011 17:21

- Share: Share  -

31 Comments

X Share & bookmark

Recommend  4

8

Share  0

1

Facebook

Google

Messenger

Reddit

Twitter

Digg

Fark

LinkedIn

Google Buzz

StumbleUpon

Y! Buzz

What are these?

Share:

- _
- _
- _
- 8
- Recommend 4
- **Share** 0
- 1

DISQUS

comments powered by DISQUS

## OUR NEWS BLOGS

- Celebrities
- Defence
- Education
- Environment
- Health and lifestyle
- Pictures
- Politics

- Religion
- Royal family
- Society
- Sport
- US politics
- World



BIG SAVINGS FOR YOUR SMALL BUSINESS WITH USPS APPROVED POSTAGE SOLUTIONS

CLICK HERE

TO LEARN HOW TO REDUCE YOUR MAILING COSTS

**Archives**

Select Month

**News bloggers**

- **UK Politics**
- Norman Tebbit
- Benedict Brogan
- Peter Oborne
- James Kirkup
- David Hughes
- Mary Riddell
- Janet Daley

- Ed West
- Brendan O'Neill
- Cristina Odone
- Katharine Birbalsingh
- Jenny McCartney
- Iain Hollingshead
- Geoffrey Lean
- Richard Landes

- Andrew Gilligan
- Graeme Archer
- Robert Colvile
- John McTernan
- Neil O'Brien
- Daniel Knowles
- Sebastian Payne
- Will Heaven

- **Other news**
- Damian Thompson
- Andrew M Brown
- Tom Chivers
- Toby Young
- James Delingpole

- **US Politics**
- Toby Harnden
- Tim Stanley
- Nile Gardiner
- Melissa Whitworth
- Jon Swaine

- **Foreign**
- Con Coughlin
- Richard Spencer
- Peter Foster
- Rob Crilly
- Michael Weiss
- Praveen Swami
- Danielle Demetriou

## News Tags

afghanistan  animal welfare  Barack Obama  BBC  Boris Johnson  china  climate change  Climategate  coalition  Conservative Party  Conservatives  David Cameron  david miliband  Ed Balls  Ed Miliband  eu  euro  Eurosceptic  General Election 2010  George Osborne  George W Bush  global warming  gordon brown  Hillary Clinton  Iran  Islam  Israel  Ken Livingstone  labour  Liberal Democrats  Libya  Margaret Thatcher  Michael Gove  NHS  Nick Clegg  phone hacking  Pope Benedict XVI  referendum  Sarah Palin  tea party  tony blair  twitter  US politics  vince cable  William Hague

## News Topics

- David Cameron
- Liberal Democrats
- Conservative Party
- Labour Party
- Barack Obama
- Pictures

- Defence
- Climate Change
- Royal Wedding
- Religion
- China
- Afghanistan

Back to top

- News
- Politics
- World News
- Obituaries

- Travel

- Health
- Jobs

- Sport
- Football
- Cricket
- Fantasy Football

- Culture

- Motoring

- Dating

- Finance
- Personal Finance
- Economics
- Markets

- Fashion

- Property
- Crossword

- Comment
- Blogs
- My Telegraph
- Letters

- Technology

- Gardening
- Telegraph Journalists

- Contact Us
- Privacy Policy
- Advertising
- A to Z

- Tickets

- Announcements
- Reader Prints
-

-
- Follow Us
- Apps
- Epaper
- Expat

- Promotions
- Subscriber
- Syndication

© Copyright of Telegraph Media Group Limited 2011

Terms and Conditions

Today's News

Archive

Style Book

Weather Forecast

# Exhibit M

# Exhibit N

# The Telegraph



## Damian Reece
We should worry about what they haven't discussed in Brussels



## Jeremy Warner
Can the European ideal survive?



## A Evans-Pritchard
Thank you Germany



## Ian Cowie
95pc of private sector pensions have no inflation protection at all

# Liam Fox denies involvement in dispute between 3M and Porton Capital

Defence Secretary Dr Liam Fox has denied any involvement in the alleged $30m (£18.4m) blackmail of US technology giant 3M by private equity firm Porton Capital.



Dr Fox initially said he had not discussed the $41m legal dispute during a trip to the Middle East.



By Jonathan Russell (http://www.telegraph.co.uk/journalists/jonathan-russell/)

5:45AM BST 09 Aug 2011



Comment (http://www.telegraph.co.uk/finance/8689691/Liam-Fox-denies-involvement-in-dispute-between-3M-and-Porton-Capital.html#disqus_thread)

The move came as the Cabinet Minister was forced into an embarrassing about turn over earlier denials he had discussed the legal dispute between 3M and Porton Capital with the head of the private equity firm Harvey Boulter.

Dr Fox initially said he had not discussed the $41m legal dispute with Mr Boulter during a trip to the Middle East. However he was forced to reverse his position after a national newspaper presented him with two witness statements confirming the two men had met in a Dubai hotel where the issue was raised.

Following this June meeting, Mr Boulter wrote two emails to the lawyer representing 3M in which it is alleged he threatened that the UK Government could reconsider the knighthood granted to 3M's British chief executive Sir George Buckley if the case was not settled.

It is also alleged he threatened 3M, which has extensive business interests in the UK, that failure to settle the case would leave the UK Government "seething, with ramifications for a while...".

In legal filings the line is interpreted by 3M as a threat to "interfere with 3M's ability to do business with the British Government."

Liam Fox rebuffs defence spending criticism (http://www.telegraph.co.uk/news/uknews/defence/8678814/Liam-Fox-rebuffs-defence-spending-criticism.html)

Russia resurrects criminal investigation against whistleblower Sergei Magnitsky (http://www.telegraph.co.uk/finance/financial-crime/8678130/Russia-resurrects-criminal-investigation-against-whistleblower-Sergei-Magnitsky.html)

10 years in prison for Germany's 'Mini-Madoff' (http://www.telegraph.co.uk/finance/financial-crime/8655763/10-years-in-prison-for-Germanys-Mini-Madoff.html)

Macmillan forced to pay £11.2m over African deals (http://www.telegraph.co.uk/finance/financial-crime/8655750/Macmillan-forced-to-pay-11.2m-over-African-deals.html)

Alstom UK directors refused SFO challenge (http://www.telegraph.co.uk/finance/financial-crime/8635717/Alstom-UK-directors-refused-SFO-challenge.html)

London banker second to face insider trading charge (http://www.telegraph.co.uk/finance/financial-crime/8682361/London-banker-second-to-face-insider-trading-charge.html)

The email correspondence was revealed in legal documents published in the US.

The legal dispute involves a 2007 deal in which 3M bought technology developed by the Ministry of Defence that it was claimed could detect MRSA superbugs.

The deal which involved Porton Capital would have led to significant earn-out fees if the technology had been commercialised, something 3M decided not to do, after deciding it was not viable.

Porton Capital sued 3M over money it claimed it was owed under the earn-out agreement. 3M has countersued against Porton Capital, Mr Boulter and his PR Lanny Davis alleging defamation and extortion.

William Brewer, partner at US lawfirm Bickel & Brewer representing 3M said: "3M has significant business interests in the UK and, therefore, is committed to finding out what Mr Boulter meant when he referenced those interests in his e-mails.

"If Mr Boulter and Dr Fox did, in fact, discuss this case during their meeting, we would like to know if Dr Fox was aware of the demands that Mr Boulter placed upon 3M."

Porton Capital declined to comment.

A spokesman for the Ministry of Defence said: "Dr Fox was in the UAE on official business transiting through from a visit to British Forces in Afghanistan and undertook a number of Gulf media engagements while there. During their meeting Mr Boulter disclosed his involvement in a legal case as a matter of propriety, but Dr Fox did not enter into a discussion about this in any respect and at no point raised or discussed the issue of a knighthood."

© Copyright of Telegraph Media Group Limited 2011

# Exhibit O



&curren;🖶 PRINT THIS

## As Trial to Begin This Week, Pressure Increases on 3M to Come Clean About Failure to Market Life-Saving Medical Technology

LONDON, June 13, 2011 /PRNewswire/ -- International pressure is mounting on multinational conglomerate 3M to disclose the motives and background behind its decision to suspend testing and marketing of a potentially life-saving medical device.

The UK Government begins legal proceedings against the Dow 30 firm this week to seek damages of up to 41m pounds Sterling for breach of contract. And a former British Defense Minister has joined global calls for the company to explain why it failed to honor a commitment to commercialize BacLite, a rapid and affordable device for detecting MRSA developed by the UK Ministry of Defense.

Former Defense Minister and MP for West Bromwich East Tom Watson is calling for "transparency" in the High Court of Justice's proceedings, due to commence on Wednesday 15th June.

BacLite uses a type of fluorescent light to detect the presence of the 'superbug', and has achieved 95% reliability in European medical trials. It was commercially launched in 2005 by Acolyte Biomedica, a public/private venture between the investment group Porton and the MoD's civilian research arm Ploughshare Innovations.

Acolyte founder Bill Mullen emphasized BacLite's ability to detect MRSA in five hours "before it was able to spread and infect others within the hospital." The device's rapid detection was in contrast to most existing technology that took "at least one if not two days."

3M purchased BacLite in 2007, committing to obtaining US Food and Drug Administration approval and marketing the device globally. Instead the company used a new and mismanaged experimental protocol under which BacLite's reliability plummeted. 3M subsequently refused to retest BacLite and pulled it from the market.

An internal 3M investigation identified numerous flaws in the experiment's design and implementation. Ploughshare's CEO Pete Hotten commented on his company's disappointment that "3M Corporation failed to get an excellent diagnostic technology into the market, through what 3M's own officials describe as avoidable mistakes."

Among other lapses, an internal 3M investigation discovered that the company's scientists incubated test samples at 35C rather than 37C, the temperature of the human body. The storage temperature alone, according to Hong Kong Acolyte investor Jeevan Hingorani, "raises concerns... as to [3M's] sincerity, from the very outset, in performing their contractual obligations."

The High Court proceedings will see the Ministry of Defense's civilian research arm, Ploughshare Innovations, and a group of private investors claiming damages from 3M.

Commenting on the case, Tom Watson MP said: "This is clearly a matter of public interest, both in terms of public health and also in terms of the potential earnings lost to the UK taxpayer from sales of this product.

"For this reason, I urge the court to ensure full transparency throughout the legal proceedings in the coming weeks, allowing all documentation and evidence to be made public.

"The British public has a right to know why such an important, potentially life-saving UK product became obsolete as a result of 3M's failure to re-do those vital FDA trials."

Many involved in the case have already gone further.

Philip Fletcher Wilson, CEO of Millennium Investment Corporation went further, ascribing the decision to shelve



BacLite to "3M's bad faith" and suggesting that the company "had obligations to the investors that they evaded." He pointed out that "many senior investors across a wide range of industries in Japan" were exposed and would not soon forget the behavior.

Wilson's views have been echoed widely by other Acolyte investors, including Omran Mohd Saleh Al Musawi. Mr. Musawi described 3M's behavior as "dishonourable and in bad faith."

For Media Enquiries Contact: Catherine Nicholls at +44 7789 644 979 or Charles Cook at +44 7710 910 563 or Josh Block  in the US, 202/756-8293

SOURCE Lanny J. Davis & Associates

Back to top
RELATED LINKS
http://www.davis-block.com

**Find this article at:**
http://www.prnewswire.com/news-releases/as-trial-to-begin-this-week-pressure-increases-on-3m-to-come-clean-about-failure-to-market-life-saving-medical-technology-123761319.html

☐  Check the box to include the list of links referenced in the article.



# Exhibit P



EDITION: U.S.

Register | Sign In    Search News & Quotes    Sub

| Home | Business | Markets | World | Politics | Technology | Opinion | Money | Life & Culture | Pictures | Video |

SPDR
STATE STREET GLOBAL ADVISORS

*Precise in a world that isn't.*    ▶ SPDR  LEARN MORE

**ARTICLE**



ERIN BURNETT
*OUTFRONT*
NEW TO PRIMETIME
WEEKNIGHTS
7ET
CNN

# International Press Conference Advisory -- Allegations Against 3M Corporation of Possible "Negligence and Recklessness" in Testing of Proven "Superbug"/Staph ("MRSA") Infection Detection Device -- U.S. FDA Investigation and

\* Reuters is not responsible for the content in this press release.

Tue May 10, 2011 2:43pm EDT

International Press Conference Advisory – Allegations Against 3M Corporation of Possible "Negligence and Recklessness" in Testing of Proven "Superbug"/Staph ("MRSA") Infection Detection Device -- U.S. FDA Investigation and Public Hearings Sought

PR Newswire

May 10

**MORE REUTERS RESULTS FOR:**
"infection detection device reuters may 10 2011"

**Follow Reuters**

Facebook    Twitter    RSS    YouTube

**READ**

1 Italian deputies in fist fight over reforms
   8:02am EDT

2 Nazi jokes, wrath at Germans highlight Greek despair
   8:42am EDT

3 Worst California biker feud in decade erupted at Starbucks
   3.12pm EDT

4 New risk for Occupy Wall Street: less media interest
   ▶ VIDEO
   25 Oct 2011

5 Steve Jobs Wanted Jon Stewart to Help Prove Fox News Was 'Incredibly Destructive'
   6:05am EDT

**DISCUSSED**

291  Obama to announce help on housing, student loans

159  Gaddafi captured as he fled Sirte: NTC official    Latest from My Topics

Login or register

WHEN:    WEDNESDAY, MAY 11th

9:30 AM (0930) CENTRAL DAYLIGHT TIME

10:30 AM (1030) EASTERN DAYLIGHT TIME

3:30 PM (1530) U.K. TIME

CALL-IN NUMBERS:

U.S. CALLERS: 1-866-690-4243

EUROPEAN CALLERS: 1-707-595-2672

BACK-UP IF DIFFICULTY CALLING IN: 1-612-548-3440

WHERE:    Hotel Ivy, Mozart Room, 201 South 11th Street, Minneapolis, MN 55415

WHO:    Robert R. Hopper, Robert R. Hopper & Associates, Minneapolis, MN

Lanny J. Davis, Lanny J. Davis & Associates, Washington, D.C. (Former White House Special Counsel)

SUBJECT:    ALLEGATIONS AGAINST 3M CORPORATION OF POSSIBLE "NEGLIGENCE AND RECKLESSNESS" IN TESTING OF PROVEN ANTI-"SUPERBUG"/STAPH ("MRSA") INFECTION DETECTION DEVICE – U.S. FOOD AND DRUG ADMINISTRATION INVESTIGATION AND PUBLIC HEARINGS SOUGHT

*LETTER TO U.S. FDA PLUS PUBLIC PETITION FOR INVESTIGATION AND HEARINGS AND DOCUMENTS SUPPORTING ALLEGATIONS TO BE RELEASED AND POSTED AT www.MRSA-INJUSTICE.com*

FOR FURTHER INFORMATION CALL:

figure in a broad U.S. crackdown on insider trading at hedge funds.

CONTINUE READING

**MOST POPULAR**

**Clues to Gaddafi's death concealed from public view**

**New risk for Occupy Wall Street: less media interest** | ▶ VIDEO

**Two young boys found locked in kennel in Nebraska home**

**Netflix Stock Plunge: Will Reed Hastings' Hubris Bring Down an Internet Meteor?**

**Eurozone aims to ramp up rescue fund, details deferred** | ▶ VIDEO

**UPDATE 6-Police scuffle with protesters in Oakland march**

---

Wall Street climbs as euro plan details emerge

» More Top News

---

**ANALYSIS & OPINION**



**Facebook makes us embrace creepy**
By Kevin Kelleher
We are learning to love Facebook's invasion of our private lives. We're learning to stop worrying that our faces, our thoughts, our conversations with family and friends are becoming data-mining fodder for advertisers.
Full Article

Herrup: Are firms really hijacking Wall St. protests?

» More Analysis & Opinion

---

Demand drives Ford, Boeing results

» More Top Videos

---

**TODAY IN PICTURES**

**Editor's choice**
A selection of our best photos from the past 24 hours.

View Slideshow

---

S&P 500
12.40
1,241.45·
+1.01%

TR US
INDEX
1.54
113.14
+1.38%

Int'l
Indices

NIKKEI
8,748.47

HANG
SENG
19,066.54

» Markets

---

EDITION  U S

Back to top

Reuters.com        Business | Markets | World | Politics | Technology | Opinion | Money | Pictures | Videos | Site Index

Legal              Bankruptcy Law | California Legal | New York Legal | Securities Law

Support & Contact  Contact Us | Advertise With Us

Account Information Register | Sign In

Connect with Reuters   Twitter    Facebook    LinkedIn    RSS    Podcast    Newsletters    Mobile

About              Privacy Policy | Terms of Use

---

Thomson Reuters is the world's leading source of intelligent information for businesses and professionals.

