UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA
------------------------------------------------X
3M COMPANY,                              :     Civil Action No.
                                         :     1:11-CV-01527-RLW
                                         :
            Plaintiff,                   :
                                         :
      - v -                              :
                                         :
HARVEY BOULTER,                          :
PORTON CAPITAL TECHNOLOGY FUNDS,         :
PORTON CAPITAL, INC., LANNY DAVIS,       :
LANNY J. DAVIS & ASSOCIATES, PLLC and    :
DAVIS-BLOCK LLC,                         :
                                         :
            Defendants.                  :
------------------------------------------------X

## DECLARATION OF TIMOTHY JOSEPH MALONEY

I, Timothy Joseph Maloney, declare under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

1.  I am a citizen and resident of the United Kingdom (the "U.K."). I am over eighteen years old and fully competent and qualified in all respects to make this Declaration. The facts stated herein are true and correct and, unless otherwise qualified, are within my personal knowledge.

2.  I am a partner in the law firm of Dorsey & Whitney (Europe) LLP, which has served as Solicitors for the 3M Company ("3M"). I represented 3M in a proceeding brought by Porton Capital Technology Funds, Porton Capital Inc. and Ploughshare Innovations Limited ("Claimants") in the U.K. High Court in London in December 2008 (the "BacLite Litigation"). My knowledge of the matters stated below derives from that representation and from the sources described. I submit this Declaration in support of the 3M Company's Consolidated Response to the Special Motions to Dismiss filed by

- 1 -

Defendants Lanny Davis, Lanny J. Davis & Associates, PLLC and Davis-Block LLC and Porton Capital Technology Funds and Porton Capital, Inc.

A.      **The BacLite Litigation**

       1.      **3M expands into a potential new market.**

       3.      Porton Capital Technology Funds ("Porton Technology") is an investment fund that, through five sub-funds (collectively, the "Funds"), invests in commercial ventures, including life science entrepreneurs. Porton Capital, Inc. ("Porton Capital"), is the investment manager of the Funds.

       4.      The Funds partnered with the U.K. Government, in particular the Ministry of Defence ("MoD") and its Defence Science & Technology Laboratory ("Dstl") to acquire an ownership interest in Acolyte Biomedica Limited ("Acolyte"). Acolyte was a British company partly owned by the MoD, as its only product, BacLite, was developed with MoD technology.

       5.      3M caused 3M U.K. Holdings Limited, a wholly-owned subsidiary of 3M, to acquire all outstanding shares of Acolyte. At the time, Acolyte's only commercially available product was BacLite, a device that allegedly allowed hospitals and clinics to screen for Methicillin Resistant *Staphylococcus aureus* bacteria ("MRSA"). In connection with the acquisition, 3M entered into a Sales and Purchase Agreement ("SPA"), which granted Acolyte's selling shareholders (the "Vendors") an opportunity to receive conditional earn-out payments on net sales of BacLite through December 2009.

       6.      The earn-out structure in the SPA compensated Claimants only according to BacLite's actual net sales. Additionally, 3M was required by the SPA to "actively market BacLite, and to diligently seek regulatory approval in the United States ("U.S."), Canada and Australia.

7. After the acquisition, 3M continued to actively market BacLite, pursuant to the SPA, in the U.K. as well as the rest of the European Union, and sought approval in Canada, Australia, and the U.S. Additionally, 3M completed nine clinical tests for BacLite, which was required in order to gain the approval of the Food and Drug Administration to sell BacLite in the U.S. The clinical trials, however, demonstrated that BacLite was not scientifically or commercially viable because: (i) it was not "robust," meaning that it was not capable of meeting its claimed performance parameters in a real world environment; (ii) it was overly complicated, involving over a dozen manual steps, thus increasing the chances of error in busy clinical environments and requiring highly-skilled personnel to operate it; (iii) it was too slow to meet current market demands, even if it could be run in 5 hours, as Acolyte claimed; (iv) the test could not actually be run in 5 hours; (v) the test could not routinely achieve the sensitivity and specificity ratings stated by Acolyte prior to the acquisition; and (vi) by early 2008, the market niche 3M expected to exploit with BacLite had unexpectedly narrowed because the cheaper chromogenic agar tests had gotten faster and the faster, more expensive PCR tests had gotten cheaper.

