## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **3M COMPANY,** | |
| Plaintiff, | |
| v. | Civil Action No. 11-cv-1527 (RLW) |
| **BOULTER,** et al. | |
| Defendants. | |

## <u>MEMORANDUM OPINION</u>

Plaintiff 3M Company ("3M") has sued Defendants Lanny J. Davis, Lanny J. Davis & Associates, PLLC, Davis-Block LLC (collectively the "Davis Defendants"), and Harvey Boulter, Porton Capital Technology Funds, Porton Capital, Inc. (collectively the "Porton Defendants") for a number of claims, including commercial defamation, tortious interference with contract and prospective business relations, and civil conspiracy. <u>See</u> First Amended Complaint ("FAC").

Before the Court are the following sets of preliminary motions: 1) Defendants' Special Motions to Dismiss under the D.C. Anti-SLAPP Act of 2010 (Dkt. Nos. 8, 55, 34 and 57); 2) 3M's Motion to Strike Defendants' Special Motions to Dismiss and Cross Motion for Discovery (Dkt. Nos. 16, 40); 3) the Davis Defendants' Rule 12(b)(6) Motions to Dismiss (Dkt. Nos. 30, 52); and 4) the Porton Defendants' Rule 12(b)(2) and 12(b)(6) Motions to Dismiss (Dkt. Nos. 31, 51). The District of Columbia ("District") has intervened for the purpose of defending the validity of the D.C. Anti-SLAPP Act and to defend the Act's applicability in a federal court sitting in diversity. For the following reasons, Defendants' Special Motions to Dismiss are denied, 3M's Motion to Strike and Cross Motion for discovery are denied as moot, and Defendants' Rule 12 Motions to Dismiss are granted in part and denied in part.

## FACTUAL SUMMARY

3M has brought claims against the Defendants for: Intimidation and Blackmail under United Kingdom (U.K.) law (Count I); Tortious Interference with Existing and Prospective Business Advantage (Count II); Tortious Interference with Contract (Count III); Commercial Defamation (Count IV); Injurious Falsehood and Business Disparagement (Count V); Breach of Fiduciary Duty (Count VI); Aiding and Abetting (Count VII); and Civil Conspiracy (Count VIII).  3M seeks compensatory and punitive damages from Defendants, as well as injunctive relief.

3M's factual allegations have been set forth fully in the First Amended Complaint, and have been repeated numerous times at length in the parties' briefs.  Accordingly, the Court will not restate all the factual allegations here.

### The Underlying Dispute: the BacLite Litigation in London

As part of its plan to expand into the global diagnostics market, 3M U.K. Holdings Limited (3M's wholly-owned subsidiary) acquired all of the outstanding shares of Acolyte Biomedica Limited ("Acolyte"), a company whose only commercially-available product at the time was BacLite.  (FAC ¶ 42).  BacLite is a test that screens for MRSA (Methicillin Resistant Staphylococcus aureus bacteria), commonly known as a "superbug."  (FAC ¶ 42).  Because superbugs such as MRSA are resistant to conventional antibiotics, they are of "special concern to medical professionals."  (FAC ¶ 42).

Acolyte sold 3M on the potential that BacLite would fill a market void.  (FAC ¶ 43).  At the time, other screening tests for MRSA were either slower and cheaper ($2-3 per test with results in 48-72 hours) or much faster but more expensive (approximately $25 per test with results in 1-2 hours).  (FAC ¶ 43).  Acolyte represented to 3M that BacLite could produce results

in 5 hours with a cost of $12-15 per test.  (FAC ¶ 43).  Acolyte also represented that BacLite was

highly sensitive and accurate in clinical trials.  (FAC ¶ 43).

    3M entered into a Sales and Purchase Agreement ("SPA") to purchase Acolyte.  (FAC ¶

45).  Under the SPA, Acolyte's selling shareholders (the "vendors") had the opportunity to

receive conditional earn-out payments on net sales of BacLite through December 2009.  (FAC ¶

45).  The vendors of Acolyte included the U.K. Ministry of Defense ("MoD"), which had been

involved in the development of BacLite, and Defendant Porton Technology, an investment fund

directed by Defendant Harvey Boulter.[1]  (FAC ¶¶ 28-29).  Boulter is also the Chief Executive

Officer of Porton Capital, the investment manager of Boulter's funds.  (FAC ¶ 28).  According to

3M, Boulter had "developed significant relationships" within the U.K. government through his

businesses.  (FAC ¶ 30).

    Although 3M actively marketed BacLite in many countries and began to seek regulatory

approval for the product, it became apparent to 3M that BacLite performed much poorer in

clinical trials than Acolyte had initially represented.  (FAC ¶¶ 45-48).  3M ultimately determined

that BacLite was not commercially viable for several reasons, including: 1) that BacLite was not

"robust" because it was incapable of meeting its claimed performance in a real world

environment; 2) that BacLite was overly complicated to use, thus increasing the chances for error

in clinical environments; and 3) that the middle-market niche that 3M had hoped to fill with

BacLite had "unexpectedly narrowed."  (FAC ¶ 49).

    Having determined that BacLite would not be commercially viable in the U.S., Canada or

Australia, 3M sought the vendors' consent (as required by the SPA) in July 2008 to stop

---

[1]    It appears that Boulter has not yet been served in this case.  According to 3M, because
Boulter is not a citizen of the United States, 3M is in the process of serving Boulter through the
procedures of the Hague Convention.  (Dkt. No. 43 at 5 n.14).  3M did not request that the
determination of the pending motions be stayed pending service of process on Boulter.

marketing BacLite.  (FAC ¶¶ 49-52).  Under the SPA, the vendors could not unreasonably withhold such consent.  (FAC ¶ 52).  3M offered the vendors $1.07 million, which was the amount that 3M had expected to receive from BacLite sales through December 2009.  (FAC ¶ 52).  The Boulter Defendants, however, were not satisfied and instead sought to "wring" tens of millions of dollars from 3M—an amount "much greater than that to which they were entitled." (FAC ¶ 53).  According to 3M, it was at approximately this time that Defendants began their "campaign of harassment and intimidation."  (FAC ¶ 53).

### 3M's Allegations of Intimidation, Coercion and Defamation

3M alleges that the Porton Defendants first sought to threaten 3M's CEO George Buckley ("Buckley").  (FAC ¶¶ 54-56).  Boulter's friend informed Buckley via e-mail that he and Boulter had influence over several groups of 3M investors who owned material positions of 3M stock, that Boulter and his friend had informed the investors of 3M's position regarding Acolyte, and that the investors were threatening to sell their entire positions.  (FAC ¶ 54). Through these e-mails, Boulter "threatened 3M with a crippling sell-off of 3M's stock, and commensurate damage to 3M's value" if 3M did not accede to his demands.  (FAC ¶ 57).  3M does not allege that it or Buckley capitulated to those demands or that those investors sold their positions.

In December 2008, certain vendors, including the Porton Defendants, ultimately sued 3M in the U.K. High Court in London for breach of the SPA (the "BacLite Litigation").  (FAC ¶ 59). Although 3M does not specify this in its Complaint, the Court takes judicial notice of the fact that, besides the Porton Defendants, the other claimant in the BacLite Litigation was Ploughshare Innovations Limited, "an investment arm of the UK Ministry of Defence" and a subsequent shareholder in Acolyte.  (Dkt. No. 28-1 at ¶ 8).  Among other things, the claimants alleged that

3M breached the SPA because it failed to market BacLite actively and obtain regulatory approval in the United States. (FAC ¶ 59). Those claimants "repeatedly demanded" that 3M pay them nearly $66 million, the maximum potential amount of earn out payments under the SPA. (FAC ¶¶ 58-59).

3M alleges that, leading up to the U.K. trial in 2011, the Porton Defendants hired Washington, D.C. lawyer Lanny J. Davis and began a scheme to extract $30 million from 3M in two ways: 1) by launching "a comprehensive, international, and unrelenting bombardment of sensational and false accusations against 3M in the global media"; and 2) by attempting "to leverage access to the U.K. MoD." (FAC ¶¶ 60-63). 3M claims that Davis became the "mastermind[] [of] Defendants' scheme against 3M" and was the "spider in the web" of Defendants' alleged conspiracy.[2] (FAC ¶¶ 17, 61-62).

First, Davis began a "defamatory media blitz" against 3M. (FAC ¶¶ 64-65). That campaign focused on 3M's decision to withdraw its efforts to market and obtain regulatory approval for BacLite. (FAC ¶¶ 66-79). Some of the alleged defamatory conduct included:

- Publishing press releases which claimed that 3M had dropped BacLite out of "bad faith" and had dealt dishonestly with the FDA. (FAC ¶¶ 66, 74).

- Filing a "sham's citizen's petition" which Davis submitted to the FDA on behalf of the Porton Defendants. (FAC ¶¶ 66, 78-79). In the petition, Defendants request that the FDA investigate 3M and hold an evidentiary hearing to determine, among other things, whether 3M intentionally botched the BacLite clinical trial in order to promote 3M's own MRSA detection product. (Id.).

---

[2]     3M has also sued two entities of which Davis is a principal: his Washington, D.C. public relations and law firm Lanny J. Davis & Associates PLLC (FAC ¶¶ 12-13) and another entity named Davis-Block LLC (FAC ¶ 14).

- Making statements accusing 3M and Buckley of being responsible for the deaths of MRSA victims, including statements during an "international press conference" at which Davis claimed that "thousands and thousands and thousands of people who died [from MRSA] might be alive today had there been a BacLite . . . ." (FAC ¶ 70).

- Davis' coordination of "fake public demonstrations" attended by "pretend protestors" purportedly affected by 3M's decision not to market BacLite. (FAC ¶¶ 66, 76).

- Davis' creation of a web site called [www.MRSA-INJUSTICE.com](www.MRSA-INJUSTICE.com), in which Defendants republished false and defamatory allegations against 3M.  (FAC ¶ 77).

3M alleges that Davis made such statements intentionally, maliciously, and with knowledge that the statements were false when they were made.  (FAC ¶¶ 70-71, 75).  According to 3M, Defendants did not make such statements to call attention to any purported public health issue, but rather to advance their own commercial interests and to coerce 3M to pay the Porton Defendants millions of dollars.  (FAC ¶¶ 71, 79).

### Defendants' Alleged Extortionate Threats

3M claims that Defendants then sought to interfere with 3M's existing business with the U.K. government, and did so by meeting with then-Minister of Defense Dr. Liam Fox. (FAC ¶¶ 80-83).

In June 2011, 3M's attorneys were engaged in settlement discussions with Davis regarding the BacLite Litigation.  (FAC ¶ 84).  Despite efforts to settle, 3M's counsel terminated the settlement discussions with Davis on June 9, 2011 because the parties were too far apart. (FAC ¶ 84).  On June 16, 2011, Boulter met privately with Fox in Dubai.  (FAC ¶ 83).  3M claims that, although much of what occurred at the meeting is subject to debate, there is no dispute that Boulter and Fox discussed the BacLite Litigation.  (FAC ¶ 83).  According to 3M,

Defendants began to use that meeting to attempt to extort money from 3M.  (FAC ¶ 93).  3M claims that:

- On June 17, 2011, Davis placed an unsolicited phone call to 3M's attorney and suggested that 3M speak directly with Boulter.  Davis subsequently sent an email, on which Boulter was copied, granting 3M express authorization to speak directly with Boulter.  (FAC ¶ 85).  In that e-mail, Davis also acknowledged to Boulter that his meeting with Dr. Fox had "given [Boulter] even stronger reason not to come down very [sic] in $34m position."  (FAC ¶ 86).  According to 3M, the purpose of Davis' authorization was to allow Boulter to communicate "an illegal extortionate threat."  (FAC ¶ 86).

- Later that day, Boulter called 3M's attorney, informed him that he had met with Fox, and that Fox had told him that if 3M did not resolve the BacLite Litigation to his satisfaction, "there would be repercussions for 3M and Buckley."  (FAC ¶ 87).

- On June 18, 2011, Boulter e-mailed 3M's attorney and, among other things, stated that he had met with Dr. Fox regarding "our current favourite topic."  Boulter claimed that he had been given authority to settle the BacLite Litigation on behalf of the MoD, and again asked for $30mn.  Boulter informed 3M's counsel that, if 3M did not settle, that might leave the U.K. Government "quietly seething, with ramifications for a while."  Boulter also referred to the fact that David Cameron's Cabinet would be shortly "discussing the rather embarrassing situation of [Buckley's] knighthood," and that the topic was "discussed today."  (FAC ¶¶ 89, 91).

3M alleges that these communications "constituted an overt attempt by the Defendants, acting in concert, to blackmail, extort and intimidate 3M . . . ."  (FAC ¶ 93).  Those threats were meant to communicate the message that, if 3M did not settle the BacLite litigation, Defendants would interfere with 3M's current and future business relationships with the U.K. Government and would interfere with Buckley's "planned investiture as a Knight Bachelor."  (FAC ¶¶ 90-91, 93).  3M does not allege that it capitulated to these threats or that Buckley, ultimately, was not

knighted by the Queen of England.  Instead, 3M claims that it responded by filing suit and "expos[ing]" Defendants.[3]  (FAC ¶ 94).