Thomsonreuters.com

About Thomson Reuters

Investor Relations

Careers

Contact Us

Our Flagship financial information platform incorporating Reuters Insider

An ultra-low latency infrastructure for electronic trading and data distribution

A connected approach to governance, risk and compliance

Our next generation legal research platform

Our global tax workstation

Thomson Reuters is the world's largest international multimedia news agency, providing investing news, world news, business news, technology news, headline news, small business news, news alerts, personal finance, stock market, and mutual funds information available on Reuters.com, video, mobile, and interactive television platforms. Thomson Reuters journalists are subject to an Editorial Handbook which requires fair presentation and disclosure of relevant interests.

NYSE and AMEX quotes delayed by at least 20 minutes. Nasdaq delayed by at least 15 minutes. For a complete list of exchanges and delays, please click here

Login or register          Latest from
                           My Topics

**86**     Fraud case leaves California
           Democrats scrambling

WATCHED



Video purports to show
Gaddafi capture
Mon, Oct 24 2011



Sirte bodies buried in mass
grave, Libya vows probe
Tue, Oct 25 2011



Chinese robots display ping-
pong prowess
Sun, Oct 23 2011

U.S. MEDIA:

Robert R. Hopper & Associates: (763) 476-5809
robertr.hopper@gmail.com

Maddie Melendez: (202) 756-8293
mmelendez@lannyjdavis.com

EUROPEAN MEDIA:
Catherine Nicholls: +44-7789-644-979
catherine@tetra-strategy.co.uk

/PRNewswire -- May 10, 2011/

SOURCE Lanny J. Davis & Associates

Videos you may like:                    by Taboola     Sponsored links



**Deadly Afghan tanker blast**
Wed, Oct 26 2011

**MRSA Staff Infection?**
MRSA Staff Infection Facts & Myths.
What your doctor Won't Tell You.
www.staph-infection-resources.com



**Shooting suspect in custody**
Thu, Oct 13 2011

**Arrested for Assault?**
Board Certified Attorneys with over 50
years of combined experience
www.hunesranchclub.com



**Video purports to show
Gaddafi capture**
Mon, Oct 24 2011

**Medical Expert Witnesses**
Find the Right Injury Expert Matched to
Your Litigation Needs
www.RoundTableGroup.com

AdChoices ▷

Comments (0)

This discussion is now closed. We welcome comments on our articles for a
limited period after their publication.

Ads by Marchex



5.7% per month in ETFs w/ Proven System
Trade Only 5-10 Minutes Per Night. Easier Than Forex or Options, No Hype/Fluff.
ETFtradingcourse.com



Buying Gold Made Easy
Goldline - It's Simple To Buy Gold. FREE Gold Investment Kit -Act Now!
GoldlineGold.com



Hot Penny Stock Up 32% -Next Pick Coming
Discover why smart investors are turning to Research Driven Alerts for hot picks
ResearchDrivenAlerts.com



Home Insurance Quotes
Protect Your Home Today. Fast, Free & No Obligation Quotes.
www.QuoteWhiz.com/homeinsurance

MORE FROM REUTERS

## Ex-Goldman director Gupta charged in insider case

NEW YORK - Rajat Gupta, who sat on the
boards of some of America's most prestigious
companies, was arrested and charged on
Wednesday with being the "illegal eyes and
ears" for his friend Raj Rajaratnam, the central

Login or register          Latest from
                           My Topics

TOP NEWS



**Eurozone aims to ramp
up rescue fund, details
deferred**
BRUSSELS/ROME - Euro zone
leaders intend to multiply the
capacity of their rescue fund
around fourfold to one trillion euros but details of how they
plan to draw a line under Europe's worsening debt crisis will
not be nailed until next month, sources said | Video

Freddie Mac CEO to resign, regulator says

TOP VIDEOS



**German lawmakers back
Merkel**

MARKETS

US Indices

DOW
179.14
11,885.76
+1.53%

NASDAQ
19.96
2,658.38
+0.76%

# Exhibit Q

# Exhibit R

# BBC NEWS

## UK POLITICS

# Liam Fox row: Werritty 'described as a special adviser'



ADVERTISEMENT

The official BBC News Android App
DOWNLOAD FOR FREE

**11 October 2011** Last updated at 11:35 ET

Help

A businessman who met the defence secretary through Adam Werritty says the meeting would not have taken place if he had known Mr Werritty was not connected to the MoD.

The Porton Group's Harvey Boulter told the BBC he met Mr Werritty in April in Dubai, and at the end of the "pre-planned" meeting, Liam Fox "walked through the lobby... [Mr Werritty] introduced me to him, I shook his hand".

Civil servants are investigating the conduct of the defence secretary and are expected to look at why Mr Werritty accompanied him on many overseas visits - despite having no official role.

## Read More

Fox row 'distracting MoD staff'

**US & Canada**

   

Tear gas fired at US protesters    The disappearing island    Protest too 'noisy and unsanitary'    O
G

**World**

   

Hunt for survivors in quake rubble    Severe floods hit northern Italy    Thai PM: Floods threaten all Bangkok    Br
Eu

**Business**

   

Euro problems and legal issues explained    George Soros on euro crisis    Why this is crunch day for eurozone    Dr
co

**Science & Technology**

   

Javan rhino 'extinct' in Vietnam    Site helping threatened crayfish    Nokia bets on Windows Phone future    Bc
de

**Entertainment**

   

David Attenborough on global warming    Alcohol blamed for Winehouse death    Can Bollywood take on Hollywood?    Sp
fil

**UK**



**MoD reclaims fallen soldier's pay**



**Nelson's letter to be auctioned**



**Queen opens new Melbourne Hospital**



**Predictions for top Christmas toys**



BBC © 2011 The BBC is not responsible for the content of external sites. Read more.

1

2

3

4

5

6

7

8

9

10

11

12

13     Liam Fox row: Werritty 'described as a special adviser'

14

15

16

17

18

19

20

21

22

23

24

25

1               INTERVIEWER: When did you first meet

2   Mr. Werritty?

3               HARVEY BOULTER: Uh, I first met him in,

4   uh, April of 2011, uh, at a meeting in the

5   Shangri-La, for about an hour in the lobby.

6               INTERVIEWER: Was that a chance meeting?

7               HARVEY BOULTER: Uh, no, it was pretty

8   planned. It was organized by, uh, a political

9   lobbying group in London called Tetra Strategy.

10  Uh, they knew Adam and, uh, had offered him, uh,

11  as--as a--a meeting for me as a--he--he was

12  offered up as a special advisor to Dr. Liam Fox.

13              And, uh, would be helpful, uh, for me

14  to meet with him. And so I organized the meeting

15  when he arrived into, uh, Dubai in the Shangri-

16  La. Had about an hour with--uh, an hour with him.

17              INTERVIEWER: And--and, uh, did you get

18  the impression that he was a man that, uh, you

19  know, you could, uh--you could business with and,

20  uh, that he had the ear of the defense secretary?

21              HARVEY BOULTER: Well, uh, absolutely,

22  in regard of his ear to the, uh, defense

23  secretary. I mean, he was presented to me through

24  Tetra as a special advisor to Dr. Fox. He

25  presented himself as an advisor to Dr. Fox.

Page 3

1          You know, I had a meeting where he was

2   absolutely engaged on the topics I was discussing

3   with him and, at the end of the meeting, uh,

4   yeah, Fox walked through the lobby, and I shook

5   him by the hand, you know, quick handshake,

6   introduction, you know. And so, for me, without

7   doubt, you know, he was, you know, what he said

8   he was on his card, an advisor to Dr. Fox.

9          INTERVIEWER: Did money pass hands for

10  that meeting?

11          HARVEY BOULTER: No, it didn't. Uh, and

12  you wouldn't have expected it to. I mean, you

13  know, uh, you--you don't pay advisors to

14  government ministers. So the topic of money never

15  came up at all. Uh, uh, you know, with--with

16  hindsight, you know, it, uh, does beg the

17  question how he is paid. Uh, but certainly there

18  was no suggestion of money from his side, uh, to

19  my--you know, or--or--or from me.

20          INTERVIEWER: Yeah. But pres--but

21  presumably, uh, you--you pay the PR company to

22  facilitate a meeting with someone who you thought

23  was a special advisor to the secretary for

24  defense.

25          HARVEY BOULTER: Well, I paid them for

1    political lobbying. I was, uh, in litigation, uh,

2    with 3M. Uh, and I was fighting a case wi--with,

3    uh, the Ministry of Defense, or one of their

4    subsidiaries.

5                    Uh, and, uh, because of the UK taxpayer

6    implications, we decided to hire a political

7    lobbyist to help us with, you know, government

8    relations and media relations. We're not experts

9    in that; they were. Uh, and so I put them on

10   retainer for a period of time to help me--help

11   guide me through that process.

12                   INTERVIEWER: And, uh, did you know of

13   Werritty beforehand?

14                   HARVEY BOULTER: Uh, no, I--I didn't. I

15   hadn't come across him--uh, him at all.

16                   INTERVIEWER: Was there anything in his

17   demeanor that suggested he wasn't a--a special

18   advisor, [CHUCKLES] and was just a good friend?

19                   HARVEY BOULTER: No, uh, absolutely not.

20   I mean, you know, we--we discussed topics of

21   relevance to the UK Ministry of Defense. One was

22   a voice encryption technology, uh, for welfare

23   calling for UK troops overseas, and the other was

24   a bit of litigation where I am the co-claimant

25   with a--an--uh, an entity that is owned by the

1    Ministry of Defense.

2                    So, uh, uh, absolutely, it was, uh, MoD

3    business that we were there discussing. Uh, so no

4    hint that he wasn't anything other than what he

5    said, uh, he was at the outset.

6                    INTERVIEWER: If you had known that he

7    wasn't a special advisor, would it have been

8    appropriate for you to be having that

9    conversation, in the sense that, you know, I

10   mean, presumably, some of this technology you're

11   discussing about the encryption of calls so that

12   soldiers can ring families at home from

13   Afghanistan without fear of being targeted by the

14   Taliban--I mean, that's presumably quite

15   sensitive stuff.

16                    HARVEY BOULTER: Yeah. I mean, uh, if

17   I'd known that he--he wasn't a--a part of the

18   Ministry of Defense, then the meeting would've

19   probably never happened in the first place, uh,

20   to be very honest.

21                    Uh, but certainly the discussion

22   topics, you know, are sensitive. You--it's not

23   right to say that they're classified; that's a

24   technical term, uh, defined by UK government. But

25   they are very sensitive.

Page 6

1              You know, the technology has enormous

2     capability. Uh, it operationally secures voice

3     communications. We have a number of sensive--

4     sensitive customers that we do not talk about.

5     Uh, you know, and, uh, yeah, it wouldn't have

6     been appropriate to have had that, uh, level and

7     detail level of conversation with somebody who

8     was, you know, not, uh, a government, uh--a

9     government employee.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Gotham Transcription states that the preceding

2   transcript was created by one of its employees

3   using standard electronic transcription equipment

4   and is a true and accurate record of the audio on

5   the provided media to the best of that employee's

6   ability.  The media from which we worked was

7   provided to us. We can make no statement as to

8   its authenticity.

9

10                  Attested to by:

11

12

13                  Sonya Ledanski Hyde

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit S

# Independent.co.uk

Exclusive:

# Fox feels heat as new claim casts doubt on MoD denial

Liam Fox faces damaging new questions over friend's role

By Oliver Wright, Whitehall Editor
*Saturday, 8 October 2011*

Adam Werritty, a self-styled adviser and former flatmate of Liam Fox, arranged a meeting with the Defence Secretary for a company interested in selling technology to the Ministry of Defence, The Independent has been told. .

The meeting, which took place in a Dubai hotel without any officials present, apparently centred on voice encryption technology which the company, the Porton Group, was interested in demonstrating to the MoD.

The alleged subject of the meeting suggests that Mr Werritty, who was Mr Fox's best man, was able to arrange access to the minister for private companies on matters where they could gain commercially. It also seems to contradict statements by the Ministry of Defence which suggested Mr Werritty had never been involved in official MoD business.

"Mr Werritty's meetings with the Secretary of State have concerned entirely private matters, not to discuss MoD business," they said.

Under the terms of the Ministerial Code, "ministers must ensure that no conflict arises, or could reasonably be perceived to arise, between their public duties and their private interests".

Harvey Boulter, CEO of the Porton Group, told The Independent that he had retained the services of a lobbying firm for media advice as part of a legal dispute his company was involved in which indirectly involved the MoD.

The firm, Tetra Strategy, put him in contact with Mr Werritty – who was described as an adviser to Mr Fox – to see if it might be possible to arrange a meeting with Mr Fox to discuss the case.

"Tetra suggested a meeting with Adam Werritty because he was an adviser to Mr Fox. They figured I might be able to meet with Mr Fox if Adam Werritty sanctioned it.

"It was: meet the adviser. If you get through the adviser you get to see the boss and then I might be able to persuade him to say something publicly positive about the case."

But at that meeting Mr Boulter says he also raised a voice encryption technology product which one of his companies had developed and was interested in selling to the MoD.

He suggested to Mr Werritty that he would like to show the technology directly to Mr Fox.

"At the meeting [in April] Mr Werritty agreed that Cellcrypt was interesting. He said he would speak to the boss. He came back in June and I met him again and he said, I will organise a meeting with the boss."

That meeting, according to Mr Boulter, took place in June at the Shangri-La Hotel in Dubai where Mr Fox was staying on official business. It included three representatives from Porton as well as Mr Fox and Mr Werritty – but no officials from the MoD were present.

Mr Boulter said 90 per cent of the meeting was about the Cellcrypt voice encryption technology – and included a demonstration for Mr Fox of how it worked. He confirmed that he was interested in selling the technology to the MoD.

"It was – this is what the technology is, this is how it works, this is the strength of it. We did a demonstration for him so he could do a voice encrypted call in Dubai, which he did. We also talked about some of the customers which we have."

Asked what he thought the role of Mr Werritty was, Mr Boulter said: "I one hundred per cent thought that he was an adviser to Mr Fox.

"He produced this card the first time I met him which said he was an adviser to the Rt Hon Dr Fox. And in the meeting he was sitting next to the minister so you wouldn't question it.

"You would never go to the guy and say 'are you really who you say you are' because he's sitting there next to the minister. I honestly didn't question it. I was very surprised when I learnt he didn't have security clearance because I assumed he was an adviser to Mr Fox which is what it said on his card. I had no reason not to believe that. You can sort of imagine someone pretending to be an adviser to Mr Fox – but then they would never get near the man would they? Anyone can print a business card, but sitting next to him in a meeting you assume he is what he says he is on his card."

Mr Fox has been accused of putting national security at risk by allowing Mr Werritty access to the Ministry of Defence, even though he is not employed by the Government.

It also emerged last night that Mr Werritty used Mr Fox's office in Parliament, before he became a minister, as the official headquarters of a rightwing charity, the Atlantic Bridge, that he ran and which Mr Fox was also involved with. Parliamentary answers have revealed that Mr Werritty visited Mr Fox at the MoD 14 times in the space of 16 months. Mr Werritty also joined the Defence Secretary on an official visit to Sri Lanka, despite Mr Fox having previously said Mr Werritty did not travel with him on official visits overseas.

Speaking yesterday, the Labour MP John Mann said: "This whole visit was organised by the British high commission, quite appropriately, but the photograph of Werritty in Sri Lanka with Fox at the time is a photo [from] the British high commission, that's hugely significant. An official high commission photo, obviously of an event that they were involved in organising, part of the official visit, and Adam Werritty was there."

He added: "Unless Mr Werritty was there as a tourist, visiting the tourist sites, then he's obviously there on business. If he's there on business, why is he in an official event photograph by the British high commission with his close friend Liam Fox, our Defence Secretary? He's either there as a tourist – in which case what a coincidence and why is he at official events? – or he's there on business."

Tetra Strategy confirmed that it had put Mr Boulter in contract with Mr Werritty but had no further involvement with either party.