8. Moreover, by the end of 2008, BacLite's middle-market niche had crumbled because its faster competitors were getting cheaper and the less expensive competitors were getting faster.

2. **3M seeks consent to cease the BacLite business, but certain vendors bring claims against 3M.**

9. In consideration of 3M's determination that BacLite is not commercially viable, and pursuant to its contractual rights under the SPA, in July 2008, 3M sought the Vendors' consent to allow 3M to stop marketing BacLite before December 2009. 3M

recognized that the Vendors under the SPA were entitled to the reasonable value of any sales for 2009 that consequently would not be made. In accordance with the SPA, 3M offered to pay the vendors $1.07 million, which 3M calculated was the amount of net BacLite sales that it reasonably expected to actually achieve through December 31, 3009.

10. After two years of litigation, and several million dollars spend in legal costs, the Claimants were only awarded the sum of $1.03 million. As a result of the offers made by 3M, Claimants are highly likely, in my view, to be held liable to indemnify 3M for a major portion of its costs and attorney fees, including the costs of the trial. Claimants' liability will ultimately be decided by the trial judge at a hearing on 3 February, 2012.

### 3. Claimants' use threats of retaliation to pressure 3M to agree to Claimants' demands.

11. Harvey Boulter ("Boulter") is the Director of Porton Capital Technology Funds and the Chief Executive Officer of Porton Capital Inc. On August 30, 2008, an associate and friend of Boulter, Robert L. Hamburger ("Hamburger"), sent an email to 3M Chairman, President, and CEO, George Buckley ("Buckley") (as he then was), which forwarded the text of an email which he said that he had received from Boulter. Boulter's email stated as follows:

> Just to make you aware. We have one investor group in [Porton Capital] inc who tell me they control a very material position of 3M stock. These people rarely do things under $100 million and usually it is high multiples of this.
>
> We informed them of 3M's position re Acolyte. They have taken a view that 3M is a dishonest party and have threatened to sell their entire position.
>
> I have asked them to please not do this and allow us a period to sort this issue out as I don't believe this would be helpful to our negotiation. 3M's actions have created one hell of a storm.

> Some of these [Gulf Cooperation Council] families are propping up various U.S. sectors right now and they don't necessarily do it in a western rational way.
>
> If you can get some high level attention to this matter I would appreciate. Their U.K. counsel did not even know of the letter they sent. Sounds like an uncoordinated mess that has a recipe to get a lot worse rapidly.

12. Later in the day, Boulter sent a second e-mail stating that, unless 3M took immediate action, the investors would act—potentially irrationally—to harm 3M. It states that it was "essential that 3M do nothing to further escalate this situation" because it had already "triggered a rather unexpected chain of events." Boulter further stated that the foreign investors were a volatile group that was "understandably not very happy" and were "simple people of vast means" and that Buckley needed to do something to "help me buy some time" with the investors.

### 4. **Claimants sue 3M in London.**

13. The SPA provides that the Vendors' consent to 3M's request to stop marketing BacLite cannot be unreasonably withheld. Nevertheless, Claimants refused 3M's request for their permission to cease the BacLite business in return for a payment of $1.07 million and further demanded that 3M pay them nearly $66 million, which is the maximum amount of earn-out payments allowed under the SPA. Claimants' demand however, ignored the fact that earn-out payments were not guaranteed but, rather, were contingent on BacLite's actual performance in the market. That demand of $66 million, bore no rational relationship to the "real world" sales and performance data that 3M had provided Vendors at their request, which demonstrated that 3M's projections of $1.07 million in sales in 2009 were far more realistic. The recent decision in the BacLite Litigation has proven this point, with the High Court finding that total worldwide sales of

BacLite in 2009 would have been $2,152,000 – or about 3% of the implied total sales of which Defendants purported to base their demand prior to the litigation.

14. Claimants' attorneys complained that 3M was in breach of the SPA and withdrew their request that 3M continue to perform under the contract. Claimants filed the BacLite Litigation in the U.K. High Court in London on August 28, 2008, asserting damages against 3M for breach of contract. Specifically, Claimants alleged that 3M failed to actively market BacLite, to diligently seek regulatory approval for BacLite in the U.S. and Canada and to devote resources to BacLite to a similar overall degree as were given to other products in 3M's Medical Division. In its defence to the lawsuit, 3M denied each of these contentions and asserted that Claimants were entitled to less than $2 million as a result of 3M's decision to cease BacLite's sales.