### U.K. High Court's Ruling in the BacLite Litigation

On November 7, 2011, the U.K. High Court issued its judgment.  The High Court found that 3M had breached the SPA, but that the claimants were entitled only to damages of approximately $1.3 million.  (FAC ¶¶ 60, 105; Dkt. No. 28-1 at ¶ 158).  That amount, according to the court, reflected the amount of the conditional earn out payments to which claimants would have been entitled.  (FAC ¶¶ 60, 105).

### 3M's Damages

3M alleges that, on account of Defendants' actions, 3M has suffered harm to its reputation and goodwill, and to its existing and prospective business relations with the U.K. Government.  (FAC ¶¶ 110-15).  3M alleges that Defendants acted on their threats to interfere with 3M's "longstanding relationships" with the MoD and the U.K. Government, and that, on account of such conduct, 3M's total direct and indirect sales to the MoD have decreased by 25 percent from 2010 to 2011.  (FAC ¶ 113).  3M alleges that over the same period, its direct and indirect sales to the U.K. government have decreased by 54 percent.  (FAC ¶ 113).  Moreover, 3M alleges that bids it has submitted to the U.K. government have "gone nowhere."  (FAC ¶ 114).

### <u>PROCEDURAL HISTORY</u>

3M filed its original Complaint on August 24, 2011, and its First Amended Complaint on December 9, 2011.  After receiving the original Complaint, and without any discovery having taken place, Defendants filed special motions to dismiss 3M's claims under Section 16-5502 of

---

[3]     3M filed its first complaint against only the Porton Defendants in New York state court. (FAC ¶ 94).  3M later dismissed that complaint, amended it, and re-filed it in this Court.

the D.C. Anti-SLAPP Act of 2010.  <u>See</u> D.C. Code §§ 16-5501-5505.  Defendants claim that

their acts in this case were "acts in furtherance of the right of advocacy on issues of public

interest," and, thus, were protected under the Act.  According to Defendants, because 3M cannot

show a likelihood of success on the merits of its claims at this stage, the claims should be

dismissed with prejudice, and Defendants awarded their costs and fees under the Act.

     3M has filed a Motion to Strike Defendants' special motions to dismiss, claiming that the

Act is *ultra vires* and, in any event, does not apply in a federal court sitting in diversity.

Defendants have also moved to dismiss the claims in the First Amended Complaint under

Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6).

<u>**ANALYSIS**</u>

**I.     THE D.C. ANTI-SLAPP ACT OF 2010**

     Defendants have filed their "special motions to dismiss" pursuant to the D.C. Anti-

SLAPP ("strategic lawsuits against public participation") statute, which became effective in the

District of Columbia on March 31, 2011.  The D.C. Council passed the legislation in response to

what it recognized as a growing "litigation phenomenon": "'Americans are being sued for

speaking out politically.  The targets are typically not extremists or experienced activists, but

normal, middle-class and blue-collar Americans, many on their first venture into the world of

government decision making.'"  Council of the District of Columbia, Committee on Public

Safety and the Judiciary Report, Bill 18-893, at 2 (Nov. 18, 2010) (hereinafter "Committee

Report") (quoting George W. Pring, <u>SLAPPS: Strategic Lawsuits Against Public Participation</u>,

Pace Envtl. L. Rev. 3, 3 (1989)).  In an effort to protect "the kind of grassroots activism that

should be hailed in our democracy," the Act purports to enable a defendant to "more

expeditiously and more equitably" dispense of meritless suits.  Committee Report at 1, 3.

The Act allows a party to file a special motion to dismiss "any claim arising from an act in furtherance of the right of advocacy on issues of public interest within 45 days after service of the claim."[4]  D.C. Code § 16-5502(a).  In order to invoke this protection, the moving party must "make[] a prima facie showing that the claim at issue arises from an act in furtherance of the right of advocacy on issues of public interest." § 16-5502(b).  If the moving party makes that showing, the "motion shall be granted unless the responding party demonstrates that the claim is likely to succeed on the merits." Id.

The Act further requires that discovery be stayed until the motion is resolved. See § 16-5502(c)(1).  If, however, it appears likely that the plaintiff will be able to defeat the special motion to dismiss with "targeted discovery," the court may order discovery if it is not "unduly burdensome." § 16-5502(c)(2).  The Court may also "condition" any discovery on the plaintiff paying the defendant's discovery expenses. Id.  Finally, the Act mandates that if any court grants a special motion to dismiss, the court must do so with prejudice. § 16-5502(d).

## II.   THE D.C. ANTI-SLAPP ACT'S APPLICABILITY IN A FEDERAL COURT SITTING IN DIVERSITY

3M argues that, under the Erie doctrine, the cabined discovery provisions of Section 16-5502(c) directly conflict with Federal Rules of Civil Procedure 26 and 56 and, thus, do not apply in federal court.[5]  3M contends that, if this Court finds that the Anti-SLAPP Act is applicable here, 3M is at the very least entitled to the same amount of discovery it would otherwise be granted under Rule 56(d).  After close consideration of this issue, the Court finds that the special

---

[4]     The Act defines the protected activity at D.C. Code § 16-5501.

[5]     This issue was first raised and briefed in connection with 3M's Cross Motion for Discovery. On November 15, 2011, this Court denied 3M's Cross Motion for Discovery without prejudice. (Dkt. No. 29).  In doing so, however, the Court did not rule on the questions raised under the Erie doctrine and instead ordered 3M to file substantive responses to Defendants' Special Motions to Dismiss.

motion to dismiss procedure of Section 16-5502, and not merely its discovery provisions, poses serious concerns under <u>Hanna v. Plumer</u>, 380 U.S. 460 (1965) and its progeny.

### a.  **Relevant Standards**

The D.C. Anti-SLAPP Act mandates that a court resolve a "special motion to dismiss" in a different manner than it would otherwise resolve a preliminary motion attacking the merits of a case under Rules 12 or 56.  This Court now considers whether those rules preclude a federal court sitting in diversity from applying the D.C. Anti-SLAPP Act.  This is an issue of first impression in this Circuit.

This case presents the question of whether a Federal Rule of Civil Procedure applies in the face of a conflicting state law.  As the Supreme Court recently recognized, the framework for deciding this question is "familiar." <u>Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.</u>, 130 S.Ct. 1431, 1437 (2010).  The Court must "first determine whether [the federal rule] answers the question in dispute." <u>Id.</u> (citing <u>Burlington N. R.R. Co. v. Woods</u>, 480 U.S. 1, 4-5 (1987)).  "This question involves a straightforward exercise in statutory interpretation to determine if the statute covers the point in dispute." <u>Stewart Org., Inc. v. Ricoh Corp.</u>, 487 U.S. 22, 26 (1988) (citing <u>Burlington Northern</u> and <u>Walker v. Armco Steel Corp.</u>, 446 U.S. 740, 749-50 (1980)).[6]

---

[6]     The Court may at this stage of the analysis refer to whether there is a "direct collision" between state and federal law.  This is not to mean that the D.C. Anti-SLAPP Act and the federal rules discussed herein must be exactly coextensive or that this—and not the test that <u>Shady Grove</u>, <u>Walker</u>, or <u>Burlington Northern</u> mandates—is the proper inquiry.  As the Supreme Court explained in <u>Stewart</u>:

> Our cases at times have referred to the question at this stage of the analysis as an inquiry into whether there is a "direct collision" between state and federal law.  Logic indicates, however, and a careful reading of the relevant passages confirms, that this language is not meant to mandate that federal law and state law be perfectly coextensive and equally applicable to the issue at hand;

If the federal rule answers or covers the question in dispute, the federal rule governs unless it is invalid.  <u>Shady Grove</u>, 130 S.Ct. at 1437; <u>Stewart</u>, 487 U.S. at 27.  The Court does not "wade into <u>Erie</u>'s murky waters unless the federal rule is inapplicable or invalid."  <u>Shady Grove</u>, 130 S.Ct. at 1437 (citing <u>Hanna v. Plumer</u>, 380 U.S. 460, 469-71 (1965)).

### b.  **The Supreme Court's Opinion in *Shady Grove***

The Supreme Court recently applied this test in considering whether a New York law governing class actions precluded a federal court sitting in diversity from entertaining a class action under Federal Rule of Civil Procedure 23.  The state law in <u>Shady Grove</u> prohibited class actions in suits seeking penalties or statutory minimum damages.  <u>Shady Grove</u>, 130 S.Ct. at 1436 n.1.  Rule 23, of course, has no such prohibition.  The plaintiffs in <u>Shady Grove</u>, who had brought suit in federal district court, wished to maintain a class action to recover unpaid statutory interest from an insurance company.  <u>Id.</u> at 1436-37.  As such, the case would not have been able to proceed as a class action in New York state court but would have been able to proceed as a class action in federal court under Rule 23.

Both the district court and the United States Court of Appeals for the Second Circuit held that the state law applied in federal diversity actions.  The Second Circuit found no conflict between the two rules because it concluded that Rule 23 and the New York state rule

> rather the "direct collision" language, at least where the applicability of a federal statute is at issue, expresses the requirement that the federal statute be sufficiently broad to cover the point in dispute.  It would make no sense for the supremacy of federal law to wane precisely because there is no state law directly on point.

<u>Stewart</u>, 487 U.S. at 26-27 n.4 (internal citations omitted).  Although the Court in <u>Stewart</u> analyzed a federal statute, as opposed to a Federal Rule of Civil Procedure, this Court sees no meaningful distinction (and neither did the Supreme Court) between the two for purposes of this step of the analysis.

"address[ed] different issues."  Id. at 1437.  Finding no federal rule on point, the Second Circuit

held that the New York state rule was "substantive" within the meaning of the Erie doctrine and

accordingly must be applied in federal diversity actions.  Id.

The Supreme Court disagreed and reversed.  Justice Scalia delivered the opinion of the

Court as to the first step of the analysis, that is, whether Rule 23 "answers the question in

dispute."  Id.[7]  The question in dispute, as the majority saw it, was "whether Shady Grove's suit

---

[7]      Justice Scalia set forth this analysis in Part II-A of Shady Grove.  Part II-A enjoyed the
assent of five justices, including Justice Stevens.  Justice Stevens also wrote a concurring opinion
in which he articulated the first step of the analysis slightly differently: that a court must first ask
"whether the scope of the federal rule is sufficiently broad to control the issue before the court,
thereby leaving no room for the operation of seemingly conflicting state law."  Shady Grove, 130
S.Ct. at 1451 (Stevens, J., concurring) (internal quotation marks omitted).  It is likely of no
moment whether the analysis in the majority opinion or in Justice Stevens' concurrence governs
because, as the District finally conceded at oral argument, the result in this case would likely be
the same.  Nevertheless, given the confusion on this issue, it is necessary to resolve this dispute.
      Despite the fact that Part II-A was a majority opinion, the District argues that Justice
Stevens' analysis should govern the Court's determination of the first question in dispute in this
case.  The District claims [Dkt. No. 32 at 22, n.12] that Justice Stevens' concurring opinion can
be considered the holding based on the rationale set forth in Marks v. United States, 430 U.S.
188 (1977), that when "a fragmented Court decides a case and no single rationale explaining the
result enjoys the assent of five Justices, the holding of the Court may be viewed as that position
taken by those Members who concurred in the judgments on the narrowest grounds."  Marks,
430 U.S. at 193 (quoting Gregg v. Georgia, 428 U.S. 153, 169 n.15 (1976) (opinion of Stewart,
Powell, and Stevens, JJ.)).  This Court disagrees.
      Although some other courts may rely on Justice Stevens' concurrence in Shady Grove for
determining the first question (i.e., whether the federal rules cover the dispute at issue or answer
the same question as the state law), this Court believes that the analysis set forth in Part II-A of
Shady Grove is the controlling test that district courts must apply.  Part II-A was a majority
opinion, and that majority opinion governs over a concurrence.  Moreover, the Supreme Court's
unanimous opinions in cases such as Walker and Burlington Northern set forth how a court
should determine whether a federal rule "answers the question" or "covers the point" in dispute.
The Supreme Court has not overruled those cases, and Justice Stevens' concurrence in Shady
Grove did not (and could not) overrule those cases.  To the extent that other courts have relied
upon Marks for the proposition that Justice Stevens' concurrence governs over Part II-A of
Shady Grove, Marks is inapposite.  The language the District and other courts cite from Marks
was in reference to whether there was any holding to come out of Memoirs v. Massachusetts,
383 U.S. 413 (1966).  In Memoirs, unlike Shady Grove, there was *no* majority opinion as to any
issue.  In such an instance, the Supreme Court held, quite reasonably, that the narrowest
concurring opinion in Memoirs would constitute the holding of the Court.

may proceed as a class action." Id.  As the Court held, Rule 23 provided an answer to that question.