The MoD declined to comment.

**Troublesome Advisers**

**William Hague and Michael Ashcroft**

*When Hague was shadow Foreign Secretary in 2005-10, he was accompanied on visits to at least 12 countries or overseas territories by Lord Ashcroft, who never held a position on the Tories' foreign affairs team. Hague faced questions about Ashcroft's tax status and whether he was using these trips for his own purposes.*

**Tony Blair and Lord Levy**

*Levy was Blair's special envoy to the Middle East for nine years, and acted unofficially as Labour's major fundraiser. It was the latter activity that led to a police investigation into the supposed award of peerages in exchange for donations. The charge never stuck.*

**Tony Blair and John Birt**

*The former head of the BBC was brought into Downing Street in 2001 as an unpaid adviser who was supposed to do "blue skies" thinking. His main contribution was to suggest a network of toll motorways, an idea immediately squashed by Alistair Darling when he took over as Transport Secretary in 2002. After a few years, Birt found another job.*

**Margaret Thatcher and Alan Walters**

*Walters was Thatcher's favourite economist and advised her how to deal with the recession in 1981 before leaving for an academic post. He vehemently opposed the idea of tying sterling to European currencies. When he returned to Downing Street in an unofficial capacity in 1989, Nigel Lawson objected so strongly that Walters resigned and went back to the US.*

**Margaret Thatcher and David Hart**

*During the 1984-85 miners' strike Hart, who inherited a huge fortune, drove around the coalfields on an unpaid mission to encourage strikebreakers. Late in 1985, he claimed to be acting for Thatcher when he aggressively lobbied the US government to place a huge order with British firms, but she disowned him and his pass to the Conservatives' annual conference was taken away.*

**Michael Portillo and David Hart**

*Ten years after Thatcher had washed her hands of Hart, John Major resigned, daring any member of his cabinet to run against him in the resulting leadership election. Hart took over a house in Westminster and installed phone lines so that Portillo would have a campaign headquarters. But Portillo decided not to run.*

---

**©independent.co.uk** Terms & Policies | Privacy Policy | Email newsletter | RSS | Contact us | Syndication | Advertising Guide | Subscriptions | Jobs | Evening Standard | Homes & Property | London Careers | Novaya Gazeta (English)

# Exhibit T



Send a release
Member sign in
Become a member
For journalists
For bloggers
Global sites

**Search**                       Advanced Search

⚬ Products & Services   ⚬ News Releases

Products & Services          Knowledge Center          Browse News Releases          Contact PR Newswire

See more news releases in: Banking & Financial Services, Biotechnology, Health Care & Hospitals, Medical Pharmaceuticals, Legal Issues

**Featured Video**

# 3M Forced to Pay for Breach of Obligations Over MRSA - High Court

  

LONDON, November 7, 2011 /PRNewswire/ --

Note: numbers in square brackets relate to
- paragraphs in the Judgment.

Harvey Boulter is available for interview.

Investment fund manager Porton Group and the Ministry of Defence subsidiary Ploughshare Innovations* today won a court battle with 3M over the multi-national company's failure to promote a test for the "superbug" MRSA.

The High Court in London found 3M was "in material breach of its obligation" under an agreement to actively market the product, BacLite.  [218]

Porton Group CEO Harvey Boulter said:- "I am delighted that we have been vindicated in our attempt to force 3M to face up to their responsibilities.

"But the victims here are those infected with MRSA. A weapon in that fight was wrongfully abandoned by 3M.

"This is a question of trust and honour which in my opinion seems to have been sadly lacking in 3M's behaviour.

"The Judge has made it quite clear that 3M did not live up to its promises."

BacLite detects MRSA within 5-6 hours, a rapid detection time that could save lives around the world.

Judge Mr Justice Hamblen awarded Porton Capital Technology Funds, Porton Capital Inc and the Ministry of Defence's technology development arm, Ploughshare Innovations Ltd (hereafter "MoD"), damages of approximately $1.3 million ($1,299,808) in compensation.

The Judge also said that Porton and the MoD had not been unreasonable when they objected to 3M's decision to shut down the project on December 31 2008, just a day before a 12-month earn-out period, under which the sellers would be paid part of the profits, began. [233(8)]

The issue dates back to February 2007 when 3M agreed to buy a company called Acolyte Biomedica - part-owned by Porton and MoD - set up to exploit the BacLite technology.

The price was £10.4 million in cash with up to £41 million to be paid based on worldwide sales of BacLite in 2009, including the UK.

3M convinced Acolyte that 3M had the medical device expertise and the global sales and marketing expertise to take over successful sales of BacLite worldwide and specifically in four major markets - the EU, including the UK, the US, Canada and Australia.

But the Judge said that 3M was not only in breach of its obligation to "actively market" BacLite but also failed to gain regulatory approval in the US.

"I find that from the end of March 2008 3M was in breach of its obligation diligently to seek regulatory approval for BacLite in the US and that had it complied with its obligation such approval would have been obtained by the beginning of February 2009," the Judge said. [158]

The test was originally developed by the British Government's Defence Science and Technology Laboratory at Porton Down, Wiltshire, to detect biological weapons.

The judge found that 3M had breached its obligations in all four territories in the deal - the EU, the United States, Canada and Australia. [218]

In the course of the trial, the Judge heard that 3M's original estimate of the earn-out payment under the Share Purchase Agreement in January 2007, a month before the purchase, was $33 million. [225(2)]

While the companies and the MoD were not unreasonable to reject 3M's decision to close down the project, he added: "It was also reasonable for them to suspect that the failure of the business had been contributed to by 3M's own breaches of the SPA." [233(5)].

Referring to 3M's compensation offer before the trial, the Judge went on: "The reasonableness of the vendors' refusal is borne

**Print      Email      RSS**

Share it ▾

Blog it ▾

Blog Search ▾

**More in These Categories**

**Banking & Financial Services**

First Reserve and CalPERS Partner to Acquire U.S. Power and Transmission Portfolio

Perfect World Unveils New Cartoon-style Martial Arts MMORPG "Fantasy Condor Heroes"

Deadline Approaching in Lawsuit against Diamond Foods, Hagens Berman Reminds Investors As SEC Investigation Is Revealed

**Legal Issues**

**Most Read**

**Most Emailed**

**Journalists and Bloggers**

Visit **PR Newswire for Journalists** for releases, photos, ProfNet experts, and customized feeds just for Media.

View and download archived video content distributed by MultiVu on **The Digital Center**.



**Free Investing Newsletter from Investor Uprising!**

12/15/11                    3M Forced to Pay for Breach of Obligations over MRSA ... Tech ... | ...

Case 1:11-cv-01527-RLW  Document 45-3  Filed 12/15/11  Page 121 of 190

out by the fact that there were a number of 3M estimates at the time which exceeded the figure offered and that the figure was meant to be conservative." [233(8)].

The failure by 3M "diligently" to pursue approval for BacLite by the US regulator - the Food and Drug Administration ("FDA") - after March 2008 was an important element in the project's termination, the Judge said. [166].  The judge found that 3M could have achieved US FDA regulatory approval by February 2009 "at the earliest" if they had corrected their own errors. [157]

Despite having identified problems with the methodology of the pre-approval testing, which had been changed by 3M from that carried out originally in the UK, and with 3M scientists suggesting solutions, there were concerns at the highest level in the company that the project was not making money fast enough. [81-82]

In an internal email of 7 March 2008, the Judge said, 3M's chairman and Chief Executive Officer, George Buckley, since awarded a knighthood, suggested "pulling the plug." A day later he said in another email he stated "tell them to deliver or tell them that we are likely pulling the plug" and warned "its time to fish or cut bait." [82].-

* Ploughshare Innovations Limited was a co-claimant in the UK High Court action with Porton against 3M.  Ploughshare Innovations Limited is a wholly owned subsidiary of the Defence Science and Technology Laboratory ("Dstl") which is in turn a wholly owned agency of the Ministry of Defence ("MoD")


Notes to editors:


1. Harvey Boulter is available for interview. All inquiries to Eben Black, DLA Piper on 07968 559 198-or eben.black@dlapiper.com or Anna Brown on 07834 570 464 or anna.brown@dlapiper.com. Also contact us for a copy of the Judgement.

2. Timeline:

**Early 2000's**

- UK Ministry of Defence investigates using photoluminescence biotechnology to detect biological weapons of mass destruction, producing BacLite.

- Dstl, the research agency of the Uk MoD, and equity investment group Porton Group form joint venture called "Acolyte" to market BacLite for MRSA detection.

**2006**

- Clinical trials demonstrate BacLite predicts the presence or absence of MRSA with 95% reliability.

- BacLite approved for sale and use in the European Union on the basis of clinical trials.

- 3M approaches Acolyte about purchasing BacLite.

**2007**

- 3M convinces Acolyte to sell BacLite, promising in its purchase contract to "actively market" and to use "diligence" to obtain regulatory approvals in the United States, Canada and Australia.

- 3M promotes BacLite, citing 95% reliability results from the EU clinical trials. It publishes brochure, still on the Internet at 3M's site, touting the reliability and importance of the technology.

- 3M asks and receives FDA approval to run US clinical trials using the same comparator used in the EU trials.

- 3M runs US clinical trials with different comparator than in EU trial and stores test samples at wrong temperature. Under these new conditions BacLite's reliability drops to 50%.

- An 11-member 3M Technical Advisory Committee to investigates the trials. Committee finds avoidable and careless errors in conducting trials.

- 3M refuses to redo trials.

**2008**

- 3M notifies Acolyte it is abandoning all its obligations to sell and market BacLite.

- 3M representative(s) pull out BacLite devices from UK medical facilities, despite successful use of the machines and published opinions from scientists that "BacLite assay's performance, ease of use, and capacity best met the needs of the authors' hospital for rapid MRSA screening.

Web: http://www.portoncapital.com

SOURCE Porton Group

Back to top

---

            Next in Banking & Financial Services News


**Custom Packages**                    **PR Newswire Membership**          **Learn about PR Newswire services**

Learn to navigate the world's financial system and profit from leading companies.

Register for **Investor Uprising**, the people's investment site, for a free weekly newsletter, information, education and premium research including our latest IU Confidential Report - "**All The Glitters: The Ultimate Gold Report**".

Browse our custom packages or
build your own to meet your
unique communications needs.

Fill out a PR Newswire
membership form or contact us at
(888) 776-0942.

Request more information about
PR Newswire products and
services or call us at (888) 776-
0942.

Start today.

About PR Newswire │ Contact PR Newswire │ PR Newswire's Terms of Use Apply │ Careers │ Privacy │ Site Map │ RSS Feeds │ Blog
Copyright © 2011 PR Newswire Association LLC. All Rights Reserved.
A UBM plc company.
Dynamic Site Platform powered by Limelight Networks.

# Exhibit U






## Lawsuit Claims 3M Scotched Government's MRSA Test

LONDON, June 15, 2011 /PRNewswire/ --

A company owned by the Ministry of Defence today (Wednesday June 15) will launch a High Court lawsuit against the American giant 3M, claiming that it failed properly to market an innovative MRSA diagnostic invented by the MoD at its Porton Down research laboratories.

The MoD company, Ploughshare Innovations, and its financial partner, private equity firm Porton Capital, are claiming up to £41m from 3M for failing to 'actively and diligently' market their MRSA test, named BacLite. 3M denies liability and is defending the claim.

BacLite was a high-speed test which enabled hospitals to identify MRSA infections within five hours, compared to the more usual 48-hour test procedures. Originally discovered in the nineties at the MoD's Porton Down research establishment in Wiltshire, it was subsequently approved by the UK health authorities and was first marketed to hospitals here in 2005.

Following early sales success in the UK, in 2007 3M bought BacLite and the company which the two partners had formed to market it, Acolyte, for an initial £10.4m. An earn-out clause in the contract meant that the partners could have been entitled to up to an additional £41m depending on BacLite's's sales between 2007 and 2009.

Ploughshare and Porton's sales agreement with 3M committed the American group to develop and market BacLite to health authorities and hospitals in Europe, North America, and Australia. However, just over a year later 3M closed the business, following intervention by its chairman, CEO and President, British-born George Buckley.

The High Court lawsuit launched today will accuse 3M of deliberately allowing BacLite to fail commercially by starving it of competent staff and funds. Additionally, the lawsuit alleges that 3M mismanaged its application for regulatory approval for BacLite with the US health authorities, and failed to seek similar approval at all in other territories.

Harvey Boulter, CEO of Porton Capital, commented - "The failure of 3M to carry out its contractual obligations and commercialise an already-proven British invention is a disgrace. MRSA is a potentially fatal germ which affects hospital patients across the world. Not only could BacLite have helped reduce patients' exposure to MRSA, but the British taxpayer could and should have benefited financially from the MoD's invention. Instead, they have been left out of pocket by 3M's negligence."

Notes to Editors:

1. Ploughshare Innovations - manages the commercial licensing to industry of intellectual property developed by the Defence Science and Technology Laboratory.
2. Porton Capital - is a venture and development capital firm which specialises in the commercialisation of technology in partnership with the British Government. Porton has approx. $700m AUM and has offices in North America, Europe, the Middle East, Africa and Asia.

*Distributed by PR Newswire on behalf of Porton Group*

Contact details for all releases are only available to the media via **PR Newswire for Journalists.**

**PR Newswire Europe Ltd.**

209 - 215 Blackfriars Road, London, SE1 8NL
Tel :     +44 (0)20 7490 8111
Fax :    +44 (0)20 7490 1255
E-mail :  info@prnewswire.co.uk

Copyright © 2011 PR Newswire Europe Limited. All rights reserved.
A United Business Media Company.
Terms and conditions of use apply.

# Exhibit V

# Exhibit W

**theguardian**

Printing sponsored by:

**Kodak**
All-in-One Printers

# 3M countersues as MRSA row becomes toxic

- Knighthood question gives fresh twist to dispute
- Investment fund head accused of 'blackmail'

**Rupert Neate**
guardian.co.uk, Monday 20 June 2011 16.11 EDT

A larger | smaller



This scanning electron micrograph (SEM) shows clumps of methicillin-resistant Staphylococcus aureus bacteria, commonly referred to as MRSA, magnified x9560. Photograph: Medisean/Corbis

A company with links to the government has been accused of threatening a knighthood awarded to the head of one of the US's biggest companies.

Harvey Boulter, chief executive of Porton Capital, an investment fund that worked with the government to develop a test for MRSA, has been accused of "blackmail" by claiming that the prime minister may reconsider a knighthood awarded to George Buckley, the British-born chief executive of the US conglomerate 3M.

Lawyers for 3M claim Boulter's threat came after he demanded 3M hand over $30m (£18.5m) to settle a long-running dispute about the potentially lifesaving test sold to the US company in 2007.

In an email to 3M, seen by the Guardian, Boulter said: "As a result of my meeting [with Liam Fox, the defence secretary] you ought to understand that David Cameron's cabinet might very shortly be discussing the rather embarrassing situation of George [Buckley]'s knighthood. It was discussed today. Governments are big and sometimes decisions in one part are not well co-ordinated." [See footnote.]

Boulter said 3M's decision to kill off the MRSA testing system, called BacLite, had left the government in a "very awkward situation". The test, which detects the presence of MRSA in hours rather than days, was developed by – and jointly owned by – the Ministry of Defence's civilian research arm, Ploughshare Innovations. "They [the government] feel that you should do the right thing. I can tell you that even at $20m-$25m you will leave them not feeling great about the whole episode," Boulter said in the email to 3M's lawyers early on Saturday morning.

"At a headline of $30m+ you will allow the MoD to internally save face."

Boulter, who claims to have been "given sole authority by the MoD to settle on behalf of them", said that unless 3M paid out millions of pounds the government would be "quietly seething, with ramifications for a while". "They have memories like elephants," he added. "I said to Dr Fox I would try, I have done so."

"From my side, I don't hold a grudge, whether this is $5m or $35m it is small beer. We manage $700m and many of our investors call $5m a rounding error."

Boulter followed up the first email with a second sent in the early hours of Sunday morning. "I need to tell something to Dr Fox's office on Sunday night," he said. "I don't really want to give a 'radio silence' message as he is secretary of defence and will not expect that. I am trying to manage all of the dynamics carefully."