15. The BacLite Litigation was conducted in the High Court between mid-June and July 18, 2011, with closing arguments conducted on September 29 and October 3-4, 2011. On November 7, 2011, the High Court issued its reasoned judgment, which rejected Claimants' allegations of impropriety by 3M and its executives, and vindicated 3M by finding that Claimants' 60.4% share of BacLite's potential sales in 2009 was only $1,299,808 – almost $38 million less than what Claimants had demanded at trial, and less than what 3M had offered before trial began to settle the lawsuit.

**B.     The Claimants Did Not Succeed On Most Of The Issues They Raised During The BacLite Litigation And At Trial.**

    **1.     The ever-changing nature of Claimants' case before trial**

16. During the course of the BacLite Litigation, Claimants made a number of claims and allegations for which there was no factual or legal basis. As a result, the claims were ultimately abandoned by substantive amendments to the Particulars of

Claim, summarily rejected by the Court or simply not pursued at trial. Claimants were ordered to pay the legal costs incurred by 3M in dealing with these baseless allegations.

17. For example, in the original Particulars of Claim, Claimants implied that 3M had bought BacLite in order to shut it down in favor of 3M's Fastman product. Specifically, paragraph 14 of the Original Particulars of Claim, served on December 22, 2008, states that:

> "The Claimants will contend that Defendant's decisions in regards to BacLite are consistent with a decision to undermine BacLite and breach its undertakings in the SPA, and instead to support and market a competitor product from 3M it called Fastman, despite the reduction in hospital MRSA morbidity and mortality and public health expenditures that BacLite's cost-effective widespread use would entail, particularly in regards to newly emerging strains of MRSA."

18. This allegation was eventually withdrawn by the Claimants in the Re-Amended Particulars of Claim, dated July 28, 2010, after extensive document disclosure by 3M on the issue brought forth no evidence to support it. The Court referred to this event as a "sea change" in Claimants' "original theme of the claim."

19. Claimants also sought to amend the Particulars of Claim to allege that the Share Purchase Agreement imposed on 3M an obligation to "develop" BacLite after it purchased Acolyte. The Court rejected this amendment, correctly concluding that the proposed claim had no basis in the language of the Share Purchase Agreement. Moreover, the Court rejected Claimants' contention that the 3M Company induced 3M U.K. Holdings into breaching the Share Purchase Agreement.

20. Finally, Claimants alleged that 3M's motivation in ceasing the business of BacLite was actually to realize a "substantial one-time gain" from shutting down Acolyte. That claim, however, was neither mentioned by Claimants in their opening submissions nor put to any 3M witness at trial.

## 2. The Court found for Defendants on nearly all of the disputed issues put forward by Claimants at trial.

21. In addition to those allegations that were abandoned by Claimants either before or during trial, or which were dismissed before trial, the overwhelming majority of time, effort, and resources that were spent in this litigation were dedicated to fact and expert testimony, as well as documentary evidence that went to allegations on which Claimants did not prevail, specifically that:

- The term "diligently" in the SPA imposed a standard of reasonable care on 3M as to how it went about seeking regulatory approval for BacLite in those Major Markets in which it was required to do so.

- 3M "botched" the U.S. clinical trials for BacLite by negligently: (i) failing to conduct a pre-trial clinical investigation; (ii) failing to properly monitor the trials; (iii) using the wrong comparator; (iv) using the wrong incubator temperature; (v) concluding wrongly that BacLite suffered from technical problem, such as the "swab age" problem and inordinate sensitivity to temperature variation; and (vi) concluding, without any rational basis, that BacLite was unable to obtain U.S. regulatory approval in the form it was purchased from Acolyte.

- Dr. William Brennan's analytical conclusion that BacLite had a "swab age" problem was unsupported by the evidence, and was reached solely to provide an excuse for 3M to abandon the U.S. regulatory approval process.

- 3M failed to begin marketing BacLite until September 2007.

- 3M's "60-Day" marketing plan was, in effect, an abandonment of any active marketing efforts for BacLite.