The Court first looked at the text and scope of Rule 23, which states that a class action "may be maintained" as long as certain prerequisites are met.  The Court found that Rule 23 by its terms created a categorical rule "entitling a plaintiff whose suit meets the specified criteria to pursue his claim as a class action." Id. at 1437.  Finding that Rule 23 provided a "one-size-fits-all formula" for deciding whether a class action could be maintained, the Court held that Rule 23 would apply in diversity actions because the New York statute "undeniably" "attempt[ed] to answer the same question." Id. at 1437-39.  The Court rejected appellee's argument that Rule 23 did not control because the federal rule neither implicitly nor explicitly empowered a federal court to "certify a class in each and every case." Id. at 1438.  In fact, the Court held, that is *exactly* what the Rule did. Id.  As the Court stated, "Rule 23 unambiguously authorizes *any* plaintiff, in *any* federal civil proceeding, to maintain a class action if the Rule's prerequisites are met." Id. at 1442.[8]

The Supreme Court's decision in Shady Grove, among others, provides clear guidance on how to analyze purported conflicts between the Federal Rules of Civil Procedure and state laws.  The Court first looks at whether the federal rule, fairly construed, answers or covers the question in dispute.  See Shady Grove, 130 S.Ct. at 1437; Burlington Northern, 480 U.S. at 4-5; Walker, 446 U.S. at 747-48.  The Supreme Court instructs that the federal rule is not to be "narrowly

---

The Court does not believe that this reasoning from Marks can or should be stretched to apply to the situation in Shady Grove, where there was a majority opinion joined by five Justices as to Part II-A.  The majority did not concur merely in the result as to Part II-A.  The majority assented to the opinion and, thus, the analysis.  As such, Part II-A of Shady Grove governs over any concurring opinion.  See 21 C.J.S. *Courts* § 198 (2011).

[8]   The Court also reached the judgment that Rule 23 was valid under the Rules Enabling Act. Id. at 1445-46 (plurality) and 1454-55 (Stevens, J., concurring).

construed in order to avoid a 'direct collision' with state law," but that the federal rule is to be given its plain meaning.  <u>Walker</u>, 446 U.S. at 748-50 & n.9; <u>see also</u> <u>Shady Grove</u>, 130 S.Ct. at 1442 (when construing federal rule, "[w]e cannot contort its text, even to avert a collision with state law . . . ."); 19 Charles Alan Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u> § 4508, 251 (2d ed. 1996) (hereinafter "Wright & Miller") (stating that Supreme Court has rejected any suggestion that the Federal Rules of Civil Procedure should be "construed narrowly or distorted in order to avoid what otherwise would be a direct collision with state law.").

### c. **Federal Rules of Civil Procedure 12 and 56**

With the framework the Supreme Court has mandated, this Court turns to whether Federal Rules of Civil Procedure 12 and 56 answer the question in dispute in this case.  The question in dispute is whether this Court may dismiss 3M's claims with prejudice on a preliminary basis based on the pleadings or on matters outside the pleadings merely because 3M has not "demonstrate[d] that the claim is likely to succeed on the merits."  D.C. Code § 16-5502.  The Court finds that Rules 12 and 56 answer the question in dispute.

Federal Rule of Civil Procedure 12(d) provides as follows:

**(d) Result of Presenting Matters Outside the Pleadings**.  If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.  All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

The language that currently appears in Rule 12(d) was added by amendment in 1946.[9]  The Advisory Committee Notes from 1946 indicate that the purpose of this language was to set forth

---

[9]     When added in 1946, substantially identical language was placed at the end of Rule 12(b) and at the end of Rule 12(c) governing a motion for judgment on the pleadings.  Pursuant to the stylistic amendments made effective December 1, 2007, that language was consolidated and placed in a new Rule 12(d).  See Tsai v. Maryland Aviation, 306 F. App'x 1, 4 n.1 (4th Cir.

the rules governing a motion seeking adjudication on the merits based upon matters outside of the pleadings.  In such a case, the Advisory Committee explained that the court must use the summary judgment standard set forth in Rule 56.  The Advisory Committee explained that Rule 56 does not permit a district court to dispose of a motion seeking judgment based on a factual showing of the merits if there is a genuine dispute of material fact.  See 5C Wright & Miller § 1366 at 145-46 (3d ed. 2004) ("The [Advisory Committee Note] makes it clear that the last sentence of Rule 12(b) is not intended to permit the resolution of disputes on the basis of affidavits and other pretrial data when there is a material issue of fact that justifies a trial on the merits.").

This amendment to Rule 12 was borne out of significant confusion and debate in the early years of the Federal Rules of Civil Procedure regarding whether Rule 12(b)(6) recognized "speaking demurrers" or "speaking motions," motions attacking the merits of a pleader's claim by relying on matters outside the pleadings, such as affidavits or other factual material.  See, e.g., 5C Wright & Miller § 1364 at 128-32 (3d ed. 2004); H. Church Ford, J., *Federal Rules of Civil Procedure Pleadings, Motions, Parties and Pre-Trial Procedure*, 1 F.R.D. 315, 319-21 (1940) (describing the contrasting views of Advisory Committee members Judge Clark and Judge Donworth and the conflicting decisions of various courts, Judge Ford concluded that "[i]t seems obvious that no uniformity of practice in this respect can be hoped for until this feature of the rules is interpreted by the Circuit Courts and in all probability not until decided by the Supreme Court.").  Such motions were called "speaking motions" because of their reference to affidavits or other materials that are testimonial in nature.  See Gallup v. Caldwell, 120 F.2d 90, 92-93 (3d Cir. 1941) (in determining whether the court could review matters outside the pleadings on a

---

2008).  Moreover, because the 1946 Amendments became effective in 1948, some sources refer to those amendments as the 1948 Amendments.

motion to dismiss, court observes that "[t]he problem . . . [of] whether the Federal Rules of Civil Procedure countenance a 'speaking' motion to dismiss, has been much discussed since the adoption of the Rules."); see also George C. Roeming, Editorial Note, *Speaking Motions Under New Federal Rule 12(b)(6)*, 9 GEO. WASH. L. REV. 174 (1940) (extensive discussion of the differing views surrounding such "speaking motions"); James A. Pike, *Some Current Trends in the Construction of the Federal Rules*, 9 GEO. WASH. L. REV. 26, 34-37 (1940) (same, also referring to such motions as the "speaking demurrer"); Stanley E. Sparrowe, *Pleading: Availability of a "Speaking Motion" under Federal Rule 12(b)(6)*, 30 CAL. L. REV. 92 (1941); Commentary, *The Speaking Motion*, 6 FED. RULES SERV. 741 (1943).

A prevailing view emerged.  Most courts to consider the issue held that matters outside the pleadings could be considered on a Rule 12 motion to dismiss, but that such a "speaking motion" should be governed by the summary judgment standards of Rule 56.  For example, in Gallup, the United States Court of Appeals for the Third Circuit held that a motion to dismiss could raise matters outside of the pleadings (in that case, affidavits).  The Third Circuit cautioned, however, that:

> [i]n so holding, we do not indicate that disputed questions of fact involved in the merits of claim or defense may necessarily be fought out as preliminary issues raised upon motions. The affidavits filed by the parties here raised no fact controversy, but a question of law.  No problem arising out of a possible claim to jury trial is involved.

Gallup, 120 F.2d at 93.

Thus, the purpose of the language added by the 1946 Amendment "was to resolve the split of authority concerning 'speaking motions' by providing a definite basis in the federal rules for the treatment of Rule 12(b)(6) motions supported by matter extraneous to the pleading."  5C Wright & Miller § 1364 at 132 (emphasis added).  In the early years under the rules, many courts

"freely analogized" speaking motions under Rule 12(b)(6) to motions for summary judgment, and the 1946 amendments confirmed the "strong relationship between the two procedures."  Id. at 129-30; see also id. at § 1366 at 148.

Accordingly, the Advisory Committee Notes to the 1946 Amendment clearly explain that Rule 12(d) links Rule 12 with Rule 56 to provide the exclusive means for federal courts to use to rule upon a pretrial motion to adjudicate a case on the merits based on matters outside the complaint, whether the motion is labeled a "motion to dismiss," a "motion for judgment on the pleadings," a "motion for summary judgment," a "speaking motion," or anything else:

> Rule 12(b)(6), permitting a motion to dismiss for failure of the complaint to state a claim on which relief can be granted, is substantially the same as the old demurrer for failure of a pleading to state a cause of action.  Some courts have held that as the rule by its terms refers to statements in the complaint, extraneous matter on affidavits, depositions or otherwise, may not be introduced in support of the motion, or to resist it.  On the other hand, in many cases the district courts have permitted the introduction of such material.  When these cases have reached circuit courts of appeals in situations where the extraneous material so received shows that there is no genuine issue as to any material question of fact and that on the undisputed facts as disclosed by the affidavits or depositions, one party or the other is entitled to judgment as a matter of law, the circuit courts, properly enough, have been reluctant to dispose of the case merely on the face of the pleading, and in the interest of prompt disposition of the action have made a final disposition of it.  In dealing with such situations the Second Circuit has made the sound suggestion that whatever its label or original basis, the motion may be treated as a motion for summary judgment and disposed of as such. [Citations omitted.]

> It has also been suggested that this practice could be justified on the ground that the federal rules permit "speaking" motions.  The Committee entertains the view that on motion under Rule 12(b)(6) to dismiss for failure of the complaint to state a good claim, the trial court should have authority to permit the introduction of extraneous matter, such as may be offered on a motion for summary judgment, and if it does not exclude such matter the motion should then be treated as a motion for summary judgment and disposed of in the manner and on the conditions stated in Rule 56 relating to summary judgments, and, of course, in such a situation, when the case reaches the circuit court of appeals, that court should treat the motion in the same way.  The Committee believes that such practice, however, should be tied to the summary judgment rule.  The term "speaking motion" is not mentioned in the rules, and if there is such a thing its

> limitations are undefined.  Where extraneous matter is received, by tying further proceedings to the summary judgment rule the courts have a definite basis in the rules for disposing of the motion.
>
> The Committee emphasizes particularly the fact that the summary judgment rule does not permit a case to be disposed of by judgment on the merits on affidavits, which disclose a conflict on a material issue of fact, and unless this practice is tied to the summary judgment rule, the extent to which a court, on the introduction of such extraneous matter, may resolve questions of fact on conflicting proof would be left uncertain.
>
> * * * *
>
> The addition at the end of subdivision (b) makes it clear that on a motion under Rule 12(b)(6) extraneous material may not be considered if the court excludes it, but that if the court does not exclude such material the motion shall be treated as a motion for summary judgment and disposed of as provided in Rule 56.  It will also be observed that if a motion under Rule 12(b)(6) is thus converted into a summary judgment motion, the amendment insures that both parties shall be given a reasonable opportunity to submit affidavits and extraneous proofs to avoid taking a party by surprise through the conversion of the motion into a motion for summary judgment.  In this manner and to this extent the amendment regularizes the practice above described.  As the courts are already dealing with cases in this way, the effect of this amendment is really only to define the practice carefully and apply the requirements of the summary judgment rule in the disposition of the motion.

FED. R. CIV. P. 12 advisory committee's note on 1946 Amendment (emphasis added).  In addition to the text of the rules and the Advisory Committee Notes, the transcript of the Advisory Committee meeting adopting the 1946 Amendments clearly demonstrates the intent to have all motions to dismiss attacking the merits of the claim governed by the summary judgment standard if matters outside of the pleadings were considered by the court.  See Proceedings of the Advisory Committee on Rules for Civil Procedure, Vol. 1, pp. 99-159 (Mar. 25, 1946), available at  http://www.uscourts.gov/uscourts/RulesAndPolicies/rules/Minutes/CV03-1946-min-Vol1.pdf; id. at 153 (statement by Advisory Committee Chairman William D. Mitchell, mandatory language was inserted in the amendment "because we don't want a judge deciding a case on affidavits other than in Rule 56.").

In support of this explanation of the Rule, the Advisory Committee cited approvingly several circuit court opinions that had reversed dismissals on the merits based on consideration of matters outside of the pleadings where the district court did not follow the summary judgment standard.   In several of those cases, defendants had sought dismissal not merely because the complaint failed a state a claim as a matter of law, but also based on the contention that the facts did not support the allegations in complaint.   In one such case cited by the Advisory Committee, the court explained:

> Counsel for defendant and the court below apparently misconceived the purpose and effect of defendant's motion to dismiss the amended complaint. They were seemingly concerned with the question whether the plaintiff had a meritorious claim upon which she was entitled ultimately to prevail, rather than with the sole question presented, which was whether the amended complaint, construed in the light most favorable to the plaintiff and with all doubts resolved in favor of its sufficiency, stated a claim upon which relief could be granted.
>
> * * * *
>
> In view of the means which the Rules of Civil Procedure afford a defendant to obtain a speedy disposition of a claim which is without foundation or substance, by either securing a more definite statement or a bill of particulars under Rule 12(e) and thereafter applying for judgment on the pleadings under Rule 12(h)(1), or by moving for a summary judgment under Rule 56, we think there is no justification for dismissing a complaint for insufficiency of statement, except where it appears to a certainty that the plaintiff would be entitled to no relief under any state of facts which could be proved in support of the claim.