A spokesman for the Defence Science and Technology Laboratory, which owns Ploughshare, confirmed that Boulter was acting on its behalf in the legal battle with 3M. He refused to confirm whether Fox, or another representative of the government, was aware of the emails sent to 3M's legal counsel over the weekend.

The emails come a week after Boulter's investment fund, Porton Capital, began legal proceedings against 3M demanding up to £41m in disputed proceeds from the sale of the BacLite MRSA test.

Now 3M is countersuing Porton Capital and Boulter personally for "blackmail". "Instead of awaiting the outcome of the pending litigation, defendants and their investors have engaged in an unlawful campaign to blackmail 3M into paying $30m in order to avoid the continuation of the campaign by which defendants seek to publicly defame 3M and its chairman and chief executive and to tortiously interfere with 3M's legitimate business pursuits in the UK," 3M said in legal papers filed late on Sunday night.

Buckley, who is from a humble background in Yorkshire, received a knighthood in the Queen's birthday honours list earlier this month. Buckley declined to comment on the legal action.

A spokesman for Porton Capital said 3M's claims were "without merit" and criticised the company for making the correspondence public. "Under no conceivable circumstances could anything discussed in those conversations be interpreted as anything other than a good faith attempt to settle the case – there were no threats made, either explicit or implied. The decision by 3M's chairman Mr Buckley and his US personal attorney to make public these confidential discussions – including private discussions with third parties – on a unilateral basis is shocking."

• This article was amended on 14 October 2011 to append the following clarification: In the story above, reporting the background to a legal dispute between an investment company, Porton Capital and US conglomerate, 3m, we quote an email from Harvey Boulter, Porton's chief executive, to William Brewer, a lawyer acting for 3m: "As a result of my meeting [with Liam Fox, the defence secretary] you ought to understand that David Cameron's cabinet might very shortly be discussing the rather embarrassing situation of George [Buckley]'s knighthood." Boulter has contacted us and asked us to state that the meeting at which Buckley's knighthood was discussed was not the one with Fox but was at another meeting he had that day connected to the dispute.

© 2011 Guardian News and Media Limited or its affiliated companies. All rights reserved.

**theguardian**

Printing sponsored by:

**Kodak**
All-in-One Printers

# 3M countersues as MRSA row becomes toxic

- Knighthood question gives fresh twist to dispute
- Investment fund head accused of 'blackmail'

Rupert Neate
guardian.co.uk, Monday 20 June 2011 16.11 EDT

A larger | smaller



This scanning electron micrograph (SEM) shows clumps of methicillin-resistant Staphylococcus aureus bacteria, commonly referred to as MRSA, magnified x9560. Photograph: Medisan/Corbis

A company with links to the government has been accused of threatening a knighthood awarded to the head of one of the US's biggest companies.

Harvey Boulter, chief executive of Porton Capital, an investment fund that worked with the government to develop a test for MRSA, has been accused of "blackmail" by claiming that the prime minister may reconsider a knighthood awarded to George Buckley, the British-born chief executive of the US conglomerate 3M.

Lawyers for 3M claim Boulter's threat came after he demanded 3M hand over $30m (£18.5m) to settle a long-running dispute about the potentially lifesaving test sold to the US company in 2007.

In an email to 3M, seen by the Guardian, Boulter said: "As a result of my meeting [with Liam Fox, the defence secretary] you ought to understand that David Cameron's cabinet might very shortly be discussing the rather embarrassing situation of George [Buckley]'s knighthood. It was discussed today. Governments are big and sometimes decisions in one part are not well co-ordinated." [See footnote.]

Boulter said 3M's decision to kill off the MRSA testing system, called BacLite, had left the government in a "very awkward situation". The test, which detects the presence of MRSA in hours rather than days, was developed by – and jointly owned by – the Ministry of Defence's civilian research arm, Ploughshare Innovations. "They [the government] feel that you should do the right thing. I can tell you that even at $20m-$25m you will leave them not feeling great about the whole episode," Boulter said in the email to 3M's lawyers early on Saturday morning.

"At a headline of $30m+ you will allow the MoD to internally save face."

Boulter, who claims to have been "given sole authority by the MoD to settle on behalf of them", said that unless 3M paid out millions of pounds the government would be "quietly seething, with ramifications for a while". "They have memories like elephants," he added. "I said to Dr Fox I would try, I have done so."

"From my side, I don't hold a grudge, whether this is $5m or $35m it is small beer. We manage $700m and many of our investors call $5m a rounding error."

Boulter followed up the first email with a second sent in the early hours of Sunday morning. "I need to tell something to Dr Fox's office on Sunday night," he said. "I don't really want to give a 'radio silence' message as he is secretary of defence and will not expect that. I am trying to manage all of the dynamics carefully."

A spokesman for the Defence Science and Technology Laboratory, which owns Ploughshare, confirmed that Boulter was acting on its behalf in the legal battle with 3M. He refused to confirm whether Fox, or another representative of the government, was aware of the emails sent to 3M's legal counsel over the weekend.

The emails come a week after Boulter's investment fund, Porton Capital, began legal proceedings against 3M demanding up to £41m in disputed proceeds from the sale of the BacLite MRSA test.

Now 3M is countersuing Porton Capital and Boulter personally for "blackmail". "Instead of awaiting the outcome of the pending litigation, defendants and their investors have engaged in an unlawful campaign to blackmail 3M into paying $30m in order to avoid the continuation of the campaign by which defendants seek to publicly defame 3M and its chairman and chief executive and to tortiously interfere with 3M's legitimate business pursuits in the UK," 3M said in legal papers filed late on Sunday night.

Buckley, who is from a humble background in Yorkshire, received a knighthood in the Queen's birthday honours list earlier this month. Buckley declined to comment on the legal action.

A spokesman for Porton Capital said 3M's claims were "without merit" and criticised the company for making the correspondence public. "Under no conceivable circumstances could anything discussed in those conversations be interpreted as anything other than a good faith attempt to settle the case – there were no threats made, either explicit or implied. The decision by 3M's chairman Mr Buckley and his US personal attorney to make public these confidential discussions – including private discussions with third parties – on a unilateral basis is shocking."

• This article was amended on 14 October 2011 to append the following clarification: In the story above, reporting the background to a legal dispute between an investment company, Porton Capital and US conglomerate, 3m, we quote an email from Harvey Boulter, Porton's chief executive, to William Brewer, a lawyer acting for 3m: "As a result of my meeting [with Liam Fox, the defence secretary] you ought to understand that David Cameron's cabinet might very shortly be discussing the rather embarrassing situation of George [Buckley]'s knighthood." Boulter has contacted us and asked us to state that the meeting at which Buckley's knighthood was discussed was not the one with Fox but was at another meeting he had that day connected to the dispute.

© 2011 Guardian News and Media Limited or its affiliated companies. All rights reserved.

# Exhibit X

**theguardian**

Printing sponsored by:

**Kodak**
All-in-One Printers

# Businessman met Fox's friend two months before 'chance' Dubai meeting

Claim that meeting was accidental comes after emails obtained by Guardian showed Adam Werritty had tried to set it up

Rupert Neate
guardian.co.uk, Saturday 8 October 2011 14.25 EDT

A larger | smaller



Email from Adam Werritty to Harvey Boulter, 5 April 2011

Emails dating back to April, obtained by the Guardian, appear to undermine Liam Fox's claim that his controversial meeting with a businessman in Dubai was a result of a chance encounter at a restaurant.

An email from 5 April shows that the defence secretary's friend, Adam Werritty, met Harvey Boulter, the chief executive of a private equity partner of the MoD. In the email, Werritty says "very good meeting you [Boulter] in Dubai".

Boulter told the Guardian on Saturday night that he first met Werritty to arrange a meeting with Fox in April.

Fox told the BBC on Saturday: "Actually the defence ministry representative asked for it [the meeting] when they happened to be sitting at a nearby table at a restaurant."

He said he was on his "way home" from Afghanistan and made the stop-over to switch from military to civilian aircraft.

Fox was speaking to the BBC during a visit to Libya, which has been overshadowed by the controversy surrounding his links to his former flatmate and self-styled adviser.

Fox's declaration that the meeting was accidental comes after emails obtained by the Guardian showed that Werritty had tried to set it up. Further emails appear to show that Werritty's attempts to set up a meeting date back to April.

The correspondence is between Werritty and Boulter, the chief executive of Porton Group, a private equity partner of the MoD.

On 5 April, Werritty refers to a meeting between Fox's self-styled adviser and Boulter in Dubai. He thanks Boulter for the information on "two issues" discussed which he promises to "push along as discussed".

It is understood that Boulter subsequently expressed concerns to Werritty about the possibility of a legal battle about technology developed in partnership with the MoD.

Boulter's private equity firm and the MoD innovation unit sold technology called Acolyte, designed to help the fight against MRSA infections, to US conglomerate 3M. A dispute about the technology led to 3M refusing to pay the full agreed fee for the deal. Sources say Boulter was keen to meet Fox to get him to press 3M to pay him the rest of the money.

On 19 May, Werritty emails Boulter to say he had "passed this [Boulter's concerns about a legal battle] to one of the Special advisers and I'd hope they'd want to make an issue out of this but that's about all I can do on this".

Harvey Boulter told the Guardian late on Saturday about an April discussion with Werritty about arranging a meeting with Fox.

"I met Werritty in April when I first presented this [legal battle over MRSA technology sold to 3M].

"Werritty and I discussed setting up a meeting with Fox. He [Werritty] said he would with Fox at some point in the future," Boulter said.

Boulter said he met Werritty over dinner in Dubai on 15 or 16 June.

"I bumped into him in the restaurant and he offered to set up the meeting with Fox, because he said he [Fox] was in town.

"The fact that a meeting was going to happen was pre-arranged in April. A meeting with the MoD doesn't happen by chance. I'm sure I wouldn't have just got to meet him [Fox] unless I'd been pre-briefed."

An email seen by the Guardian, which is dated 7.49pm on 16 June, Boulter, who lives in Dubai, invites Werritty to his house, which is 15 minutes from the Shangri-la hotel where he is staying. He offers to send a car for "you and boss".

At 9.55am on Friday 17 June Werritty replies to Boulter to tell him he would prefer to have the meeting at the hotel on the "41st floor lounge".

Boulter has already gone public about the meeting with Fox before the defence secretary claimed it was accidental.

Boulter has confirmed he met the defence secretary shortly after the email exchange with Werritty on the Friday morning.

Reacting to the publication of emails, Labour's shadow defence secretary, Jim Murphy, said:

"Liam Fox's claim that his meeting in Dubai was accidental lasted merely a matter of hours.

"This issue has gone from being embarrassing to being controversial and has now moved way beyond that. This will cause alarm bells to start ringing even more loudly in Downing Street.

"The secretary of state's version of events appear to be unravelling and he now has even bigger questions to answer."

© 2011 Guardian News and Media Limited or its affiliated companies. All rights reserved.



Email from Adam Werritty to Harvey Boulter, 5 April 2011

# Exhibit Y

Printing sponsored by:

**Kodak**
All-in-One Printers

**theguardian**

# Businessman met Fox's friend two months before 'chance' Dubai meeting

Claim that meeting was accidental comes after emails obtained by Guardian showed Adam Werritty had tried to set it up

Rupert Neate
guardian.co.uk, Saturday 8 October 2011 14.25 EDT

A larger | smaller



Email from Adam Werritty to Harvey Boulter, 5 April 2011

Emails dating back to April, obtained by the Guardian, appear to undermine Liam Fox's claim that his controversial meeting with a businessman in Dubai was a result of a chance encounter at a restaurant.

An email from 5 April shows that the defence secretary's friend, Adam Werritty, met Harvey Boulter, the chief executive of a private equity partner of the MoD. In the email, Werritty says "very good meeting you [Boulter] in Dubai".

Boulter told the Guardian on Saturday night that he first met Werritty to arrange a meeting with Fox in April.

Fox told the BBC on Saturday: "Actually the defence ministry representative asked for it [the meeting] when they happened to be sitting at a nearby table at a restaurant."

He said he was on his "way home" from Afghanistan and made the stop-over to switch from military to civilian aircraft.

Fox was speaking to the BBC during a visit to Libya, which has been overshadowed by the controversy surrounding his links to his former flatmate and self-styled adviser.

Fox's declaration that the meeting was accidental comes after emails obtained by the Guardian showed that Werritty had tried to set it up. Further emails appear to show that Werritty's attempts to set up a meeting date back to April.

The correspondence is between Werritty and Boulter, the chief executive of Porton Group, a private equity partner of the MoD.

On 5 April, Werritty refers to a meeting between Fox's self-styled adviser and Boulter in Dubai. He thanks Boulter for the information on "two issues" discussed which he promises to "push along as discussed".

It is understood that Boulter subsequently expressed concerns to Werritty about the possibility of a legal battle about technology developed in partnership with the MoD.

Boulter's private equity firm and the MoD innovation unit sold technology called Acolyte, designed to help the fight against MRSA infections, to US conglomerate 3M. A dispute about the technology led to 3M refusing to pay the full agreed fee for the deal. Sources say Boulter was keen to meet Fox to get him to press 3M to pay him the rest of the money.

On 19 May, Werritty emails Boulter to say he had "passed this [Boulter's concerns about a legal battle] to one of the Special advisers and I'd hope they'd want to make an issue out of this but that's about all I can do on this".

Harvey Boulter told the Guardian late on Saturday about an April discussion with Werritty about arranging a meeting with Fox.

"I met Werritty in April when I first presented this [legal battle over MRSA technology sold to 3M].

"Werritty and I discussed setting up a meeting with Fox. He [Werritty] said he would with Fox at some point in the future," Boulter said.

Boulter said he met Werritty over dinner in Dubai on 15 or 16 June.

"I bumped into him in the restaurant and he offered to set up the meeting with Fox, because he said he [Fox] was in town.

"The fact that a meeting was going to happen was pre-arranged in April. A meeting with the MoD doesn't happen by chance. I'm sure I wouldn't have just got to meet him [Fox] unless I'd been pre-briefed."

An email seen by the Guardian, which is dated 7.49pm on 16 June, Boulter, who lives in Dubai, invites Werritty to his house, which is 15 minutes from the Shangri-la hotel where he is staying. He offers to send a car for "you and boss".

At 9.55am on Friday 17 June Werritty replies to Boulter to tell him he would prefer to have the meeting at the hotel on the "41st floor lounge".

Boulter has already gone public about the meeting with Fox before the defence secretary claimed it was accidental.

Boulter has confirmed he met the defence secretary shortly after the email exchange with Werritty on the Friday morning.

Reacting to the publication of emails, Labour's shadow defence secretary, Jim Murphy, said:

"Liam Fox's claim that his meeting in Dubai was accidental lasted merely a matter of hours.

"This issue has gone from being embarrassing to being controversial and has now moved way beyond that. This will cause alarm bells to start ringing even more loudly in Downing Street.

"The secretary of state's version of events appear to be unravelling and he now has even bigger questions to answer."

© 2011 Guardian News and Media Limited or its affiliated companies. All rights reserved.



Email from Adam Werritty to Harvey Boulter, 5 April 2011

# Exhibit Z

the**guardian** **TheObserver**

Printing sponsored by:

**Kodak**
All-in-One Printers

# Emails and video footage pile pressure on beleaguered Liam Fox

Film of Sri Lankan meeting and email exchange between friend and businessman undermine defence secretary's prior claims

Rupert Neate, Toby Helm, Nick Hopkins and Jamie Doward
guardian.co.uk, Saturday 8 October 2011 18.46 EDT

A larger | smaller

Defence secretary Liam Fox's future hangs in the balance as the *Observer* reveals film and email evidence that appears to contradict prior claims about his friend Adam Werritty's involvement in meetings with overseas dignitaries and businessmen.

The film shows that Fox's former flatmate, who was also best man at his wedding, met the president of Sri Lanka with Fox for a meeting in a London hotel last year, despite having no role in government.

The defence secretary has strenuously denied that 34-year-old Werritty had been present at any official meetings with foreign dignitaries overseas and his department refused to comment on Saturday when questioned about this meeting. However, the video and photographs obtained by this newspaper appear to show Werritty shaking hands with President Mahinda Rajapaksa.

Fox's troubles deepened further on Saturday when the defence secretary said that a meeting in Dubai in June this year with a businessman, also attended by Werritty, only happened as a result of a chance meeting there in a restaurant.