- 3M' reassignment of some members of its sales force in March 2008 was, in effect, an abandonment of its active marketing efforts on behalf of BacLite.

- 3M should not have waited to launch BacLite in Australia and Canada until after it had obtained regulatory approval for BacLite in the U.S..

- BacLite was a "robust" product that could easily have obtained its stated performance goals of being an easy-to-use, five hour, cost

- effective, and flexible MRSA screening test in any clinical setting in any of the Major Markets.

- BacLite's sales experience before December 2008, combined with evidence from various marketing studies and focus group evaluations, proved that BacLite would have been a tremendous success in the Major Markets.

- BacLite could have effectively competed with both the genetic PCR MRSA screening tests, which were much faster than BacLite and getting less expensive, and the chromogenic agar tests, which were much cheaper than BacLite and getting faster.

- Buckley conspired with Brad Sauer ("Sauer"), 3M's Vice President of 3M's Healthcare Division, to direct James Ingebrand ("Ingebrand"), then the Director of 3M's Infection Prevention Division, to terminate BacLite because it was losing money, and to "make up" reasons to do so that had nothing to do with BacLite's performance. 3M's failure to call either Buckley or Sauer as witnesses implied that 3M was trying to "hide" these "facts" from the Court.

22. The Court found in favor of 3M on each of these issues. In particular, the Court agreed with 3M that:

- "Diligently" in the Share Purchase Agreement means with reasonable application, industry and perseverance. It does not involve any distinct requirement of reasonable care.

- A "considered and reasoned decision was reached [by 3M] to use MSA" as a comparator in the U.S. clinical trials.

- 3M had no reason to believe that the change in comparator would materially affect BacLite's performance, and Claimants' primary witness in support of the contrary argument did not raise any objection to the change at the time it was made.

- 3M's decision to use MSA with a cefoxitin disc confirmation as a comparator in the U.S. clinical trials, instead of MSA, involved no failure on the part of 3M to exercise reasonable care or to seek regulatory approval with reasonable application, industry or perseverance. Indeed, Claimants' own expert, Professor James, accepted that this decision was reasonable.

- The decision not to carry out pre-clinical trials was a reasonable one, and it involved no failure on the part of 3M to exercise

reasonable care or to seek regulatory approval with reasonable application, industry and perseverance.

- 3M's conclusion that strict adherence to an incubator temperature of 37C in the U.S. clinical trials was not critical and was reasonable in light of 3M's inquiry on this issue, and Dr. Foote's conclusion that a temperature range of 35-37C was acceptable. 3M's decision was especially reasonable in light of the fact that incubators in the U.S. are commonly operated at 35C and not 37C.

- Instructing or allowing the U.S. clinical sites to maintain a temperature of 33-35C, rather than 37C, involved no failure on the part of 3M to exercise reasonable case or to seek regulatory approval with reasonable application, industry and perseverance.

- 3M did not fail to exercise reasonable care in relation to its monitoring of the U.S. clinical study sites. Claimants' expert, Professor James, accepted that Claimants' allegation that 3M should have conducted interim analyses of the test data would not have been proper because relevant guidelines precluded such analyses.

- "Even if the obligation to seek regulatory approval 'diligently' imported an obligation to do so with reasonable care there was no failure [by 3M] to exercise such care in relation to the U.S. clinical trials," and "the conduct of those trials involved no breach of the obligation diligently to seek regulatory approval."

- In the light of the poor results of the U.S. clinical trials, there was no doubt that 3M properly stopped the trials in order to investigate the reasons for such results. Indeed, Claimants primary witness on this issue, Mr. O'Hara, accepted that this was the right decision.

- 3M's investigation into the causes of the poor results between November 2007 and the end of March 2008 was thorough and diligent.

- There were good reasons for 3M's decision to suspend the U.S. trials and to concentrate on developing a next generation product.

- It would not have made sense for 3M to launch BacLite in Canada until the issues that arose in the U.S. trials had been fully resolved.

- 3M's U.K. marketing during the period prior to September 2007 was characterised by action. There was much active marketing that could be, and was, done even without a sales force in place.

- The level of financial, personnel and other resources devoted by 3M to marketing and sales activities for BacLite in the European Union ("E.U.") greatly exceeded the resources devoted to other products in its medical Division.