Leimer v. State Mut. Life Assurance Co., 108 F.2d 302, 304-06 (8th Cir. 1940).  Recently, the Supreme Court explained Leimer as standing for "the unobjectionable proposition that, when a complaint adequately states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder."   Bell Atl. Corp. v. Twombly, 550 U.S. 544, 563 n.8 (2007) (discussing Rule 12(b)(6)) (emphasis added).

Thus, the Supreme Court has recently affirmed the intent and purpose of Rule 12(d) as expressed by the Advisory Committee back in 1946–that the federal rules do not permit a district court to dismiss a complaint that is sufficiently pled with detailed and plausible factual allegations based upon the court's own assessment of the weight of disputed evidence or its finding that the claim is not likely to succeed on the merits.  As Judge Charles E. Clark, the Reporter of the Advisory Committee that formulated the original rules, emphasized, the assessment of the factual merits of the complaint is for the factfinder, unless the defendant can prevail on a motion for summary judgment governed by the standards set forth in Rule 56.  See Charles E. Clark, *The Handmaid of Justice*, 23 WASH. UNIV. L.Q. 297, 319 (1938) (stating that the remedy of summary judgment is "very far from universal in its applicability.  In fact in the case of a real dispute, there is no substitute anywhere for a trial.  To attempt to make the pleadings serve as such substitute is in very truth to make technical forms the mistress and not the handmaid of justice."); see also Farrall v. D.C. Amateur Athletic Union, 153 F.2d 647, 648 (D.C. Cir. 1946) ("There is a great difference between discovering whether there be an issue of fact and deciding such an issue.").

### d.  **The Law of This Circuit**

The United States Court of Appeals for the District of Columbia Circuit agrees that Federal Rules 12 and 56 are properly construed to require that a speaking motion to dismiss must be treated as a motion for summary judgment.  Even before the 1946 Amendments, this Circuit held that "affidavits were pertinent" to a motion to dismiss, such that a complaint that "stated a sufficient claim" could nonetheless be dismissed, but only where "the uncontradicted affidavits of the defendants [showed] that there was no genuine issue as to any material fact. . . ."  Nat'l War Labor Bd. v. Montgomery Ward & Co., 144 F.2d 528, 531 & n.10 (D.C. Cir. 1944) (citing

21

Gallup, 120 F.2d at 90), cert. denied, 323 U.S. 774 (1944).  Indeed, our Circuit has held that "[a]n affidavit filed in support of a motion to dismiss has no greater purpose or effect" under Rule 12 than an affidavit filed in support of a motion for summary judgment pursuant to Rule 56. Farrall, 153 F.2d at 648 (citing National War Labor Board) (emphasis added).  Thus, even prior to the 1946 Amendments to Rule 12, it was reversible error in this Circuit to grant a motion to dismiss supported by affidavits if, notwithstanding the affidavits, there were genuine issues of fact that would preclude summary judgment under the standard set forth in Rule 56.  Farrall, 153 F.2d at 650 (reversing grant of motion to dismiss due to disputed issues of material fact).

Our Circuit Court of Appeals has made clear that the 1946 amendments to Rule 12 affirmed and continued the practice in which motions to dismiss seeking consideration of matters outside the pleadings are treated as motions for summary judgment:

> Normally, Rule 12(b) requires that where 'matters outside the pleading are presented to and not excluded by the court, the motion (to dismiss for failure to state a cause of action) shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to (a summary judgment) motion by Rule 56.' Rule 12(b), Fed. R. Civ. P. . . .  Before the adoption of the quoted provision of Rule 12(b) in 1948, material extrinsic to the pleadings was often considered on motions to dismiss, by both trial and appellate courts. E.g., Farrall v. District of Columbia A.A.U., 80 U.S.App.D.C. 396, 153 F.2d 647; National War Labor Board v. Montgomery Ward & Co., 79 U.S.App.D.C. 200, 203, 144 F.2d 528, 531, certiorari denied 323 U.S. 774, 65 S.Ct. 134, 89 L.Ed. 619; Boro Hall Corp. v. General Motors Corp., 2 Cir., 124 F.2d 822; and see Advisory Committee's Note to 1948 amendment to Rule 12(b).  This practice has continued since the 1948 amendment.

Callaway v. Hamilton Nat. Bank of Wash., 195 F.2d 556, 558-59 & n.2 (D.C. Cir. 1952) (emphasis added).  Thus, Callaway construed the 1946 amendments to Rule 12 as codifying the Circuit's prior practice, as set forth in Farrall and National War Labor Board, of requiring that

"speaking motions" be treated as motions for summary judgment.[10]  Id.  Callaway reversed a

trial court order granting a speaking motion to dismiss due to disputed issues of material fact.  Id.

at 563.  This Court is bound by that construction of Rule 12.  Indeed, even if our Circuit had

been silent on this issue, this Court would deem such a construction of the meaning and intent of

the 1946 amendments to Rule 12 to be unassailable.

### e. The "Special Motions to Dismiss" Procedure Under the D.C. Anti-SLAPP Act Attempts to Answer the Same Question as Rules 12 and 56

Having now interpreted the meaning and scope of Rules 12 and 56, the applicable federal

rules, the question before the Court, as articulated in Part II-A of Shady Grove, Burlington

Northern and Walker, among other cases, is whether Section 16-5502's special motion to dismiss

procedure conflicts with, answers the same question as, or directly collides with Federal Rules 12

or 56.

The special motion to dismiss procedure under the D.C. Anti-SLAPP statute provides:

(a) A party may file a special motion to dismiss any claim arising from an act in furtherance of the right of advocacy on issues of public interest within 45 days after service of the claim.

(b) If a party filing a special motion to dismiss under this section makes a prima facie showing that the claim at issue arises from an act in furtherance of the right of advocacy on issues of public interest, then the motion shall be granted unless the responding party demonstrates that the claim is likely to succeed on the merits, in which case the motion shall be denied.

(c)(1) Except as provided in paragraph (2) of this subsection, upon the filing of a special motion to dismiss, discovery proceedings on the claim shall be stayed until the motion has been disposed of.

---

[10]    Significantly, the Advisory Committee's discussion of the 1946 amendments to Federal Rule 12 regarding the treatment of "speaking motions" cite both Gallup and National War Labor Board favorably.  FED. R. CIV. P. 12 advisory committee's note on 1946 Amendment.

(2) When it appears likely that targeted discovery will enable the plaintiff to defeat the motion and that the discovery will not be unduly burdensome, the court may order that specialized discovery be conducted. Such an order may be conditioned upon the plaintiff paying any expenses incurred by the defendant in responding to such discovery.

(d) The court shall hold an expedited hearing on the special motion to dismiss, and issue a ruling as soon as practicable after the hearing. If the special motion to dismiss is granted, dismissal shall be with prejudice.

D.C. Code § 16-5502.

Simply put, the Act allows a defendant on a preliminary basis to deal a deathly blow to a plaintiff's claim on the merits based either on the pleadings or on matters outside the pleadings. There is no question that the special motion to dismiss under the Anti-SLAPP Act operates greatly to a defendant's benefit by altering the procedure otherwise set forth in Rules 12 and 56 for determining a challenge to the merits of a plaintiff's claim and by setting a higher standard upon the plaintiff to avoid dismissal. Indeed, that is the *precise reason* that the District enacted the statute and why Defendants so vigorously seek its protections. Upon careful examination of the Act's special motion to dismiss procedure, this Court holds that it squarely attempts to answer the same question that Rules 12 and 56 cover and, therefore, cannot be applied in a federal court sitting in diversity.[11]

When considering a special motion to dismiss, Sections 16-5502(b) and 16-5502(d) require the court to grant the motion and dismiss the claim with prejudice if the defendant makes a "prima facie showing" that the claim he is seeking to dismiss "arises from an act in furtherance of the right of advocacy on issues of public interest" and the plaintiff fails to "demonstrate[] that

---

[11]    The Court expresses no opinion on whether the other mechanism of the Anti-SLAPP Act—the special motion to quash procedure set forth in Section 16-5503—is applicable in a federal diversity case. That provision was not before this Court. Likewise, the Court need not rule on the applicability of the Act's discovery provisions, given the holding that the special motion to dismiss procedure cannot be employed in federal court.

the claim is likely to succeed on the merits."  The District and Defendants do not dispute that, under this standard, a court must grant the special motion to dismiss even where matters outside the pleadings are considered, and even where the plaintiff has or can raise a genuine issue of material fact on its claim.  Indeed, the District expressly acknowledges that the Act places a "heightened burden of proof" on a plaintiff.  (Dkt. No. 32 at 32).  Likewise, the Porton Defendants argue that the Act requires this Court to evaluate whether 3M is likely to succeed on the merits of its claims and not solely whether those claims are frivolous.  (Dkt. No. 56 at 6). During the hearing, the Davis Defendants likened 3M's burden to that of a movant seeking a preliminary injunction under Fed. R. Civ. P. 65.  Moreover, at the hearing, the District conceded that the D.C. statute creates a different standard than Rule 12 or 56, arguing: "The question is did the complaint show that the plaintiff is more likely than not to succeed on the merits.  Neither [Rules] 12 [n]or 56 addressed that question . . . ."[12]  Although the District contends that the state law and the federal rules can exist "side by side" [Dkt. No. 32 at 25-26], the Court does not see how this is so, particularly in a case such as this one where the parties have introduced hundreds of pages of material outside the pleadings and Defendants ask this Court to evaluate whether 3M's claims are likely to succeed on the merits based partly on matters in those materials.  If a plaintiff is obligated to demonstrate a likelihood of success on the merits under Section 16-5502 (most likely with little to no discovery), this places a higher procedural burden on plaintiff than is required to survive a motion for summary judgment under Rule 56.  As such, Section 16-5502(b) restricts "the procedural right to maintain [an action]" established by the federal rules and squarely conflicts with Rule 12(d) and Rule 56 as construed above.  Shady Grove, 130 S.Ct. at 1439 n.4.

---

[12]     Oral argument on these motions was held before this Court on January 12, 2012.

Defendants argue that Rules 12 and 56 are not exclusive because there are a number of miscellaneous motions that are allowed under this Court's local rules and Fed. R. Civ. P. 7(b)(1). (Dkt. No. 33 at 17-19).  Defendants' argument is unpersuasive.  Defendants cannot cite any examples under Rule 7 or the local rules that even resemble a challenge to the sufficiency or merits of a plaintiff's claim prior to trial.  Id. at 18-19 (citing examples such as motion for leave to file surreply, motion to correct docket sheet, and motion for reconsideration).  The history and practice culminating in the 1946 Amendments clearly demonstrates that the framers intended that Rules 12 and 56 provide the exclusive means for challenging the merits of a plaintiff's claim based on a defense either on the face of the pleadings or on matters outside the pleadings. Moreover, like the rest of the Federal Rules of Civil Procedure, Rules 12 and 56 automatically apply in "'all civil actions and proceedings in the United States district courts.'"  Shady Grove, 130 S.Ct. at 1438 (quoting Federal Rule of Civil Procedure 1).

To the extent that Defendants and the District place any significance on the fact that the label "special motion to dismiss" is nowhere in the federal rules and, as such, a motion so labeled does not explicitly conflict with Rules 12 and 56, the Court rejects this argument.  As explained in Section II(c) of this Memorandum Opinion, the fact that the motion is labeled a "special motion to dismiss" under Section 16-5502 is immaterial, as the actual operation and effect of the motion, rather than its label, is what really matters.  There is no question that Rule 12(d) is broad and covers any situation that falls under its purview, no matter the label applied to the motion:

> Although the conversion provision in Rule 12(b) expressly applies only to the defense described in Rule 12(b)(6), it is not necessary that the moving party actually label the motion as one under that provision in order for it to be converted into a motion for summary judgment.  The element that triggers the conversion is a challenge to the sufficiency of the pleader's claim supported by extra-pleading material.  As many cases recognize, it is not relevant how the defense actually is denominated in the motion.

5C Wright & Miller § 1366 at 148 (emphasis added).[13]  Moreover, this Circuit made clear in

<u>Callaway</u> when it reviewed and reversed the district court's grant of a motion to dismiss based on

material extrinsic to the complaint that raised a dispute of fact, that the "label attached to this

proceeding at this stage" did not matter, while holding that the standards of Rules 12 and 56

governed.  <u>Callaway</u>, 195 F.2d at 559.  Indeed, when explaining the 1946 Amendments to Rule

12, the Advisory Committee observed, "<u>whatever its label</u> or original basis, the motion may be

treated as a motion for summary judgment and disposed of as such."  FED. R. CIV. P. 12 advisory

committee's note on 1946 Amendment (emphasis added).  In sum, the label attached to a motion

to dismiss by the Act has no impact on the analysis of the proper construction of Rules 12 and

56.

Finally, Defendants argue that "a number of federal statutes permit a party to file a

motion that is not mentioned or authorized by the Federal Rules," and therefore Rules 12 and 56

were not meant to be exclusive.  (Dkt. No. 33 at 19-20).  Defendants' argument is unpersuasive.