Emails between Werritty and the businessman, Harvey Boulter, obtained by the *Guardian* in August, appear to contradict Fox's account. They appear to indicate that Fox's friend had been trying to fix up such a meeting since April. Boulter said: "The fact that a meeting was going to happen was prearranged in April. A meeting with the Ministry of Defence doesn't happen by chance."

The two sets of revelations came as Downing Street stepped into a row that was threatening to spiral out of control. No 10 ordered the initial findings of an MoD inquiry into Werritty's role as a self-styled adviser to Fox to be presented to David Cameron on Monday. The inquiry had been due to last another two weeks. Amid signs that support for Fox was ebbing away, No 10's line was that it was still supportive of him. But the fact that it effectively ordered the inquiry to be speeded up shows its desperation to draw a line under the episode.

One source at the heart of government said: "The prime minister is remaining supportive of Liam while the facts are established but we will see what happens on Monday."

Sri Lankan TV news footage and press photographs appear to show that Werritty was part of Fox's delegation at the meeting with Rajapaksa, who has been accused of war crimes during the country's civil war. The footage apparently shows Werritty shaking hands and bowing to Rajapaksa.

Werritty is present as Fox discusses investment in the country, and plans to integrate Tamil political parties willing to participate within the government, according to Sri Lankan TV footage. The footage was handed to the *Observer* by Italian blogger Nomfup. Three separate sources have seen the footage and confirmed that they believe Werritty appears in the footage.

News of the meeting at the Dorchester hotel in early December will raise fresh concerns about whether Fox has misled MPs and the public about Werritty's role at the heart of government. The storm engulfing Fox has grown since the Guardian first revealed in August the extent of Werritty's closeness to Fox, and that he had described himself as an adviser to the secretary of state on business cards, although he is not a government employee. Fox will come under intense pressure when he appears at defence questions in the Commons on Monday. On Saturday night the shadow defence secretary, Jim Murphy, demanded that Fox make a statement to the House.

"This is a self-inflicted political crisis and it seems to run and run with fresh allegations every day," Murphy said. Sources have also told this newspaper that the government investigation into Werritty's role will examine every overseas trip Fox has taken, both as secretary of state and before as the shadow minister, to discover if he was accompanied by Werritty and if he met foreign leaders.

The MoD said the Sri Lanka meeting was a "private engagement". The *Observer* understands that Fox is also under scrutiny over other official visits abroad, including the annual trip to the International Institute of Strategic Studies in Singapore. He gave a speech at the IISS in early June, and it is believed he met Werritty during the short stay.

Whitehall sources said that the MoD appears to be "99% sure" it has never paid for any of Werritty's flights or accommodation, but officials are trying to establish if there was any potential blurring of the lines that may have compromised Fox's position.

Fox's friendship with Werritty is also likely to trigger questions over his involvement in a company called UK Health Group. Records reveal that in 2007 Fox owned shares in the company, as did Werritty. But there is no mention of this shareholding in Fox's register of members' interests, an apparent breach of parliament's strict rules.

The *Guardian* has revealed Werritty:

• Involved Fox in discussions with Boulter that have left Fox facing the prospect of being called to give evidence in a "blackmail" trial in the US.

• Was present at a discussion about the possibility of providing British security-sensitive technology to Libyan rebels.

• Has visited Fox at the MoD's Whitehall offices 14 times in a little over a year and hands out business cards that say he is "an adviser to the Rt Hon Dr Fox MP".

• Ran a controversial charity from inside Fox's office in the houses of parliament.

• Collected £90,000 in salary from the Atlantic Bridge charity, which is linked to major US business lobby groups.

• Has previously been present when Fox met Rajapaksa and other senior Sri Lanka ministers.

• Was an investor in the same health consultancy company as Fox.

The December meeting at the Dorchester hotel took place when Fox had been defence secretary for six months. After the *Guardian* revealed that Werritty brokered a crucial legal meeting in Dubai, a spokesman for Fox said: "Mr Werritty is not an employee and has, therefore, not travelled with me on any official overseas visits."

The MoD refused to comment on the meeting. Werritty did not respond to requests for comment.

Speaking about the Dubai meeting during a visit to Libya on Saturday which has been overshadowed by the controversy over his links to Werritty, Fox said he had been on his "way home" from Afghanistan and made the stopover to switch to a civilian aircraft.

© 2011 Guardian News and Media Limited or its affiliated companies. All rights reserved.

# Exhibit aa

Case 1:10-cv-01655-RLW  Document 45-3  Filed 12/16/11  Page 144 of 190

the**guardian**

Printing sponsored by:

**Kodak**
All-in-One Printers

# Government weighs into 'blackmail' row over 3M and MRSA test

## Alleged threat to knighthood for 3M chief executive could lead Ministry of Defence to sue private equity boss

Rupert Neate
guardian.co.uk, Monday 27 June 2011 12.37 EDT

A larger | smaller



The Ministry of Defence has weighed into the 'blackmail' row between 3M and Porton Capital, saying that Liam Fox, above, had not discussed George Buckley's knighthood with Harvey Boulter. Photograph: Omar Sobhani/Reuters

The government has distanced itself from a private equity boss for threatening to use his political muscle to "blackmail" the head of one of America's biggest companies.

The Ministry of Defence stepped back after Harvey Boulter, chief executive of Porton Capital, allegedly claimed he would use his government influence to interfere with a knighthood awarded to the British-born chief executive of Post-it note maker 3M.

Boulter suggested he had the backing of the defence secretary, Liam Fox, when he allegedly demanded 3M pay $30m (£18.5m) from 3M to settle a long-running court case over disputed payments for potentially life-saving MRSA technology part-owned by the MoD.

According to 3M's lawyers, Boulter told them that if the case were not settled out of court, the government might reconsider a knighthood recently awarded to George Buckley, 3M's chief executive officer.

The US firm has launched a countersuit accusing Porton Capital and Boulter personally of "blackmail".

The MoD has refused to rule out launching its own legal action against him, for bringing the government into disrepute.

"Dr Fox met with Mr Boulter to discuss an entirely different matter. At no point did he enter into any discussion about this legal case, nor was there any mention of anyone's knighthood," the MoD said.

The legal battle centres on emails Boulter sent to 3M lawyers 10 days ago.

"As a result of my meeting [with Liam Fox, the defence secretary] you ought to understand that David Cameron's cabinet might very shortly be discussing the rather embarrassing situation of George [Buckley]'s knighthood," Boulter said in the first email [see footnote]. "It was discussed today. Governments are big and sometimes decisions in one part are not well co-ordinated."

When 3M did not respond to the apparent threat, Boulter sent a second email demanding an answer within 12 hours.

The emails form the basis of 3M's lawsuit against Porton Capital, and Boulter personally. "Instead of awaiting the outcome of the pending litigation, defendants and their investors have engaged in an unlawful campaign to blackmail 3M into paying $30m in order to avoid the continuation of the campaign by which defendants seek to publicly defame 3M and its chairman and chief executive, and to tortiously interfere with 3M's legitimate business pursuits in the UK," 3M said in its legal filing.

The legal action by 3M is a countersuit to one from Porton that claims 3M owes up to £41m for MRSA technology part-owned by the MoD.

Boulter refused to comment.

• This article was amended on 15 July and 14 October 2011 to remove text that suggested the government had attacked Harvey Boulter, chief executive of Porton Capital. This has been corrected. In addition the following clarification was appended: In the story above, reporting the background to a legal dispute between an investment company, Porton Capital and US conglomerate, 3m, we quote an email from Harvey Boulter, Porton's chief executive, to William Brewer, a lawyer acting for 3m: "As a result of my meeting [with Liam Fox, the defence secretary] you ought to understand that David Cameron's cabinet might very shortly be discussing the rather embarrassing situation of George [Buckley]'s knighthood". Boulter has contacted us and asked us to state that the meeting at which Buckley's knighthood was discussed was not the one with Fox but was at another meeting he had that day connected to the dispute.

© 2011 Guardian News and Media Limited or its affiliated companies. All rights reserved.

# Exhibit bb

# Exhibit cc

**theguardian**

Printing sponsored by:

**Kodak**
All-in-One Printers

# How Adam Werritty's role as self-styled adviser to Liam Fox unravelled

A meeting in Dubai brought the defence secretary's close friend – and his role in Fox's life – into the spotlight

Rupert Neate
guardian.co.uk, Friday 14 October 2011 15.59 EDT

A larger | smaller



Liam Fox said he had met Adam Werritty 14 times inside the MoD in 16 months after the election. Photograph: Matt Dunham/AP

On 17 June Liam Fox touched down in Dubai after a gruelling visit to the troops in Afghanistan. Almost immediately he met up with Adam Werritty, his best man, former flatmate and firm friend of 13 years.

Werritty, 33, a Scottish Tory who first met Fox when the defence secretary went to speak at Edinburgh University – where Werritty was a student of public policy – had arrived in the emirate a few days earlier to set up meetings for his "boss". Top of Werritty's agenda for Fox was a meeting with Dubai-based British businessman Harvey Boulter on the 41st floor of the five-star Shangri-La hotel.

At 11am Werritty and Fox were whisked into the hotel and rode the elevator to the executive meeting suite, one floor above Werritty's room on the 40th floor. Waiting for them was Boulter, 41, chief executive of Porton Capital, and two executives from Cellcrypt, a Porton company that creates state-of-the-art encryption software.

As they settled into the sofas, Boulter offered to supply Cellcrypt for free to British troops in Afghanistan so that they could call their loved ones back home without fear of their calls being intercepted by the Taliban. Fox loved the idea. But just as they were about to wrap up the 45-minute meeting, Boulter got to the topic that had been worrying him for months: of money that had slipped through his fingers.

The last deal Boulter and the MoD teamed up on had gone wrong. Boulter had helped the government commercialise and sell potential life-saving MRSA technology to the American conglomerate 3M for £41m.

But 3M, the maker of Post-it notes, had refused to pay all the money, claiming the MRSA technology, called Acolyte, didn't work. Boulter had managed to get coverage of the story in the Observer a few days earlier.

While Fox and Werritty went out partying that night to celebrate the forthcoming marriage of Fox's official adviser Luke Coffey, Boulter jumped on a plane to Milan.

Early the next morning, as he stepped off a plane in Italy, Boulter cranked up the pressure on 3M's lawyer. He sent a hastily drafted email that 3M later alleged implied that the government would raise questions about a knighthood awarded to 3M's British chief executive. Boulter's email said: "David Cameron's cabinet might very shortly be discussing the rather embarrassing situation of George's [George Buckley, 3M's chief executive] knighthood".

Life was about to get even tougher for Boulter, one the richest western men in Dubai, as 3M launched a blackmail lawsuit against him based on that email allegedly punched out on his BlackBerry in the middle of the night.

But the first he heard of the lawsuit was when the Guardian called on the afternoon of the following Monday to seek comment after 3M dropped the legal papers with this paper before telling Boulter.

The private equity boss denies that the emails, available in full on Guardian.co.uk, constitute blackmail, and claims that when he mentioned the threat to Buckley's knighthood he was not referring to the meeting with Fox. The Guardian wanted to know what happened at that meeting so contacted the Ministry of Defence, assuming they had a record of exactly what took place. The MoD replied on 24 June: "Dr Fox met with Mr Boulter to discuss an entirely different matter. At no point did he enter into any discussion about the legal case."

Curious. Who was telling the truth? A flamboyant race car-driving businessman or the secretary of state for defence?

In order to find out, the Guardian tracked down the other two executives present at the meeting, who confirmed that the Acolyte case was discussed.

The MoD then issued a backtrack statement on 17 August. "During their meeting Mr Boulter disclosed his involvement in a legal case as a matter of propriety, but Dr Fox did not enter into a discussion about this in any respect and at no point raised or discussed the issue of a knighthood."

Surely the MoD official who sat in on the meeting must have kept a record of the meeting? So why was the department changing its position?

There was a simple answer from the MoD: there were no officials present at the meeting.

Who, then, was Adam Werritty? "Adam Werritty is not an MoD employee. He is a friend of the secretary of state," the MoD said. But Boulter was adamant Werritty was Fox's official adviser, and he said he had his business card to prove it. "Adviser to the Rt. Hon. Dr Liam Fox MP", the card read under the House of Commons Portcullis logo.

On 19 August the Guardian revealed Werritty's existence, but our questions did not stop there. How many meetings had this unofficial adviser set up? Who had he met? Defence bosses? Generals? Heads of state? Did he often travel abroad with Fox? Did they meet up at the MoD's HQ on Whitehall?

The MoD said it was "unable" to say if Werritty had been to the MoD because those sorts of records were hard to collate and the paper would have to wait for the answers to a Freedom of Information request.

Step forward John Mann MP, who tabled a parliamentary question, to which Fox replied that he had met Werritty 14 times inside the MoD in the 16 months since the election.

The defence secretary added that: "Mr Werritty is not an employee of the Ministry of Defence and has, therefore, not travelled with me on any official overseas visits." Given the defence minister's not very transparent track record, was this really true? After trawling the internet for days the Guardian and the Observer came across photos and videos that showed the dynamic duo meeting the president and various ministers of Sri Lanka.

These were "not official" meetings, the MoD said. But by now things had started to smell, and Fox's department was forced into releasing a record of every meeting the pair had ever had. There were 40 – 22 at the MoD and 18 overseas – where Werritty had been present including meetings with the forthcoming British ambassador to Israel and US General John Allen, who was soon to be appointed commander of the International Security Assistance Force (ISAF) in Afghanistan.

Werritty's jetsetting – he appeared to be on a plane, first-class, almost every other week – raised further questions about the self-styled adviser who did not appear to have a regular job.

Fox reassured the house on Monday that Werritty was "not dependent on any transactional behaviour to maintain his income". This distinctly odd turn of phrase had Fleet Street a-flutter trying to track down how Werritty funded the 19 overseas trips (the MoD added one more at the last minute on Thursday night) that are estimated to have cost more than £50,000.

Revelations that Tory donors and shadowy figures were supporting a company set up specifically to support Werritty appears to have been the final straw in the pair's long relationship.

## For the record: denials issued over the past month

"Mr Werritty is not an employee of the Ministry of Defence and has, therefore, not travelled with me on any official overseas visits." **Liam Fox in the House of Commons, 13 September**

"A number of baseless accusations have been made in recent days." **Liam Liam Fox, responding to Guardian reports, 6 October**

"Adam Werritty was not part of Dr Fox's delegation [to Sri Lanka] and he did not attend any official meetings." **MoD spokesman, 8 October**

"The defence industry representatives asked for it [the Dubai meeting] when they happened to be sitting at a nearby table at a restaurant. So, it's not that unusual." **Liam Fox, 8 October**

"He [Werritty] said anybody who asked like a journalist, tell them we didn't meet. I said I can't do that because clearly we have met." **Harvey Boulter, the Dubai businessman told to cover up his meeting with Fox**

© 2011 Guardian News and Media Limited or its affiliated companies. All rights reserved.

# Exhibit dd

**theguardian**

Printing sponsored by:

**Kodak**
All-in-One Printers

# Liam Fox, his adviser, and an irregular meeting in Dubai

Emails shed light on contentious legal battle as MoD admits MRSA superbug case was raised at meeting

Rupert Neate
guardian.co.uk, Friday 7 October 2011 16.18 EDT

A larger | smaller



Liam Fox, left, with Adam Werritty, his best man at his 2005 wedding and a friend for at least 14 years. Photograph: Stefan Rousseau/PA

Just as the Dubai heat started to get unbearable one morning in June Liam Fox swept into the air conditioned comfort of the five-star Shangri-La hotel.

Inside he was whisked up to the 41st floor – which enjoys panoramic views of the city – but the defence secretary wasn't there to enjoy the view. He was there for a crucial legal meeting.

In the hotel Fox was reunited with Adam Werritty, a close personal friend of his for at least 14 years, and three Dubai-based businessmen, including British private equity boss Harvey Boulter.

The meeting, which had been organised by Werritty, who has handed out business cards embossed with a logo of the House of Commons portcullis that describe him as "an advisor to RT Hon Dr Fox MP", was to demonstrate new technology that might allow troops to call home without fear of the calls being intercepted by the enemy.

But there was a second item on the agenda: a highly contentious legal battle. The MoD's last partnership with Boulter had turned from a potentially life-saving new weapon in the fight against the MRSA superbug into a legal headache.

The MoD's innovation unit had teamed up with Boulter's Porton Capital to commercially produce technology called Acolyte that is claimed to drastically cut the time it takes to identify MRSA infections.