- A "considerable and impressive" amount of active marketing was carried out throughout the period from February 2007 to September 2007 in the E.U.

- Accordingly, the Court "reject[ed] the Claimants' case" that 3M failed to actively market BacLite prior to September 2007.

- The implementation of the 60 day plan in January 2008 involved more, not less, marketing of BacLite and a redeployment of some resources, but it did not mean that there was no active marketing.

- There was no material breach of 3M's obligation to actively market in the U.S. prior to February 2009.

- Once performance issues with BacLite had arisen in the U.S. clinical trials, it was a sensible and reasonable decision by 3M to defer any launch in Australia until they had been resolved.

- BacLite was delicate and difficult to get right in the real world and was not robust because "it was too sensitive to minor changes in environment or deviations from the 'ideal' operating protocol."

- BacLite was not as easy to use by customers as Claimants' alleged because it was "a relatively complicated test with more hands on time than was claimed," and required frequent manual interventions which made it difficult for laboratory technicians to accomplish other tasks while BacLite was processing.

- In reality BacLite was not a 5 hour test as claimed, but instead took an average of 5 ½ to 6 hours to conduct.

- As batch test, there was an inherent inflexibility in the product – the right number of samples had to be accumulated at the right rate.

- Dr. Brennan's analytical studies regarding a potential "swab age" problem with BacLite were carried out conscientiously and in good faith and was not somehow designed to demonstrate flaws in BacLite.

- Dr. Brennan's studies supported the provisional conclusions that he reached, and that on any view 3M was entitled to rely on those conclusions.

- There are compelling reasons why BacLite, as sold to 3M by Acolyte, would never have been a commercial success and why future sales of the product would have been limited even if the SPA had been fully performed.

- "[a] very real issue for BacLite was always whether hospitals would be prepared to adapt their workflow [around it] ... . For hospitals with lesser testing needs, it was unlikely to be cost effective. For hospitals with greater testing needs it would not be sufficient."

- BacLite's middle-market niche "was increasingly 'squeezed' as the slower tests became faster and the faster, more expensive tests became cheaper."

- Contrary to Claimants' contentions, the "opportunity pipeline" documents did not purport to provide, and do not provide, a reliable sales forecast for BacLite on which there could be reasonable basis to calculate Claimants' alleged damages.

- Claimants' expert Dr. Huckle's opinion that 3M should have secured U.K. sales of around $5.2 million in 2009, representing 52 new accounts and over 10% of the available U.K. market, was unrealistic, as it was based on theoretical estimates achievable market share.

- Estimation of sales for BacLite in 2009 should, instead, be based on the evidence presented by 3M's fact witness, Mr. Collier, which was based on the actual pipeline and actual prospects for BacLite sales.

- 3M would actually have obtained no more than six new accounts in the U.K. in 2009, in accordance with Mr. Collier's evidence and that of 3M's expert Dr. Stammers, valued at $1,050,000.

- The opinion of Claimants' expert, Dr. Huckle, that 3M should have obtained 2009 sales for BacLite in the E.U. of $16.5 million, representing over 150 accounts and 8.5% of the total available market, was unrealistic, and 3M's approach of relying on actual prospects rather than theoretical estimates of achievable market share was more accurate – yielding total 2009 sales of BacLite in the E.U. of 10 new accounts valued at $445,000.

- Even if 3M had obtained regulatory approval in the U.S. by switching to MSA-Ox as comparator, instead of MSA, as 3M's expert Mr. Powell noted, this fact may well have damaged BacLite's commercial prospects in the U.S. market (judgment, para. 328(2)).

- In relation to the probable market share in the U.S., 3M's expert Mr. Powell's approach was far more realistic than that of Dr. Huckle, and based on Mr. Powell's approach the Court estimated BacLite sales in the U.S. in 2009 would have been $417,000.

- Mr. Powell's estimate of the size of the Canadian market in relation to the size of the U.S. market was more realistic than Dr. Huckle's, resulting in an estimate of BacLite sales in 2009 in Canada of $90,000.

- Mr. Powell's estimate of the size of the Australian market in relation to the size of the U.S. market was more realistic than Dr. Huckle's, resulting in an estimate of BacLite sales in 2009 in Australia of $150,000.