Rejecting an identical argument in <u>Shady Grove</u>, the majority opinion pointed out that

"Congress, unlike [a state or local government], has ultimate authority over the Federal Rules of

Civil Procedure; it can create exceptions to an individual rule as it sees fit . . . ."  <u>Shady Grove</u>,

130 S.Ct. at 1438.

---

[13]       In the first edition of Moore's Federal Practice, the author argued that "speaking
motions" should encompass a broad scope, because the "scope of Rule 12(b) is as broad as the
field of defense," and unless a motion could be accompanied by "affidavit or make reference to
depositions on file on the case [Rule 12(b)'s] utility is seriously impaired."  2 JAMES WM.
MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 12App.101[2] (3d ed. 2007).  Professor Moore
served as an assistant to the Reporter (Judge Clark) of the Advisory Committee at the time of the
1938 enactment and 1946 amendments to the federal rules.  <u>See</u> Laurens Walker, *A
Comprehensive Reform for Federal Civil Rulemaking*, 61 GEO. WASH. L. REV. 455, 466 (1993).

**f.**   **The Special Motions to Dismiss Procedure Strips a Federal Court of Discretion Otherwise Granted in the Federal Rules of Civil Procedure**

Another reason that the D.C. Anti-SLAPP Act cannot apply here is that it wholly strips a federal court of the discretion it otherwise has to determine whether a claim will be dismissed with or without prejudice.  Section 16-5502(d) mandates that a dismissal under the Act *must* be a dismissal with prejudice, no matter the substance of a defendant's special motion to dismiss.  Thus, whether the defendant's challenge under the Anti-SLAPP Act is akin to a Rule 12(b)(2) motion for lack of personal jurisdiction, a Rule 12(b)(6) motion for failure to state a claim, a Rule 12(d) converted motion for summary judgment, or a speaking motion seeking dismissal due to weaknesses in the plaintiff's evidence, the dismissal must be with prejudice.  This is a direct conflict with the Federal Rules, which do *not* mandate dismissal with prejudice in every circumstance, and which in fact vest a district court with discretion to determine whether a dismissal under Rule 12(b) would operate as an adjudication on the merits.[14]  See FED. R. CIV. P. 41(b) ("Unless the dismissal order states otherwise, a dismissal under this subsection (b) and any dismissal not under this rule—except one for lack of jurisdiction, improper venue, or failure to join a party under Rule 19—operates as an adjudication on the merits.") (emphasis added); see also Best v. Kelly, 39 F.3d 328, 331 (D.C. Cir. 1994) (citing Rule 41(b) as support for its statement that Rule 12(b)(6) dismissals operate as adjudications on the merits, "unless the court specifically states otherwise."); 9 Wright & Miller § 2373 at 760-61 (3d ed. 2008) (stating that dismissals under Rule 12(b)(6) come "within the literal language of the last sentence of Rule 41(b)").  Moreover, despite the fact that Rule 41(b) may create a "default" that dismissals under Rule 41(b) would operate as an adjudication on the merits, there is no question from the text of

---

[14]      The Anti-SLAPP Act's language that a dismissal shall be "with prejudice" is the functional equivalent of an "adjudication on the merits."  See Semtek Intern. Inc. v. Lockheed Martin Corp., 531 U.S. 497, 505 (2001) (quoting 18 Wright & Miller §§ 2373 & 4435).

the rule that the district court has discretion to "state otherwise."  <u>See</u> 9 Wright & Miller § 2373 at 749-51 ("Rule 41(b) expressly provides that the district court may specify that a dismissal is without prejudice . . . Indeed, one of the most useful features of Rule 41 is that it gives the court discretion about the effect of a dismissal and provides what the effect will be if the court fails to specify.").  Under the Anti-SLAPP Act, however, the federal court's hands are tied.[15]

The Supreme Court's unanimous opinion in <u>Burlington Northern R.R. Co. v. Woods</u>, 480 U.S. 1 (1987), on which the majority opinion in <u>Shady Grove</u> relies,[16] is controlling here.  In <u>Burlington Northern</u>, the Court considered whether, in diversity actions, a federal court must apply an Alabama state statute that imposed a fixed penalty on appellants who obtained stays of judgment pending unsuccessful appeals.  The Alabama statute provided for mandatory damages in the amount of 10 percent of the trial court judgment anytime an appellant had sought a stay of a monetary judgment pending appeal and the judgment was affirmed on appeal without substantial modification.  <u>Id.</u> at 3-4.  The purpose of the Alabama "mandatory affirmance penalty," quite analogous to the purpose of the D.C. Anti-SLAPP Act, was to penalize frivolous appeals and appeals interposed for delay and to provide "additional damages" to appellees "for having to suffer the ordeal of defending the judgments on appeal."  <u>Id.</u> at 4.

---

[15]     The D.C. Anti-SLAPP Act also divests this Court of discretion to determine, under Rule 12(d) whether the conversion to a Rule 56 motion should, in fact, occur.  Under Rule 12(d), the Court has the discretion to determine whether it will accept or exclude the extra-pleading materials.  <u>See</u> FED. R. CIV. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to <u>and not excluded by the court</u> . . . .") (emphasis added).  As conceded by the District at oral argument, the D.C. Anti-SLAPP Act will require consideration of extra-pleading materials in some instances to determine whether the movant has made his prima facie showing or whether the plaintiff can demonstrate a likelihood of success on the merits.

[16]     See <u>Shady Grove</u>, 130 S.Ct. at 1437.

The Supreme Court held that the Alabama state statute could not apply in a federal diversity case because it conflicted with Federal Rule of Appellate Procedure 38.   Rule 38 provides that a court of appeals "may" award damages and costs to an appellee where it determines that an appeal is frivolous.   <u>Id.</u>  Relying on the Advisory Committee's Note to Rule 38, the Supreme Court held that Rule 38 vested the court with discretion "'in the case of a frivolous appeal as a matter of justice to the appellee and as a penalty against the appellant.'" <u>Id.</u> (quoting Advisory Committee's Note on FED. R. APP. PROC. 38).   Comparing Rule 38 to the Alabama state rule, the Supreme Court held that:

> [Rule 38's] discretionary mode of operation unmistakably conflicts with the mandatory provision of Alabama's affirmance penalty statute.   Moreover, the purposes underlying the Rule are sufficiently coextensive with the asserted purposes of the Alabama statute to indicate that the Rule occupies the statute's field of operation so as to preclude its application in federal diversity actions.

<u>Id.</u> at 7.  Significantly, the Court rejected an argument similar to one made by the District in this case: that because Alabama had a state appellate rule similar to Federal Rule 38 which may be applied in state court alongside the mandatory affirmance penalty statute, the federal court sitting in diversity could likewise "impose the mandatory penalty and likewise remain free to exercise its discretionary authority under Federal Rule 38." <u>Id.</u> at 7-8.  The Court rejected that argument because it:

> ignores the significant possibility that a court of appeals may, in any given case, find a limited justification for imposing penalties in an amount *less than* 10% of the lower court's judgment.  Federal Rule 38 adopts a case-by-case approach to identifying and deterring frivolous appeals; the Alabama statute precludes any exercise of discretion within its scope of operation.   Whatever circumscriptive effect the mandatory affirmance penalty statute may have on the state court's exercise of discretion under Alabama's Rule 38, that Rule provides no authority for defining the scope of discretion allowed under Federal Rule 38.

Id. at 7-8.

Thus, the Supreme Court in Burlington Northern explained that the Alabama rule conflicted with the federal rule even though the federal court might at times find grounds to impose the same penalties specified in the Alabama statute.  The direct conflict was borne out of the fact that the state law deprives the federal court of discretion on a categorical basis.  For this precise reason, the D.C. Anti-SLAPP statute conflicts with Federal Rules 12 and 56.  Even though a special motion to dismiss under Section 16-5502 might sometimes raise arguments that are identical to a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, a Rule 12(b)(6) motion to dismiss for failure to state a claim, or a Rule 12(d)/56 motion for summary judgment, the statute ultimately mandates dismissal with prejudice if the plaintiff fails to demonstrate a likelihood of success on the merits, even where a plaintiff has raised a genuine issue of material fact and even where dismissal without prejudice is appropriate.  Just as in Burlington Northern, the Anti-SLAPP Act in this way "precludes any exercise of discretion within its scope of operation."  Id. at 7-8.[17]  Not surprisingly, neither Defendants nor the District cited Burlington Northern in their voluminous briefing.

Pursuant to the unanimous opinions in Burlington Northern and Walker, as well as the majority opinion in part II-A of Shady Grove and other Supreme Court cases, the first obligation of the Court is to construe the applicable federal rule according to its plain meaning and the relevant explanations provided in the Advisory Committee Notes.  This Court holds that the text and structure of Rules 12 and 56 were intended to create a system of federal civil procedure requiring notice pleading by plaintiffs, whereby a federal court may dismiss a case when the

---

[17]    Importantly, the Court in Burlington Northern noted that "[t]he choice made by the drafters of the Federal Rules in favor of a discretionary procedure affects only the process of enforcing litigants' rights and not the rights themselves."  Burlington, 480 U.S. at 8.

plaintiff fails to plead sufficiently detailed and plausible facts to state a valid claim, but a federal court may not dismiss a case without a trial based upon its view of the merits of the case after considering matters outside of the pleadings, except in those instances where summary judgment under Rule 56 is appropriate. These are bedrock principles of the Federal Rules of Civil Procedure. These principles were expressly articulated by this Circuit in <u>National War Labor Board</u> and <u>Farrall</u>, by the 1946 amendments that added what is now Rule 12(d), by the contemporaneous Advisory Committee Notes explaining the 1946 amendments, and by this Circuit in <u>Callaway</u> construing the 1946 amendments. To the extent that other federal courts have failed to undertake this analysis or have reached a different interpretation of Rules 12 and 56 when upholding Anti-SLAPP laws from other states, this Court respectfully disagrees with those opinions and must follow the binding precedent of this Circuit.

### g. **Opinions From Other Circuits**

The District and Defendants rely heavily on the United States Court of Appeals for the First Circuit's decision in <u>Godin v. Schencks</u>, 629 F.3d 79 (1st Cir. 2010). There, the First Circuit held that Maine's Anti-SLAPP statute applied in federal diversity cases because Federal Rules 12 and 56 were "not so broad as to cover the <u>issues</u> within the scope of" Maine's statute.[18] <u>Godin</u>, 629 F.3d at 88 (emphasis added). The First Circuit found it significant that, although the federal rules and the Maine statute may overlap, they address "different (but related) subject-matters" and thus there was no conflict. <u>Id.</u>

---

[18] Maine's Anti-SLAPP statute has a somewhat different standard on a special motion to dismiss than does the D.C. statute. <u>See</u> ME. REV. STAT. tit. 14, § 556 ("The court shall grant the special motion, unless the party against whom the special motion is made shows that the moving party's exercise of its right of petition was devoid of any reasonable factual support or any arguable basis in law and that the moving party's acts caused actual injury to the responding party."). As shown below, that difference is immaterial as the Maine statute still changes the standards and procedures set forth in Federal Rules 12 and 56.

Instead of first interpreting the scope and meaning of the federal rules, as was done in Shady Grove and other cases, the First Circuit appears to have found no conflict based on a side-by-side comparison of the federal rules and the Maine statute.  Id. at 88-89.  According to the court, the Maine statute did not seek to displace the Federal Rules or have the rules cease to function partly because the Maine statute "is only addressed to special procedures for state claims based on a defendant's petitioning activity."  Id.  Moreover, the First Circuit found that the scope of Rules 12 and 56 was not so broad because the Rules "do not purport to apply only to suits challenging the defendants' exercise of their constitutional petitioning rights."  Id.  This Court respectfully does not see how Rules 12 and 56 fail to answer the same question as the Anti-SLAPP Act because, as even the First Circuit acknowledged, Rules 12(b)(6) and 56 "are general federal procedures governing all categories of cases."  Id.  Based on this Circuit's construction of Rules 12 and 56 as set forth above, those rules govern "all categories of cases" and provide the exclusive means by which a motion may challenge the sufficiency of a claim. This is the *precise* reason why Rules 12 and 56 answer the question in dispute.

Importantly, the First Circuit conceded that, under the Maine statute, a court would be required on a preliminary basis to evaluate material factual disputes that it would not otherwise evaluate on a Rule 56 motion:

> Inherent in Rule 56 is that a fact-finder's evaluation of material factual disputes is not required.  But Section 556 [the Maine statute] serves the entirely distinct function of protecting those specific defendants that have been targeted with litigation on the basis of their protected speech.  When applicable, Section 556 requires a court to consider whether the defendant's conduct had a reasonable basis in fact or law, and whether that conduct caused actual injury.  Fed.R.Civ.P. 56 cannot be said to control those issues.