At first it was a major success and the pair sold it to US Post-it note conglomerate 3M in £41m deal. But 3M later claimed the technology failed US tests and refused to pay the full amount.

Boulter was furious. He wanted to fight 3M all the way, but to do that he needed the might of HM's government. The 41-year-old businessman, who spends most of his life on a boat sailing the Gulf, spent weeks trying to get someone in government to listen. He didn't have much luck until someone introduced him to Adam Werritty.

Werritty, 34, flew to Dubai to meet Boulter and discuss his concerns in April. When he got back to London, Werritty emailed Boulter saying: "Very good meeting with you in Dubai. Thanks for passing along the below along with the e-info on the two issues [Acolyte; and the phone call encryption system] we discussed. Please leave this with me to push along as discussed."

A month later Werritty emailed Boulter again to say he had passed on Boulter's concerns to Fox's special advisers, and said: "I'd hope they'd want to make an issue out of this."

Fast forward to June, when Fox was on a morale-boosting visit to the troops in Afghanistan and stopped off in Dubai for a few days on the way home.

When he landed in Dubai he met Werritty. The MoD says Werritty just happened to be there at the same time and insists he was not part of Fox's official entourage.

Fox chose not to stay in the British embassy but at The Address, a new high-end hotel, which the MoD has not granted security clearance.

Early on the morning of Friday 17 June – a religious day in the Emirates – Werritty emailed Boulter: "Morning Harvey. He'd [Fox] prefer to have it here [at the Shangri-La]. Let's meet on the 41st floor lounge."

The meeting between the five men was a pleasant and jolly affair, but the disputed conversation turned toxic the next day.

In the early hours of the following morning Boulter fired off an email to 3M lawyers. "I had a 45-minute meeting with Dr Liam Fox, the British defence minister, on our current favourite topic ... As a result of my meeting [with Fox] today you ought to know that David Cameron's cabinet might very shortly be discussing the rather embarrassing situation of George's [George Buckley, 3M's chief executive] knighthood." [See footnote.]

Boulter suggested that a settlement "at a headline of $30m+ will allow MoD to internally save face".

When 3M failed to reply, Boulter followed up the first email with a second sent in the early hours of Sunday morning. "I need to tell something to Dr Fox's office on Sunday night," he said. "I don't really want to give a 'radio silence' message as he is secretary of defence and will not expect that. I am trying to manage all of the dynamics carefully."

This led to 3M immediately suing Boulter for "blackmail" and calling on Fox to explain exactly what he said in the meeting and whether or not he gave Boulter the go-ahead to send the late-night email.

At first Fox fought back strongly denying that the Acolyte technology was ever discussed. "Dr Fox met with Mr Boulter to discuss an entirely different matter," the MoD said. "At no point did he enter into any discussion about this legal case, nor was there any mention of anyone's knighthood."

But the Guardian tracked down both of the other businessmen present at the meeting, who confirmed that they heard the MRSA case discussed and Fox retracted his previous denial.

"During their meeting Mr Boulter disclosed his involvement in a legal case as a matter of propriety," the MoD said. "But Dr Fox did not enter into a discussion about this in any respect and at no point raised or discussed the issue of a knighthood."

However, one of the witnesses said Boulter informed Fox of the progress of the 3M legal battle, to which the defence secretary is said to have replied: "I'm sure you're handling this [the case] in the best way possible." Fox's spokesman did not respond to requests to confirm or deny the statement, and 3M is still preparing to call Fox as a witness if the blackmail case reaches court.

The highly irregular Dubai meeting has cast a spotlight on Werritty, who has operated in Fox's shadow for at least 14 years.

The Guardian understands that the pair first met while Werritty, who is from St Andrews, Scotland, was at university in the 1990s.

Although it is unclear how they first met, it is likely to have been through Werritty's degree in public policy at Edinburgh. Soon after Werritty graduated with a 2:2, he got a job at PPP, the healthcare company.

Soon after Fox founded the Atlantic Bridge charity, which was designed to promote the "special relationship" between the UK and the US, he asked Werritty to run the charity as executive director. The charity was backed by the American Legislative Exchange Council (Alec) and the hedge fund millionaire Michael Hintze.

The funding of the charity, which was supported by senior Tories and patronised by Lady Thatcher, allowed Werritty and Fox to frequently travel to events in America. In one instance Fox flew back from Washington to the UK in Hintze's private jet, the register of members' interests shows. It has been suggested that Werritty was also present on the jet.

While in London, Werritty ran the day-to-day operations of the charity from room 341 in the MPs' block at Portcullis House, which was provided to Fox at taxpayers' expense while he was in opposition until last year. Staff in the building still remember Werritty, who stands taller than Fox and has a receding hairline.

Werritty worked for the Atlantic Bridge until last summer when the regulator demanded that its "current activities must cease immediately" because "the activities of the charity have not furthered any of its other charitable purposes in any way".

The charity was finally dissolved last Friday after its remaining trustees – Fox had already resigned from the board – decided to close it down rather than address the Charity Commission's concerns.

Official records show Werritty collected £90,000 in salary from the charity between 2007 and 2010.

But it appears that running Fox's charity was not political enough for Werritty, a policy-obsessed nerd according to acquaintances.

Werritty attached himself to Fox as a self-styled adviser and took an active interest in Fox's work as shadow health secretary and shadow defence secretary.

He was on the board of a health consultancy company while Fox was leading the Tories on health. According to Companies House filings, Werritty owned 11.5% of UK Health Group and Fox owned 2.3%.

By the time Fox had moved on to become shadow defence minister, Werritty had become involved in a firm called Securities Futures, which describes its principal activities as being "promoting a better understanding of asymmetric 'security' risks that

the UK faces and publishing work that encourages a better informed debate on these important issues".

When Fox entered government, Werritty appeared to want to go with him. But instead of getting a job in the civil service or for the Conservative party he knocked up his own business cards embossed with the House of Commons Portcullis logo and just happened to appear at Fox's side in Dubai and Sri Lanka.

• This article was amended on 10 and 14 October 2011. The original said Werritty stands "a couple of foot taller than Fox". This has been corrected. This article was also amended to append the following clarification: In the story above, reporting the background to a legal dispute between an investment company, Porton Capital and US conglomerate, 3m, we quote an email from Harvey Boulter, Porton's chief executive, to William Brewer, a lawyer acting for 3m: "As a result of my meeting [with Fox] today you ought to know that David Cameron's cabinet might very shortly be discussing the rather embarrassing situation of George's [George Buckley, 3M's chief executive] knighthood." Boulter has contacted us and asked us to state that the meeting at which Buckley's knighthood was discussed was not the one with Fox but was at another meeting he had that day connected to the dispute.

© 2011 Guardian News and Media Limited or its affiliated companies. All rights reserved.

# Exhibit ee

**theguardian**

Printing sponsored by:

**Kodak**
All-in-One Printers

# Liam Fox's friend set up crucial legal meeting

Adam Werritty organised talks over row with 3M on MRSA technology

Rupert Neate
guardian.co.uk, Thursday 18 August 2011 16.04 EDT

A larger | smaller



Defence secretary Liam Fox. Photograph: Andy Rain/EPA

<u>Liam Fox</u> relied on a close personal friend rather than his team of official advisers to broker a crucial meeting at the heart of an explosive legal battle involving the defence secretary, it has emerged.

A Guardian investigation into Fox's role in an alleged threat to withdraw a knighthood from a businessman has revealed that Fox sought the advice of <u>Adam Werritty</u>, a long-term "friend" who ran a charity set up by Fox which was later suspended by regulators.

Werritty, who purports to be one of Fox's official advisers but is not a government employee, organised a "private meeting" for Fox to discuss a highly explosive legal case that centres on life-saving MRSA technology the MoD and its private equity partner, Porton Capital, sold to 3M, the US Post-it note maker.

Fox has repeatedly denied that he was personally involved in the case but he faces the embarrassment of being forced to give evidence about allegations of blackmail in a US court.

Werritty, who has been a close friend of Fox's for years and was once a housemate, told Harvey Boulter, the boss of Porton Capital, that Fox would meet him at an upmarket hotel in Dubai to discuss the legal battle with 3M.

The MoD, which has already been forced into one embarrassing U-turn over this case, had claimed Fox and Boulter met to discuss an "entirely different matter".

But email correspondence between Werritty and Boulter shows that the MRSA technology, called Acolyte, was on the agenda for the meeting at the five-star Shangri-La hotel in Dubai in June.

Werritty emailed Boulter in April saying: "Very good meeting with you in Dubai. Thanks for passing along the below along with the e-info on the two issues [one issue was Acolyte; the other was a mobile phone encryption service developed by one of Boulter's companies] we discussed. Please leave this with me to push along as discussed."

A month later Werritty emailed Boulter again to say he had passed on Boulter's concerns about the Acolyte case to Fox's special advisers, and said: "I'd hope they'd want to make an issue out of this."

On the day of the meeting Werritty emailed saying: "Morning Harvey. He'd [Fox] prefer to have it here [at the Shangri-La]. Let's meet on the 41st floor lounge."

Witnesses to the 16 June meeting claim Boulter informed Fox about the progress of the legal battle, to which the defence secretary is said to have replied: "I'm sure you're handling this [the case] in the best way possible." Fox's spokesman refused to confirm or deny this statement.

Just hours after the meeting, Boulter fired off an email to 3M's lawyers. It said: "I had a 45-minute meeting with Dr Liam Fox, the British defence minister on our current favourite topic ... As a result of my meeting [with Fox] today you ought to know that David Cameron's cabinet might very shortly be discussing the rather embarrassing situation of George's [George Buckley, 3M's chief executive] knighthood." [See footnote.]

Boulter suggested that a settlement "at a headline of $30m+ will allow MoD to internally save face".

As a result of the meeting Fox now faces the threat of being forced to give evidence in a US court, after 3M launched a blackmail lawsuit.

The MoD confirmed that Werritty, who distributes House of Commons business cards that describe him as "advisor to Rt Hon Dr Liam Fox MP", was not a government employee. The ministry said: "Adam Werritty is not an MoD employee, he is a friend of the secretary of state".

The MoD said no government officials were present at the 16 June meeting and no minutes were taken, which is against protocol. Although no records were kept, the spokesman said: "Dr Fox did not enter into a discussion about this in any respect and at no point raised or discussed the issue of a knighthood."

Werritty ran a charity which Fox founded but which was later suspended by regulators. Fox installed Werritty as the executive director and sole employee of the Atlantic Bridge, a charity closely linked to US neo-conservatives and funded by Michael Hintze, the hedge fund billionaire and big Conservative party donor.

Last summer the Charity Commission said Atlantic Bridge's "current activities must cease immediately". The commission said the charity's primary objective appeared to be "promoting a political policy [that] is closely associated with the Conservative party".

"The activities of the charity have not furthered any of its other charitable purposes in any way," the commission's investigation report said last July.

Members of the charity's advisory board have included George Osborne, William Hague and Michael Gove. Baroness Thatcher was honorary patron.

Werritty is believed to be the charity's sole member of staff.

The charity's annual report shows it paid its sole staff member £37,151 in 2009 and £15,222 in 2010. Unnamed consultants were paid a total of £63,738 in 2009 and 2010.

• This article was amended on 14 October 2011 to append the following clarification: In the story above, reporting the background to a legal dispute between an investment company, Porton Capital and US conglomerate, 3m, we quote an email from Harvey Boulter, Porton's chief executive, to William Brewer, a lawyer acting for 3m: "As a result of my meeting [with Fox] today you ought to know that David Cameron's cabinet might very shortly be discussing the rather embarrassing situation of George's [George Buckley, 3M's chief executive] knighthood." Boulter has contacted us and asked us to state that the meeting at which Buckley's knighthood was discussed was not the one with Fox but was at another meeting he had that day connected to the dispute.

© 2011 Guardian News and Media Limited or its affiliated companies. All rights reserved.

# Exhibit ff

**theguardian**

Printing sponsored by:

**Kodak**
All-in-One Printers

# Revealed: how lobbyists were paid to facilitate meeting with Liam Fox

• Emails show Dubai encounter planned in March
• Minister says sorry for 'blurred distinctions'

Rupert Neate and Patrick Wintour
The Guardian, Sunday 9 October 2011

A larger | smaller

**This article is the subject of a legal complaint on behalf of Tetra Strategy - who wish us to make clear that Tetra did not seek to make the meeting with Dr Fox secretive - see our clarification and their full statement below.**

Political lobbyists were paid thousands of pounds to help a Dubai-based businessman arrange a secretive meeting with Liam Fox [see footnote], which the defence secretary claims came about only after a chance meeting in a restaurant.

Invoices seen by the Guardian show that Harvey Boulter, the private equity boss at the heart of the growing controversy engulfing Fox, was paying £10,000 a month to lobbyists for help that included brokering the meeting with Fox through Adam Werritty, who claimed to be an "adviser to the Rt Hon Dr Fox MP".

This latest revelation comes as Fox finally admitted on Sunday that it had been "wrong" for him to meet Boulter, a commercial partner of the Ministry of Defence, in Dubai's five-star Shangri-la hotel without any officials present.

"I accept that it was a mistake to allow distinctions to be blurred between my professional responsibilities and my personal loyalties to a friend," he said. "I am sorry for this."

Fox's apology to the prime minister came two months after the Guardian first asked him to explain his relationship with Werritty, who appears to have been operating in Fox's shadow for a decade.

David Cameron and Fox spoke on the phone on Sunday morning following a fresh slew of allegations that Fox had allowed Werritty to accompany him on official visits.

No 10 stressed that the prime minister did not want to lose his defence secretary and would do what he could to keep him in place.

After the conversation with Cameron, Fox issued a statement admitting he had made mistakes and apologising for allowing proper distinctions to be blurred.

His remarks, bound to face fierce scrutiny from Labour during Commons defence questions on Tuesday, in effect amount to an admission that he breached the ministerial code, which requires him not to act in a way that would allow the impression of a conflict of interest to occur.

But Fox insisted no wrongdoing had taken place. He promised to tighten procedures to avoid any repetition. He will know he is in the political danger zone, but be buoyed by

the signs of support from Number 10 after a weekend in which it appeared that
Cameron was slowly removing his support.

Fox said: "At no stage did I or my department provide classified information or briefings
to Mr Werritty or assist with his commercial work – let alone benefit personally from
this work. Nevertheless, I do accept that given Mr Werritty's defence-related business
interests, my frequent contacts with him may have given an impression of wrongdoing,
and may also have given third parties the misleading impression that Mr Werritty was
an official adviser rather than simply a friend. I have learned lessons from this
experience."

He did not state whether he or Werritty had profited financially from the meeting
Werritty arranged, nor has the Guardian seen any evidence to suggest this.

But an invoice, seen by the Guardian, shows that Boulter enlisted the services of a
lobbying firm to help him skip layers of bureaucracy and meet Fox for an urgent
meeting on the 41st floor of the hotel.

The invoice shows Boulter paid Tetra Strategy £10,000 for "project fees". It is
understood that the fees covered fixing up media interviews and political lobbying.

Emails seen by the Guardian show the boss of Tetra, Lee Petar, had been working to
arrange a meeting between Boulter and Fox or Werritty since 25 March. This throws
further doubt on Fox's claim that the controversial encounter took place after a chance
meeting between Werritty and Boulter over dinner in Dubai in April.

An email from Petar to Boulter states: "I would be keen to introduce you to the special
adviser to the secretary of state for defence Liam Fox. Clearly he [Werritty] could be a
useful ally for us all on a number of different fronts.

"I am trying to see if we can get a slot in Liam's diary too," he adds.

Later that day Petar emails both men: "I do believe it would be a worthwhile
introduction for you both ....."

The next day Werritty, who visited Fox at the MoD's Whitehall headquarters 14 times in
a little over a year, emailed back agreeing to a meeting in early April.

On the day of the meeting Fox – apparently coincidentally – happened to be in Dubai as
well and Boulter was introduced to the defence secretary and the pair shook hands.

Other emails, obtained by the Guardian, show that Werritty then arranged for Fox to
meet Boulter for 45 minutes on 17 June. That meeting has left Fox facing the prospect of
being called to give evidence in a blackmail trial in the US.

Fox has claimed that the meeting came about after a chance encounter in a high-class
Dubai restaurant and was not prearranged.