- The total net sales for BacLite in the Major Markets for 2009 would have been $2,152,000, resulting in an award to Claimants of $1,299,808.

- Following the Deep Dive Review, there was no decision to terminate the business with immediate effect.

- There is no satisfactory evidence that 3M U.S. knew or intended that there was a breach of the obligation to actively market from the end of June 2008 or that 3M U.S. knew that the termination of the business was a breach of contract and intended such breach to take place.

- The Court made no finding that 3M's decision to cease the manufacture and sale of BacLite was based on any rationale other than the company's reasonable determination that the product was a commercial failure because it could not perform as expected in actual clinical environments, thus rejecting Claimants' theory that Buckley, Sauer and Ingebrand conspired to find invalid and improper reasons to justify 3M's decision.

23. Of particular note is the fact that 3M prevailed on each and every issue on which significant expert testimony was presented at trial – *i.e.,* active marketing, the

diligence and reasonableness of 3M's efforts to seek regulatory approval for BacLite in the U.S. and damages.

C. **The Claimant's Use Of Improper And Misleading Tactics In Relation To The BacLite Litigation.**

24. The Claimants, in conjunction with Lanny Davis ("Davis"), their U.S. attorney and self-proclaimed media relations specialist, orchestrated a campaign of improper and misleading actions in relation to their conduct of the BacLite Litigation. These tactics included the following, which are discussed in detail below:

- Making misleading public references to serious allegations which the Claimants knew to be unsustainable, including that: (i) 3M's conduct in respect of BacLite had led to loss of life; and (ii) that 3M had purchased Acolyte from the vendors in order to "kill" the product in favour of its own Fastman product. It is clear from the evidence before the Court that both of these allegations were unsupported by any evidence (or had already been withdrawn from Claimants' pleading), and yet they continue to be made by the Claimants in the media.

- The setting up of the "MRSA Injustice" website and the issuing of various press releases as part of sustained media campaign that spread false and misleading information about 3M.

- Raising the proceedings in discussions with Dr. Liam Fox MP ("Dr. Fox"), the then Secretary of State for Defence, and then subsequently referring to these discussions in email correspondence to 3M's U.S. lawyers in an effort to pressure 3M into settling the lawsuit for an amount far in excess of what it was worth.

- Arranging for fake "protests" to take place outside of the Court during the trial.

2. **The Claimants' misleading media campaign against 3M**

25. On March 9, 2011, an article was published on the Forbes.com website written by Davis entitled "3M's George Buckley Criticizes Obama While Ignoring Good Corporate Governance." This article described BacLite as a "life-saving health care

- 14 -

product" and stated that following 3M's decision to "pull the plug" on the contract "lives are still at risk from MRSAs in hospitals in U.K., the U.S. and throughout the world." The article concluded by stating that:

> "... perhaps shareholders too will want to know – and perhaps so should the Securities and Exchange Commission – why there wasn't full disclosure on material nonpublic facts, if any, concerning these decisions, facts which might endanger 3M's reputation and adversely affect share values once the full story is known"

26.     On May 11, 2011, Davis organized and conducted a press conference in Minneapolis. The stated purpose of the press conference was to announce a "citizen's petition" that he had filed with the FDA, which asked that the FDA investigate 3M's allegedly "reckless" conduct of the BacLite clinical trials.

27.     The "citizens' petition" included various allegations against 3M which Claimants must have known were false and/or misleading, including that:

- 3M intentionally botched the BacLite clinical trials and abandoned BacLite in order to promote 3M's own MRSA detection product, FastMan. There is no evidence of this allegation, however, and it was voluntarily dropped by Claimants in the BacLite Litigation.

- "Acolyte was sold to 3M for a relatively small down payment of 10 million pounds sterling—with another 41 million pounds to be paid out through the end of 2009." This was false because Porton was only entitled, under the SPA, to receive an amount based on the net sales of BacLite, of which 41 million pounds was the maximum possible payout under the SPA, not the minimum.

- "Hospital patients in Europe, the U.S., Canada, and Australia are not able to gain the protection of BacLite's ability to detect deadly MRSAs within hours, rather than days, as a result of 3M's inexplicable conduct in botching the U.S. clinical trials." This was false because a range of other, far more reliable MRSA tests were available – specifically, genetic PCR tests and the increasingly faster chromogenic agar tests – that provided results either far more quickly than, or in some cases in about the same time frame as, BacLite could. Indeed, that is one of the reasons BacLite proved a commercial failure.