Id. at 89 (emphasis added).  Citing this language from Godin, the District acknowledges that a court applying the D.C. Anti-SLAPP Act would, at times, also be required to resolve disputed facts, even where it would not otherwise do so under Rule 56.  See Dkt. No. 32 at 28-29 (quoting Godin).  Relying on Godin, the District argues there is no conflict.  This Court respectfully disagrees with this interpretation by Godin and the District.  It is not that Rules 12(d) and 56 merely do "not require" or do not "control" the evaluation of material factual disputes before trial; as held by this Circuit in Callaway, Rules 12(d) and 56 expressly *prohibit* such an evaluation.  Accordingly, because the D.C. Act requires the court to undertake a fact-finding role, even where there is a genuine issue of material fact, the statute directly collides with the prohibition of Rules 12(d) and 56.

The First Circuit also held that the Maine statute must apply in federal court because it creates substantive rights, such as substantive legal defenses for a defendant, shifting burdens to a plaintiff, and because it substantively alters the type of harm that is actionable by requiring "actual injury."  Id. at 89-90.  As the First Circuit observed, it is "not the province of either Rule 12 or Rule 56 to supply substantive defenses or the elements of plaintiffs' proof to causes of action, state or federal."  Id. at 89.  The District and Defendants in this case echo this view, arguing that the D.C. Anti-SLAPP statute has created substantive rights, such as an immunity from suit, that the federal rules cannot displace.  (Dkt. No. 32 at 29; No. 33 at 28-29).

This Court need not conclusively decide whether the D.C. Anti-SLAPP Act creates any substantive rights.  Because this Court finds that Rules 12 and 56 answer the question in dispute, the Court need not "wade into Erie's murky waters" to consider that issue.  See Shady Grove, 130 S.Ct. at 1437.  Nonetheless, even assuming a substantive right is created, the Anti-SLAPP Act cannot apply in this Court because the D.C. Council has clearly mandated the *procedure* for

enforcing any such substantive right that preempts Federal Rules 12 and 56.   Indeed, as the preamble to the D.C. Anti-SLAPP Act states, the Act's purpose is:

> To provide a special motion for the <u>quick and efficient dismissal</u> of strategic lawsuits against public participation, to stay discovery proceedings until the special motion is considered, to provide a motion to quash attempts to seek personal identifying information and to award the costs of litigation to the moving party on a successful special motion.

58 D.C. Reg. 741 (Jan. 28, 2011) (emphasis added).  The D.C. Council could have, but chose not to, simply granted a defendant an immunity that could be invoked via a Rule 12 or 56 motion, similar to existing qualified or absolute immunities.   Instead, the Council mandated a dismissal procedure that directly conflicts with the operation of the federal rules as required by the binding precedent of this Circuit.   For these reasons, this Court respectfully declines to follow the First Circuit's reasoning in <u>Godin</u> that the state law is primarily substantive.

Likewise, the Court disagrees with the opinion of the United States Court of Appeals for the Ninth Circuit in <u>United States v. Lockheed Missiles & Space Co.</u>, 190 F.3d 963, 972 (9th Cir. 1999).   There, the Ninth Circuit found no conflict between Federal Rules 12 or 56 and the California Anti-SLAPP statute on the rationale that Rule 12 or 56 motions could be filed after the California special motion to strike.   In so holding, the court concluded that there was "no indication that Federal Rules of Civil Procedure 8, 12, or 56 were intended to 'occupy the field' with respect to pretrial procedures aimed at weeding out meritless claims."   <u>Id.</u> at 972-73.  Based on this Circuit's analysis of the history and intent of Federal Rule 12(d) as explained in <u>Callaway</u>, the law in this Circuit is that "occupying the field" of weeding out meritless claims is

*precisely* what Rules 12 and 56 were meant to do.  As such, this Court cannot agree with the

analysis of the Ninth Circuit.[19]

This Court recognizes that other courts, in construing specific state Anti-SLAPP statutes,

have come to various conclusions about the applicability of those statutes in a federal court

---

[19]      The Ninth Circuit initially issued its opinion in Lockheed on March 24, 1999.  See U.S.
v. Lockheed Missiles & Space Co., Inc., 171 F.3d 1208 (9th Cir. 1999).  The panel, however,
amended the opinion and issued a superseding opinion on September 10, 1999, which is the
opinion cited above.  190 F.3d 963.  For purposes of this discussion, the amended opinion did
not alter the original opinion in any significant way.
        In July 1999, the United States District Court for the Central District of California found
a conflict between Federal Rule of Civil Procedure 56 and the "discovery-limiting" aspects of
California's Anti-SLAPP statute.  See Rogers v. Home Shopping Network, Inc., 57 F.Supp.2d
973, 982 (C.D. Cal. 1999).  The court in Rogers interpreted the original Lockheed opinion as
standing for the proposition that simply bringing a special motion to strike under California's
statute did not create a conflict with Federal Rules 12 and 56 because the two did not impose
different standards on a plaintiff.  Id. at 982-84.  However, the court in Rogers stated that if the
standards were different, they would conflict.  Id. at 984 (stating that if "Lockheed applied a
heavier burden on the plaintiff in a special motion to strike than that imposed by the Federal
Rules, Lockheed's explanation for the lack of conflict is unsound . . . .").  The court did,
however, find a conflict between the discovery-limiting provisions of the California statute and
Rule 56 because the California statute "created a default rule that allows the defendant served
with a complaint to immediately put the plaintiff to his or her proof before the plaintiff can
conduct discovery."  Id. at 980.  As the court stated, "[i]f this expedited procedure were used in
federal court to test the plaintiff's evidence before the plaintiff has completed discovery, it would
collide with Federal Rule of Civil Procedure 56."  Id.  The court ultimately held that "in federal
court, a special motion to strike must be decided pursuant to the standards of Rule 12(b)(6) or
Rule 56."  Id. at 984.  Implicit in the Rogers opinion, therefore, is the conclusion that Rules 12
and 56 were, indeed, so broad as to preempt conflicting state statutes.
        In 2001, the Ninth Circuit also held that the California statute's discovery-limiting
provisions directly collided with the discovery procedures of Rule 56 and could not be applied in
federal court.  See Metabolife Int'l, Inc. v. Wornick, 264 F.3d 832, 845-47 (9th Cir. 2001).  In so
holding, the Ninth Circuit approvingly cited Rogers and adopted its reasoning.  Metabolife, 264
F.3d at 846.
        Based on the Ninth Circuit's opinion in Metabolife, it appears that the ultimate view of
the Ninth Circuit is that the California Anti-SLAPP Statute can only be applied as long as it is
consistent with the standards of Rules 12 and 56.  If the prevailing view of the Ninth Circuit is,
as suggested by Rogers and Metabolife, that Rules 12 and 56 are so broad as to cover or answer
the same question as the California statute, then this Court does not disagree with that view.  If
the prevailing view of the Ninth Circuit, however, is that Rules 12 and 56 are not so broad as to
"occupy the field" with respect to pretrial procedures aimed at weeding out meritless claims as
stated in Lockheed, this Court disagrees for the reasons stated in this Memorandum Opinion.

sitting in diversity.   To the extent that other courts have concluded that the specific state dismissal procedures operated essentially the same as Rules 12 and 56, the cases are distinguishable and not necessarily inconsistent with the analysis of this Court.   See, e.g., La. Crisis Assistance Ctr. v. Marzano-Lesnevich, 2011 WL 5878159 at *7-8 (E.D. La. 2011) (finding that the burdens and standards under the Louisiana Anti-SLAPP statute directly corresponded to and did not collide with the burdens and standards under Rule 56).[20]   On the other hand, to the extent that other courts construed the state dismissal procedure as placing a heavier procedural burden on the plaintiff than Rules 12 and 56 but nonetheless found no conflict, this Court respectfully disagrees with their holdings as contrary to the law of this Circuit, for the reasons set forth above.

### h.   Rules Enabling Act

Having found that Rules 12 and 56 answer the dispute at issue in this case, those rules will govern unless they were adopted in violation of the Rules Enabling Act, 28 U.S.C. § 2072. See Shady Grove, 130 S.Ct. at 1442.  Challenges to federal rules under the Rules Enabling Act face several hurdles.  First, although the Federal Rules of Civil Procedure are not enacted by Congress, "Congress participates in the rulemaking process."   Bus. Guides, Inc. v. Chromatic Communs. Enters., 498 U.S. 533, 552 (1991) (quoting 5A Wright & Miller § 1332 at 57–58 (3d ed. 2004)).  The Rules are not made effective until Congress has had an opportunity to review them for at least seven months.  See 28 U.S.C. § 2074.  As such, the Congressional review and "the study and approval given each proposed Rule by the Advisory Committee, the Judicial

---

[20]     Although the United States Court of Appeals for the Fifth Circuit applied Louisiana's Anti-SLAPP statute in a federal court sitting in diversity, the parties in that case do not appear to have disputed the applicability of the state statute in federal court.   That case, therefore, is distinguishable because the Fifth Circuit did not engage in any meaningful analysis under Hanna. See Henry v. Lake Charles American Press, LLC, 566 F.3d 164, 181-83 (5th Cir. 2009).

Conference, and [the Supreme Court] . . . give the Rules presumptive validity under both the constitutional and statutory constraints."  Burlington Northern, 480 U.S. at 5-6 (citing Hanna, 380 U.S. at 471); see also 19 Wright & Miller § 4508, 252 ("Hanna frees the federal courts from Erie concerns when one of the Rules is applicable and, in addition, provides the Rules with a presumptive validity if not quite an automatic seal of approval.").

Accordingly, challenges to the Federal Rules can succeed "only if the Advisory Committee, [the Supreme] Court, and Congress erred in their prima facie judgment that the Rule in question transgresses neither the terms of the Enabling Act nor constitutional restrictions." Bus. Guides, 498 U.S. at 552 (quoting Hanna, 380 U.S. at 471).  Notably, the Supreme Court has rejected every Rules Enabling Act challenge to a Federal Rule that has come before it.  Shady Grove, 130 S.Ct. at 1442 (plurality); see also id. at 1457 ("the bar for finding an Enabling Act problem is a high one.") (Stevens, J., concurring).

Similarly, this Court does not find that Rules 12 and 56 run afoul of the Rules Enabling Act or the Constitution.  Given the procedural characteristics of Rule 12(d) and Rule 56, they fall squarely within the proper scope of the Rules Enabling Act.  See Burlington Northern, 480 U.S. at 8; Shady Grove, 130 S.Ct. at 1442 (federal rule is valid so long as it "really regulates procedure") (quoting Sibbach v. Wilson & Co., 312 U.S. 1, 14 (1941) (plurality)).  Indeed, the Supreme Court has observed that pleading standards and summary judgment rules are classic examples of appropriate procedural rules.  Shady Grove, 130 S.Ct. at 1441.  In addition, the D.C. Anti-SLAPP Act is codified with procedural matters in the D.C. Code, and the Act applies to all claims, not just to claims brought under District law,[21] seriously undermining any contention that the Act "serves the function of defining [state] rights or remedies."  Shady Grove, 130 S.Ct. at

---

[21]     In this case, Defendants even seek to apply the Act to dismiss a claim that they contend is governed by U.K. law.

1457 (Stevens, J., concurring).   The Act is a summary dismissal procedure that the Defendants and the District seek to clothe in the costume of the substantive right of immunity—but this is largely a masquerade.   Based on the procedural characteristics of the Act, and the presumptive validity of the Federal Rules of Civil Procedure, this Court is satisfied that Rules 12 and 56 do not abridge, enlarge or modify any substantive right in violation of the Rules Enabling Act.

## III.   SPECIAL MOTIONS TO DISMISS

Under the D.C. Anti-SLAPP Act, the Davis Defendants have moved to dismiss 3M's claims for commercial defamation (count IV), injurious falsehood and business disparagement (count V), breach of fiduciary duty (count VI), aiding and abetting (count VII), and civil conspiracy (count VIII).   (Dkt. No. 55).[22]   The Porton Defendants have moved to dismiss the same claims, except they do not move to dismiss the breach of fiduciary duty claim brought solely against the Davis Defendants. (Dkt. No. 57).   Having found that the special motion to dismiss procedure under the Anti-SLAPP Act does not apply to a federal court sitting in diversity, the Court denies Defendants' special motions to dismiss.

## IV.   3M's MOTION TO STRIKE SPECIAL MOTIONS TO DISMISS

Given this Court's holding that Section 16-5502's special motion to dismiss procedure does not apply in this Court, 3M's Motion to Strike is denied as moot.   The Court now turns to Defendants' Rule 12 motions to dismiss.

---

[22]   At the hearing, the Davis Defendants also contended that the D.C. Anti-SLAPP Act barred the tortious interference claims alleged in Counts II and III.   Previously, the Davis Defendants argued that the Act barred the intimidation/blackmail claim.  (Dkt. No. 9).