Boulter told the Guardian: "This suggestion that I bumped into them in a restaurant and
they organised the meeting for me is kind of ridiculous.

"It's a bit like me bumping into you in a pub in London and buying you a beer and
saying 'oh by the way can I meet the owner of the paper' and you saying 'oh sure', come
on."

In a taste of the likely counter-attack by Labour on Monday, the party's defence
spokesman, Kevan Jones, rejected the defence secretary's apology, accusing Fox of being
in denial.

Jones said: "This is a remarkable admission. Just 24 hours ago Liam Fox called these
allegations 'baseless' and now he has apologised, but yet is denying any wrongdoing took
place.

"The defence secretary simply cannot have sensitive meetings behind the back of his officials. This is incredibly serious and this response in incredible. There is no need for new procedures, but there is a need for a secretary of state who abides by existing ones."

Fox issued his statement of apology without yet seeing a report being compiled by Ursula Brennan, the defence permanent secretary.

That report is due to be sent to the cabinet secretary, Sir Gus O'Donnell, on Tuesday and may yet determine his political fate once it is read by Cameron.

Brennan has been through Fox's entire diary and will have to rule on whether in her view the defence secretary had in any way compromised national security or given Werritty any improper commercial advantage.

In his statement Fox makes no reference to his meeting with the Sri Lankan president in the company of Werritty last December at the Dorchester hotel in London, but it is understood Fox regards the meeting as not an official occasion.

A video shows Werritty attending that private meeting and shaking hands and bowing to Rajapaksa.

His aides accept that Fox met Sri Lankan President Mahinda Rajapaksa on an official visit to the country organised by the Foreign Office in June, and say that Werritty attended a lecture given by Fox, but was not part of an official delegation.

---

• **This footnote was added on 10 October 2011:** A story on the circumstances leading to a meeting between Liam Fox and Harvey Boulter stated that political lobbyists were paid thousands of pounds to help Mr Boulter, a Dubai-based businessman, arrange a "secretive meeting" with the defence secretary. To clarify: the lobbying firm, Tetra Strategy, did not seek to make the meeting secretive. It arranged for Harvey Boulter to meet Liam Fox's unofficial adviser, Adam Werritty, and it offered to seek a slot for Mr Boulter in Mr Fox's diary as part of a range of advisory work it was paid to do for Mr Boulter. Liam Fox has subsequently acknowledged it was his mistake not to have Ministry of Defence officials present.

**Statement from Tetra Strategy**

Tetra Strategy was retained in 2010 to provide litigation PR assistance to the Porton Group in connection with its ongoing High Court claim in England against 3M. The case concerned the development of new MRSA testing technology developed by the MoD. Tetra introduced its client to Adam Werritty in March 2011, who was widely believed at the time to be an official adviser to Dr Liam Fox. The purpose of the introduction was to brief the MoD on the litigation. The suggestion by the Guardian that Tetra was paid to arrange a "secretive" meeting with Dr Fox is not true and is expressly denied. Tetra is referring this matter to the PCC."

© 2011 Guardian News and Media Limited or its affiliated companies. All rights reserved.

# Exhibit gg

# Exhibit hh

# Exhibit ii

# Exhibit jj

**Exhibit kk**

# Exhibit ll

# Exhibit mm

<u>**SUPREME COURT OF THE STATE OF NEW YORK**</u>                    <u>**Index No: 651708/2011**</u>

<u>**COUNTY OF NEW YORK**</u>

**3M COMPANY**

**Plaintiff**

**-v-**

**(1)  HARVEY BOULTER**
**(2)  PORTON CAPITAL TECHNOLOGY FUNDS**
**(3)  PORTON CAPITAL INC**

**Defendants**

_____

**AFFIDAVIT OF STEPHEN AULD Q.C.**
**REGARDING POINTS OF ENGLISH LAW**
**RELEVANT TO DEFENDANTS' MOTION TO DISMISS**
_____

I, **STEPHEN AULD Q.C.** of One Essex Court, Temple, London EC4Y 9AR, England, **BEING DULY SWORN, DEPOSES AND SAYS**:

1.      <u>**INTRODUCTION**</u>

1.1.      I am an English Barrister and Queen's Counsel. I have been asked to make this Affidavit on behalf of the Plaintiff in these proceedings and do so for the purposes more particularly set out in paragraph 3 below.

1.2.      The matters set out below are within my personal knowledge and professional experience and are true to the best of my knowledge, information and belief.

2.      <u>**PROFESSIONAL EXPERIENCE**</u>

2.1.      I was called to the bar of England and Wales in 1979 and appointed a Queen's Counsel in 1999.  I practise from One Essex Court Chambers, Temple, London EC4Y 9AR and specialise in commercial litigation.  I attach as Exhibit A a more detailed description of my qualifications and professional experience.

2.2.     In particular, relevant to the principal subject matter of this Affidavit, I have been extensively involved in claims involving civil and commercial fraud.

3.     **PURPOSE OF DECLARATION**

3.1.     I make this Declaration in relation to the Defendants' Motion to Dismiss the Plaintiff's Complaint in the above action.  I have been provided with, and have considered, the documents referred in Exhibit B hereto. In particular, I have considered:

> (1)     The Plaintiff's Summons and Complaint in the action dated June 19, 2011.

> (2)     Exhibits A and B to the Complaint (the "Communications").

> (3)     The Affidavit of Mr. Pushpinder Saini QC dated July 14, 2011 ("Mr. Saini's Affidavit").

3.2.     I have been asked to express my professional opinion on whether, assuming that that the facts alleged in the Plaintiff's Summons and Complaint are true, the Plaintiff would have a civil claim as a matter of English law. For the sake of completeness, I would point out that for present purposes I have not been asked to deal with in this Affidavit the other matters that Mr. Saini QC addressed in his Affidavit. My summary and conclusions are set out in paragraphs 4 and 10 below.

4.     **EXECUTIVE SUMMARY**

4.1.     **Introduction**

4.1.1.     Mr. Saini QC addresses the question of the potential tort claims the Plaintiff could bring in England on the basis of the facts alleged in the Complaint.  He discusses three potential claims:

> (1)     Unlawful means conspiracy (paragraphs 30 to 33).

> (2)     Lawful means conspiracy (paragraph 34.2).

> (3)     Causing loss by unlawful means (paragraph 34.1).

4.1.2.     I make some further reference to these aspects in paragraphs 7 and 8 below. However, in my view, it is quite clear that the fact situations which can give rise to criminal liability for blackmail are very similar to those giving rise to civil liability for what have been termed "*duress*" and, as I will

explain, "*two part intimidation*". Mr. Saini QC appears to make no mention of the tort of two-party intimidation which is, in essence, the civil law equivalent of the criminal liability provided for in section 21 of the Theft Act 1968.

4.1.3.   I give some outline examples of illustrative fact situations later in this Affidavit. I would note in passing that, as a matter of ordinary language and usage, the term "*blackmail*" is often used, not in the technical sense attracting the statutory and common law criminal offence but to refer to a situation where the defendant seeks to obtain advantage for himself by making threats against the claimant.

4.1.4.   In my opinion, for the reasons set out below, the facts alleged in Count 1 of the Complaint are materially the same as those required to allege the tort of two-party intimidation and therefore, if true, would amount to a cause of action under English law.

4.2.   **Summary**

Put shortly therefore, the effect of the developments in English law described in more detail below is that, inter alia:

(1)   Three-party intimidation no longer exists as an independent tort in English law.  It is subsumed within the tort of causing loss to the defendant by unlawful means directed at a third party.

(2)   Two-party intimidation is a different tort which raises different issues.

(3)   In two-party intimidation, like the crime of blackmail and the restitutionary action for duress upon which it is based, the requirement for wrongfulness is that the threatened conduct need not be unlawful; the requirement is that the threat is *illegitimate*.

(4)   There are fact situations which could form the basis for the crime of blackmail which also properly form the basis for claims in tort, in particular, in the present context in two-party intimidation.

5.      **DISCUSSION**

5.1.    **The Tort of Two-Party Intimidation**

5.1.1.  English law distinguishes between two torts of intimidation, known as "*two-party intimidation*" and "*three-party intimidation*":

(1)     *Two-party intimidation* arises where D illegitimately threatens P that, unless P takes, or refrains from, a course of action, D will perform an act and, as a result of that threat, loss is caused to P.

(2)     *Three-party intimidation* arises where D unlawfully threatens X that, unless X takes, or refrains from, a course of action which has an effect on P, D will perform an act and, as a result of the threat, loss is caused to P.

5.1.2.  Three-party intimidation appears now to have been subsumed into a general tort of "*causing loss by unlawful means*" (discussed below), but it was recently made clear by the House of Lords that two-party intimidation cases raise "*altogether different issues*": **OBG v Allan** [2007] UKHL 21, [2008] 1 AC 1, para 61.

5.1.3.  Whilst, as a matter of English law, "*the actionability of two-party intimidation is not in doubt, there is very little guidance in the deciding cases on the requirements of this tort.*": per Steyn LJ, later Lord Steyn, in **Godwin v Uzoigwe** [1993] Fam Law 65 (CA).

5.2.    **Intimidation**

5.2.1.  The term 'intimidation' to describe the tort or wrongdoing can be traced to the first decision of **Salmond on Torts** in 1907. This textbook was at the time (and has to some extent remained) one of the leading textbooks on the English law of torts. This derivation is referred to in **OBG v. Allan** [2007] UKHL 21; [2008] 1 AC 1 at paragraphs [7] and [25].  In 1907 Salmond identified two different forms of the tort of intimidation, namely (1) 'Intimidation of a person to his own injury' (two-party intimidation) and (2) 'Intimidation of a person to Another's Injury' (three-party Intimidation).

5.2.2.  As **Salmond** identified and as I have already indicated above, two-party intimidation is where the Defendant intimidates the Claimant causing loss to the Claimant. While three-party intimidation is

where the Defendant intimidates a third party causing loss to the Claimant. Further, as I indicate below, as a result of recent clarification provided by the House of Lords, it is now necessary, and at least for the moment important, to distinguish two-party and three-party intimidation. Among other things, three-party intimidation is no longer an independent tort.  It is now subsumed within the broader tort of causing loss to a defendant by the use of unlawful means in relation to a third party.   Two-party intimidation, however, remains an independent tort to which different considerations apply.

5.2.3.    In order to understand the elements of two-party intimidation, it is necessary to say something briefly about the historical development of the tort.   More particularly, although the tort of intimidation is still very undeveloped, there have been several significant developments since 1907.

5.3.    **Relevant Developments**

5.3.1.    Prior to the decision of **OBG v. Allan** [2007] UKHL 21; [2008] 1 AC 1, most intimidation cases concerned three-party intimidation.   The leading case was **Rookes v. Barnard** [1964] AC 1129 where a union committed the tort of three-party intimidation by threatening the third party employer that it would induce its members to break their contracts with the employer unless the employer dismissed the claimant.  The tort of three-party intimidation was committed even though the dismissal of the claimant was an act which the employer was entitled to do.

5.3.2.    In **OBG v. Allan** at [7] and [25] Lord Hoffman held that Salmond's three-party tort of intimidation was not an independent tort.  It was instead part of the broader tort of causing loss by unlawful means toward a third party.  His Lordship held that this 'umbrella' three-party tort required the commission of a civil wrong by the defendant in relation to the third party.   It therefore encompassed cases of conspiracy to injure the defendant by commission of a wrong to a third party as well as three-party intimidation.

5.3.3.    In **OBG v. Allan** Lord Hoffmann emphasised that two-party intimidation raises '*altogether different issues*' from this 'umbrella' three-party tort: **OBG v. Allan** [at [61]]; see also **Stratford v. Lindley** [1965] AC 269 at 325 (Lord Reid).  Because the threat in two-party intimidation is made directly at the claimant rather than through the instrumentality of a third party, the concerns that the law has (in the three-party umbrella tort) with imposing liability on a defendant for *indirect* and *lawful* acts of a *third party* are not relevant to two-party intimidation where the defendant intimidates the claimant directly.  In **OBG**, Lord Walker gave an example showing the need for such a "*control mechanism*" in three-party cases.  His Lordship referred (at [266]) to "*a*

*pizza delivery business which obtains more business, to the detriment of its competitors, because its drivers regularly exceed the speed limit and jump red lights."* Since speeding is not a civil wrong committed against a third party, the loss suffered by the competitors is not actionable under the umbrella tort of causing loss to the defendant by unlawful means against a third party.

5.3.4.  This fundamental difference between "*two-party*" and "*three-party*" torts was again explained by the House of Lords in the context of conspiracy in **Customs & Excise Commissioners v. Total Network SL** [2008] UKHL 19; 1 AC 1174. The House of Lords unanimously held that the requirement that a civil wrong be committed to a third party (in the case of the umbrella three-party tort) did not apply to a two-party case of conspiracy. In that two-party case involving a tort of conspiracy to injure the claimant directly criminal wrongdoing was held to be sufficient. Lord Hope, at [43], in a passage with which Lord Walker agreed (at [99]) said

> *"caution is needed where the unlawful act is directed against a third party at whose instance it is not actionable because he suffers no loss. There the claimant's cause of action is, as Hazel Carty, <u>An Analysis of the Economic Torts</u>, p.274 puts it, parasitic on the unlawful means used by the defendant against another party. As to that situation I would prefer to reserve my opinion. But in this case there was no third party....One has to ask why, in this situation, the law should not provide a remedy."*

5.3.5.  Lord Mance also explained that two-party wrongdoing cases differ from three-party cases where the wrong is committed through the intermediary of a third party and where there is a need to *"delimit the liability"* (**Customs & Excise Commissioners** at [124]; see also at [99], Lord Walker). The way of delimiting the defendant's liability in three-party cases was to insist upon the commission of a civil wrong against the third party.

5.3.6.  Unlike three-party intimidation (now part of the umbrella tort of 'causing loss by unlawful means to a third party'), there is no two-party intimidation case where a Court has considered the nature of the threat or conduct threatened which will suffice. In the only English case where the two-party intimidation was successfully raised – a decision before the more detailed consideration of this area of the law by the House of Lords in **OBG** and **Total** – the Court of Appeal did not need to consider the conduct which would suffice because the facts (assault and keeping the claimant in circumstances amounting virtually to slavery) were so stark: **Godwin v. Uzoigwe** [1993] Fam Law 65. However, Steyn LJ observed that coercion is the essence of the tort:

> '*there is very little guidance in the decided cases on the requirements of this tort. Nevertheless, it seems tolerably clear that coercion is of the essence of the tort*'.

The following year Steyn LJ, delivering the lead judgment in the duress case of **CTN Cash and Carry Ltd v. Gallaher Ltd** [1994] 4 All ER 714 at 718, held that:

> *"a threat may be illegitimate when coupled with a demand for payment even if the threat is one of lawful action."*

The tort of two-party intimidation was originally recognised as the tortious equivalent of the crime of blackmail and the restitutionary action for duress.   Thus when Sir John Salmond first recognised the two-party tort of intimidation, he relied upon a passage from the advice to the Lords by Hawkins J. in **Allen v. Flood** [1898] AC 1 at 17.  In the passage relied upon, Hawkins J. described an action for "*intimidation*" by reference to the concept of "*menaces*" (now called "*blackmail*") and also by reference to the decision in **Williams v. Bayley** (1866) LR 1 HL 200 (now regarded as a leading decision on the restitutionary action for duress: **Goff and Jones**' *The Law of Restitution* (7th Edn, 2007) at ([10-010]).

### 5.4.   **Duress**

Modern cases also recognise that intimidation is the tortious action which corresponds with the restitutionary action for duress.  The difference between the two is that although the remedy in the restitutionary action is limited to restitution, the tortious action for intimidation permits recovery of damages.  In **The Universe Sentinel** [1983] 1 AC 366 Lord Scarman said (at 400):

> *"It is, I think, already established law that economic pressure can in law amount to duress; and that duress, if proved, not only renders voidable a transaction into which a person has entered under its compulsion but is <u>actionable as a tort</u>, if it causes damage or loss."* (emphasis added)

The same point was made by Lord Diplock at 385.  It has been observed that the tortious action contemplated by Lords Scarman and Diplock was two-party intimidation: J. Edelman **Gain-based Damages** (2002) at 49.   Finally, in **Chitty on Contracts** (30th Edn, 2008) at 7-055, the observation is also made that the "*doctrines of duress and intimidation are based on similar principles.*"

### 5.5.   **Blackmail**

It is now recognised that both blackmail and duress (the criminal and restitutionary equivalent actions to two-party intimidation) are actionable if the threat is <u>illegitimate</u>.  It does not matter if the threatened conduct is lawful.  The <u>traditional</u> position that only threats of unlawful conduct

could amount to blackmail or duress (see **Ware and De Freville v. Motor Trade Association** [1921] 3 KB 40) was overruled in relation to blackmail in 1937 (see **Thorne v. Motor Trade Association** [1937] AC 797 at 806) and has recently been overruled in relation to duress (see **The Universe Sentinel** [1983] 1 AC366 at 384, 401; **CTN Cash and Carry Ltd v. Gallaher Ltd** [1994] 4 All ER 714 at 718; **R v. Attorney General for England and Wales** [2003] UKPC 22). In both cases a lawful, but <u>illegitimate</u>, threat will suffice. It is therefore to be expected that two-party intimidation will itself have developed in a similar manner.