- BacLite was a state-of-the-art product that could detect MRSA within five hours, and that the only other option was a Petri-dish growth method that took 2-3 days. The Defendants further state in the citizen's petition that that the abandonment of BacLite "has led to countless unnecessary infections and deaths." This was false because PCR tests for MRSA detection were available that could detect MRSA faster than BacLite. Chromogenetic agar tests were also available, many of which could provide results in the same time frame as could BacLite in "real world" clinical settings. Moreover, there is absolutely no evidence that any infections or deaths have been linked to the lack of BacLite testing, or that any patient has ever gone without MRSA testing because of the unavailability of BacLite. BacLite's application was to screen newly-admitted hospital patients for latent MRSA bacterial they might be carrying in order to clear those patients from quarantine. BacLite was not intended to diagnose sick patients., Other tests were available for MRSA detection at every hospital or clinic that used BacLite, and also in those that did not.

- The undersigned certifies, that, to the best knowledge and belief of the undersigned, this petition includes all information and views on which the petition relies, and that it includes representative data and information known to the petitioner which are unfavorable to the petition.

28. Davis also used the press conference to launch a website with the address www.mrsa-injustice.com. This website contained a number of misleading allegations, some which had already been shown in this lawsuit to be unfounded, including a statement that "[p]eer reviewed medical studies indicated that [BacLite] worked, hospitals could have used it to save lives and money, and it might have been marketed widely – until 3M acquired it and later abandoned it." Moreover, under the heading "3M abandons BacLite but markets more expensive, less proven Fastman Competitor" the website said the following:

- It turns out that 3M's Health Products Division had engaged a decade long ongoing effort to develop its own product to detect MRSA, called Fastman. This was a product that the company has admitted it intended to "market... for MRSA detection," an announcement it made while there were still six or seven months

> left under the agreement requiring 3M to "actively" market BacLite;

- Fastman was a potential competitor to BacLite, but it was both more expensive and less robust, i.e. able only to detect previously identified strains of MRSA. It also appears that Fastman had not yet completed testing at the time of 3M's purchase of BacLite. Fastman would thus possibly have been at a competitive disadvantage.

- Combined with 3M's negligence in running the BacLite trials, there are serious questions revolving around 3M's motivation to purchase BacLite. Did the company know that at some point, it would stop selling it and replace it by its own Fastman product? Did it ever intend to "actively" market BacLite?

29. During the press conference, Davis, or his associate Robert Hopper ("Hopper"), also asserted that 3M's alleged negligence with regard to BacLite meant that "thousands and thousands" of individuals who died of MRSA infections would otherwise be alive today. Specifically, Davis and/or Hopper stated that:

> "Tests… were botched in the United States so that American hospitals don't have the benefit of this product that can detect this deadly superbug that killed more people than AIDS in this last year … All those who have suffered from MRSA. could have avoided exposure but for the decision by 3M to abandon it and to refuse to seek approval form the FDA … Thousands and thousands and thousands of people who died might be alive today had there been a BacLite… ."

30. Davis further accused 3M of "hiding the technical report" and suggested that this meant that 3M must have been "motivated by other things besides selling BacLite under the contract." This allegation is false because 3M disclosed the technical report to the Claimants in the litigation and, further, was under no obligation to submit the BacLite Technical Report to the FDA, and thus could not, under any circumstances, have "misled" the FDA as to that report. As someone who has advised corporations, including 3M, on FDA procedures, Davis should have known that the allegation was false.

31. Davis also issued other public statements, which they repeated in various press releases, blogs, internet forums and other media, including that:

- 3M's introduction of BacLite into the U.S. market "could possibly have saved lives" and further requesting that individuals "please spread the word around to raise awareness for fellow patients."

- 3M's "personal interests and corporate decisions negatively affected sale of [BacLite] ... . Please send this article around, can be found on various news websites. Make awareness of BacLite, make into a success story."

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 15, 2011.

_____
Timothy Joseph Maloney

5258073.6
2124-06

- 18 -