## V.   DEFENDANTS' RULE 12 MOTIONS TO DISMISS

### a.   Porton Defendants' Rule 12(b)(2) Motion to Dismiss for Lack of Personal Jurisdiction

When personal jurisdiction is challenged under Rule 12(b)(2), the plaintiff bears the burden of establishing a factual basis for the Court's exercise of personal jurisdiction over each defendant.   Crane v. N.Y. Zoological Soc'y, 894 F.2d 454, 456 (D.C. Cir. 1990) (emphasis added).   In order to survive a motion to dismiss for lack of personal jurisdiction, the plaintiff must make a "prima facie showing of the pertinent jurisdictional facts."   First Chi. Int'l v. United Exch. Co., 836 F.2d 1375, 1378 (D.C. Cir. 1988).   To establish that personal jurisdiction exists, the plaintiff must allege specific facts that connect the defendant with the forum.   Second Amendment Found. v. U.S. Conference of Mayors, 274 F.3d 521, 524 (D.C. Cir. 2001).   Plaintiff "cannot rely on conclusory allegations."   Atlantigas Corp. v. Nisource, Inc., 290 F.Supp.2d 34, 42 (D.D.C. 2003).   In determining whether a plaintiff has demonstrated that personal jurisdiction exists, the Court is not bound to treat all of the plaintiff's allegations as true, but instead "may receive and weigh affidavits and other relevant matter to assist in determining the jurisdictional facts."   United States v. Philip Morris Inc., 116 F. Supp. 2d 116, 120 n.4 (D.D.C. 2000).

In analyzing the claims of personal jurisdiction over the Porton Defendants, it is important to note that 3M has not yet completed service over Harvey Boulter.   Moreover, 3M does not request that this Court stay determination of the Rule 12(b)(2) motion until Boulter is served.   Thus, this Court must determine whether 3M's showing as to the entities Porton Capital, Inc. and Porton Capital Technology Funds, standing alone, is sufficient to warrant personal jurisdiction over those defendants.   For purposes of this jurisdictional discussion, the Court does not include Boulter when referring to the "Porton Defendants."

It is undisputed that the Porton Defendants themselves were never physically present in the District of Columbia and that they never personally performed any of the alleged tortious acts here.  As 3M alleges, the Porton Defendants are organized under the laws of the Cayman Islands and do business in the U.K., Dubai and other international jurisdictions.  (FAC ¶¶ 10-11).  3M argues that D.C.'s long-arm statute, D.C. Code § 13-423 (2001), confers specific personal jurisdiction over the Porton Defendants under two specific theories: conspiracy jurisdiction and agency jurisdiction.[23]   The Court finds that 3M has failed to meet its burden to establish jurisdiction under either theory.

To establish conspiracy jurisdiction, the plaintiff must allege: 1) the existence of a civil conspiracy; 2) the defendant's participation in the conspiracy, and 3) an overt act by a co-conspirator within the forum, subject to the long-arm statute, and in furtherance of the conspiracy.  See FC Inv. Grp. v. IFX Markets, Ltd., 529 F.3d 1087, 1096 (D.C. Cir. 2008).  To allege a civil conspiracy, the plaintiff must plead with particularity: 1) an agreement between two or more persons; 2) to participate in an unlawful act, or to participate in a lawful act in an unlawful manner; 3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; 4) pursuant to, and in furtherance of, the common scheme.  Exec. Sandwich Shoppe, Inc. v. Carr Realty Corp., 749 A.2d 724, 738 (D.C. 2000).  "Bald speculation or a conclusory statement that individuals are co-conspirators is insufficient to establish personal jurisdiction under a conspiracy theory."  Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan, 115 F.3d 1020, 1031 (D.C. Cir. 1997) (internal quotation marks and citations omitted); see also Edmond v. United States Postal Service General Counsel, 949 F.2d 415, 428 (D.C. Cir. 1991)

---

[23]     3M does not allege that this Court has general jurisdiction over the Porton Defendants based on their contacts within this jurisdiction.

(stating that "our cases clearly require unusually particularized pleading [of the elements of conspiracy jurisdiction].").

3M has failed to meet its burden to plead a conspiracy between the Porton Defendants and the Davis Defendants with particularity.  Beyond alleging that Davis, a lawyer, represented the Porton Defendants, there are no facts or fair inferences from facts to support the element of an agreement between the parties to participate in an unlawful act.  3M does not specify, moreover, how the Porton Defendants participated in that conspiracy for jurisdictional purposes. 3M's claims of conspiracy jurisdiction against the Porton Defendants are bald and conclusory statements insufficient to establish jurisdiction over them.  For these reasons, the Court finds that 3M has failed to meet its burden to make a prima facie showing as to conspiracy jurisdiction.

3M next argues that this Court may exercise personal jurisdiction over the Porton defendants under the D.C. long-arm statute because Davis "transacted business" in the District as the Porton Defendants' agent and 3M's claims arose from that conduct.  See D.C. Code § 13-423(a)(1) ("A District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's . . . transacting any business in the District of Columbia.").  Section (a)(1)'s "transacting any business" clause "has been interpreted to provide jurisdiction to the full extent allowed by the Due Process Clause." United States v. Ferrara, 54 F.3d 825, 828 (D.C. Cir. 1995).

Setting aside the issue of whether the Porton Defendants were "transacting business" under the statute merely by hiring an attorney (Davis) to represent them, 3M has wholly failed to address the Porton Defendants' substantial argument that an exercise of personal jurisdiction over them would offend traditional notions of fair play and substantial justice, would not comport with due process, and that 3M's allegations fall "far short" of the basic constitutional

requirements for establishing jurisdiction.  (Dkt. No. 31-3 at 17-23; Dkt. No. 51-2 at 4 n.6).[24]

Although the statutory and constitutional jurisdictional questions "merge into a single inquiry"

under Section 13-423(a)(1), that does not absolve 3M of its burden to show that jurisdiction

comports with due process.  Ferrara, 54 F.3d at 828.

　　　Despite exchanging numerous briefs with Defendants—including two rounds of briefing

on the Rule 12 Motions—3M makes only a passing reference in a footnote to these constitutional

requirements.[25]  This statement is not sufficient to meet 3M's burden on a central jurisdictional

issue.  Nor is it sufficient to avoid having the Porton Defendants' constitutional arguments

deemed conceded by 3M.  See F.D.I.C. v. Bender, 127 F.3d 58, 67-68 (D.C. Cir. 1997); Hopkins

v. Women's Div., Gen. Bd. of Global Ministries, 238 F.Supp.2d 174, 178 (D.D.C. 2002) ("It is

well understood in this Circuit that when a plaintiff files an opposition to a motion to dismiss

addressing only certain arguments raised by the defendant, a court may treat those arguments

that the plaintiff failed to address as conceded.").  Because the Porton Defendants' argument that

the exercise of personal jurisdiction does not comport with the due process requirement is

conceded by 3M, the Porton Defendants' motion to dismiss under Rule 12(b)(2) is granted.[26]

---

[24]　　The Porton Defendants' submission includes a declaration from its principal Andrew Collins, in which Collins details how the Porton Defendants have no contact with the District of Columbia.  3M fails to address this declaration in any way.

[25]　　See Dkt. No. 43 at 37 n.165; Dkt. No. 58 at 3-4 n.5.

[26]　　3M has not made a motion for jurisdictional discovery and has referred to it only in passing.  (See Dkt. No. 58 at 4).  To the extent 3M seeks jurisdictional discovery, 3M has failed to meet its burden.  See Orellana v. Croplife Int'l, 740 F.Supp.2d 33, 40 (D.D.C. 2010) ("A generalized request for jurisdictional discovery in an attempt to establish personal jurisdiction over a defendant is not sufficient.").  Moreover, because the Porton Defendants are dismissed under Rule 12(b)(2), their arguments under Rule 12(b)(6) are moot and the Court need not reach those issues.

### b.  Davis Defendants' Rule 12(b)(6) Motions to Dismiss

"To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, --- U.S. ----, 129 S.Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

A court considering a Rule 12(b)(6) motion must construe the complaint in the light most favorable to plaintiffs and must accept as true all reasonable factual inferences drawn from well-pleaded factual allegations.  In re United Mine Workers of Am. Empl. Benefit Plans Litig., 854 F. Supp. 914, 915 (D.D.C. 1994).  However, where the well-pleaded facts do not permit a court, drawing on its judicial experience and common sense, to infer more than the "mere possibility of misconduct," the complaint has not shown that the pleader is entitled to relief. Iqbal, 129 S.Ct. at 1950.  Moreover, the Court accepts "neither inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint, nor legal conclusions cast in the form of factual allegations." Browning v. Clinton, 292 F.3d 235, 242 (D.C. Cir. 2002) (internal citations and quotation marks omitted).

In evaluating a Rule 12(b)(6) motion to dismiss,  a court "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [a court] may take judicial notice." Trudeau v. FTC, 456 F.3d 178, 183 (D.C. Cir. 2006) (quoting EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624-25 (D.C. Cir. 1997)).

### i.  Count One: Intimidation Under English Law

3M claims that Defendants are liable for the tort of intimidation under English law, citing Boulter's allegedly extortionate communications to 3M's attorney regarding settling the London

Litigation.  No party appears to dispute that English law applies to this claim, and both parties have submitted declarations from lawyers in England to assist the Court with an understanding of English law.[27]

There is no dispute that the U.K. Court of Appeals recently stated that "the essential ingredients of the tort of intimidation" are: 1) a threat by the defendant to do something unlawful or illegitimate; 2) the threat must be intended to coerce the plaintiff to take or refrain from taking some action; 3) the threat must in fact coerce the plaintiff; and 4) the plaintiff must incur loss or damage as a result of the coercion.  (Dkt. No. 30-2 at 19) (citing Berezovsky v. Abramovich, [2011] All ER (D) 253 (Feb); [2011] EWCA Civ 153) (emphasis added).

3M fails to allege actual coercion/capitulation and resulting damages from the alleged intimidation, and, as such, its claim must be dismissed.  It is undisputed that 3M did not in fact settle the BacLite litigation, despite Defendants' urgings.  3M argues, however, that a "plaintiff may suffer harm for intimidation even if it does not capitulate to the blackmailer's demand; plaintiff incurs intimidation damages by taking steps to mitigate or forestall the effect of a blackmail threat."  (Dkt. No. 43 at 65).  For that proposition, 3M cites only the declaration of Stephen Auld, 3M's expert witness on English law.  Although Auld admits that the "very recent" Berezovsky case lists coercion in fact as an element, he claims based solely on his view and not on any cited case law, that English law should not require actual coercion or capitulation in these circumstances.  See Auld Decl. ¶¶ 5.7.1-5.7.4 (stating that, although the Berezovsky case "gives, at the present, the clearest indication of the essential ingredients [of intimidation], it does not conclusively define them."); see also id. ¶ 5.7.6 ("It is also likely in my view that, where the

---

[27]    Under Federal Rule of Civil Procedure 44.1, this Court may "consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence" in determining foreign law.

effect of the intimidation is not that the plaintiff submits to the illegitimate threat but, instead takes (costly) steps to mitigate the effect of the threat should it be carried out, the plaintiff should be able to recover the cost of those steps by way of damages.  <u>As far as I am aware, there is no case which has had to address this particular issue . . .</u>") (emphasis added).

3M, therefore, asks this Court to ignore the language of the <u>Berezovsky</u> case, which Auld admits requires coercion in fact, and instead rely on the opinion of Auld regarding where he believes the case law will head in the future.  Against the clear statement of elements in the <u>Berezovsky</u> case, and the lack of foundation for Auld's opinion on this specific issue, this Court holds that 3M was required to plead that it actually capitulated to Defendants' alleged threats.  Because it failed to do so, 3M's claim for intimidation against the Davis Defendants is dismissed.

### ii. Counts Two and Three: Tortious Interference with Contract and Tortious Interference with Existing and Prospective Advantage

3M's claims for tortious interference with contract and with existing and prospective advantage will also be dismissed.  3M argues that D.C. law should apply to its claim for tortious interference with existing and prospective business advantage, while Defendants claim that U.K. law should apply.  Assuming for 3M's benefit that D.C. law applies to this claim, 3M has still failed to state a claim.

To establish a claim for tortious interference, a plaintiff must prove: (1) the existence of a valid contractual or other business relationship; (2) the defendant's knowledge of the relationship; (3) intentional interference with that relationship by the defendant; and (4) resulting damages.  <u>See</u> <u>NCRIC, Inc. v. Columbia Hosp. for Women Med. Ctr., Inc.</u>, 957 A.2d 890, 900 (D.C. 2008).

In support of this claim, 3M alleges that Defendants "have wrongfully, intentionally, maliciously and in bad faith taken actions to interfere with 3M's existing and prospective business relationships with the U.K. Government through unlawful means." (FAC ¶ 128). Although 3M claims in a conclusory fashion that it has "suffered identifiable losses to its prospective business relationships" with the MoD, it gives only two specific instances. (FAC ¶ 114). In one instance, 3M alleges that it submitted a contract to the MoD "which has not yet been acted upon, and may be re-bid." (FAC ¶114). In another instance, 3M's efforts to obtain a contract with the MoD have "also gone nowhere." (FAC ¶ 114).

3M has failed to allege any facts to support a conclusion or inference that the Davis Defendants intentionally interfered with 3M's existing and prospective business relationships or contracts with the U.K. government. For its proposition that it has "more than adequately pleaded" intentional interference for this claim, 3M relies on the allegations in its Amended Complaint at ¶¶ 6, 90, 80-104, 112-14, and 126-134. (Dkt. No. 58 at 16 n.70). Upon a careful review of those allegations, however, none of those factual allegations support 3M's conclusion. 3M does not allege, for example, that the Davis Defendants had contact with the U.K. government professionals responsible for making those decisions or that Davis had any communications with the U.K. government at all. There are no circumstantial facts, moreover, that reflect that, on account of anything the Davis Defendants specifically did, 3M's bids went "nowhere."