5.6.    **Illustrative Examples**

Several examples of two-party intimidation can be given:

(1)    A points a gun at B, and threatens B that unless B gratuitously transfers his car to C, A will shoot B. The gun is loaded. B submits, and gratuitously transfers his car to C.

(2)    A tells B that he has paid X to be out of sight, pointing a gun at B, and unless B gratuitously transfers his car to C, X will shoot B. B submits, and gratuitously transfers his car to C. It does not matter whether X exists: see **Allen v. Flood** [1989] AC 1 at 87 (Lord Halsbury).

(3)    A tells B that unless B gratuitously transfers his car to C then A will report B to the authorities for unlawful activities that B has been conducting. B gratuitously transfers his car to C. See the recognition of this principle in the context of duress in **Williams v. Bayley** (1866) LR 1 HL 200.

5.7.    **The Berezovsky Case**

5.7.1.   I should also mention in this context, a very recent case in which the Court of Appeal referred to the essential ingredients of the tort of two-party intimidation, namely (**Berezovsky v Abramovich** [2011] EWCA Civ 153, para 5) in the following terms:

> *"(1) a threat by the defendant to do something unlawful or "illegitimate";*
>
> *(2) the threat must be intended to coerce the claimant to take or refrain from taking some course of action;*
>
> *(3) the threat must in fact coerce the claimant to take such action;*
>
> *(4) loss or damage must be incurred by the claimant as a result."*

5.7.2.   It is important however to note in relation to this case:

   (1)   The issue arose in the context of a strike-out/summary judgment application which did not involve a full trial and in respect of which the Claimant was merely required to show a sufficiently arguable case.

   (2)   That the ingredients of the tort of two-party intimidation were agreed at that interlocutory stage.

   (3)   Therefore, whilst the case gives, at present, the clearest indication of the essential ingredients, it does not conclusively define them.

   (4)   The tort of two-party intimidation is still underdeveloped in the case law and its parameters are, to some extent, uncertain and developing.

5.7.3.   Consequently, given the position in that case, the Court of Appeal did not have to address the issue. However, they expressed the following views:

> *"[The parties] have…agreed, for the purpose of these interlocutory proceedings, that it is arguable that the means to be used need not necessarily be unlawful, if they can be categorised as "illegitimate" whatever that may precisely mean. (It is pointed out that, in defining the crime of blackmail, section 21 of the Theft Act requires only that there be an 'unwarranted demand with menaces' and it is then said that the law of tort should not be kinder to the defendant than the criminal law.) That is a debate into which this court does not need to enter."*

5.7.4.   Consequently, the judgments in this case are of limited value. The issue is currently being argued in the Commercial Court in the trial of **Berezovsky v Abramovich** but it is unlikely that any judgment will be handed down before mid-2012 (and, indeed, the Court may decide that it need not address the issue).

5.7.5.   Whilst the above case law demonstrates that the issue is open, it is in my view that an English Court will more likely than not hold that illegitimate threats *are* sufficient for the tort of two-party intimidation.   This is predominantly for the reason that the Court of Appeal focussed on in **Berezovsky**, which is that the tort of two-party intimidation is, in essence, the civil equivalent of the criminal liability provided in section 21 of the Theft Act 1968 and the law of tort should not be

kinder to the defendant than the criminal law. *A fortiori*, in light of the fact that, were criminal proceedings brought, the victim of the blackmail could obtain a compensation order for loss caused by the blackmail under section 130 of the Powers of Criminal Courts (Sentencing) Act 2000. Further, such an analysis maintains consistency between the tort of two-party intimidation and the position under contract law, where a contract can be set aside for threats amounting to economic duress, even if the threats were to perform lawful (but illegitimate) acts: **CTN Cash and Carry v Gallaher** [1994] 4 All ER 714 (CA).

5.7.6.   It is also likely in my view that, where the effect of the intimidation is not that the plaintiff submits to the illegitimate threat but, instead, takes (costly) steps to mitigate the effect of the threat should it be carried out, the plaintiff should be able to recover the cost of those steps by way of damages. As far as I am aware, there is no case which has had to address this particular issue although there are some cases which have general formulations of the tort suggesting that if P does not submit to the threat, there can be no damage suffered. However, any contrary conclusion appears very unlikely. Suppose that D threatens P that he will shoot P's child playing outside if P does not pay him £100. In order to protect his child, P jumps out of the window causing himself injury. D could hardly argue that he is not liable in damages for P's personal injuries on the basis that P did not actually submit to the threat. The critical issue must be whether damage was caused by D's intimidation.

6.   **APPLICATION TO THE PRESENT CASE**

6.1.   The Plaintiff's case, as pleaded in the Complaint dated June 19, 2011, fulfils the essential ingredients of the tort of two-party intimidation as set out above:

(1)   Paragraphs 36 to 41 particularise alleged threats made to the Plaintiff, with regard to their UK business interests and Mr. Buckley's investiture as a Knight Bachelor, which are also alleged to be "*egregious and wrongful*" at paragraph 43. In my opinion, this constitutes an allegation of an illegitimate threat.

(2)   Paragraph 42 alleges that the intention behind the threats was to cause the Plaintiff to settle the London lawsuit for more than it was worth. In my opinion, this constitutes an allegation that the intention behind the threats was to coerce the Plaintiff into taking a course of action.

(3)      Paragraph 49 alleges that the threat caused the Plaintiff damage in an amount to be proved at trial.  In my opinion, this constitutes an allegation that the Plaintiff suffered loss as a consequence of the alleged illegitimate threat.

6.2.    In relation to the point at (3) above, I note that Mr. Saini QC, at paragraph 33 of his Affidavit, makes the point that the nature of the damage is not disclosed.  I am not in a position to express any opinion on whether the pleading is sufficiently particularised for the purposes of the law of New York.  Damage is a necessary part of the cause of action as a matter of English law and it has been pleaded at paragraph 49 of the Complaint.

6.3.    In the circumstances, it is my opinion that, although the Plaintiff has pleaded its cause of action under section 21 of the Theft Act 1968, the allegations pleaded are materially the same as those required for the tort of two-party intimidation which is, in essence, the civil law equivalent of blackmail.

7.      **UNLAWFUL MEANS CONSPIRACY**

7.1.    English law makes a distinction between two conspiracy-based torts: (1) the tort of unlawful means conspiracy; and (2) the tort of lawful means conspiracy.

7.2.    The relevant principles concerning the tort of unlawful means conspiracy have recently been extensively reviewed by Morgan J in **Digicel (St Lucia) Ltd v Cable & Wireless plc** [2010] EWHC 774 (Ch).  The ingredients of the tort are as follows:

(1)      There must be a combination.

(2)      The combination must be to use unlawful means (whether tortious or criminal acts).

(3)      There must be an intention to injure a claimant by the use of those unlawful means.

(4)      The use of the unlawful means must cause a claimant to suffer loss or damage as a result.

7.3.    On the assumption that either the crime of blackmail or the tort of two-party intimidation can be established, in paragraphs 67 to 72 the Plaintiff has made factual allegations which satisfy (1) to (3) of the above requirements.  The allegation in paragraph 49, that is the Plaintiff has been damaged as a result of the unlawful acts of the Defendants, satisfies requirement (4).

7.4.    Therefore, on the assumption that the facts pleaded are found to be true, the Plaintiff has pleaded a cause of action which entitles it to damages as a matter of English law.

8.    **LAWFUL MEANS CONSPIRACY**

8.1.    As indicated by its name, the tort of lawful means conspiracy does not require the conspirators to have employed any unlawful means.  However, it does require that the conspirators act with "*the predominant purpose of injuring the plaintiff*": **Lonrho plc v Fayed** [1992] 1 AC 448, 465-6. This is a question of fact.

8.2.    The pleaded allegations at paragraphs 62 to 66, if true, would satisfy the requirements of the tort of lawful means conspiracy.

9.    **CONCLUSION**

As indicated in paragraph 4 above, my conclusion is that, although the Plaintiff has pleaded its case under section 21 of the Theft Act 1968 (blackmail), the allegations relied upon, if true, would be sufficient to establish a cause of action, as a matter of English law, under the tort of two-party intimidation, which as a matter of English law may regarded as the civil law equivalent of section 21 of the Theft Act 1968.

**STEPHEN AULD Q.C.**

One Essex Court
Temple
London EC4Y 9AR

28 October 2011

**SUPREME COURT OF THE STATE OF NEW YORK**

Index No: 651708/2011

**COUNTY OF NEW YORK**

3M COMPANY

Plaintiff

-v-

(1) HARVEY BOULTER
(2) PORTON CAPITAL TECHNOLOGY FUNDS
(3) PORTON CAPITAL INC

Defendants

---

**EXHIBIT A**

---

This is Exhibit A to the Affidavit of Stephen Auld Q.C. Regarding Poiints of English Law Relevant to Defendants' Motion to Dismiss.

| | |
|---|---|
| Sworn by: | *Steph Auld QC* ) |
| Name: | STEPHEN AULD QC ) |
| Date: | 28 OCTOBER 2011 ) |
| At: | LONDON ENGLAND ) |
| Before me, | ROBERT SCOTT KERSS ) |
| | *[signature]* ) |

Name, ROBERT SCOTT KERSS
A Solicitor/Commissioner FOR OATHS, NOTARY PUBLIC.

SAVILLE AND CO NOTARIES
ONE CAREY LANE
LONDON, EC2V 8AE

My Commission expires at Death

SAVILLE & Cᵒ
NOTARIES PUBLIC
One Carey Lane
London EC2V 8AE
Telephone: +44 (0)20 7920 0000
Facsimile: +44 (0)20 7920 0088
www.savillenotaries.com



# ONE ESSEX COURT

## STEPHEN AULD QC



**Barrister**
**Date of call:** 1979
**QC:** 1999

Stephen Auld QC undertakes a wide and varied range of commercial work and City litigation. He has a particular expertise in and enjoys (1) City regulation, banking and financial services, (2) fraud and asset recovery, (3) corporate acquisitions, (4) sports and media cases, especially film and music business contracts, (5) hard and soft Commodity trading and oil, gas and derivatives. Stephen is called to the Bar of the Supreme Court of the Eastern Caribbean (BVI).

*Stephen Auld QC is 'every solicitor's ideal combination: extremely personable with the cutting edge and legal excellence that stands him apart as one of the best of the best'.* **Legal 500 2011**

## SCOPE OF PRACTICE

Acquisition of companies

Arbitration
domestic and international

Banking & finance

Breach of warranty

Civil fraud (incl. asset tracing)

Commercial law

Company law

Directors' duties, contracts & terminations

DTI enquiries

Jurisdiction & conflict of laws

Professional negligence

Restraint of trade

Share sale agreements

Sports, media & entertainment

Trusts & asset tracing

## EXAMPLES OF RECENT CASES

**Arbitration** domestic and international

Acting for the Respondents in arbitration in a dispute over monies owed in relation to sales and purchases of raw materials and steel products.

Advising clients in arbitration proceedings on issues of UK law involving a business interruption coverage dispute in the US.

Acting as Expert for US clients in an ICC arbitration involving issues of breach of oral contract and fraud.

Advising on a potential dispute relating to an investment agreement entered into concerning hotel/shopping complexes in the Middle East.

Acting for the Respondents in arbitration pursuant to rules of London Metal Exchange.

Acting as an Arbitrator in a dispute arising out Delivery and Licence Agreement and a Support and Maintenance Agreement. OMX agreed to develop and deliver a bespoke trading and clearing system to BSE and provide related support and maintenance services. During the project a dispute arose between the parties in relation to the agreed timeframe and functionality for delivery of the trading system.

### Banking & finance

Acting for the defendants in Socimer International Bank Ltd v. Standard Bank London Ltd [2004] EWHC 1041 (Comm).

The Securities and Futures Authority in some of its most substantial disciplinary cases, arising from the Maxwell collapse and the Sumitomo copper scandal, and in relation to advance fee fraud and money laundering

Standard Bank v Shaina (Chancery Division) Debt trading, bonds, asset freezing and indemnity costs

Acting in relation to an investigation by the FSA into one of the aspects arising out of the management of Equitable Life. Issues involve non-disclosure to the regulator of a letter to a financial reinsurance treaty and solvency issues.

SFA v Sir Michael Richardson (Financial Services Tribunal and Appeal).

Acting for the respondent in Kevin Foster v. The Financial Services Authority.

### Civil fraud (incl. asset tracing)

Canada Trust Company & Ors. v. W O Stolzenberg & Ors. Acting for the Claimants as trustees for certain pension funds established by Daimler Chrysler Canada Ltd. Loans totalling CAN$240 million made to investment companies were proved to have been procured by fraudulent misrepresentation. Involved issues including jurisdiction (Brussels Convention), world-wide freezing injunctions, tracing and asset recovery.

Gemini Travel (Chancery Division) Take over fraud.

Turtle Wax v Armour (Commercial Court) Fraud, Distribution Agreement.

### Commercial law

Acting for Ryanair in a multi-million pound dispute with the travel website Expedia. The dispute arises out of an agreement for Expedia to supply hotel accommodation to Ryanair's customers through a private label website linked from Ryanair's website. The central issue in the case is whether Ryanair took appropriate steps to prevent third parties "screen scraping" Ryanair's website.

Acting for Ryanair in disputes concerning airport charges as a result of its use of Stansted Airport. Issues of abuse of dominant market position, breach of Article 82 and the Competition Act 1998

Advising in relation to a dispute over the use of landfill sites and the amount of compensation owed by Defra (Secretary of State for the Department of the Environment, Food Rural Affairs) after the 2001 Foot & Mouth epidemic.

Appearing in the House of Lords for the appellant in (1) Optident Ltd (2) Ultradent Productions Inv v. Secretary of State for Trade & Industry (2) Secretary of State for Health [2001] UKHL 32. Pharmaceutical regulation

Advising an international defence contractor in relation to a missile system.

Metro Trading (Commercial Court) Oil trading and bunkering receivership.

### Company law

Acting and advising both vendors and purchasers in relation to numerous substantial takeover and acquisition disputes.

Acting in relation to a dispute involving an acquisition of a banking and advisory firm specialising in Telecom, Media and Technology (TMT) industries. Involves Section 459 Petition and possible breach of fiduciary duties.

Acting for Respondents in relation to a claim of constructive dismissal by a former Director.

Acting for former directors of Queens Moat Houses Plc in John Bairstow & Ors v. Queens Moat Houses Plc and Ors.

### Jurisdiction & conflict of laws

Bas Capital Funding Corp; Deutsche Bank London; Paine Webber Capital Inc and Ors v. Medfinco Ltd; Abacus Holdings Ltd; iWorld Group Europe Holdings Ltd & Ors (2004) 1 Lloyd's Rep 652. Involving a claim for damages for breach of an agreement and injunctions sought to prevent further breaches.

Murthy v Sivajothi (Court of Appeal). Conflict of laws / asset freezing.

### Sports, media & entertainment

Acting and advising film producers, studios and agents/distributors in relation to claims concerning the financing and distribution of films, including appearing in the Court of Appeal in United Film Distributors (2001) 2 All ER (Comm) 865 (film contracts and conflicts) and J&M v Citibank (Fraud in film financing).

Acting for and advising an international footballer in FA/Premier League disciplinary proceedings. Involved issues of transfer price and breach of contract.

© One Essex Court 2011. All rights reserved.

# Exhibit nn

# Exhibit oo

# Exhibit pp

# Exhibit qq

# Exhibit rr