Moreover, to the extent that 3M attempts to impute to Davis the communications made by Boulter to Dr. Fox, the Court finds that those facts do not support the inference that Boulter interfered with or threatened to interfere with any of 3M's existing or prospective contractual relationships within the MoD. Boulter states in the e-mail that he was "authorized" to speak on

behalf of the MoD—a co-plaintiff in the BacLite litigation.  Boulter's statements that the MoD government may be upset with 3M for not settling the litigation on the MoD's terms, moreover, do not support the specific conclusion or fair inference that "Fox, or others within the U.K. Government, would take steps to interfere with 3M's current and future relationships with that government."  (FAC ¶ 90).  Boulter was discussing how his co-plaintiff in the BacLite litigation may react if 3M did not settle the case.  The allegations are too attenuated to establish that the Davis Defendants interfered with the prospective contracts identified by 3M.  3M argues that these are factual issues that must be resolved later on summary judgment or at trial.  The Court disagrees.  Although the Court must accept all the well-pleaded allegations as true and resolve all inferences in 3M's favor, the Court need not accept inferences that are not supported by the facts alleged.  See Browning, 292 F.3d at 242.

In addition to failing to prove the "intentional interference" element, 3M's claim for tortious interference with contract (Count Three) must be dismissed for failure to allege an actual breach or failure of performance.  This count is based on 3M's allegation that Defendants' conduct interfered with an existing "enabling contract" that 3M had signed with the U.K. government in March 2011.[28]  (FAC ¶ 113).  Pursuant to that contract, the U.K. government was to purchase an estimated "10,000" air filters, and a "minimum order quantity" of 1,920 units in "Year 1" of the contract.  (FAC ¶ 113).  Although 3M does not specify when "Year 1" begins or ends, 3M alleges that as of September 30, 2011, the U.K. government had only purchased 406 units.  (FAC ¶ 113).  3M does not allege that the U.K. government actually breached the contract or that either party has of yet failed to perform under that contract.

---

[28]    Although 3M claims in conclusory fashion that it has "one or more contracts" with the U.K. government, it only actually specifies one existing contract in its Amended Complaint. (FAC ¶¶ 113, 136).  The Court need not consider other contracts that were pled in a wholly conclusory manner with no factual allegations to support them.

3M implicitly admits that it has not pled an actual breach of the enabling contract because it argues that an actual breach is not an essential element of tortious interference with contract under D.C. law.  See Dkt. No. 58 at 8 ("3M is not required to establish an actual breach, failure of performance is sufficient.").  The parties disagree over whether D.C. law requires 3M to plead an actual breach or merely failure of performance on the part of the third party.  This Court need not resolve this issue, because, even assuming it were sufficient for 3M to plead a "failure of performance," it has failed to do so.  (FAC ¶ 113).  Although 3M has alleged a reduction in business with the U.K. government, it has given no specific examples of actual contracts except for the March 2011 "enabling contract."  (FAC ¶ 113).  Despite 3M's claims otherwise, it has *not* pled that the U.K. government has failed to perform under that contract.  3M has only pled that in "Year 1," which 3M implicitly acknowledges is not yet over (see FAC ¶ 113), the U.K. government has not yet met its estimated minimum order quantity.  This case does not fall in line with the cases 3M cites for the proposition that a plaintiff need only plead a failure to perform. See, e.g., Casco Marina Dev., LLC v. District of Columbia Redevelopment Land Agency, 834 A.2d 77, 83 (D.C. 2003) (third party cancelled contract with plaintiff); Sorrells v. Garfinkel's, Brooks Bros., Miller & Rhoads, Inc., 565 A.2d 285, 289-90 (D.C. 1989) (employer cancelled employment contract with employee).  As such, the tortious interference with contract claim will be dismissed.

### iii.   Count Four: Commercial Defamation

The Davis Defendants' motion to dismiss 3M's claim for commercial defamation is denied.  To show defamation under District of Columbia law, a plaintiff must allege that: 1) the defendant made a false and defamatory statement concerning the plaintiff; 2) that the defendant published the statement without privilege to a third party; 3) that the defendant's fault in

publishing the statement amounted to at least negligence; and 4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm.  See Oparaugo v. Watts, 884 A.2d 63, 76 (D.C. 2005).  The Court finds that 3M has stated a claim for defamation against the Davis Defendants through the allegations of the Amended Complaint.

The Davis Defendants make numerous arguments why 3M's claim must be dismissed, and this Court need not address all of them at this time.  The Court will note, however, a few points.  First, the Davis Defendants claim that all of the allegedly defamatory statements are statements of opinion or statements of non-verifiable facts and, as such, are protected from liability.  The Court finds that 3M has made detailed allegations of defamatory statements, such as Davis' statement that "thousands and thousands and thousands of people who died might be alive today had there been a BacLite" (FAC ¶ 70).  See Moss v. Stockard, 580 A.2d 1011, 1023 (D.C. 1990) ("A statement is defamatory if it tends to injure the plaintiff in his trade, profession or community standing, or lower him in the estimation of the community.") (internal citations and quotation marks omitted).  This statement, among others, are reasonably susceptible of defamatory meaning and are actionable.  See Klayman v. Segal, 783 A.2d 607, 613 (D.C. 2001) ("We will not dismiss a complaint under Rule 12(b)(6) which alleges defamation if the communications of which plaintiff complains were reasonably susceptible of defamatory meaning.") (internal quotation marks omitted).

Moreover, the Davis Defendants contend that their statements were all protected by the "fair comment" privilege and that 3M failed to overcome that privilege by pleading actual malice.  (Dkt. No. opening memo at 17-19; Dkt. No. 50 at 18-19).  The Court finds that 3M's allegations of Davis' statements—particularly those in reference to 3M's responsibility for

thousands of MRSA deaths or exposures (FAC ¶¶ 66-70)—reflect actual malice and/or bad faith on their face and cannot be dismissed at this stage.   Whether 3M will be able to defeat any potential privileges or substantiate its claims are, of course, questions for another day.   3M's claim for defamation, therefore, is sufficient to withstand Rule 12(b)(6) scrutiny.

### iv.   Count Five: Injurious Falsehood and Business Disparagement

Defendants seek to dismiss 3M's claim for Injurious Falsehood and Business Disparagement.   Although Defendants claim that the District of Columbia does not recognize a separate tort of business disparagement, 3M does not appear to contest that point.   3M lists both torts in the same count, and does not conduct a separate analysis in its brief with respect to business disparagement.   (Dkt. No. 58 at 10-12).   3M's claim is based on the same allegedly defamatory statements upon which its defamation claim is based.

To assert a claim for injurious falsehood, a plaintiff must allege that: 1) Defendants made an unprivileged publication of false statements concerning 3M's property or products; 2) Defendants' publication was made with knowledge or reckless disregard of the falsity of the statements, and 3) special damages.   Whetstone Candy Co. v. National Consumers League, 360 F.Supp.2d 77, 81 (D.D.C. 2004).   The special damages element is subject to a heightened pleading standard.   Browning, 292 F.3d at 245.   This heightened standard applies because "'special damages,' unlike general damages, are 'not the necessary consequence of [the] defendant's conduct, [but] stem from the particular circumstances of the case.'"   Id. (quoting 5 Wright & Miller, § 1310 at 700 (2d ed. 1990)).   A plaintiff "can satisfy this pleading obligation by identifying either particular customers whose business has been lost or facts showing an established business and the amount of sales before and after the disparaging publication, along

with evidence of causation."  Id.; see also FED. R. CIV. P. 9(g) ("If an item of special damage is claimed, it must be specifically stated.").

3M concedes that it must plead special damages to survive dismissal on this claim.  (Dkt. No. 58 at 12).  3M argues, however, that it has met this heightened pleading standard because it has identified particular customers whose business has been lost, valid business expectancies, and "evidence of causation."  In support for the fact that it has pled causation, 3M directs this Court to the allegations in its Amended Complaint at ¶¶ 64-79, 153-160.  (Dkt. No. 58 at 12 n.53).  A close examination of those allegations, however, reflect no *facts* supporting the conclusion that 3M's actual damages were the "natural and direct result" of Defendants' conduct. See Browning, 292 F.3d at 245 (plaintiff must allege special damages "with particularity and specify facts showing that such special damages were the natural and direct result of the defendant's conduct.").  In fact, the allegations of causation upon which 3M relies for this claim are conclusory statements alleging that Defendants caused damage to 3M, with no specific facts reflecting that causation.  See FAC ¶¶ 154; 160; 158 ("As a natural, direct, and proximate result of Defendants' wrongful actions, 3M has suffered special damages, as identified herein, the full amount which will be proven at trial.").  As such, Defendants' motion to dismiss this claim will be granted.

### v.  Count Six: Breach of Fiduciary Duty (only against Davis)

3M's claim against Davis for breach of fiduciary duty will be dismissed.  3M alleged that, in 2000 while Davis was an attorney at the law firm Patton Boggs LLP, 3M retained Davis to provide "crisis management" services in connection with "issues 3M was facing."  (FAC ¶ 62).  3M also alleges that, during that time, Davis had access to 3M's litigation strategy "playbook" and that Davis later used those strategies to exert pressure against 3M in 2011.

(FAC ¶ 62).   3M does not allege specifically how Davis used the information from the "playbook" or how that act proximately caused 3M's injuries.

To state a claim for breach of fiduciary duty under D.C. law, a plaintiff must allege that the defendant: 1) owed plaintiff a fiduciary duty; 2) the defendant breached that duty; and 3) the breach proximately caused injury to the plaintiff.   See Paul v. Judicial Watch, Inc., 543 F.Supp.2d 1, 6 (D.D.C. 2008).   The Court holds that 3M has failed to sufficiently allege that Davis owed 3M a fiduciary duty in this context.   3M seems to believe that the only thing that is necessary to state that Davis owed it a fiduciary duty is to allege that 3M was Davis' former client.   (Dkt. No. 58 at 7).   3M fails to show how Davis owed 3M a fiduciary duty despite having represented 3M eleven years earlier in an unrelated case.   3M basically argues that Davis learned in his earlier representation that 3M sought to avoid negative publicity, but anyone with common sense knows that fact.   Moreover, although 3M accuses Davis in conclusory fashion of using strategies he learned in 2000, 3M fails to state any of those strategies with any specificity.   The Court holds that 3M has failed to state a claim against Davis for breach of fiduciary duty.

### vi.   Count Seven: Aiding and Abetting

3M's claim for aiding and abetting will be dismissed.   According to the District of Columbia Court of Appeals, to which this Court looks on issues of District of Columbia law, the tort of aiding and abetting is not recognized under District law.   In Flax v. Schertler, 935 A.2d 1091, 1108 n.15 (D.C. 2007), the District of Columbia Court of Appeals stated that: "[a]lthough the Halberstam court [the case upon which 3M relies] predicted that this court would recognize a tort of aiding and abetting tortious conduct, we have not done so to date, and we are not bound by that court's ruling."   Flax (citing M.A.P. v. Ryan, 285 A.2d 310, 312 (D.C. 1971)).   To the extent that 3M relies on this Circuit's 1983 opinion in Halberstam v. Welch, 705 F.2d 472 (D.C.

Cir. 1983) to support its proposition that such a tort does exist under D.C. law, it is the District of Columbia Court of Appeals' holding—and not this Circuit's prediction—that must control in this case.  See <u>M.A.P.</u>, 285 A.2d at 312.

### vii.   Count Eight: Civil Conspiracy

As stated previously, to allege a conspiracy, a plaintiff must plead with particularity: 1) an agreement between two or more persons; 2) to participate in an unlawful act, or to participate in a lawful act in an unlawful manner; 3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; 4) pursuant to, and in furtherance of, the common scheme. <u>Executive Sandwich</u>, 749 A.2d at 738.

For the same reasons outlined in Part V(a) above, 3M fails to state a claim for civil conspiracy against the Davis Defendants.  Despite 3M's colorful characterizations that Davis acted as the "spider in the web" and mastermind of Defendants' alleged scheme and that his offices were the "nerve center" of Defendants' conspiracy, 3M has failed to allege with particularity an agreement between Davis and the other Defendants to commit an unlawful act. 3M's allegations about Davis notwithstanding, the well-pleaded facts do not give rise to a "plausible" inference that a conspiracy existed.

### **CONCLUSION**

For the foregoing reasons, Defendants' Special Motions to Dismiss under the D.C. Anti-SLAPP Act are denied, 3M's Motion to Strike is denied as moot, 3M's Cross Motion for Discovery is denied as moot, the Porton Defendants' Rule 12(b)(2) motion to dismiss is granted, and the Davis Defendants' Rule 12(b)(6) motion is granted in part and denied in part.  An Order accompanies this Memorandum.

Date: February 2, 2012

_____
ROBERT L. WILKINS
United States District Judge